IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| RAVENWHITE LICENSING LLC, | § | |
| *Plaintiff*, | § | |
| | § | Case No. 2:24-cv-00688-JRG-RSP |
| v. | § | |
| | § | |
| THE HOME DEPOT, INC., HOME | § | (Lead Case) |
| DEPOT U.S.A., INC., | § | |
| | § | |
| *Defendants*. | § | |

**CLAIM CONSTRUCTION ORDER**

Before the Court is Plaintiff's Opening Claim Construction Brief (Dkt. No. 110) filed by RavenWhite Licensing LLC. Also before the Court is the Defendant's Responsive Claim Construction Brief (Dkt. No. 112) filed by Walmart Inc. and Wal-Mart Stores Texas, LLC (collectively, "Walmart"), along with Plaintiff's Reply Claim Construction Brief (Dkt. No. 114).

The Court held a hearing on March 10, 2026. Having considered the parties' briefing, submitted evidence, and heard arguments from counsel, the Court resolves the disputes as ordered herein.

## I.    BACKGROUND

Plaintiff alleges infringement of two patents: U.S. Patent No. 10,594,823 ("the '823 Patent") and U.S. Patent No. 11,562,402 ("the '402 Patent") (collectively, "the Asserted Patents"). The Asserted Patents relate to storage of cookies by a browser during web access and tiered advertising bidding systems.

The '823 Patent is titled, "Method and Apparatus for Storing Information in a Browser Storage Area of a Client Device," and its Abstract sets forth as follows:

> Disclosed is a method and apparatus for performing steps to cause encoded information to be stored at a client device during a first network session between a server and the client device. To cause encoded information to be stored at a client device, the server first determines a set of network resource requests that encode

1

the information. These network resource requests may include requests for one or more specific URLs and/or requests for one or more files. The server then causes the client device to initiate the network resource requests. The server may cause this initiation by, for example, redirecting the client device to the network resources. The client device initiating the network resource requests causes data representative of the network resource requests to be stored at the client device.

The '402 Patent is titled, "Advertising model," and its Abstract sets forth as follows:

Tiered advertisement bidding is disclosed. One or more quality metrics associated with a user profile are determined. An advertisement bid is selected from a plurality of tiered bids based at least in part on the determined quality metrics. Determining the quality metrics can include determining a conversion assessment. Determining the quality metric can also include determining whether a need associated with a user profile has been met for a category. In some cases, persona detection is performed with respect to the user profile.

## II.    LEGAL STANDARDS

"'The claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (quoting *Innova/Pure-Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). "The court has the power and obligation to construe as a matter of law the meaning of language used in the patent claim." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*); *aff'g,* 517 U.S. 370, 390 (1996).

To ascertain the meaning of claims, courts look to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. The specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. *Id.* A patent's claims must be read in view of the specification, of which they are a part. *Id.* For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id.* "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims."

*Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

When construing claims, "[t]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.,* 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips,* 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations omitted). "The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.,* as of the effective filing date of the patent application." *Phillips,* 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

There are, however, two exceptions to this rule. The first exception is when a patentee sets out a definition and acts as his own lexicographer. The second exception is when the patentee disavows the full scope of a claim term either in the specification or during prosecution. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1580 (Fed. Cir. 1996).

The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). Although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A.*

3

*v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

"Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001). "The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). "Absent a clear disavowal in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language." *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004). A disavowal or disclaimer must be clear and unmistakable. *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366-67 (Fed. Cir. 2012),

The prosecution history also continues to play an important role in claim interpretation. Like the specification, the prosecution history helps to demonstrate how the inventor and the United States Patent and Trademark Office ("PTO") understood the patent. *Phillips*, 415 F.3d at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id.* Nevertheless, the prosecution history is intrinsic evidence that is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims. *Id.*; *see Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) (noting that

"a patentee's statements during prosecution, whether relied on by the examiner or not, are relevant to claim interpretation").

Intrinsic evidence, therefore, is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.,* 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips,* 415 F.3d at 1312). But for claim terms with less-apparent meanings, courts consider " 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean[,] [including] the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.' " *Phillips,* 415 F.3d at 1314 (quoting *Innova*, 381 F.3d at 1116). In those situations, "the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015) (citation omitted). "In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence.  These are the 'evidentiary underpinnings' of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal." *Id.* (citing 517 U.S. 370).

However, the intrinsic record may not be sacrificed in favor of extrinsic evidence. According to *Phillips*, reliance on dictionary definitions, for example at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id.* at 1321.

The Supreme Court of the United States has "read [35 U.S.C.] § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled

in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910, 134 S. Ct. 2120, 2129 (2014). "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Id.* The claims "must be precise enough to afford clear notice of what is claimed," but that consideration must be made while accounting for the inherent limitations of language. *Id.* at 908. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

### III.    AGREED TERMS

The parties have submitted no agreed terms.

### IV.    DISPUTED TERMS

1. **"first cookie of a first type" / "second cookie of a second type different from the first type"**

| Claim term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "first cookie of a first type" | "data stored on the client device accessible according to a first access procedure" | Plain and ordinary meaning<br><br>If construed: "second cookie of a second type different from the first type with respect to how the cookie is cleared by a user or accessed by a server"<br><br>Otherwise, indefinite |
| "second cookie of a second type different from the first type"<br><br>('823 Patent, Claims 1, 6) | "data stored on the client device accessible according to a second access procedure different from the first access procedure" | |

The parties agree, at least in principle, that the term "cookie" carries a broad, plain and ordinary meaning encompassing both traditional cookies and non-traditional cache cookies. The remaining dispute is whether the construction defining how one cookie type differs from the other

should reference (1) how the cookie is cleared by a user and (2) how the cookie is accessed by a server or whether it requires an access procedure.

Plaintiff argues the terms should be construed as "data stored on the client device accessible according to a first [or second] access procedure" because the specification uses the words "data" and "cookie" synonymously and discloses different cookie types requiring different access procedures. Plaintiff initially disagreed with the "accessed by a server" part of Defendant's proposal but by its Reply brief, Plaintiff conceded that the distinction between cookie types is "how the cookie is accessed" and agreed that its own "access procedure" language and the "accessed by a server" language are "not materially different." Nonetheless, Plaintiff opposes Defendant's "cleared by a user" requirement as improperly limiting because it does not exist in the claims and is not inventor lexicography.

Defendant seeks a plain and ordinary meaning construction of these terms and makes its proposed construction in the alternative. Its proposal that the "second cookie of a second type [is] different from the first type with respect to how the cookie is cleared by a user or accessed by a server" is based in the specification's dedicated "Characteristics of Cache Cookies" section, which enumerates the two distinctions between cache and traditional cookies captured in its proposal. Defendant argues that this passage is the intrinsic record's definition of what makes the two cookie types different and should be incorporated into the claim construction. Otherwise, Defendant argues the term is indefinite.

As a threshold matter, the Court must determine whether construction is necessary. Defendant nominally prefers plain and ordinary meaning, but both parties' briefing makes clear they disagree about what the plain meaning is. This is not a dispute about how a term of agreed meaning applies to the accused product; it is a dispute about the term's scope itself. Specifically,

whether "different from the first type" has any operative legal meaning without a construction that identifies the characteristic that makes the types different. Where the parties have presented a fundamental disagreement about the scope of a claim term, the Court has both the power and the obligation to resolve it by construction. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008). The Court accordingly construes these terms.

The Court begins with the claim language. Claims 1 and 6 each require that a "first cookie of a first type" be stored in a "first client device browser storage area" during a first previous network session, and that a "second cookie of a second type different from the first type" be stored in a "second client device browser storage area different from the first" during a second previous network session. The claim therefore must encompass at least two distinct cookie types. The claims then require the system or method to perform a first identification using the first cookie and a second identification using the second cookie, and to make a determination based on the presence of a network resource request associated with one cookie and the absence of a network resource request associated with the other.

Dependent claims 2 and 7 provide some guidance. Both add the limitation that the client device "is identified by a server in a domain different from a server that caused the two different types of cookies to be stored." This language expressly attributes the storage of and access to both types of cookies to different servers. In other words, server access is an implicit feature of independent claims 1 and 6 because they must carry broader scope than the claims that depend from them. For server access to function as a narrowing addition in claims 2 and 7, it must be at least implicit in the independent claims' broader scope. This structure supports a construction of "different from the first type" that is informed by, though not limited to, how the cookie is accessed by a server.

