# EXHIBIT G

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

FUNDAMENTAL INNOVATION
SYSTEMS INTERNATIONAL LLC,

     Plaintiff,

     v.

ANKER INNOVATIONS LTD. and
FANTASIA TRADING LLC d/b/a
ANKERDIRECT,

     Defendants.

Civil Action No. 21-339-RGA

## MEMORANDUM OPINION

Brian E. Farnan, Michael J. Farnan, FARNAN LLP, Wilmington, DE; Hong Annita Zhong, Jason G. Sheasby, IRELL & MANELLA LLP, Los Angeles, CA,

     Attorneys for Plaintiff.

John G. Day, Andrew C. Mayo, ASHBY & GEDDES, Wilmington, DE; Michael C. Chow, ORRICK, HERRINGTON & SUTCLIFFE LLP, Irvine, CA; Yufeng (Ethan) Ma, ORRICK, HERRINGTON & SUTCLIFFE LLP, Chicago, IL; Robert J. Benson, BAKER BOTTS, San Francisco, CA; Jeffery L. Johnson, BAKER BOTTS, Houston, TX,

     Attorneys for Defendants.

February 11, 2025



**ANDREWS, U.S. DISTRICT JUDGE:**

Before me are two motions. (D.I. 124; D.I. 127). One is Plaintiff's combined motion for summary judgment and *Daubert* motion. (D.I. 124). I have already ruled on much of Plaintiff's *Daubert* motion. (D.I. 208). What remains of the *Daubert* motion relates to portions of testimony from one of Defendants' experts, Dr. Min. (D.I. 240 at 1). The other pending motion is Defendants' *Daubert* motion to exclude testimony of one of Plaintiff's experts, Mr. Weinstein. (D.I. 127). I have reviewed the parties' briefing. (D.I. 125, 128, 136, 139, 144, 147, 242, 246, 254, 256, 260). I heard oral argument on February 23, 2024, and I heard testimony from two of Plaintiff's experts on November 18, 2024. For the reasons set forth below, the remaining portion of Plaintiff's *Daubert* motion is GRANTED in part and DENIED in part, Plaintiff's motion for summary judgment is GRANTED in part and DENIED in part, and Defendants' *Daubert* motion is GRANTED.

## I.   BACKGROUND

Plaintiff Fundamental Innovation Systems International filed this suit against Defendants Anker Innovations Ltd. and Fantasia Trading LLC (together, "Anker") on March 5, 2021, alleging infringement of four of its patents. (D.I. 1). The patents share a common specification and are generally directed to techniques using Universal Serial Bus ("USB") for data communication and charging mobile devices. (D.I. 40 at 1 n.1; D.I. 1 at 3). The patents at issue are U.S. Patent Nos. 6,936,936 (the "'936 patent"), 7,239,111 (the "'111 patent"), 8,624,550 (the "'550 patent"), and 7,453,233 (the "'233 patent"). (D.I. 1 at 1). These four patents are part of the Fischer patent family. (D.I. 128 at 1).

2

Fundamental filed a combined motion for summary judgment and *Daubert* motion seeking a ruling that its asserted patents are not invalid under 35 U.S.C. § 101[1] and that the asserted claims of the '550 patent are not invalid for indefiniteness, and to exclude certain testimony of Anker's experts, Dr. Min and Mr. Bakewell. (D.I. 124). After holding oral argument, I ruled on the motion as to Mr. Bakewell. (D.I. 208). I partially ruled on the motion as to Dr. Min. (*Id.*). I reserved judgment on whether Dr. Min could offer certain opinions on the '550 patent because, at the time of argument, that patent was subject to a reexamination proceeding at the Patent Office. Three items remain outstanding from Fundamental's motion: (1) whether Dr. Min can testify about certain terms of the '550 patent, (2) patent eligibility under 101 of the '550 patent, and (3) indefiniteness of the '550 patent. (D.I. 240 at 1).

Anker filed a *Daubert* motion, seeking to exclude testimony from Fundamental's expert, Mr. Weinstein. (D.I. 127). I heard testimony from Mr. Weinstein and another expert for Fundamental, Dr. Conte, on November 18, 2024. (D.I. 243, hereinafter cited as "Tr."). Anker also filed a cross-motion for summary judgment, seeking summary judgment on invalidity. Fundamental moved to strike the cross-motion, which I granted. (D.I. 192). One issue remains outstanding from Anker's motions: Mr. Weinstein's damages testimony. (D.I. 240 at 1).

## II. LEGAL STANDARD

### A. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Material facts are those "that could affect the outcome" of the proceeding.

---

[1] In its opening brief, Fundamental argued all of its asserted patents are patent eligible under § 101. (D.I. 125 at 1). Anker challenges only the '550 patent, so I will address patent eligibility of only the '550 patent. (D.I. 240).

3

*Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[A] dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Id.* The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." FED. R. CIV. P. 56(c)(1). The non-moving party's evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams*, 891 F.2d at 461.

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

### B. Patentability

#### 1. 35 U.S.C. § 101

Patentability under 35 U.S.C. § 101 is a threshold legal issue. *Bilski v. Kappos*, 561 U.S. 593, 602 (2010). Section 101 of the Patent Act defines patent-eligible subject matter. It provides: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court recognizes three categories of subject matter that are not eligible for patents: laws of nature, natural phenomena, and abstract ideas. *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). The purpose of these exceptions is to protect "the basic tools of scientific and technological work." *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 71 (2012) (internal citation omitted).

In *Alice*, the Supreme Court reaffirmed the framework laid out in its earlier case *Mayo* "for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 573 U.S. at 217. The framework is a two-step process. *Id.*

I must first determine whether the claims are directed to a patent-ineligible concept. *Id.* If the claims are directed to a patent-ineligible concept, then I proceed to step two. *Id.* If the claims are not directed to a patent-ineligible concept, then the inquiry ends and the claims are not ineligible under § 101. *Id.* For software-implemented inventions, the first step "often turns on whether the claims focus on specific asserted improvements in computer capabilities or instead on a process or system that qualifies as an abstract idea for which computers are invoked merely as a tool." *Int'l Bus. Machs. Corp. v. Zillow Grp., Inc.*, 50 F.4th 1371, 1377 (Fed. Cir. 2022)

(cleaned up). Asserted improvements in computer technology do not automatically fail this step. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016). *Id.* at 1335–36. I must "articulate what the claims are directed to with enough specificity to ensure the step one inquiry is meaningful." *Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1347 (Fed. Cir. 2017).

If the claims fail step one, then I must proceed to step two and look to "the elements of the claim both individually and as an ordered combination" to see if there is an "inventive concept—i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 573 U.S. at 217–18 (cleaned up). To be patent-eligible, "[a] claim that recites an abstract idea must include additional features to ensure that the claim is more than a drafting effort designed to monopolize the abstract idea." *Id.* at 221 (cleaned up). "[T]he prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of the idea to a particular technological environment." *Id.* at 222 (cleaned up). "[T]he mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id.* at 223. "To save a patent at step two, an inventive concept must be evident in the claims." *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017).