The specification adds substantial context to the claim language. At the broadest level, it confirms that "cookie" must be read to encompass both traditional and non-traditional browser-stored data. A traditional cookie is defined at the outset: "A cookie is a message transmitted to a browser by a server. The message can include user-specific identifiers or personal information about the user. The browser typically stores the message in a text file. The message (i.e., cookie) is then sent back to the server each time the browser requests a Web page from the server." ('823 Patent, col. 1:47–52.) Cache cookies are introduced as a distinct category: "the data stored in the browser storage area 170 that is representative of the network resource requests is referred to herein as a cache cookie 174." ('823 Patent, col. 5:10–13.) The specification uses "data" and "cookie" interchangeably, equating "the data (the cache cookie 174)" ('823 Patent, col. 5:33–34), and identifies cache cookies as encompassing both "one or more URLs stored in the history cache" and "one or more TIFs stored in [the] TIF area." ('823 Patent, col. 8:1–3.) The Court agrees with the parties that "cookie" as claimed encompasses both traditional HTTP cookies and non-traditional browser-stored data, including history-cache and TIF-based cookies.

The central specification dispute concerns the "Characteristics of Cache Cookies" section, which is the primary textual foundation for Defendant's proposed construction. That section provides: "Although cache cookies can provide an alternative to traditional cookies, several differences exist between the two. For one and as described above, cache cookies do not get cleared when a user clears or blocks traditional cookies. Second, unlike traditional cookies, which can typically only be accessed by a server in the specified domain, cache cookies stored in the history cache can be accessed by a server in any domain." ('823 Patent, col. 7:58–65.) Defendant argues these two enumerated characteristics constitute the intrinsic record's own account of what distinguishes the two types, and that a construction reflecting both is therefore compelled.

9

First, the Court declines to import the clearing characteristic from this passage because how the cookies are cleared is not a requisite distinction of cookie types. The specification qualifies the clearing characteristic with the word "typically." An earlier passage states: "Unlike traditional cookies, which can be blocked or cleared (e.g., via spyware or via a browser setting to block or remove cookies), the cache cookie 174 *typically* cannot be blocked or cleared via spyware or a browser setting." ('823 Patent, col. 5:18–22.) The word "typically" is a qualifier and signals that resistance to clearing is a common attribute of the described embodiment, but not a universal and invariable rule. The specification could have stated that cache cookies "cannot" or "do not" get cleared but it did not. Where the specification itself hedges a feature as merely "typical," that feature cannot be elevated into a mandatory claim element without clear lexicographic or disavowal support. No such support exists here. The "Characteristics" section does not use definitional language ("as used herein" or "is defined as"). Rather, it describes observed attributes of a preferred embodiment. That is precisely the kind of specification passage courts must resist importing as a claim limitation.

Defendant's own prior-proceeding conduct is further probative. Walmart's IPR petition (Dkt. No. 110-8, at 7) challenged Claims 1 and 6 of the '823 Patent without applying a "cleared by user" limitation. Defendant had an opportunity to advance its understanding of the claims, and its choice not to include the clearing characteristic weighs against importing it here.

The server-access characteristic, by contrast, is a clear distinction that the specification describes with specificity throughout. Traditional cookies are transmitted directly to a server with each browser request. ('823 Patent, col. 1:47–52.) The server reads them actively and directly. Cache cookies, by contrast, are not transmitted to a server at all. Instead, the server causes the browser to initiate a set of network resource requests, and the browser's decision to request or not

10

request each resource reveals whether that resource is present in local storage. The server then derives what information is stored from that pattern. ('823 Patent, col. 5:35–42.)

This distinction between direct transmission versus indirect, or inferential, derivation is precisely what the specification identifies as the difference between the two types of cookies. It is properly captured by the portion of Defendant's proposal that identifies the difference as how the cookies are "accessed by a server." The Court declines to adopt Plaintiff's "access procedure" language because the phrase "access procedure" appears nowhere in the '823 Patent specification and is ambiguous as to what exact procedure is being prescribed. "Accessed by a server" closely tracks the language the specification uses to describe the distinction between cookie types and is the more faithful construction.

Extrinsic evidence aligns with the Court's evaluation. Plaintiff's technical expert, Dr. Bernard Jansen, submitted an unrebutted declaration confirming that a person of ordinary skill in the art (POSITA) would "readily ascertain the scope of 'second cookie of a second type different from the first type'" and would understand that what distinguishes one type of cookie from another is how it is accessed, because different types of cookies require different procedures for access. (Dkt. No. 110-16, ¶¶30–33.) Dr. Jansen specifically identified the three cookie types disclosed in the specification as examples one of skill would recognize. Defendant submitted no expert testimony on these terms. Dr. Jansen's unrebutted opinion corroborates the intrinsic-evidence analysis and confirms that the server-access distinction is the characteristic a skilled artisan would associate with cookie-type differentiation in this context.

Defendant's indefiniteness alternative argument is also rejected. Under *Nautilus*, a claim is invalid for indefiniteness only if it fails to inform a person of ordinary skill in the art about the scope of the invention with reasonable certainty. That standard requires proof by clear and

11

convincing evidence. Defendant's arguments, unaccompanied by expert testimony, do not carry its burden here.

For the foregoing reasons, the Court finds **the terms "first cookie of a first type" and "second cookie of a second type different from the first type" are not indefinite and mean that the cookies are different with respect to how they are accessed by a server.**

**2. "first client device browser storage area" / "second client device browser storage area different from the first client device browser storage area"**

| Claim term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "first client device browser storage area"<br><br><br><br>"second client device browser storage area different from the first client device browser storage area"<br><br>('823 Patent, Claims 1, 6) | "first storage area managed by and native to a browser on the client device"<br><br><br>"second storage area managed by and native to the browser on the client device and different from the first client device browser storage area" | Plain and ordinary meaning;<br><br>If construed: "second client device browser storage area that is different from the first client device browser storage area with respect to how it is cleared"<br><br>Otherwise, indefinite |

This dispute presents two distinct issues. First, whether "browser storage area" is limited to storage areas managed by and native to the browser application, as opposed to storage areas created and managed by third-party software such as Flash plugins, or whether it carries a broader plain meaning. And second, whether the distinction between the first and second browser storage areas must be defined by how the areas are cleared. Both questions require the Court to determine the operative scope of the modifier "browser" and whether any specific differentiating criterion should be imported from the specification.

12

Plaintiff proposes construing the terms to require that each storage area be "managed by and native to a browser on the client device." Plaintiff makes three arguments. First, the specification describes three browser-managed storage areas (the cookie text file, the history cache, and the TIF area), each of which is created by and dedicated to the browser. Second, prosecution history shows that the applicant added the word "browser" to the storage area terms during prosecution specifically to distinguish prior art disclosing Flash cookie storage, which resides in operating-system-level directories and not the browser. Third, Plaintiff argues that extending it to non-browser file storage would effectively read out the word "browser" from the claim term. Plaintiff opposes Defendant's "cleared" limitation for the same reason as Term 1, and additionally argues that two storage areas can be separately managed and dedicated even if both are cleared through the same process.

Defendant seeks plain and ordinary meaning, asserting that the terms simply require two different browser storage areas on the client device. If construction is necessary, Defendant proposes that the second storage area be defined as different from the first "with respect to how it is cleared," relying on the specification's statement that cache cookies "do not get cleared when a user clears or blocks traditional cookies." ('823 Patent, col. 7:58–61.) Defendant objects to the "managed by and native to" language, arguing that neither phrase appears in the specification and that adopting them would introduce confusion without clarifying the claim scope.

In its Reply, Plaintiff agreed in principle with Defendant's plain meaning preference but noted that the construction "should be qualified to exclude storage areas managed by third-party software plugins, which were laid to rest during prosecution." Plaintiff clarified that it does not insist on the exact "managed by and native to" phrasing, but seeks to preserve the prosecution history disclaimer against Flash-type non-browser storage.

The Court begins its analysis with a review of the claims. Claims 1 and 6 recite that "the first cookie of the first type is stored in a first client device browser storage area and the second cookie of the second type is stored in a second client device browser storage area different from the first client device browser storage area." Certain features of this language are significant.

The modifier "browser" is not surplusage. The claims do not use the bare term "storage area" or "client device storage area"; they specifically require a "browser storage area." Every word in a claim should be given meaning, and the deliberate addition of "browser" as a modifier must constrain the scope of the storage area in some way. At minimum, "browser storage area" requires that the storage area bear some meaningful relationship to the browser, as distinguished from storage areas on the client device that operate independently of the browser.