### 2. 35 U.S.C. § 112

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). Where "different approaches to measurement are involved" in the indefiniteness inquiry, "the patent and prosecution history must disclose a single known approach or establish that, where multiple known approaches exist, a person having ordinary

skill in the art would know which approach to select." *Dow Chem. Co. v. Nova Chems. Corp. (Can.)*, 803 F.3d 620, 630 (Fed. Cir. 2015).

Indefiniteness is a question of law that may depend on subsidiary factual findings based on intrinsic evidence, *i.e.*, "the patent claims and specifications, along with the patent's prosecution history," and extrinsic evidence, "for example, to understand the meaning of a term in the relevant art at the relevant time." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1339-40 (Fed. Cir. 2015). "Regardless of whether a subsidiary factual finding plays a small or large role in the ultimate conclusion about the meaning of the patent term, the ultimate question of construction will remain a legal question." *Id.* at 1340 (cleaned up). "[D]efiniteness . . . is amenable to resolution by the jury where the issues are factual in nature." *BJ Servs. Co. v. Halliburton Energy Servs., Inc.*, 338 F.3d 1368, 1372 (Fed. Cir. 2003).

## C. Expert Testimony

Federal Rule of Evidence 702 sets out the requirements for expert witness testimony and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED. R. EVID. 702. The Third Circuit has explained:

> Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." Secondly, the testimony must be reliable; it "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his o[r] her belief. In sum, *Daubert* holds that an

7

inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. The Supreme Court explained in *Daubert* that "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."

By means of a so-called "*Daubert* hearing," the district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury. *See Daubert* ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a) [of the Federal Rules of Evidence] whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.").

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404–05 (3d Cir. 2003)

(footnote and internal citations omitted).

## III. DISCUSSION

### A. Fundamental's Motion for Summary Judgment

Fundamental seeks summary judgment of patent eligibility under 35 U.S.C. § 101 and non-indefiniteness under 35 U.S.C. § 112 of its '550 patent. (D.I. 125 at 1–2).

#### 1. Patent Eligibility Under 35 U.S.C. § 101

Fundamental argues the '550 patent claims are patent eligible under 35 U.S.C. § 101. (D.I. 125 at 16). I will use claim 1 as an example in my analysis. Claim 1 of the '550 patent recites:

1. An adapter comprising:

a USB VBUS line and a USB communication path,

said adapter configured to supply current on the VBUS line without regard to at least one associated condition specified in a USB specification.

('550 patent at 12:7–12).

8

At *Alice* step one, Fundamental argues the '550 patent claims are directed to improvements in USB charging technology. (D.I. 125 at 16). Fundamental argues the improvements include capabilities to charge a USB device without "enumeration" as defined in USB 2.0.[2] (*Id.*). Enumeration is a process where a "USB host and USB device exchange certain data in order to configure the USB device for use with the USB host." (D.I. 1 ¶ 16). Fundamental argues the '550 patent claims solve the computer-specific problem in USB technology of USB devices being limited in the power sources from which they can draw power. (D.I. 125 at 17–19). Fundamental also points out that, in a separate action, Chief Judge Connolly denied a motion to dismiss challenging a handful of Fundamental's patents, including the '550 patent, and concluded that the patents were not ineligible under § 101. (*Id.* at 10, 20).

Anker argues the '550 patent claims fail *Alice* step one. (D.I. 139 at 2). Anker argues the claims "are directed to the abstract idea of providing access to power by ignoring any (unspecified) requirement of an industry standard." (*Id.* at 4). Anker argues the claims contain conventional components with the only addition being the requirement that the adapter supplies current "without regard to at least one associated condition specified in a USB specification," which is an abstract idea. (*Id.* at 3–4). Anker's argument rests primarily on its assertion that "[t]he Federal Circuit has consistently held a patent invalid if it is directed to the abstract idea of controlling access to resources." (*Id.* at 5). Anker asserts the '550 patent claims recite such ineligible material because they "are simply directed to allowing access to a resource in an

---

[2] USB 2.0 is a revised USB specification that was released in April 2000. (D.I. 1 at 4). It provides standards and specifications to be used with USB technology. (*Id.*). It is prior art to the asserted patents. (D.I. 244 at 8:7–10). The patents assert to build on, or improve upon, the capabilities described in USB 2.0. (*Id.* at 25:16–20; D.I. 1 at 4).

existing system (*e.g.*, power from a wall outlet), by not enforcing conditions on access, namely, one or more conditions specified by an existing USB standard." (*Id.* at 6).

I do not think the '550 patent claims are directed to an abstract idea. The claims are directed to specific improvements in computer technology: capability to charge a USB device without the limitations imposed by USB 2.0. This allows mobile devices to draw power from sources that would not be available under prior art USB capabilities. (*See* '550 patent at 2:1–15, 2:64–3:10).

I think Anker describes the '550 patent claims in an overly abstract manner. "[D]escribing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." *Enfish*, 822 F.3d at 1337. I do not think it is fair to characterize the '550 patent claims as controlling access to resources.

Anker cites a handful of cases to support its argument. Anker mainly relies upon *Prism Techs. LLC v. T-Mobile USA, Inc.*, 696 F. App'x 1014 (Fed. Cir. 2017). (D.I. 139 at 5). There, the court held invalid claims directed to "a method for controlling access" that included steps, performed on an "authentication server," of "receiving . . . identity data," "authenticating . . . the identity data," "authorizing . . . at least one client computer device," and "permitting access" upon authentication. *Prism*, 696 F. App'x at 1016, 1018. The court held the claims were directed to the abstract idea of "providing restricted access to resources" and included no inventive concept because the claims did not alter the way computers function, as alleged by the plaintiff, but "merely recite[d] a host of elements that are indisputably generic computer components." *Id.* at 1017.

10

I think this case is distinguishable from *Prism*. The '550 patent claims are not directed to the abstract idea of controlling access to data, but are directed to improvements in mobile device charging technology. The patent specification explains that the claimed invention charges a mobile device without enumeration. ('550 patent at 9:8–19). This is an improvement over the prior art and is directed to a specific improvement in USB charging technology. *See SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1303 (Fed. Cir. 2019) (holding claims were not directed to an abstract idea because they were "directed to using a specific technique . . . to solve a technological problem arising in computer networks"). These improvements are reflected in the claims. For example, claim 1 states the claimed adapter is "configured to supply current on the VBUS line without regard to at least one associated condition specified in a USB specification." ('550 patent at 12:7–12). This allows for charging capabilities beyond what was available in the prior art. (*See id.* at 1:46–2:15). I note that Chief Judge Connolly came to a similar conclusion when confronted with a § 101 challenge to a group of patents, including the '550 patent, on a motion to dismiss. (D.I. 126-1 at 14:3–6, 14:18–20).

Since I conclude that the '550 patent claims are not directed to an abstract idea, I need not proceed to *Alice* step two. *Alice*, 573 U.S. at 217.

Anker alleges summary judgment is inappropriate because there are genuine disputes of material fact. (D.I. 139 at 9–10). But Anker does not say what facts are in dispute. (*Id.*). I will not consider Anker's conclusory statement when it offers no disputed facts.