At the same time, the claim language does not itself specify the nature of that relationship. The claims do not use the phrases "managed by" or "native to." The claims also do not limit the storage areas to any specific sub-type (like "history cache" or "TIF area"). Similarly, the only stated requirement for the second storage area relative to the first is that it be "different from the first." The claim is silent as to how the two areas differ; it requires only that they are distinct browser storage areas.

The specification treats "browser storage area" as a known term of art referring to storage that resides within and is operated by the browser. The patent's title is "Method and Apparatus for Storing Information in a Browser Storage Area of a Client Device," and the Abstract describes causing "a browser to store information in a browser storage area." The specification introduces storage in the browser as part of the invention, which "relates generally to client-server communications and more specifically to causing a browser to store information in a browser storage area of a client device." ('823 Patent, col. 1:31–34.) The browser storage area is identified

14

as associated with the browser with specificity. And the server causes the browser, not the operating system or a third-party plugin, to store data in it.

The specification further describes the browser storage area as a component of and belonging to the browser. The Abstract states that a server may ". . . 'read' a cache cookie to and from a browser storage area associated with a browser." ('823 Patent, col. 3:1–4.) Data is stored in "browser storage area 170 (e.g., browser cache)" ('823 Patent, col. 4:53–55), and FIG. 1A depicts browser storage area 170 as a component nested within the client device alongside the browser 116. FIG. 2 depicts browser storage area 200 as containing two sub-areas, the history cache 204 and TIF area 212, both of which are populated and read by the browser as it navigates the web. The specification additionally describes the browser storage area as "a general read/write memory structure in the user's browser." ('823 Patent, col. 10:14–15.) Each of these passages places the browser storage area within the browser, not within the operating system generally or within third-party software.

The three storage areas described in the specification — the cookie text file where the browser "typically stores the message" ('823 Patent, col. 1:46–52), the history cache 204 that "contains Uniform Resource Locators (URLs) 208 recently visited by the browser" ('823 Patent, col. 6:4–8), and the TIF area 212 "for storing TIFs 216" downloaded by the browser ('823 Patent, col. 6:54–66) — are all populated and maintained by the browser itself as a byproduct of normal browsing activity. None are created or managed by external software. The consistent picture painted by the patent confirms that "browser storage area" refers to storage the browser manages as its own data infrastructure.

Although the phrase "managed by" does not appear verbatim in the specification, the pervasive description of the browser storage area as belonging to and operated by the browser

conveys, at minimum, that the area must be one that the browser manages. The word "native," however, is more problematic because it introduces an ambiguity about what additional parameters "native" might require that the word "managed by" does not already encompass. Accordingly, a browser storage area is a storage area that is managed by a browser.

As for Defendant's proposed "cleared" differentiator, it fares no better under Term 2 than it did under Term 1. The specification passages Defendant relies upon that cache cookies "do not get cleared when a user clears or blocks traditional cookies" ('823 Patent, col. 7:58–61) and that the cache cookie "typically cannot be blocked or cleared via spyware or a browser setting" ('823 Patent, col. 5:18–22) describe characteristics of the cache cookie itself, not of the storage area where it resides. Indeed, Defendant has not identified any specification language that defines the difference between the first and second browser storage areas in terms of how they are cleared. No lexicography or disavowal supports importing a clearing limitation into the storage area terms.

The prosecution history provides some support for the "browser" qualifier, though the strength of the disclaimer is far more limited than Plaintiff suggests. Although the Applicant overcame prior art disclosing Flash cookies, it was not because of the "browser storage area" limitation. The claims were not amended to add "browser" to the storage area terms until after the application was allowed. (Dkt. No. 110-9, Amendment After Allowance.) Nevertheless, the Applicant's deliberate addition of "browser" as a modifier to "storage area" is entitled to some weight and signals an intent to distinguish storage areas between those that are managed by the browser and those that are not.

Extrinsic evidence further reinforce the Court's conclusion. Dr. Jansen opined that one of ordinary skill in the art reading the intrinsic record would understand "the browser storage area as belonging to, being accessed by, and being managed by the browser itself." (Dkt. No. 110-16,

16

¶36.) He further opined that a skilled artisan "would not consider a 'browser storage area' to include areas that are not managed by the browser itself, such as third party software (such as Flash), including browser extensions and add-ons." (*Id*., ¶39.) On the clearing issue, Dr. Jansen explained that a POSITA "would consider these two areas [history cache and TIF area] to be separate storage areas, irrespective of whether they are cleared separately or at the same time." (*Id*., ¶41.) He also opined that the terms are not indefinite because the patent informs a POSITA with reasonable certainty about their scope. (*Id*., ¶42.) Defendant submitted no expert testimony in response. Dr. Jansen's unrebutted opinions are consistent with and reinforce the intrinsic record analysis.

Defendant's indefiniteness argument fails. The claim language requires two "different" browser storage areas, which is a structurally clear requirement that a POSITA would understand without difficulty.

The Court therefore finds **"first client device browser storage area" to mean "first storage area of browser data that is managed by a browser on the client device," and "second client device browser storage area different from the first client device browser storage area" to mean "second storage area of browser data managed by the browser on the client device and different from the first client device browser storage area."**

17

### 3.  "one or more processors configured to . . ."

| Claim term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "one or more processors configured to: … perform a determination based at least in part on (1) a presence of a network resource request associated with one of the first cookie and the second cookie, and (2) an absence of a network resource request associated with the other of the first cookie and the second cookie" ('823 Patent, Claim 1) | No construction necessary; Plain and ordinary meaning | Subject to 35 U.S.C. § 112(6); Indefinite due to lack of corresponding algorithmic structure in the specification |

This disputed term arises from Claim 1 of the '823 Patent, which recites a system anchored by "one or more processors configured to" perform a series of operations, culminating in the disputed term element "perform a determination . . . ." The dispute presents two questions: first, whether the "one or more processors configured to" limitation invokes means-plus-function treatment under 35 U.S.C. § 112(6) despite not using "means for" language; and second, if § 112(6) does apply, whether the specification discloses adequate corresponding algorithmic structure for the "determination" function. Though Plaintiff nominally frames the dispute around the final determination, the "one or more processors configured to" clause is the structural preamble to every functional limitation in the claim and cannot be analyzed in isolation from the claim's overall structural context.

Plaintiff argues that § 112(6) does not apply because the claim does not use "means for" language, triggering a rebuttable presumption against means-plus-function treatment that Defendant cannot overcome. Plaintiff contends that "processor" is a well-understood structural term in the art, not a nonce word, and that Claim 1 reinforces this by pairing the processor with "a

18

memory coupled to the one or more processors and configured to provide the one or more processors with instructions." This hardware pairing by identifying two physical components, their physical relationship, and the directional data flow is structural character. Plaintiff relies principally on *VDPP LLC v. Vizio, Inc.*, where the Federal Circuit reversed a § 112(6) finding for a "processor adapted to" limitation, holding that a POSITA would not regard processors as mere black boxes because they existed in the prior art at the time of the invention and the specification described them as "well-known." No. 2021-2040, 2022 WL 885771, at *3 (Fed. Cir. Mar. 25, 2022). Plaintiff also cites this Court's decision in *G+ Communications, LLC v. Samsung Electronics Co.*, which held that "'processor' undoubtedly connotes structure to an electrical engineer, computer engineer, and computer scientist." No. 2:22-cv-00078-JRG, 2023 WL 4534366, at *17 (E.D. Tex. July 13, 2023).

Defendant argues that the § 112(6) question is not answered by the word "processor" in isolation but depends on whether the stated objectives and operation of the processor connote sufficiently definite structure in the context of the particular claim and specification. Defendant contends that because the "processor configured to" clause precedes every functional limitation in Claim 1, the processor is defined entirely by the functions it performs, rendering it a nonce term in this context. Defendant draws an analogy to *WSOU Investments LLC v. Google LLC*, No. 2022-1063, 2023 WL 6889033, at *4 (Fed. Cir. Oct. 19, 2023), where the Federal Circuit upheld § 112(6) treatment because the specification described the processor so broadly as to "generically be anything that manipulates data." Defendant also distinguishes *G+ Communications* on the ground that the processor limitation in that case was accompanied by a detailed algorithm, which is "completely missing" here. Defendant argues that if § 112(6) applies, the term is indefinite because the specification discloses no algorithm for the "determination" step. Defendant additionally

19

invokes the § 101 briefing, in which Plaintiff argued that the '823 claims "are not conventionally executed by general purpose computers," as an admission that the processor is not generic structure.