### 2. Indefiniteness Under 35 U.S.C. § 112

Fundamental seeks summary judgment that the '550 patent claims are not indefinite under 35 U.S.C. § 112. (D.I. 125 at 21). Anker's expert, Dr. Baker, opines that the claims reciting "without regard to at least one associated condition specified in a USB specification" are

11

not reasonably certain to a POSA and are thus indefinite. (*Id.*). Fundamental argues that a court in the Eastern District of Texas found otherwise. (*Id.* at 21–22). Fundamental argues that its expert, Dr. Fernald, explains that a POSA would be able to reasonably ascertain whether a device infringes, thus rendering the claims not indefinite. (*Id.* at 22).

Anker offers three reasons why the claims may be indefinite: (1) a POSA would need to understand the subjective intent of the designer to determine if a device infringes, (2) it is not reasonably certain what limits and conditions are referred to in the claim language "without regard to at least one USB Specification imposed limit," and (3) the agreed construction of "USB" makes the term uncertain. (D.I. 139 at 12–15). Anker argues that summary judgment on indefiniteness is inappropriate when there are factual disputes such as conflicting expert testimony. (*Id.* at 11–12).

I think there are sufficient factual disputes between Dr. Baker and Dr. Fernald to preclude me from deciding whether the '550 patent claims are not invalid for indefiniteness as a matter of law.

The parties agreed that "USB" should be construed as USB 2.0 and other related versions of USB specifications. (D.I. 125 at 21).[3] Dr. Baker opines that a POSA would not know which versions of USB specifications the claims refer to. (D.I. 126-2 ¶ 156). This could be important because Dr. Baker contends "the limits and conditions in different versions of the USB Specification are often different." (*Id.* ¶ 153). On the other hand, Dr. Fernald contends the voltage and current limits are the same for three USB specifications. (D.I. 126-8 ¶ 889). Dr. Baker does not seem to address this. Neither expert offers opinions about which specifications a

---

[3] More formally, the construction is, "Universal Serial Bus as described in Universal Serial Bus Specification Revision 2.0 and related versions of this standard at the time of the claimed invention." (D.I. 27 at 3).

12

POSA would consider. I am not sure if only the three identified by Dr. Fernald would be considered or if more would be considered, if there are more. I think there are at least material disputes as to what "related versions" of USB 2.0 are, whether there are more "related versions" of USB 2.0 outside the three identified by Dr. Fernald, and whether any "related versions" have meaningfully different limits and conditions.

Dr. Baker contends a POSA would not be able to determine if a device infringes without knowing how the adapter was designed. (D.I. 126-2 ¶ 151). Dr. Baker says the objective performance of an adapter would not necessarily inform a POSA if it draws current "without regard to" USB 2.0. (*Id.*). On the other hand, Dr. Fernald contends it is the operation of an adapter, not the intent of the designer, that would allow a POSA to determine whether an adapter infringes. (D.I. 126-8 ¶ 876). I do not think there is a dispute of material fact here. The claim construction does not have a limitation that depends upon the intent of the designer. Thus, were this the only dispute about indefiniteness, I would grant Plaintiff's motion on this issue. It is not the only issue, though. Nevertheless, I will prohibit Defendant from advancing this particular argument at trial.

Since there are disputes of material fact, Fundamental's motion for summary judgment that the '550 patent claims are not indefinite is denied.

### B. Fundamental's *Daubert* Motion

Fundamental seeks to exclude certain opinions of Anker's expert, Dr. Min. (D.I. 124). Fundamental argues Anker seeks to impermissibly offer testimony from Dr. Min on the construction of terms that were not briefed as part of claim construction and, further, that the

13

constructions are inconsistent with the patent specification.[4] (D.I. 125 at 24–25). Fundamental has raised this argument with respect to the following terms in the '550 patent: "without regard to" and "in response to," "USB Specification," "USB Specification imposed limit," and "identification signal." (D.I. 240 at 1).

Anker argues Dr. Min is not construing claims, but giving a noninfringement opinion based on the plain and ordinary meaning of the claim terms. (D.I. 139 at 16). Anker argues that, in seeking to exclude Dr. Min's opinions, Fundamental is improperly construing terms that were not offered for claim construction. (*Id.*). Anker argues that the law requires experts to apply the plain and ordinary meaning of non-construed terms, and that parties can offer expert testimony on the plain and ordinary meaning of terms so long as that testimony does not conflict with the court's claim construction. (*Id.* at 16–17).

### 1. "without regard to" and "in response to"

Fundamental seeks to prevent Dr. Min from testifying about "without regard to" and "in response to." (D.I. 125 at 26; D.I. 126-17 ¶ 208). In his expert report, Dr. Min opines that the accused products do not infringe because they do not determine how much power to supply and they thus are not configured to supply current "without regard to" any "associated condition." (D.I. 126-17 ¶ 208).

Fundamental argues Dr. Min implicitly and improperly requires the claimed adapter to determine how much current to supply when he construes "without regard to." (D.I. 125 at 26). Fundamental argues the specification teaches that a mobile device draws power from the adapter

---

[4] The parties agreed upon a construction for "identification signal." (D.I. 27 at 5–6). The other disputed terms were not offered for construction. (D.I. 40). Notwithstanding my rulings here, either party is able to object at trial if questions or answers during examination wander into claim construction. Indeed, to preserve the issue, the party must timely object or the objection is forfeited.

and the adapter merely reacts to the mobile device's signals. (*Id.*). Fundamental argues that, because Dr. Min's opinions are divorced from what the patent specification teaches, he should not be allowed to offer this "erroneous claim interpretation." (*Id.* at 27).

Anker argues Dr. Min gives a noninfringement opinion based on the plain and ordinary meaning of "without regard to." (D.I. 139 at 21). Anker argues Fundamental acts erroneously in pointing to the specification because it is the claims, not the specification, that delineate patent rights. (*Id.* at 22).

I think Dr. Min can offer his opinion that because the accused products do not determine how much power to supply, the accused products do not infringe because they do not meet the "without regard to" limitation. That is a noninfringement argument, not a claim construction. Fundamental can counter this with cross examination and its own experts.

However, Dr. Min also opines:

> Dr. Conte's interpretation is akin to saying a rock on the ground is configured to lie there without regard to the price of gas in the U.S. In that sense, the term would be meaningless because the rock also is without regard to every knowable fact. There is absolutely no "configuring" done to the rock that has anything to do with the price of gas in the U.S. That cannot be the correct construction. Further, there must be some element of "knowledge" to "disregard" a rule.

(D.I. 126-17 ¶ 208). Dr. Min's assertions about a "correct construction" and a required "element of 'knowledge' to 'disregard' a rule" are not noninfringement opinions, but impermissible claim construction. Those sentences are struck.

As for "in response to," which appears in asserted claims 4 and 13, Fundamental points to no specific paragraph from Dr. Min's expert report that should be excluded. (D.I. 125 at 27). I presume Fundamental wishes to exclude paragraph 216, where Dr. Min offers the opinion that "the [a]ccused [p]roducts do not supply current in response to an abnormal data condition on said USB communication path" because "the [a]ccused [p]roducts supply current regardless of any

15

data conditions" and "do not make any determination based on the signals that the Conte Report identifies." (D.I. 126-17 ¶ 216). Fundamental offers the same argument it offered for "without regard to." (D.I. 125 at 27). For the same reasons explained above, I think this is an infringement dispute, not a claim construction dispute. Dr. Min can testify about whether the accused products meet that limitation. That paragraph does not have any impermissible claim construction.