The legal framework is well-established. A claim limitation lacking the word "means" is presumptively not subject to § 112(6). *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347–48 (Fed. Cir. 2015). That presumption can be rebutted only if the challenger demonstrates that the claim term "fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.* The burden falls on the party seeking § 112(6) application. Because Claim 1 does not use "means for," Defendant bears the burden of overcoming the presumption.

The Court begins its analysis with an examination of the claim language. Claim 1 recites as follows:

> 1. A system, comprising:
>
> one or more processors configured to:
>
>> receive a network resource request from a client device, wherein the network resource request corresponds to a first cookie of a first type that was caused to be stored to the client device during a first previous network session, wherein the first cookie of the first type was caused to be stored to the client device at least in part by causing the client device to initiate a set of network resource requests determined during the first previous network session, wherein the client device initiating the set of network resource requests caused data representative of the set of network resource requests to be stored at the client device, wherein a second cookie of a second type different from the first type was caused to be stored at the client device during a second previous network session, and wherein the first cookie of the first type is stored in a first client device browser storage area and the second cookie of the second type is stored in a second client device browser storage area different from the first client device browser storage area;
>>
>> based at least in part on the network resource request from the client device corresponding to the first cookie of the first type caused to be stored at the client device during the first previous network session, determine information that was encoded and stored in the client device;

perform a first identification of at least one of the client device and a user of the client device using the first cookie of the first type, wherein the first identification is performed using the first cookie of the first type at least in part by using the determined information that was encoded and stored in the client device;

perform a second identification of at least one of the client device and the user of the client device using the second cookie of the second type; and

perform a determination based at least in part on (1) a presence of a network resource request associated with one of the first cookie and the second cookie, and (2) an absence of a network resource request associated with the other of the first cookie and the second cookie; and

a memory coupled to the one or more processors and configured to provide the one or more processors with instructions.

Two structural features of the claim language are critical. First, "one or more processors" is a physical-component recitation. "Processor" is not used here as a coined term, a generic placeholder, or a nonce word. It is a structural label for a class of hardware that has existed and been well-understood in computing technology for decades. Courts have consistently recognized that "processor" is a structural term that conveys meaning to a POSITA as a name for a physical computing component. *See VDPP*, 2022 WL 885771, at \*3; *G+ Commc'ns*, 2023 WL 4534366, at \*17.

Second, and critically, the claim does not stop at a bare "processor configured to" recitation. It claims a system and pairs the processor with a second named physical component: "a memory coupled to the one or more processors and configured to provide the one or more processors with instructions." This additional language recites: (a) a named physical component (memory), (b) its physical relationship to the processor (coupled to), and (c) the directional data flow (memory provides instructions to processor). The claim thus describes a multi-element structural system, not a single functional black box. This structure closely tracks the reasoning in *WSOU* that weighed in *favor* of finding no § 112(6) application. In *WSOU*, the Federal Circuit

21

held that the '825 patent's claim was not subject to § 112(6) because it recited "at least one memory including computer program code … configured, with the at least one processor," reasoning that "the recited combination of these multiple broadly named structures informs the skilled artisan's relative understanding of what each structure is and what it is not." *WSOU*, 2023 WL 6889033 at *4. The processor-plus-memory structure in Claim 1 of the '823 Patent is functionally identical in character to the '825 patent structure the Federal Circuit held sufficient to avoid § 112(6).

Defendant's argument that the processor is purely functional claiming because "processor configured to" precedes every functional limitation is not persuasive. The same observation could be made of virtually any "processor configured to" claim. The presence of multiple downstream functions does not negate the structural identity of the processor itself. The question is whether the claim recites sufficiently definite structure, not whether the claim is longer or shorter. A claim can recite a structurally definite processor and then enumerate many functions that processor performs. The enumeration of functions does not transform the processor into a means-plus-function element.

The specification confirms that "processor" in the '823 Patent is a hardware component, not an abstraction. The "Computer Implementation" section of the specification describes the invention's hardware platform in concrete terms: "An appropriate server computer may be implemented, for example, using well known computer processors, memory units, storage devices, computer software, and other nodes." ('823 Patent, col. 14:57–60.) FIG. 4 depicts server computer 400 as a hardware block diagram with distinct, labeled physical components: processor 404, memory 412, storage 408, I/O 424, and interface 416. The specification then describes: "Server computer 400 contains a processor 404 which controls the overall operation of computer 400 by executing computer program instructions which define such operation." ('823 Patent, col. 14:62–

64.) These instructions "may be stored in a storage device 408 (e.g., magnetic disk) and loaded into memory." ('823 Patent, col. 14:65–67.)

This is precisely the kind of specification description that the Federal Circuit found dispositive in *VDPP*. There, the district court was criticized for applying § 112(6) to a processor limitation without consulting the specification, noting that the specification described processors as "well-known" — exactly what the '823 Patent does at column 14:57–60. *VDPP*, 2022 WL 885771, at *3. Accordingly, a POSITA reading the '823 Patent specification would understand "processor" to refer to a known, concrete hardware component executing stored instructions rather than a black box abstractly performing functions.

Defendant's combination of hardware/software argument from col. 15:10–16 is unavailing. The passage states that "the processing steps described herein may also be implemented using dedicated hardware, the circuitry of which is configured specifically for implementing such processing steps. Alternatively, the processing steps may be implemented using various combinations of hardware and software." Defendant argues this "combination" disclosure mirrors the '045 patent specification language in *WSOU* that marked the processor as generically any structure that manipulates data, triggering § 112(6). The Court disagrees. The subject of the column 15 sentences is "processing steps," not the processor itself. The '823 specification draws a clear conceptual line between the processor, which is described as a well-known hardware component in the Computer Implementation section, and the processing steps that the processor executes, which may be implemented in various ways. Acknowledging that the computational work can be embodied in different forms does not undercut the structural identity of the processor hardware that performs it.

Expert testimony comports with this analysis. Dr. Jansen testified that a POSITA would understand "processor" to be "a well-known structure that is configurable to perform instructions" and is physical hardware. (Dkt. No. 110-16, ¶¶45-49.) Defendant submitted no expert testimony to the contrary. An unrebutted expert declaration confirming structural character materially strengthens the presumption against § 112(6).

Defendant's reliance on arguments made in the § 101 briefing is misplaced. Section 101 analysis asks whether the claims are directed to patent-eligible subject matter and whether they add an inventive concept beyond an abstract idea; it does not ask whether a given term recites sufficiently definite structure for § 112 purposes. The two inquiries operate on different legal axes. Plaintiff's statement that the '823 claims "are not conventionally executed by general purpose computers" goes to whether the claimed cookie-management technique is a novel, non-routine application of computing technology for § 101 purposes. It says nothing about whether the word "processor" in Claim 1 conveys a structural name for a physical hardware component. The novelty of what the processor does is irrelevant to whether the processor itself is a structural term.

Defendant has not overcome the presumption against means-plus-function treatment. Because § 112(6) does not apply, Defendant's indefiniteness argument, which depends entirely on the absence of algorithmic structure in the specification, also fails. The term is given its plain and ordinary meaning. No further construction is necessary.

Accordingly, the Court finds the **"one or more processors configured to" limitation is not subject to 35 U.S.C. § 112(6). Plain and ordinary meaning applies.**

24

**4.  "perform[ing] a determination based at least in part on . . ."**

| Claim term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "perform[ing] a determination based at least in part on (1) a presence of a network resource request associated with one of the first cookie and the second cookie, and (2) an absence of a network resource request associated with the other of the first cookie and the second cookie"<br><br>('823 Patent, Claims 1, 6) | No construction necessary; plain and ordinary meaning | Indefinite |

The disputed term appears in Claims 1 and 6 of the '823 Patent. The sole question is whether "perform[ing] a determination" is indefinite under *Nautilus* because the claims identify the inputs to the determination but do not expressly specify its output. This term is analytically independent of Term 3. Even if § 112(6) does not govern the processor limitation, Defendant contends the "determination" step fails on its own for want of a defined result. The Court disagrees and holds the term is not indefinite.

Plaintiff argues that the claim language itself supplies sufficient certainty because the "determination" step is made based on a conjunctive pair of inputs that must both be satisfied, which is an objective bound of the claim's scope. Plaintiff also points to the specification, which describes a concrete embodiment in which detecting this presence/absence pattern leads the system to rewrite the missing cookie.