### 2. "USB specification"

Fundamental argues Dr. Min should not be allowed to testify that Battery Charging 1.2 Specification ("BC 1.2") is part of USB 2.0. (D.I. 125 at 27). The patent specification and claims make numerous references to USB 2.0, a revised USB specification that provides standards and conditions for USB technology. (D.I. 1 at 4). The parties agree that "USB" means "Universal Serial Bus as described in Universal Serial Bus Specification Revision 2.0 and related versions of this standard at the time of the claimed invention." (D.I. 255 at 1). The priority date for all the patents is October 23, 2001. (D.I. 126-17 ¶ 30). Dr. Min seeks to offer an opinion that BC 1.2, which was published in 2012, is part of the USB 2.0 standard. (*Id.* ¶ 203; D.I. 125 at 27). Dr. Min points to instances where BC 1.2 cites to USB 2.0 and argues that "BC 1.2 is a companion document to the USB 2.0 Specification, which together make the USB 2.0 standard." (D.I. 126-17 ¶ 207).

Fundamental argues terms must be interpreted as of the effective filing date, so Dr. Min should not be allowed to rely on BC 1.2 because it was published after the priority date of the patents and cannot be part of the parties' agreed upon construction. (D.I. 125 at 27–28).

Anker argues Dr. Min should be allowed to explain the relationship between BC 1.2 and USB 2.0, including its "backward compatibility," because Fundamental's infringement

16

contentions rely on the accused products being compliant with BC 1.2. (D.I. 139 at 23). Anker alleges that, to the extent Fundamental disagrees with Anker about the relationship between BC 1.2 and USB 2.0, that is a factual dispute that can be explored at trial. (*Id.* at 24).

Anker also argues that Fundamental's own expert, Dr. Conte, opines that other specifications, released between 2008 and 2017, are part of the "USB 2.0 Specification." (*Id.*). Dr. Conte opines that products that comply with later-released USB specifications infringe the patents because the later specifications "all require that devices complying with these specifications be interoperable with USB 2.0." (*Id.*). Anker argues Fundamental cannot "have it both ways." (*Id.* at 25).

In its reply, Fundamental submits Dr. Min can explain the relationship between BC 1.2 and USB 2.0 to the extent that relationship is relevant, but argues he cannot insist that BC 1.2 is part of "USB specification." (D.I. 144 at 10). Fundamental argues that Dr. Conte does not claim that later USB specifications are part of "USB Specification," but explains the importance of backwards compatibility in USB specification revisions. (*Id.*).

Dr. Min can testify about the relationship between BC 1.2 and USB 2.0, to the extent it is relevant. Fundamental takes no issue with this. (*Id.*). I do not think Dr. Min can testify that USB specifications released after the patents' priority date are included in "USB Specification." Such testimony is contrary to the parties' agreed construction and principles of patent law. "[W]hen a claim term understood to have a narrow meaning when the application is filed later acquires a broader definition, the literal scope of the term is limited to what it was understood to mean at the time of filing." *Kopykake Enters., Inc. v. Lucks Co.*, 264 F.3d 1377, 1383 (Fed. Cir. 2001). Terms must be given their meaning at the time of filing. *Id.* The patent drafter is no Cassandra. The law of patents recognizes no prophetic declarations or subsequent art to be

incorporated into a patent specification. At the time of filing in 2001, "USB Specification" meant those specifications that were released. Dr. Min cannot testify that "USB Specification" includes later-released specifications.

Though Anker does not seek to exclude Dr. Conte's opinions on "USB Specification," I note that Dr. Conte's opinions do not create the same issues as Dr. Min's opinions. Contrary to Anker's assertions, Dr. Conte does not assert that "USB Specification" includes later-released specifications. (D.I. 140-4 ¶ 50–59). The section of Dr. Conte's report cited by Anker is titled "History and Revisions to the USB Protocol." (*Id.*). Dr. Conte's opinions are exactly that. He provides context for the development of USB technology and explains that one goal of the technology was to create backwards compatibility, which is evidenced by later-released USB specifications. (*Id.*). He does not opine that later-released USB specifications are part of the claimed "USB Specification."

### 3. "USB specification imposed limit"

Fundamental argues Dr. Min should not be allowed to opine that the accused products do not meet the "USB specification imposed limit" limitation of asserted claim 10 of the '550 patent because the accused products are not defined by USB 2.0. (D.I. 125 at 28). Fundamental argues this opinion is wrong as a matter of law because the claim language requires that the adapter be non-conforming with USB 2.0. (*Id.*). Fundamental argues this is erroneous claim interpretation. (*Id.* at 29).

Anker argues Dr. Min is not impermissibly construing the claim term, but is giving his opinion on the plain and ordinary meaning of "imposed," which, in his view, means "forced to be accepted or put in place." (D.I. 139 at 26). In its reply, Fundamental argues Dr. Min is

18

merely using a dictionary definition of "imposed," which should not be allowed. (D.I. 144 at 11).[5]

The relevant portion of Dr. Min's report can be summarized as follows: A certain "condition" of USB 2.0 is inapplicable to the accused products because the accused products are not defined by USB 2.0 and thus that condition cannot be "imposed" on the accused products and the accused products cannot be "configured" to disregard that "imposed" condition. (D.I. 126-17 ¶ 229). I think this is a permissible noninfringement opinion. Dr. Min's opinion is not that the accused products do not infringe because they do not comply with USB 2.0; his opinion is that the accused products are not configured to disregard a USB 2.0 limit. While he comes to this conclusion with an opinion that the accused products do not conform with USB 2.0, his line of reasoning and conclusion are not contrary to law or the agreed-upon construction. I take Dr. Min to opine that USB 2.0 is wholly inapplicable to the accused products and they thus cannot be "configured" to disregard a "USB specification imposed limit." This is permissible testimony.

### 4. "identification signal"

The parties have asked that I resolve the "construction or application" of "identification signal." (D.I. 240 at 1, citing D.I. 257). The parties did not brief "identification signal" in their claim construction brief. Indeed, the parties have agreed to a construction. (*Id.*). The parties did raise the dispute with respect to Dr. Min's opinions, so that is how I will address it.

"Identification signal" appears in claims of three of the four asserted patents. (D.I. 257 at 27:3–5). For example, in claim 1 of the '936 patent, one limitation is, "an identification

---

[5] To the extent the dispute boils down to whether Dr. Min can state what his understanding of the definition of "imposed" is, "imposed" is a common English word, and he is no better positioned than the jury to understand the word. Thus, he should not be giving a definition, whether from a dictionary or elsewhere, of "imposed" to the jury. I do not think that impacts the admissibility of any of his noninfringement opinions.

subsystem electrically coupled to the primary USB connector for providing an identification signal at one or more data lines of the primary USB connector." ('936 patent at 11:61–64). The parties agree that "identification signal" means "signal that identifies a power source type." (D.I. 125 at 29). It would follow that "an identification signal" is "a signal that identifies a power source type." Or, "one or more identification signals" are "one or more signals that identify a power source type." Dr. Min seeks to opine that while there can be one or more identification signals, each identification signal is a "single signal." (*Id.*). Fundamental argues this is an impermissible and unjustified limitation included by an expert. (*Id.*).