Defendant responds that identifying inputs is not enough; a POSITA must also be able to determine with reasonable certainty what the "determination" produces or decides. Because the claim specifies only what data feeds into the determination and not what conclusion or action

results from it, the term fails to provide the output-level clarity *Nautilus* requires. Defendant analogizes to instructing a processor to "make a determination based on numbers 2, 5, and 10" without specifying whether the operation is addition, subtraction, or multiplication.  In such a case, knowing the inputs does not resolve what computation is demanded. Defendant adds that "based at least in part on" compounds the ambiguity by making even the input list open-ended, leaving a POSITA without a finite set of conditions that trigger the determination.

The Court begins its analysis by examining the claims. Claims 1 and 6 are parallel in relevant structure. Claim 1 recites: "perform a determination based at least in part on (1) a presence of a network resource request associated with one of the first cookie and the second cookie, and (2) an absence of a network resource request associated with the other of the first cookie and the second cookie." Claim 6 recites identical language in method form.

Defendant's objection is, at bottom, that the claim does not name the output of the determination, such as whether the system identifies a discrepancy, triggers a rewrite, detects pharming, or reaches some other conclusion. But the claim does not need to specify an output to be definite; it needs to inform a POSITA with reasonable certainty about the scope of what is claimed. The "determination" step does that in three respects.

First, the conjunctive input structure requiring both a presence and an absence to be detected defines the trigger condition with precision. The determination is made when and only when the system observes one cookie's associated request and the absence of the other's. That is a technically defined binary condition, not an open-ended inquiry. A system that observes both cookies present, or both absent, does not meet the limitation. The claim thus carves out a specific operational state of the cookie-management system, which is meaningful and bounded.

26

Second, the word "determination" is not used in isolation but in a specific sequential context. Claims 1 and 6 each proceed through a defined pipeline: a prior step determines "information that was encoded and stored in the client device" from the network resource requests associated with the first cookie; a first identification step identifies the client device or user using that first cookie; a second identification step identifies the client device or user using the second cookie; and the determination step then follows. The word "determine" and its variants appear throughout the claims in this context (including "determine information that was encoded and stored in the client device" and references to "determined" information and "determined" network resource requests) consistently referring to the system resolving or establishing the state of a tracked object based on observed signals. Read in context, "perform a determination based at least in part on (1) … and (2)" is a decision-making step of the same kind. The system resolves what the observed presence/absence pattern means for the state of the client device's cookies. A POSITA fluent in this technical domain would understand the determination as a step in which the system evaluates the cookie-state evidence and reaches a conclusion about the client device's cookie configuration, which informs on what action to take next.

Indeed, the dependent claims confirm that the "determination" has a well-understood and identifiable scope. Claims 4 and 9 each recite "wherein the determination comprises detection of pharming." This express limitation on the determination's content demonstrates that "determination" is not an amorphous concept but one that encompasses concrete, identifiable decisions. Claims 5 and 10 further recite that "in response to the performed determination, the one or more processors are configured to cause a third cookie to be stored." That downstream, triggered action confirms the determination produces a real-world output with operational consequence.

27

Claim differentiation principles reinforce that the independent claims' "determination" is broader than, but encompasses, these concrete instances of determination outputs.

Third, the "based at least in part on" construction does not compound ambiguity. Rather, it is a commonly-used phrase that establishes a floor of required inputs without foreclosing additional ones. This is standard claim drafting language. The claim specifies two required inputs and "at least in part on" signals that the system may also consider other factors. It is similar to the patent drafting term of art "comprising" being an open-ended method of claiming. "Based at least in part," on its own, does not leave a POSITA uncertain about what the claim covers.

Defendant's numerical analogy (making a determination based on 2, 5, and 10 without specifying the operation) mischaracterizes and overly simplifies the claim. The inputs in Claims 1 and 6 are not abstract numbers. They are technically specified states of a cookie-management system embedded in a detailed claim that describes the system's architecture, the two cookie types, the two storage areas, the encoding of information in network resource requests, two prior identification steps, and then the determination step. The claim provides extensive context that a set of abstract numbers does not. A POSITA reading the full claim in light of the specification would understand that the determination step is the system's evaluative conclusion following the two identification steps, not an unconstrained computation operating on raw inputs.

The specification confirms the claim language reading. Column 14:38–51 describes an embodiment of the determination step: upon detecting the network resource requests indicative of one cookie's presence and the other's absence, "the server can determine the user's identity from the cache cookie that was not erased and can subsequently rewrite the previously erased cache cookie again." The specification thus provides a real-world example that anchors the claim term's meaning in the art.

28

Extrinsic evidence provides added verification. Dr. Jansen opined that a POSITA reading the '823 Patent would understand the determination step to be bounded by its conjunctive input structure and that bounded input condition informs a POSITA with reasonable certainty about the claim's scope. (Dkt. No. 110-16, ¶ 51.) Defendant submitted no expert testimony in response. An unrebutted expert opinion consistent with the intrinsic record strengthens the finding of definiteness.

Defendant has not met its high burden of persuasion to show that this claim term cannot be reasonably ascertained by one of ordinary skill in the art in a way that renders it indefinite. Its indefiniteness argument is, in substance, a breadth objection because the claim does not name every possible output of the determination. Breadth, however, does not render a claim indefinite.

For the foregoing reasons, the Court finds that **"perform[ing] a determination based at least in part on (1) a presence of a network resource request associated with one of the first cookie and the second cookie, and (2) an absence of a network resource request associated with the other of the first cookie and the second cookie" is not indefinite. The term carries its plain and ordinary meaning.**

5. **"quality level"**

| Claim term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "quality level"<br><br>('402 Patent, Claims 1, 10, 19) | "computed value associated with searches, purchases, conversion assessments, or historical click behavior" | "a discrete calculated ranking of interest" |

The term "quality level" appears in independent Claims 1, 10, and 19 of the '402 Patent, which are substantively parallel in their use of the term. Claim 1 recites a method, Claim 10 a system, and Claim 19 a computer program product. The parties agree that a "quality level" must be calculated or computed, but disagree on three subsidiary questions: whether the output is a "value" or a "ranking"; whether it must be "discrete" (i.e., a single calculated number rather than a range); and whether it is limited to measuring a user's "interest."

Plaintiff proposes construing "quality level" as a "computed value associated with searches, purchases, conversion assessments, or historical click behavior." Plaintiff argues that none of the words "discrete," "ranking," or "interest" appears in the claims, and that importing them requires lexicography or disclaimer, neither of which is present. Plaintiff contends that the ordinary meaning of "level" denotes a magnitude on a scale, not a ranked order. Plaintiff also argues that the specification uses "quality score" synonymously with "quality level" and describes the quality level as an "assessed value," which confirms that the term measures magnitude rather than rank. Plaintiff further argues that the specification's numerical examples, in which advertisers bid based on quality level thresholds such as "quality level 5 or higher, out of 10," reflect that advertisers care about the magnitude of the level and not the order in which users are ranked relative to one another.

Defendant proposes construing "quality level" as "a discrete calculated ranking of interest." Defendant contends that the specification describes quality levels as whole numbers out of 10 in a multi-dimensional bidding example and that those embodiments show the quality level is a single discrete number. Defendant also relies on a specification passage stating that user observations about "likely interests" is "a component in the quality level assessment," (col. 17:29–

30

34). Defendant clarified in a footnote to its brief that "discrete" means a single calculated number as opposed to a range.

The Court begins its analysis by reviewing the claim language. Here, claim 1 is representative, as reproduced below with the disputed term in bold.

1. A method, comprising:

determining a first **quality level** associated with a user profile, wherein the first **quality level** is based at least in part on an estimate of a likelihood of an event, wherein the first **quality level** is determined based at least in part on at least one of: (1) a first search associated with the user profile or (2) a first purchase associated with the user profile, and wherein the determining of the first **quality level** is based at least in part on a unique identifier and clustering;

determining, for a user associated with the user profile, an indication of interest in a first category, wherein the indication of interest in the first category is determined based at least in part on at least one of: (1) a second search associated with the user profile or (2) a second purchase associated with the user profile;

storing, in a record associated with the user, the indication of interest in the first category;

subsequent to determining the indication of interest in the first category, determining, for the user, that a need relative to the first category has been met based at least in part on at least one of: (1) a third search associated with the user profile or (2) a third purchase associated with the user profile;

based at least in part on the determination that the need relative to the first category has been met, determining an indication of interest in a second category, wherein the indication of interest in the first category and the indication of interest in the second category comprise a sequence of related indications of interest;

in response to determining that the need relative to the first category has been met, determining a second **quality level** associated with the user, wherein the second **quality level** is determined with respect to the first category;

wherein at least one of the first **quality level** or the second **quality level** is based at least in part on a conversion assessment associated with the user profile, and wherein the conversion assessment is based at least in part on historical click behavior; and

displaying an advertisement to the user based at least in part on at least one of the first **quality level** or the second **quality level.**

Several features of this claim language guide construction. First, the claims do not use the words "discrete," "ranking," or "interest." Importing any of those concepts requires either a clear act of lexicography or an unmistakable disclaimer, neither of which is present here. Absent such anchors in the intrinsic record, a construction that imports those limitations improperly narrows the claim scope beyond what the claim language supports.