Anker argues Fundamental mischaracterizes Dr. Min's position. (D.I. 139 at 26–27). Anker argues that Dr. Min opines, based on the plain and ordinary meaning of "identification signal," that the signal cannot be made of multiple signals.[6] (*Id.* at 27). Anker argues Dr. Min's opinion is that there very well may be multiple signals in an embodiment, but each "identification signal" cannot be comprised of multiple signals. (*Id.*). At oral argument on February 23, 2024, Anker argued this is a noninfringement opinion. (D.I. 257 at 29:1–12).

Fundamental argues that Anker is offering two inconsistent positions: first in Dr. Min's expert report that an "identification signal" is a single signal and now in its briefing that "identification signal" can have one or more signals. (D.I. 144 at 11).

Preliminarily, I do not think Anker is offering conflicting positions. Dr. Min opines in his report that one identification signal is a single signal. (D.I. 126-17 ¶ 102). Anker argues in its brief that one identification signal cannot be comprised of multiple signals, which may exist

---

[6] There is an agreed-upon construction of "identification signal," so Dr. Min ought to be starting from that construction, not the "plain and ordinary meaning" of the term.

on one or more data pins, but there can be multiple identification signals in a system. (D.I. 139 at 27). These positions are not inconsistent as alleged by Fundamental.

The common specification of the patents provides: "The identification signal could be the communication of a single voltage on one or more of the USB data lines, different voltages on the two data lines, a series of pulses or voltage level changes, or other types of electrical signals." ('111 patent at 8:25–29). That is a fairly broad description of what could constitute an identification signal.

Dr. Min has many noninfringement opinions, most of which are not challenged in the *Daubert* motion. But the statement that "the identification signal is a single signal" is claim construction (as is obvious since he relies upon not just the agreed construction but also the "specifications [and] the claims" for that conclusion). Moreover, it appears to be erroneous claim construction, as it is contrary to the broad way the specifications describe what might be an identification signal. That sentence (D.I. 126-17 ¶ 102) is therefore struck.

### C. Anker's *Daubert* Motion

Anker seeks to exclude testimony of Fundamental's expert, Mr. Weinstein. (D.I. 127). Fundamental seeks to use Mr. Weinstein as a damages expert who will offer opinions about "comparative license" and "cost savings" approaches. (D.I. 128 at 1, 15). Anker seeks to exclude both approaches. (*Id.*).

#### 1. Comparative License Approach

Anker seeks to exclude Mr. Weinstein's comparative license approach. (*Id.* at 19). Mr. Weinstein, in developing a reasonable royalty figure, used twenty-eight license agreements that

Fundamental entered into with other companies.[7] (*Id.* at 1). Mr. Weinstein used these twenty-eight agreements because another one of Fundamental's experts, Dr. Conte, deemed them technologically comparable. (Tr. 55:3–7). These agreements cover Fundamental's entire patent portfolio, which spans over 220 patents, 14 patent families, and 50 countries. (D.I. 128 at 1). About 74% of the patents are foreign patents, at least one of which is a foreign counterpart to the Fischer patent family. (D.I. 260 at 1–2). Four patents are asserted in this case. (D.I. 128 at 1). Anker argues Mr. Weinstein failed to properly apportion the royalty rate he derived from the comparable agreements among asserted and non-asserted patents, as well as among the four asserted patents. (*Id.* at 19).

Fundamental argues apportionment was "built in" to Mr. Weinstein's approach. (D.I. 136 at 8). Fundamental argues Mr. Weinstein relied at least in part on Dr. Conte's technological comparability analysis to conclude that, out of sixty agreements, twenty-eight were the most comparable to the facts of this case and should be considered. (*Id.* at 9). Dr. Conte reviewed the licensed products and claim charts to determine which licensing agreements were comparable. (Tr. 6:23–7:9, 7:16–24). Anker does not challenge any of Dr. Conte's testimony. (D.I. 246 at 4). Mr. Weinstein used the comparable licenses identified by Dr. Conte as a "starting point," then used facts specific to this case, including the *Georgia-Pacific* factors, to adjust the rate. (D.I. 136 at 10).

---

[7] The lump sum amounts for the comparable agreements range from $17,800 to $6,750,000, with twenty-seven of the twenty-eight agreements being for $1,000,000 or less. (D.I. 129-8; D.I. 129-1 ¶ 31). The average lump sum for the twenty-eight agreements is $589,000; without the $6,750,000 agreement, the average lump sum of the other twenty-seven agreements is $360,000. Fundamental's base royalty rate in these agreements is $0.50 per unit, but it "grant[s] discounts for litigation risk, sales volume, and the time value of money." (D.I. 129-1 ¶ 31). The dates of the agreements range from December 2017 to April 2022. (D.I. 129-8).

Fundamental argues it does not matter that there are more patents in the comparable licenses than those asserted in this case. (D.I. 136 at 11). Mr. Weinstein considered apportioning but deemed it unnecessary because (1) Fundamental's policy is only to grant portfolio licenses, and (2) the four asserted patents create all the value for Fundamental's patent portfolio. (D.I. 128 at 2; D.I. 136 at 11–12). Mr. Weinstein concludes the four asserted patents make up all the value of Fundamental's portfolio based on three things: (1) a discussion with two Fundamental employees who negotiated the licenses, (2) presentations given to the licensees, and (3) internal valuation worksheets. (D.I. 246 at 5).

First, Mr. Weinstein relies on a conversation he had with two Fundamental employees. (Tr. 55:21–56:3). These two employees negotiated the licenses and told Mr. Weinstein "that the royalty rates in those [twenty-eight] agreements were based solely on the [four] asserted patents." (*Id.*).

Second, Mr. Weinstein relies on Dr. Conte's analysis of presentations Fundamental gave to licensees during negotiations.[8] (Tr. 7:5–11, 71:19–72:13). These presentations described Fundamental's patent portfolio and charted certain patents. (*See* D.I. 147 at 5–7; Tr. 11:3–10). Some of the presentations charted just the asserted patents; others charted an additional patent called Bayne '776. (Tr. 11:3–10). Dr. Conte says that, even when it was charted, Bayne '776 did not drive the negotiations. (Tr. 12:2–9). He bases this on Fundamental having never asserted Bayne '766 in litigation and conversations he had with the Fundamental representatives that negotiated the agreements. (Tr. 11:3–10, 12:2–9). Dr. Conte admitted that one of the parties

---

[8] Dr. Conte is "an associate dean for research and a [full] professor of computer science" at Georgia Tech. (D.I. 129-6 ¶ 11). He has a Ph.D. in electrical engineering. (*Id.*; Tr. at 5:19-6:2). Anker (unsurprisingly) does not challenge his qualifications to offer technical opinions in this case. Nor does Anker challenge his qualifications to offer opinions about licensing and negotiations relating to the patents in this case.

whose license he deemed comparable was involved in litigation against Fundamental where Bayne '422, another member of the Bayne patent family, was asserted. (Tr. 34:20–36:16). Dr. Conte explained that the fact that Bayne '422 was asserted in one of the cases did not change his interpretation of the presentations because (1) that patent had narrow claims and (2) no claim charts were presented for that patent in negotiations. (Tr. 42:9–20).