Second, the claim specifies inputs to the quality level calculation (searches, purchases, conversion assessments, historical click behavior, estimates of event likelihood, unique identifiers, and clustering) none of which is limited to user "interest." A conversion assessment based on historical click behavior, for instance, captures transactional and engagement signals that have no necessary relationship to whether the user is subjectively interested in a product category. The claim's own enumeration of varied inputs defeats any construction that would confine the quality level to a single dimension of user interest.

Third, the ordinary meaning of "level" in everyday usage and in technical contexts denotes a position on a continuous or graduated scale rather than an ordered rank. One speaks of a water level, an experience level, or a skill level as a quantity, not as first or second among a group. "Ranking," by contrast, implies a relative ordering of multiple subjects. The claim language does not compare or order users relative to one another. It assigns a quality level to a user profile and then uses that level to inform advertisement display. This usage is consistent with a scalar value, not a comparative sorting.

Plaintiff's proposed construction, however, also goes further than the claim language requires. The claim itself specifies the inputs to the quality level calculation with particularity so restating those inputs in the construction ("associated with searches, purchases, conversion

32

assessments, or historical click behavior") would be redundant. A lengthy construction that simply puts words from the claim back into the definition adds nothing and risks confusion. The operative distinction the claim presents is between a "value" and a "ranking of interest." The narrower construction of "computed value" captures that distinction without appending claim elements already present.

The specification supports the construction of "quality level" as a "computed value." First, the specification uses "quality score" as a synonym for "quality level" and equates it explicitly with an "assessed value" in the context of advertiser pricing. The patent states: "an advertiser can specify that it is willing to pay $0.40 for an advertisement to be shown to a user having a particular assessed value (e.g., a quality score of 70 or better) but is only willing to pay $0.10 if the value is below that." ('402 Patent, col. 3:7–11.) The patent's own equation of "quality score" with "assessed value" is strong intrinsic evidence that a "quality level" is a magnitude, not a ranking. An advertiser willing to pay based on a threshold ("70 or better") is plainly comparing the quality score against an absolute value on a scale, not against other users' scores in a ranked list.

Second, the specification's numerical examples confirm that quality levels are scalar quantities. In the multi-dimensional bidding example, individual users such as Heidi are described as having a general quality level of 6 out of 10, a specific quality level for shoes of 4, and a specific quality level for cameras of 8. ('402 Patent, col. 8:28–34, 8:42–44, 8:47–52.) An advertiser may choose to bid on impressions for users whose quality level exceeds a threshold, e.g., those with a general quality level above 5. ('402 Patent, col. 8:47–55.) That framing assigns each user a score on an absolute scale. Although Heidi's shoe quality level of 4 is lower than her camera quality level of 8, that comparison is between two scores on the same scale for the same user, not a ranking

33

of Heidi against other users. Notably, the word "ranking" does not appear anywhere in the specification.

Third, the specification's description of quality measures confirms that the quality level is multi-dimensional and not confined to interest. Column 5:4–9 describes quality measures including "how much time a person typically spends comparison shopping," which is a behavioral signal reflecting purchasing diligence and not interest in a specific category. Even the passage Defendant relies upon, "[t]he system therefore makes observations about users and their likely life phases, likely interests, and likely lacks of interests. This helps better target material and also becomes a component in the quality level assessment for the user in the context of relevant advertisements," ('402 Patent, col. 17:29–34), describes interest-related observations as one of many input components in a broader quality level assessment.

Defendant's "discrete" qualifier fares no better. The specification's examples happen to use whole-number quality levels but the court may not import a limitation from preferred embodiments into the claims. Nothing in the specification states that quality levels must be integers, cannot be expressed as decimals or ranges, or are otherwise restricted to discrete values. The fact that all illustrated examples use round numbers is an artifact of the illustrative examples, not a definitional constraint.

The specification and dependent claims further confirm that "quality level" is a user assessment metric, not a bid price or monetary amount. The two concepts are treated as distinct at every level of the intrinsic record.

The key passage at column 3:7–11 makes this clear through its own structure: "an advertiser can specify that it is willing to pay $0.40 for an advertisement to be shown to a user having a particular assessed value (e.g., a quality score of 70 or better) but is only willing to pay

34

$0.10 if the value is below that." ('402 Patent, col. 3:7–11.) The sentence presents two separate and sequential concepts: the quality score (assessed value = 70 or better), which is the user-side metric; and the price the advertiser is willing to pay ($0.40 or $0.10), which is the bid amount. The quality score is the input that governs the bid, not the bid itself. That separation of quality level on one side and monetary bid on the other runs throughout the bidding examples, in which advertisers set price tiers keyed to quality level thresholds.

The dependent claims reinforce this distinction. Claim 7 recites: "The method of claim 1, wherein at least one of the first quality level or the second quality level is used to determine at least one of a discount or a surcharge." This dependent claim uses the quality level as an input to a separate downstream calculation that is itself a price adjustment. If the quality level were a bid price or discount amount, this language would be redundant. Instead, Claim 7 presupposes that the quality level and the resulting discount or surcharge are separate concepts. The quality level is determined first and then used to derive a pricing adjustment. Claim 16 of the '402 Patent contains a parallel dependent limitation in the system claim context.

The specification's consistent separation of quality level (the assessed value of the user) from bid amount and pricing adjustments confirms that the quality level is a standalone computed metric. It is directed at characterizing the value of the user to a merchant or advertiser, not the price the advertiser pays.

The Court issued its preliminary construction of this term as "computed value." During oral argument, both parties agreed that the construction should also clarify that the quality level is directed to the merchant or advertiser rather than to the user, and the Court incorporates that clarification. The Court therefore construes **"quality level" to mean "computed value to a merchant or advertiser."**

### 6. "clustering"

| Claim term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "clustering"<br><br>('402 Patent, Claims 1, 10, 19) | "processor-executed technique that applies a statistical or machine learning algorithm to group users into one or more personas based on similarity of measurable behavioral patterns" | "differentiating between multiple users of the same device based on identifying groupings of user behavior, such as mouse-click characteristics, mouse-over speed, session click-through rate, and average time spent per page" |

The term "clustering" appears in independent Claims 1, 10, and 19 of the '402 Patent, each of which recites that the determining of the first quality level is based at least in part on "a unique identifier and clustering." Both parties agree that clustering involves some form of grouping based on user behavior, but diverge sharply on scope. Plaintiff proposes a construction laden with implementation-specific elements while Defendant limits clustering exclusively to differentiating between multiple users of the same device. Neither construction tracks the claim language or the full scope of the specification.

Turning first to the claim language, Claims 1, 10, and 19 each recite that "the determining of the first quality level is based at least in part on a unique identifier and clustering." The term "clustering" thus functions as a standalone noun; it is an input to determining a quality level associated with a user profile. The claim does not specify what is being clustered, what algorithm or mechanism performs the clustering, or what purpose the clustering serves beyond its role as an input to quality level determination.

No claim language restricts clustering to differentiating between multiple users of the same device. Importing such a limitation would render the claim inapplicable in contexts where a single

user accesses the system from a single device, which is plainly a covered scenario. In addition, no claim language requires that clustering employ a processor, a statistical algorithm, or a machine learning technique. Notably, Claim 10 (the system claim) explicitly recites "a processor configured to" perform the claimed functions, while Claims 1 (method) and 19 (computer program product) do not. That structural asymmetry across the three parallel independent claims demonstrates that "processor-executed" cannot be read into Claims 1 and 19 through the construction of a single claim term. The definition of "clustering" must be uniform across all three claims.

What's more, dependent Claims 5 and 14 each recite that "at least one of the first quality level or the second quality level is determined at least in part by using machine learning." These dependent claims attach to the quality level determination generally, not to clustering specifically, but their existence is still instructive. If machine learning were inherent to clustering as used in the independent claims, the dependent claims that condition quality level determination on the use of machine learning would be rendered at least partially redundant. Under the doctrine of claim differentiation, the independent claims are presumed not to require the machine learning limitations that the dependent claims add.