Mr. Weinstein acknowledges that in seven of the twenty-eight negotiations, Fundamental identified patents in addition to the patents in suit. (Tr. 70:12–24). Mr. Weinstein disregards this and instead relies on "valuation worksheets" which Fundamental used during negotiations: "I go beyond Anker's interpretation [of the negotiations] because I go, again, back to those valuation worksheets . . . to determine which specific patents or patent families contributed to value." (Tr. 71:8–13).

Third, as noted, Mr. Weinstein relies on internal "valuation worksheets" created by Fundamental during the negotiations for the comparable agreements. (Tr. 56:16–19). These worksheets assign a "valuation" number to each patent in the licensing agreement. (Tr. 58:12–59:17). In at least two of the worksheets, only two patents, which are both asserted here, have a valuation number. (Tr. 59:18–60:20). All these worksheets contemplate a "capture period" for Fundamental's estimated royalty that ends with the expiration of the patents in suit, which was June 8, 2023, whereas other patents in Fundamental's portfolio expire as late as 2028. (Tr. 64:5–65:18; 66:7–19). These valuation worksheets confirm what Mr. Weinstein learned from the Fundamental representatives: The negotiations were based only on the four patents in suit. (Tr. 62:13–23). In other words, Mr. Weinstein's assessment of value is not based on technical analysis of value done by Dr. Conte. Mr. Weinstein's assessment of value is based only on what

24

Fundamental's employees told Mr. Weinstein, either directly or through the submission of the internal valuation worksheets.

Based on the foregoing, Mr. Weinstein is of the opinion that the royalty rates of the license agreements were already apportioned to the patents in suit. (Tr. 69:19–70:4). Fundamental argues that any dispute boils down to value assigned to the non-asserted patents in the comparable agreements, which is a factual dispute to be explored at trial. (D.I. 136 at 13).

I think Mr. Weinstein failed to properly apportion in his comparative license approach. I think there are at least six reasons why there was no "built-in" apportionment and why it was improper for Mr. Weinstein to fail to apportion.

First, Fundamental's policy to license its entire patent portfolio is virtually irrelevant. I indicated as much during the *Daubert* hearing. (Tr. 79:17–80:5). The Federal Circuit agrees. *Omega Pats., LLC v. CalAmp Corp.*, 13 F.4th 1361, 1379 (Fed. Cir. 2021). In *Omega*, the court rejected the plaintiff's argument that its policy of charging the same licensing fee, "whether . . . one patent or [fifty] patents" were licensed, had built-in apportionment because such a scheme "would permit it to obtain a particular royalty rate merely by relying on its internal 'policy' without regard to comparability." *Id.* at 1378–79. The same is true here. If Fundamental could use its internal policy only to license its entire patent portfolio, such a policy could "permit [it] to hide behind its generic licensing arrangement to avoid the task of apportionment." *Id.* at 1379.

Second, Mr. Weinstein relied on Fundamental personnel that negotiated the licenses who, at least as summarized by Mr. Weinstein, conclusorily state the four asserted patents drove negotiations over the comparable licenses. (D.I. 129-1 ¶ 63 & n.122). Fundamental offers no declarations from the two negotiators and does not cite to any depositions for any insight as to

25

what "driving negotiations" means.[9] The negotiators are not offered as experts by Fundamental, yet they are offering expert opinions, through Mr. Weinstein's testimony, on which patents contribute value to Fundamental's patent portfolio.[10] Experts cannot be used as conduits for hearsay or non-expert testimony with the expert's "gloss." *See Williams v. Illinois*, 567 U.S. 50, 80 (2012); *United States v. Christian*, 673 F.3d 702, 710 (7th Cir. 2012). Such testimony is unhelpful to the trier of fact. *Williams*, 567 U.S. at 80; FED. R. EVID. 702(a). Further, in his report, Mr. Weinstein states the negotiations "focused" on the four asserted patents. (*Id.* ¶ 63). I do not think "focused" means "were solely based on." Even if the negotiations "focused" on the four asserted patents, as stated by the negotiators, that does not excuse a failure to apportion for the over 200 additional patents included in the comparable licensing agreements.

Third, the internal valuation worksheets are of little help in determining which patents contribute value to the patent portfolio, for similar reasons that the licensing policy is unhelpful. Relying on internal documents prepared by Fundamental could similarly allow it to avoid apportionment. Notably, these are internal documents; they were not, with one exception, shared with the potential licensee.[11] (Tr. 63:5–9). For negotiations over a patent portfolio to be taken

---

[9] One of the two employees—Mr. Seaman—was deposed twice, one time about fifteen and a half months before Mr. Weinstein's opening expert report and the second time about five months before. (D.I. 109; *see* D.I. 129-1 ¶¶ 26 n. 59, 36 n.73). Mr. Weinstein does not cite either deposition for support that the four asserted patents are the only ones that contribute value to Fundamental's patent portfolio.

[10] To be clear, the negotiators could offer non-expert testimony, such as what they spoke about when they met with a company's representatives. What they cannot do is say what was in the mind of the representatives on the other side, such as how the representatives valued individual patents and/or portions of the portfolio. As it stands, there is a complete absence of evidence about what actually happened during the presentations with the comparable licensees, other than some of the presentations themselves.

[11] I note that Mr. Weinstein discussed this at the *Daubert* hearing, but that it was not contained in any of his reports (D.I. 129-1, 129-2), and therefore is not a disclosed basis for any of his opinions.

26

into account as to how the parties (as opposed to only one side) viewed the importance (or the "economic footprint") of the patents being licensed, an expert would have to consider the parties' actual discussions. The unilateral and unexpressed views of one side do not shed light on what the other twenty-eight participants in the negotiations valued any particular patents as having. An internal document prepared by Fundamental used to calculate a lump sum amount is not a statement of fact about value nor is it an expert opinion, and it is therefore not a reliable basis for an opinion as to valuation.

Mr. Weinstein finds it probative that the "capture period" contemplated in the valuation worksheets, which Fundamental uses to calculate the volume of sales covered by the license, ends with the expiration date of the last-to-expire of the four asserted patents. (Tr. 64:8–15). But the licenses last until the expiration of the last-to-expire patent in the entire portfolio, which is after the expiration of the last-to-expire of the four asserted patents. (*See, e.g.*, 129-9 at 8 of 236; Tr. 64:16–18). The "capture period" is simply a different way for Fundamental's non-expert employees to state that only the four asserted patents have any value. It does not add any support for Mr. Weinstein's opinions.

Fourth, even if I were to consider the internal valuation worksheets, they are imperfect proxies for determining the value of each patent in the portfolio. Mr. Weinstein admits this. (Tr. 68:11–22). The valuation numbers could be part of a negotiation strategy tailored to each licensee, as admitted by Mr. Weinstein. (*Id.*). I am not convinced that Mr. Weinstein is actually offering an expert opinion based on sufficient facts or data when he relies upon them; he is merely a conduit for the opinions of Fundamental.