The specification describes clustering as a flexible grouping technique applicable across multiple contexts, all of which relate to cataloging user behavior. This makes sense as the purpose of clustering is to determine a quality level associated with a user profile.

The primary clustering embodiment involves FIG. 6, a scatter plot that the patent describes as "likely indicat[ing] that there are three distinct users of the device." ('402 Patent, col. 12:53–55.) Defendant's proposed construction draws heavily from this embodiment. However, the patent introduces it as a single illustration of a broader technique. The ensuing sentence notes a "variety of clustering techniques can be used to ascertain how many users a device has and what the users'

characteristics are." ('402 Patent, col. 12:63–65; *see also* col. 13:3–6.) That framing makes clear that the mouse-click example is one data point among many, and clustering can be used toward many applications, such as determining the number of users and/or the user's characteristics, including one user having multiple personae (e.g., for work and home). None of these embodiments alone defines clustering. Indeed, column 13:24–28 describes a profile that has not been linked to a particular user and for which "aggregate user behavior" is used instead. A construction that excludes an expressly described embodiment cannot be correct.

The specification lists many behavioral features used for clustering that can each be a data point in a multi-dimensional space, with dimensions including time, distance, session click-through rate, interest in different topics, search terms, and average time spent per page. ('402 Patent, col. 12:65–13:3.) The role of clustering thus involves analyzing various points of data indicative of user behavior without being limited to differentiating between multiple users of one device.

Plaintiff's construction is similarly overreaching in a different direction. Nothing in the specification states that clustering must be "processor-executed," must apply a "statistical or machine learning algorithm," or must group users "into one or more personas." The specification describes clustering as producing data points that can be grouped without restricting the mechanism or the output to the specific implementation elements either side proposes.

Both parties submitted dictionary definitions of "clustering," all of which define clustering in terms of grouping data points based on similarity. The extrinsic evidence thus comports with the broader understanding.

The Court's preliminary construction found "clustering" to mean "grouping based on user behavior." During oral argument, both parties agreed that the construction should further clarify

that clustering is based on an analysis of data, and the Court incorporates that clarification. Accordingly, the Court construes **"clustering" to mean "grouping based on analysis of data indicative of user behavior."**

7. **"conversion assessment"**

| Claim term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "conversion assessment"<br><br>('402 Patent, Claims 1, 10, 19) | "an indication of how likely it is that a given individual will engage in a desired behavior if presented with an advertisement" | "an indication of how likely it is that a given individual will click on an advertisement" |

The term "conversion assessment" appears in independent Claims 1, 10, and 19 of the '402 Patent, each of which recites that at least one quality level is "based at least in part on a conversion assessment associated with the user profile," and that "the conversion assessment is based at least in part on historical click behavior." The parties agree substantially on the structure of a proper construction. Both cast it as an indication of how likely it is that a given individual will perform some action if presented with an advertisement but disagree on whether the predicted action is limited to a "click" or can encompass any "desired behavior."

The claims do not define "conversion" and do not use the word "click" to characterize the output of a conversion assessment. Claims 1, 10, and 19 also recite that the conversion assessment is "based at least in part on historical click behavior." That phrase identifies what informs the conversion assessment, not what the conversion assessment is. The input and the output are separate things, and the claim text limits only the former.

This distinction forecloses Defendant's proposed construction on the face of the claim. If clicking were the conversion, then using "historical click behavior" as an input to estimate the

39

likelihood of a future click would treat the same behavioral category as both the input and the predicted output. If such was the intention, the claim would have said "future click" instead of "conversion assessment." The more natural reading is that historical click patterns are used as a proxy for predicting a different, more commercially significant behavior: an actual transaction, sign-up, or other form of engagement.

The specification's primary use of "conversion assessment" appears at column 9:37–39: "One example of a quality metric is a conversion assessment (e.g., indicating how likely it is that a given individual will click on an advertisement)." The parenthetical signal "e.g." establishes that clicking is illustrative, not definitional. Courts applying the *Phillips* framework consistently treat "e.g." language as identifying a non-limiting example. This sentence carries no lexicographic weight absent some clear contrary indication elsewhere in the intrinsic record. No such indication exists here.

To the contrary, the specification at column 10:10–13 affirmatively distinguishes a click from a conversion. The patent describes "special-purpose filters that assess the likelihood of conversion (or other revenue event) given information about the click and the actions taken by the user after the click." The structure of this sentence is significant. The click is the observable triggering event, and the conversion is the downstream behavioral outcome the filter is designed to predict. The conversion "or other revenue event" is something that may or may not occur after a click. It may be a purchase, a completed transaction, or a sign-up, but it is not the click itself. Under Defendant's construction, assessing the "likelihood of conversion" from "actions taken by the user after the click" would be incoherent if clicking were the conversion. Thus, the more reasonable reading is that clicks and conversions are different acts or at least acts of differing

40

scope. The specification confirms the distinction throughout by its separate listing of clicks and conversions. (*See, e.g.*, '402 Patent, col. 4:32–35, 4:67–5:1.)

Defendant's arguments from the § 101 briefing are unpersuasive. The citations clearly show it was simply repeating the patent's own example, using the same "e.g.," without expressly limiting or surrendering broader scope. A click can be a conversion, but not all conversions are clicks, and the record does not purport to alter that relationship.

The Court accordingly construes **"conversion assessment" to mean "an indication of how likely it is that a given individual will engage in a desired behavior if presented with an advertisement."**

## 8.   "processor configured to . . ." and "computer instructions for . . ."

| Claim term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "processor configured to …"<br><br>"computer instructions for …"<br><br>('402 Patent, Claims 10, 19) | No construction necessary;<br><br>Plain and ordinary meaning | Subject to 35 U.S.C. § 112(6);<br><br>Indefinite due to lack of structure |

Term 8 presents two separate means-plus-function challenges under 35 U.S.C. § 112(6) that is considered separately.

"Processor Configured To …" (Claim 10)

Analysis of this term parallels the resolution of Term 3 and the Court reaches the same conclusion here.

Claim 10 of the '402 Patent is structured similarly to Claim 1 of the '823 Patent in that it does not use the word "means," so the *Williamson* presumption against § 112(6) governs. Claim 10 of the '402 Patent similarly recites a "processor configured to" perform a series of enumerated

41

functions that is the structural anchor for every functional element in the claim. Claim 10 also names the processor as a physical component connected to "a memory coupled to the processor and configured to provide the processor with instructions."

In addition to the similarities between the claims, the '402 Patent specification provides even stronger structural grounding than is present in the '823 Patent. First, the specification contains an express definition: "As used herein, the term 'processor' refers to one or more devices, circuits, and/or processing cores configured to process data, such as computer program instructions." ('402 Patent, col. 1:67–2:2.) "Devices, circuits, and/or processing cores" are indisputably physical components with known structure. This is a definitional statement that dispels any concern that "processor" operates as a generic functional placeholder. Second, column 2:54–59 describes the platform as comprising "standard commercially available server hardware (e.g., a multi-core processor, 4+ Gigabytes of RAM, and one or more Gigabit network interface adapters)." A multi-core processor was a concrete, commercially available hardware component. This characterization underscores that the '402 Patent's "processor" refers to recognized hardware, not a conceptual black box. Dr. Jansen, whose testimony is unrebutted, opined that a person of ordinary skill would understand the "processor" recited in Claim 10 to constitute physical structure. (Dkt. 110-16, ¶61.) The Court agrees.

Defendant's reliance on § 101 briefing characterizations of the claims carries little weight in this context. Whether a claim recites a novel and non-obvious invention is a question distinct from whether the structural vocabulary used to claim that invention connotes sufficiently definite structure under § 112(6).

Defendant has not met its burden of persuasion and the Court finds that § 112(6) does not apply to this claim term.

"Computer Instructions For …" (Claim 19)

Claim 19 recites "[a] computer program product embodied in a non-transitory computer readable storage medium and comprising computer instructions for" performing the claimed steps. Defendant argues that this term invokes § 112(6) because it is purely functional claiming without recitation of known structure. Defendant contends that this is not an accepted *Beauregard* claim because "computer instructions" is not synonymous with "computer program" or "computer program code," and should not be considered as such.

The Court has reviewed the language of Claim 19 and finds it to be a canonical *Beauregard* claim. *In re Beauregard*, 53 F.3d 1583, 1584 (Fed. Cir. 1995) (computer programs embodied in a tangible medium are patentable subject matter under 35 U.S.C. § 101). The structural anchor is the "non-transitory computer readable storage medium" — a physical device — and the "computer instructions for" language describes the contents of that physical medium.