Fifth, the negotiation documents show that more than the four asserted patents were presented in at least some of the negotiations. In at least seven of the twenty-eight negotiations,

27

Fundamental presented slide decks to the licensees describing more patents than the four asserted here.[12] (Tr. 70:12–24). Fundamental presented at least nineteen patents to Mophie, eighteen to CyberPower, fifteen to ATEN, and thirteen to Hubbell, Atomi, and Jasco. (D.I. 147 at 5–7). In those negotiations, the portfolio was presented as being something more than just the four patents in suit. Thus, while there is a basis to say that the negotiations focused on the four asserted patents, it is wrong to say, as Fundamental does, that "only the patents-in-suit" were identified in negotiations. (D.I. 136 at 19). Mr. Weinstein casts doubt on the presentations, and instead looks to the valuation worksheets, because the presentations were shown before the licensing agreements were finalized and seem standardized. (Tr. 71:8–13, 73:14–74:21). Though there is overlap among the presentations, and some are the same, there is evidence of differences among the presentations based on the licensee and accused products. (D.I. 147 at 7). Mr. Weinstein's comments about the presentations may be fair, but the presentations were nevertheless presented to the potential licensees, whereas the valuation worksheets were not. What the valuation worksheets show is "which of these patents actually contributed to value to that licensee from Fundamental's standpoint." (Tr. at 72:12-13). In the hypothetical negotiation, though, what is important is not one side's unilateral estimation of value.

Sixth, all the license agreements were "worldwide." (D.I. 129-1 ¶ 70). Foreign patents make up about 74% of Fundamental's patent portfolio. (D.I. 260 at 1). There is at least one

---

[12] I am not sure if more than seven licensees were presented with more than the four asserted patents. In its reply brief, Anker asserts, "based on [the] record" of the seven licenses, it is Fundamental's "practice . . . to assert additional patents in its license negotiations as part of presentations that urged target companies to take a license to Fundamental's entire patent portfolio." (D.I. 147 at 7). Neither side elicited any testimony from Mr. Weinstein on what the other twenty-one were shown. (*See* Tr. 70:19–75:9).

28

foreign counterpart to the Fischer patent family, a Canadian patent. (*Id.*).[13] The twenty-eight agreements are all lump sum agreements. (D.I. 129-2 ¶ 69 n.120). Despite the worldwide licensing, only U.S. sales (or, in some cases, U.S. and Canadian sales) were considered in calculating the effective royalty rate. (Tr. 111:13–16; D.I. 246 at 12–13; *see* D.I. 129-9 at 57 of 236). That is, the starting point for Mr. Weinstein's analysis was, effectively, to take the lump sum and to divide it by U.S. sales volume or U.S. and Canada sales volume to reach an implied royalty rate. (*See* D.I. 129-1 ¶ 66; Tr. 60:25–61:5, 76:25–77:20, 97:13–17). Since the licensing agreement gave worldwide rights, the implied royalty rate would have to consider whether the licensees were getting anything of value in relation to sales outside of the U.S. and, depending on the license, also Canada. To the extent they were, Mr. Weinstein overestimates the implied royalty rate. (D.I. 260 at 1). Mr. Weinstein did not investigate or consider how much of the licensees' sales were foreign. (Tr. 110:13–19). At least some of the licensees, like Anker, are foreign companies with worldwide sales. When the twenty-eight licenses were being negotiated, there were still pending foreign applications. (*See, e.g.*, D.I. 129-9 at 50–56). Since Mr. Weinstein did not investigate or consider the licensees' non-U.S. sales, the majority of Fundamental's patent portfolio is comprised of non-U.S. patents, and there is no evidence Mr. Weinstein (or Dr. Conte) meaningfully reviewed any of the foreign patents (Tr. 25:8–13, 26:7-9, 105:17–25), it is unreliable for Mr. Weinstein to conclude that the 163 foreign patents have no value.

---

[13] Fundamental's recent letter states that the Canadian counterpart is irrelevant for various reasons (D.I. 206 at 1), but the letter does not cite anything from any expert report showing any consideration of Fundamental's arguments by the experts. It is too late to save expert opinions with attorney argument.

29

Though comparable licenses are often used to evaluate damages in patent infringement cases, the method may be unreliable when, for example, the expert fails to apportion. *See MLC Intell. Prop., LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1373–74 (Fed. Cir. 2021). For the foregoing reasons, I do not think the "comparable licenses" approach is a reliable approach under the circumstances of this case. More particularly, I find that Fundamental has not shown that it is more likely than not that Mr. Weinstein's opinions reflect a reliable application of principles and methods to the facts of this case, as required by the Federal Rules of Evidence. FED. R. EVID. 702.

Anker also argues that Mr. Weinstein failed to conduct an economic and technological comparability analysis, contrary to Federal Circuit precedent. (D.I. 128 at 12–13). Fundamental argues Mr. Weinstein did conduct an economic comparability analysis by considering the economic similarities and differences between the licensees and Anker, including volume of sales, extent of use, timing of licenses, and more. (D.I. 136 at 21). Fundamental argues that Mr. Weinstein properly relied on Dr. Conte's technological comparability analysis and Anker does not challenge Dr. Conte's opinions. (*Id.* at 22). In its reply, Anker argues Dr. Conte failed to perform a technical analysis of whether any of the non-asserted patents were practiced by any of the licensees. (D.I. 147 at 10).

Since I determine that Mr. Weinstein failed to apportion the patents in the comparative licensing agreements, I will not address whether he conducted a sufficient economic and technical comparability analysis.

## 2. Cost Savings Approach

Anker seeks to exclude Mr. Weinstein's cost savings approach.[14] (D.I. 128 at 35–36).

Mr. Weinstein opines that Fundamental and Anker would be aware that the patents provide a cost savings of $2.68 per unit.[15] (*Id.*). Mr. Weinstein opines that the parties would agree to split this savings by allocating 71% to Fundamental, resulting in a royalty rate of $1.90 per unit. (*Id.*). This division is based on Anker's purported expected return on invested capital ("ROIC") of 29%, which Mr. Weinstein obtained from an "Equity Research Report" published by Huatai Research in 2022. (*Id.*; Tr. 91:8–13).

The Equity Research Report has one page of text, one page of graphs, one page of "Full financials," and three pages of "Disclaimers." The source for the "Full financials" is described as "Company announcements, Huatai Research estimates." The "Full financials" includes "ROIC" for Anker's "YE 31 Dec [2020]" as "29.00." In the "Disclaimers," two analysts "certify that the views expressed in this report accurately reflect the personal views of the analyst(s)." The report further disclaims:

> This report is based on information deemed reliable and publicly available by [Huatai], but [Huatai] makes no guarantee as to the accuracy or completeness of

---

[14] The parties disagree about whether Mr. Weinstein offers his cost savings approach as an independent theory of damages or to show his comparable license approach is a conservative estimate of damages. He indicated the former in his expert report and the latter in his deposition. (D.I. 129-1 ¶ 72; D.I. 136 at 25–26; D.I. 128 at 36). I do not need to resolve that dispute inasmuch as I find the cost savings approach has not been shown to be based on any reliable bargaining theory. I also note that if the cost savings approach is not an independent theory of damages, I would be unlikely to permit its presentation under Rule 403 of the Rules of Evidence, essentially for the same reasons that the Federal Circuit prohibits the presentation of unnecessary big numbers in damages theories that "skew" a jury's view of damages. *See Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*, 927 F.3d 1292, 1302 (Fed. Cir. 2019) ("[W]e have held that a party's reference to an infringer's entire revenue earned from its sale of accused products, where only part of the value of the apparatus is attributable to the patented technology, can 'skew the damages horizon for the jury.'").

[15] Anker notes that it disputes this number in a footnote of its opening brief, but not on *Daubert* grounds. (D.I. 128 at 36 n.10; *see* Tr. at 88:10–89:15). Thus, that dispute is not now at issue.

31

such information. . . . The opinions, assessments and projections contained herein only reflect the views and judgments at the issuance date. Huatai may issue research reports that contain inconsistent views, assessments and projections with those set out herein at different times. . . . Huatai has no obligation to update this report. . . . Investors should not regard this report as the sole basis for their investment or other decisions. . . . In the United States, this research report is distributed solely to institutional investors that meet US regulatory requirements.

The report is copyrighted; "[n]o . . . individuals shall infringe the copyright . . . by any means, such as . . . quoting . . . without the written consent of [Huatai]."

Anker argues Mr. Weinstein's approach has no supporting authority, is arbitrary and untethered to the facts of this case, and impermissibly fails to consider the *Georgia-Pacific* factors. (D.I. 128 at 36).

Fundamental argues that a cost savings approach is a well-accepted method to calculate patent damages, pointing to cases where a patentee was awarded all purported cost savings. (D.I. 136 at 25–27). Fundamental argues that a split based on ROIC is closely tied to the facts of this case and is specific to Anker. (*Id.* at 27). Fundamental further argues that the ROIC number "is from a reputable financial analyst firm, and is the type of data that economists and damages experts often rely upon." (*Id.* at 28). Fundamental argues Anker has failed to offer evidence that the numbers are inaccurate. (*Id.*). Finally, Fundamental argues that evaluating the *Georgia-Pacific* factors is not required, particularly when "the royalty is determined by limiting the difference in costs to those attributable to only infringing features." (*Id.* at 28–29).

At the November hearing, Mr. Weinstein said he has used this methodology in other cases, including in trial testimony. (Tr. 91:21–92:14). He said this methodology has been challenged every time he has offered it, and those challenges were all denied. (Tr. 92:6–9). Mr. Weinstein cites no instances in his report where he was permitted to use this methodology in another case. (Tr. 109:24–110:2). Mr. Weinstein could not point to any literature indicating

32

ROIC is an appropriate way to divide cost savings in an actual negotiation or in a hypothetical negotiation. (Tr. 93:17–94:19). He instead points to conversations he has had with individuals who fund and settle cases, individuals who are seeking "a satisfactory settlement."[16] (Tr. 94:9–19). After the hearing, Fundamental submitted one article that purportedly supports its position. Fundamental cites no cases supporting its position.

I do not think Fundamental has shown the cost savings approach based on ROIC is sufficiently reliable. Notably, Fundamental struggles to find supporting literature or caselaw, and the one article Fundamental provides does not sufficiently support its position.

Fundamental points to a Morgan Stanley article to support its approach. (D.I. 247-12). The article "is about return on invested capital . . . , a financial metric that can help with assessing whether a company is creating value with its investments." (*Id.* at 2 of 45). This is the only point for which Fundamental cites the article. (D.I. 246 at 14–15). Fundamental argues this article shows that ROIC is a well-accepted method to assess whether a company is creating value in its investments. (*Id.* at 15). I do not question this. I do, however, struggle to see how the article supports the idea that two companies, in a negotiation where each would want to maximize profits, would use this metric, only as applied to the potential licensee, to arrive at a reasonable royalty. Mr. Weinstein admits there are no articles discussing such a practice. (Tr. 94:9–19).

I also fail to see how Anker's ROIC is tied to the facts and parties of this case, aside from Anker being a party to the case. "To be admissible, expert testimony opining on a reasonable

---

[16] It is apparent that Mr. Weinstein is talking about how litigation funders view the settlement of litigation. Litigation funders generally fund plaintiffs, not defendants. Here, that would be Fundamental, not Anker. What a litigation funder is looking for in a litigation settlement has little, if any, relationship to the considerations that are taken into account in the hypothetical negotiation.

royalty must sufficiently tie the expert testimony on damages to the facts of the case. If the patentee fails to tie the theory to the facts of the case, the testimony must be excluded." *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp.*, 879 F.3d 1332, 1349 (Fed. Cir. 2018) (cleaned up). The only connection the report has to this case is providing information (an ROIC number for 2020) about Anker. Mr. Weinstein is unaware if Anker has ever used ROIC to split cost savings. (Tr. 107:25–108:5). There is no connection to Fundamental or the technology at issue. Fundamental has not shown that the methodology is reliable.

It is not self-evident that reliance upon the Equity Research Report is justified, and Mr. Weinstein has not shown that it is. He knows too little about the preparation of the Equity Research Report to reliably rely on it to determine what Anker's ROIC was in 2020. When cross-examined at the *Daubert* hearing about his knowledge of the underlying data used in the report, he said the following:

> Q. And are you aware of how this data was obtained?
> A. I'm really not beyond — beyond my — my understanding that — that this entity follows Anker, as well as other companies and — and collects — collects that data.
> Q. There's not a single reference or citation to any Anker document in this document, is there?
> A. I agree.
> Q. Did you do anything to corroborate the data in this document with actual data from Anker?
> A. I did not.

(Tr. 109:13–23).

The various disclaimers in the Equity Research Report do not support Mr. Weinstein's reliance upon the report. Indeed, they only raise questions about the reliability of the report.

Mr. Weinstein's reliance upon and knowledge of the Equity Research Report is analogous to the circumstances in *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012). In *ZF*, the Third Circuit affirmed a district court's exclusion of an expert's damages testimony.

34

*Id.* at 291. The district court excluded the testimony in part because the expert relied on a business plan to calculate damages. *Id.* at 290–91. Though business plans are often used by experts to calculate damages, the district court properly excluded the testimony because the expert did not know who created parts of the plan, the qualifications of those that created the plan, or the assumptions on which the plan was based. *Id.* at 292–93. Here, Mr. Weinstein does not know how the data in the report was collected. (Tr. 109:13–17). He seems to know little about the company that created the report and the process in general, other than the company being an investment bank that he sometimes relies upon in his work. (Tr. 91:8–11, 111:1–4). Mr. Weinstein did not corroborate this data with any financial data provided by Anker to Fundamental, or Anker's actual ROIC. (Tr. 109:18–23). I think he knows too little about the creation of the report to testify about it and be effectively cross-examined on it. *See ZF*, 696 F.3d at 293.

## IV.   CONCLUSION

An appropriate order will issue.