This Court has previously held that a "nontransitory computer-readable [storage] medium" claim containing "instructions" to be implemented by a "processor" is not governed by § 112(6). *SEVEN Networks, LLC v. Apple Inc.*, No. 2:19-cv-00115-JRG, 2020 WL 1536152, at *12–13 (E.D. Tex. Mar. 31, 2020). This District has similarly construed "[a] computer software system having a set of instructions stored in a nontransitory computer-readable medium" as a *Beauregard* claim not subject to § 112(6). *Intelligent Agency, LLC v. 7-Eleven, Inc.*, No. 4:20-CV-0185-ALM, 2022 WL 760203, at *21 (E.D. Tex. Mar. 11, 2022). Claim 19 follows the same structure. The Federal Circuit has also held that "program" and "user interface code" are not nonce words because they are "specific reference[s] to conventional" structures known in the art at the time of the invention. *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1008 (Fed. Cir. 2018).

43

Defendant's principal argument that "computer instructions" is not synonymous with "computer program" or "computer program code" is a semantic distinction unsupported by any authority and is contrary to the weight of the case law. "Instructions," "code," and "program" are used interchangeably throughout the computing literature and in patent jurisprudence to describe the executable instructions embodied in a computer-readable medium. The '402 Patent itself reflects this interchangeability. The definitional statement at column 1:67–2:2 defines "processor" as configured to process data "such as computer program instructions," using both terms together without distinction.

Defendant again makes an argument based on the § 101 briefing that is off the mark and fails for the same reasons articulated above. Indeed, Dr. Jansen's testimony confirms that a person of ordinary skill would understand Claim 19 as directed to a physical product, a computer readable storage medium, containing functions claimed as instructions incorporated into that well-known structure. (Dkt. 110-16, ¶¶64–66.) Defendant has presented no expert testimony or other evidentiary basis to rebut the presumption that § 112(6) does not apply.

For the foregoing reasons, the Court finds that **Section 112(6) does not apply to either "processor configured to …" (Claim 10) or "computer instructions for …" (Claim 19). Both terms are given their plain and ordinary meaning. Neither term is indefinite.**

### 9.  The five "determin[e/ing]" terms

| Claim term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| The five "determin[e/ing]" terms<br><br>('402 Patent, Claims 1, 10, 19) | No construction necessary;<br><br>Plain and ordinary meaning | Indefinite |

Term 9 encompasses five "determining" or "determine" steps recited in independent Claims 1, 10, and 19 of the '402 Patent. Defendant contends that the first quality level determination step is indefinite because it depends on an "estimate of a likelihood of an event," and that the remaining four determination steps are indefinite by downstream cascade because each depends on the validity of prior steps. Plaintiff responds that the determination steps are bounded by concrete inputs, that dependent claims expressly define the key disputed term "event," and that "estimate" and "likelihood" are objective mathematical concepts rather than subjective terms of degree.

A patent claim is indefinite only if it fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention. Indefiniteness must be proven by clear and convincing evidence. A claim is not indefinite merely because it is broad or because it encompasses multiple inputs or applications. Breadth is not indefiniteness. *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1367 (Fed. Cir. 2017). The relevant question is whether the scope of each term is ascertainable with reasonable certainty, not whether the method is simple or the claim narrow.

The Court begins its analysis of these five terms by noting that Defendant's cascade theory is only as strong as its weakest predicate. If the foundational level-one determination ("determining a first quality level . . . based at least in part on an estimate of a likelihood of an event") is not indefinite, the cascade does not begin. Claim interdependency does not itself create indefiniteness; it merely means that an invalid foundational limitation infects downstream steps. Because the Court concludes, as set forth below, that the first determination step is not indefinite, the cascade falls with it.

45

Defendant's threshold argument is that "event," as used in "an estimate of a likelihood of an event," is undefined and unknowable. But that premise is incorrect, and it is refuted by the claim language itself.

Dependent Claims 8 and 9 expressly define what "event" comprises. Claim 8 recites: "The method of claim 1, wherein the event comprises a conversion." Claim 9 recites: "The method of claim 1, wherein the event comprises a purchase." Claims 17 and 18 contain parallel limitations in the system claim context. These dependent claims resolve any uncertainty about the meaning of "event." Clearly, it is a commercial action such as a conversion or a purchase.

Both a conversion and a purchase are concrete, observable, objective behavioral events in an online advertising platform. A purchase is a completed financial transaction and a conversion is the completion of a desired commercial action by the user following advertisement exposure. Neither concept requires a subjective determination. They are the kind of events that advertising platforms routinely record, count, and act upon. When dependent claims specifically define a term in the independent claim, those definitions inform the scope of the independent claim and preclude a finding of indefiniteness as to that term.

Defendant takes issue with the definiteness of two other terms in the claim. However, the words "estimate" and "likelihood" are objective mathematical concepts. Defendant argues they are subjective terms of degree whose scope depends on unpredictable individual judgments. But this argument conflates two distinct categories of potentially uncertain claim terms.

Terms that courts have found indefinite as subjective, such as "optimal," "best," "aesthetically pleasing," or "optimizing," share a common characteristic. They require a qualitative value judgment about whether a thing meets a standard, and different observers applying different personal criteria may reach different conclusions about whether the standard is

46

satisfied. The scope of the term depends on a qualitative judgment call that lacks an objective referent. *See, e.g., Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371–73 (Fed. Cir. 2014) (subjective phrase "unobtrusive manner" that depends on unpredictable vagaries of any one person's opinion held indefinite).

In contrast, "estimate" and "likelihood" are categorically different. "Likelihood" is a standard probability or statistical concept. It is typically an objective numerical probability that a defined event will occur. The question "what is the likelihood of X?" has a computational answer given a dataset and a method. "Estimate" similarly denotes a calculated approximation performed on available data before complete information is known. It is a standard concept in statistical inference and is used in online advertising systems where real-time bidding decisions must be made prospectively on the basis of historical behavioral data. The '402 specification uses "estimate" throughout in precisely this sense. (*See, e.g.*, '402 Patent, col. 11 ("estimated distribution"); col. 12 ("estimate of the likelihood that the current device user matches a given profile" where "[c]ontextual factors can be considered in conjunction with performing the estimation" with ensuing examples).) Neither "estimate" nor "likelihood" requires a personal value judgment about a qualitative standard. Neither is a term of degree and neither is indefinite.

Defendant also assert that "based at least in part on" is open-ended and adds ambiguity to the determining steps. The Federal Circuit has addressed this structure and found it definite. In *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001), the court held that "at least one of" A, B, or C means only A, only B, only C, or any combination of A, B, and C. Such a construction is clear. The phrase "based at least in part on" is therefore a recognized non-exhaustive floor limitation that identifies items within the scope of the claim without excluding additional inputs. It is open-ended, but openness is a feature of breadth, not a source of uncertainty about scope. A person of ordinary

skill understands that the claim requires at minimum the specified inputs and permits additional inputs. That is sufficiently precise. Defendant submits no authority holding that "based at least in part on" renders a claim indefinite, and the Court is aware of none.

Defendant's reliance on the § 101 briefing that the '402 Patent claims are directed to "complex multistep methods and systems" is also unavailing. The argument misunderstands the "reasonable certainty" standard. Complexity of a claimed method and indefiniteness of the claim's language are unrelated concepts. *Nautilus* asks whether the scope of the claim is ascertainable with reasonable certainty, not whether the method is simple. A complex, multi-step method can be claimed with complete clarity whereas a single-step claim can be written in indefinite terms. The first "determining" step is not indefinite, and neither are the downstream "determining" steps on that basis.

The Court's conclusion aligns with the submitted expert testimony. Dr. Jansen opined that a person of ordinary skill in the art would understand each of the five "determining" claim terms without ambiguity, particularly when read together with the specification. (Dkt. 110-16, ¶¶71–73.) Defendant submitted no evidence to the contrary. Unsupported attorney argument that terms are subjective or undefined cannot substitute for the clear and convincing evidence required to establish indefiniteness.

The Court therefore finds that **the five "determin[e/ing]" terms are not indefinite and should be given their plain and ordinary meaning.**

## V.   CONCLUSION

The Court adopts the constructions as set forth in this opinion for the disputed terms of the Patents-at-Issue.

The parties are ordered that they may not refer, directly or indirectly, to each other's claim

48

construction positions in the presence of the jury.  Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury.  Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 23rd day of March, 2026.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE