**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| RAVENWHITE LICENSING LLC | § | |
| *Plaintiff,* | § § § | CASE NO. 2:24-CV-00688-JRG-RSP |
| | § | (*Lead Case*) |
| v. | § § | |
| THE HOME DEPOT, INC. and HOME DEPOT U.S.A., INC. | § § § | JURY TRIAL DEMANDED |
| *Defendants.* | § § § § | |

| | | |
|---|---|---|
| RAVENWHITE LICENSING LLC | § § | |
| *Plaintiff,* | § § § | CASE NO. 2:24-cv-00689-JRG-RSP |
| | § | (*Member Case*) |
| v. | § § | |
| WALMART INC. and WAL-MART STORES TEXAS, LLC | § § § | JURY TRIAL DEMANDED |
| *Defendants.* | § § § § | |

**<u>DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
OF NO INVALIDITY OF THE ASSERTED PATENTS UNDER 35 U.S.C. § 101</u>**

i

TABLE OF CONTENTS

I.    Introduction ................................................................................................................. 1

II.   Response to the statement of issues to be Decided by the Court ............................ 3

III.  Response to Plaintiff's Statement of Undisputed Material Facts (nos. 1-6) .......... 3

IV.   Background.................................................................................................................. 3

      A.  U.S. Patent No. 10,594,823 ................................................................................ 3

      B.  U.S. Patent No. 11,562,402 ................................................................................ 5

V.    Legal Framework........................................................................................................ 7

VI.   Argument ..................................................................................................................... 7

      A.  The '823 Patent is Patent Ineligible. ................................................................. 7

          1.   Claim 1 is representative of all claims of the '823 Patent............................ 7
          2.   *Alice* Step One: the claims of the '823 Patent are directed to storing and
               using cookies to identify a client device or user. ...................................... 8
          3.   *Alice* Step Two: the claims of the '823 Patent contain no inventive
               concept sufficient to render the abstract idea patent eligible. .................. 14

      B.  The '402 Patent is Patent Ineligible. ............................................................... 15

          1.   Claims 1, 10, and 19 are representative of all claims of the '402 Patent. ................. 15
          2.   *Alice* Step One: the claims of the '402 Patent are directed towards the
               abstract idea of targeted advertising. ........................................................ 16
          3.   *Alice* Step Two: the claims of the '402 Patent contain no inventive
               concept sufficient to render the abstract idea patent-eligible. ................. 23

VII. Conclusion.................................................................................................................. 29

i

TABLE OF AUTHORITIES

**Cases**

*Ancora Techs., Inc. v. HTC Am., Inc.*,
    908 F.3d 1343 (Fed. Cir. 2018) ...................................................................................... 13

*Bridge & Post, Inc. v. Verizon Communs., Inc.*,
    778 F. App'x 882 (Fed. Cir. 2019) ........................................................ 15, 18, 24, 28

*Broadband iTV, Inc. v. Amazon.com, Inc.*,
    113 F.4th 1359 (Fed. Cir. 2024) ................................................................................ 18, 24

*BSG Tech LLC v. Buyseasons*,
    899 F.3d 1281 (Fed. Cir. 2018) ...................................................................................... 14

*CardioNet, LLC v. InfoBionic, Inc.*,
    955 F.3d 1358 (Fed. Cir. 2020) ...................................................................................... 20

*Chewy, Inc. v. Int'l Bus. Machines Corp.*,
    94 F.4th 1354 (Fed. Cir. 2024) ...................................................................................... 19

*Content Extraction and Transmission LLC v. Wells Fargo Bank*,
    776 F.3d 1343 (Fed Cir. 2014) ...................................................................................... 11

*DDR Holdings LLC v. Hotels.com, L.P.*,
    773 F.3d 1245 (Fed. Cir. 2014) ...................................................................................... 27

*Dental Monitoring SAS v. Align Tech., Inc.*,
    No. 2024-2270, 2026 U.S. App. LEXIS 19691 (Fed. Cir. July 7, 2026) ............................ 22

*Elec. Commun. Techs., LLC v. ShoppersChoice.com, LLC*,
    958 F.3d 1178 (Fed. Cir. 2020) ...................................................................................... 10

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
    879 F.3d 1299 (Fed. Cir. 2018) ................................................................................ 13, 17

*In re TLI Communs. LLC v. AV Auto., LLC (In re TLI Communs. LLC Patent Litig.)*,
    823 F.3d 607 (Fed. Cir. 2016) ...................................................................................... 23

*Intell. Ventures I LLC v. Cap. One Bank (USA)*,
    792 F.3d 1363 (Fed. Cir. 2015) ............................................................................ 18, 19, 29

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
    942 F.3d 1143 (Fed. Cir. 2019) ...................................................................................... 13

*Miller Mendel, Inc. v. City of Anna*,
    107 F.4th 1345 (Fed. Cir. 2024) ...................................................................................... 9

*Morales v. Square, Inc.*,
    75 F. Supp. 3d 716 (W.D. Tex. 2014) ............................................................................ 16

*Sanderling Mgmet. Ltd. v. Snap Inc.*,
    65 F.4th 698 (Fed. Cir. 2023) ...................................................................................... 13

*SAP Am., Inc. v. InvestPic*, LLC,

898 F.3d 1161 (Fed. Cir. 2018) ........................................................................................... 14

*Smartflash LLC v. Apple Inc.*,
680 F. App'x 977 (Fed. Cir. 2017) ................................................................................ 26, 27

*Smartflash LLC v. Apple Inc.*,
No. 6:13-cv-447, 2015 WL 661174 (E.D. Tex. Feb. 2015) .................................................. 26

*Specialized Monitoring Sols., LLC v. ADT LLC*,
367 F. Supp. 3d 575 (E.D. Tex. 2019) ................................................................................... 14

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
930 F.3d 1295 (Fed. Cir. 2019) ........................................................................................... 13

*TecSec, Inc. v. Adobe Inc.*,
978 F.3d 1278 (Fed. Cir. 2020) ........................................................................................... 13

*Universal Secure Registry LLC v. Apple Inc.*,
10 F.4th 1342 (Fed. Cir. 2021) ............................................................................... 9, 11, 14, 23

*Weisner v. Google LLC*,
51 F.4th 1073 (Fed. Cir. 2022) ........................................................................................... 27

**Statutes**

35 U.S.C. § 101 ................................................................................................................. 1, 3, 7, 29

I.    **INTRODUCTION**

Plaintiff RavenWhite Licensing LLC seeks summary judgment that both U.S. Patent Nos. 10,594,823 ("the '823 Patent") and 11,562,402 ("the '402 Patent") are not invalid under 35 U.S.C. § 101. Not only should Plaintiff's motion be denied, but for the reasons detailed in Walmart's own motion for summary judgment on this issue (Dkt. 186), there is no genuine dispute that the two Asserted Patents are patent ineligible under § 101.

Under *Alice* Step One, both the '823 Patent and the '402 Patent are directed, respectively, to the abstract ideas of using cookies to identify a device or user, and targeted advertising. These are basic concepts that humans have long performed and that courts have long held to be patent ineligible. And under *Alice* Step Two, neither the '823 Patent nor the '402 Patent claims any inventive concepts. Instead, they both recite well-understood, routine, and conventional activity that is common in the art.

As discussed below, Plaintiff's argument relies heavily on the misconception that this Court previously resolved the § 101 issue ***on the merits*** during the motion to dismiss phase. Pointing to the Court's earlier denial of Walmart's Rule 12(b)(6) motion, Plaintiff claims that "[t]his Court has already determined that the asserted patents claim patent eligible subject matter." *See* Dkt. 183 at 5. In Plaintiff's view, winning a motion to dismiss at the start of a case should entitle a plaintiff to summary judgment at the end. Not only is Plaintiff incorrect, but the reasoning in the Court's earlier denial of Walmart's motion to dismiss highlights why the Asserted Patents are ineligible under § 101.

Unlike a motion for summary judgment, during the motion to dismiss phase, this Court was required to accept Plaintiff's allegations as true, such as its assertion that the '402 Patent's use of "clustering" incorporates "a 'specific, detailed algorithm' that enables 'machine learning technology' to deliver targeted advertisements." *See* Dkt. 123 at 5. Similarly, Plaintiff asserted that

1

the '823 Patent "bakes a new type of cookie" that adds "a new layer of authentication." *See id.* at 6. Based on these representations, the Court concluded at the early stage of this case that "Plaintiff's complaint had pleaded sufficient facts" to overcome a motion to dismiss. *Id.* at 5-6.

However, following discovery and claim construction, none of Plaintiff's assertions remain valid. In construing the "clustering" term, the Court rejected Plaintiff's early argument, holding instead that "[n]othing in the specification states that clustering must be 'processor-executed,' must apply a 'statistical or machine learning algorithm,' or must group users 'into one or more personas.'" *See* Dkt. 128 at 38. Rather, based on the full record, the Court concluded that the term simply means "grouping based on analysis of data indicative of user behavior," which is an abstract concept that does not depend on any detailed algorithm or machine learning technology.

Similarly, in construing the terms of the '823 Patent, Plaintiff abandoned any pretense that the claims "bake a new type of cookie." Instead, for purposes of distinguishing a "first cookie of a first type" from a "second cookie of a second type," Plaintiff's own expert recognized that the '823 Patent was pulling from three pre-existing cookie types that were well-known in the art and only differed simply in how they were accessed. *See* Dkt. 110-16 at ¶¶ 30-33; *see also* Dkt. 128 at 11. Plaintiff also conceded in its own claim construction briefing that "the claims don't limit the cookies to a particular type." *See* Dkt. 110 at 10.

As a result, given the Court's claim constructions and the additional evidence discussed below, there is no reasonable dispute that the Asserted Patents are directed towards abstract ideas. And given that these abstract ideas are simply implemented using well-understood, routine, and conventional concepts and activity, neither Asserted Patent is patent eligible under § 101. Plaintiff's attempt to cloud the issue by filing its own affirmative motion for summary judgment does not alter this conclusion or salvage the Asserted Patents.

## II.    RESPONSE TO THE STATEMENT OF ISSUES TO BE DECIDED BY THE COURT

1.      Whether the Court should grant summary judgement that the '823 claims are subject matter eligible under 35 U.S.C. § 101. It should not. The Court should instead grant summary judgment that the '823 claims **not** are subject matter eligible.

2.      Whether the Court should grant summary judgement that the '402 claims are subject matter eligible under 35 U.S.C. § 101. It should not. The Court should instead grant summary judgment that the '402 claims **lack** subject matter eligibility.

## III.    RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS (NOS. 1-6)

Walmart provides a response to Plaintiff's Statement of Undisputed Materials Facts enumerated below, using the corresponding paragraph numbers from Plaintiff's motion.[1]

4 & 5. While Plaintiff accurately quoted a handful of sentences from the Court's R&R, those quotes in isolation remove important context, which Walmart addresses in this brief and its own motion for summary judgment on this issue (Dkt. 186),

## IV.    BACKGROUND

### A.    U.S. Patent No. 10,594,823

The '823 Patent "relates generally to client-server communications and more specifically to causing a browser to store information in a browser storage area of a client device." '823 at 1:31-34. In one embodiment, the information stored in the browser storage area of the client device includes cache cookies, which, unlike a traditional cookie, "cannot be blocked or cleared via spyware or a browser setting." *Id.*, 5:21-22. The cache cookie is similar to a standard cookie in that it can identify the client device. *Id.*, 5:16-18. For example, when "browser 116 establishes a

---

[1] Walmart has no comments to non-listed numbered facts.

second network session with the server 104 ... the server 104 'reads' the data (the cache cookie 174) ... to identify the client device." *Id.*, 5:29-34.

The '823 Patent discusses two types of cache cookies stored in different areas of the browser storage area. *Id.*, Fig. 2. The first type of cache cookie takes the form of URLs stored in the history cache of the browser storage area that the server causes the client device to visit. *Id.*, 6:24-27. The second type of cache cookie takes the form of temporary internet files (TIF) that are stored in a TIF storage area of the browser. *Id.*, 7:1-6.

However, neither of these cookies were invented by the '823 Patent, and neither are claimed. Indeed, according to the '823 Patent specification, all components and processes used in the claimed system were routine and conventional. For example, the patent acknowledges that using and storing cookies associated with website resources via a browser was "typical." *See id.*, 1:35-45 ("A user typically uses a Web browser … to access a Web page over the Internet. … When the user accesses the same Web page at a later time, the server may … customize the Web page for the user."), 1:50-52 (a typical browser would send a cookie "back to the server each time the browser request[ed] a Web page from the server."), 1:55-65 ("This customization of a Web page is typically the result of cookies. A cookie is a message transmitted to a browser by a server. The message can include user-specific identifiers or personal information about the user. The browser typically stores the message in a text file. The message (*i.e.*, cookie) is then sent back to the server each time the browser requests a Web page from the server."), 4:56-5:9 (providing "a brief background of the browser storage area 170 and how a browser typically uses its browser storage area"); *see also id.*, 1:31-2:10. Similarly, the specification makes it clear that "perform[ing] [an] identification" and "performing a determination" based on cookies was also common and well-known. *Id.*, 1:47-48 ("The message [cookie] can include user-specific identifiers or personal

information about the user"), 1:53-57 (such cookies encode the user's name to "enable[e] the server to identify [the user] automatically"), 2:5-10 ("Further, the identification of a user may provide security benefits. . . . Cookies enable the Web page to display specific information (e.g., username, password, or home address) about a user to the user and not to other users.").

### B.    U.S. Patent No. 11,562,402

The '402 Patent is directed to a method for targeted advertising. Claims 1, 10 and 19 are substantively identical and involve determining "quality level[s]" that generally correspond to a user's interest in a product category and their likelihood of making a purchase. '402 Patent, cls. 1, 10, 19. These quality levels are determined using a variety of factors, including whether a need associated with a user profile has been met for an interest category, an estimate of a likelihood of an event such as a conversion or a purchase, and a conversion assessment. *Id.* The claims then recite displaying an advertisement based on a determined quality level. *Id.*

The '402 Patent also claims that a "first quality level" is determined "based at least in part on a unique identifier and clustering." *Id.*, 3:26–44, 11:40–55, 12:46–13:9, Fig. 6. Neither the '402 Patent as a whole nor Claims 1, 10 or 19 require or recite any specific "clustering" algorithm. *Id.*, 12:63–13:9; cls. 1, 10, 19. Instead, the '402 Patent blanketly states that "a variety of clustering techniques can be used" and generally describes user behaviors that are commonly used in clustering to distinguish between multiple users in a system. *Id.*, 12:63–13:9. As listed in the '402 Patent, these user behaviors may include the time, distance and rate of a user's mouse clicks, a user's interest in different topics, their search terms, or the average time that a user spends on each page. *Id.*, 12:46–13:3. As observed by the Court during claim construction, the claim language "does not specify what is being clustered, what algorithm or mechanism performs the clustering, or what purpose the clustering serves beyond its role as an input to quality level determination."

5

*See* Dkt. 128 at 36.

Similarly, the claims do not require or recite any specific algorithm or formula for determining the "quality levels" mentioned above or any of the accompanying determinations, such as the claimed "estimate of the likelihood of an event," the "indication of interest" in a given product category, or the "conversion assessment."

The '402 Patent's specification further confirms that the claimed processes and components are entirely conventional. First, in all instances, the claimed steps are those that have long been performed by human minds in the advertising world—*i.e.*, determining a quality level, determining an indication of interest, storing (*i.e.*, recording) the indication of interest, determining that a need has been met, and displaying an advertisement based on a quality level. Second, no claim recites any specific structure. Some claims, such as those depending on Claim 1, recite no structure whatsoever, while the recited structure in the other claims is nothing more than generic computer systems—*i.e.*, "a processor" and "a memory."

There is no suggestion in the '402 Patent that any of these structures were a technological improvement to solve a problem. To the contrary, the specification defines "processor" as a generic computer processor: "as used herein, the term 'processor' refers to one or more devices, circuits, and/or processing cores configured to process data, such as computer program instructions." *Id.* 1:67-2:2. The claimed "memory" is only described by the specification to the extent it "may be implemented as a general component." *Id.*, 1:62-66. Similarly, the patent states that the advertising platform (*i.e.*, the server) may comprise "standard commercially available server hardware." *Id.*, 2:53-59. The '402 Patent further discloses that "[t]hese details are provided for the purpose of example and the invention may be practiced according to claims without … all of these specific details." *Id.*, 2:13-16; *see also id.*, 17:46-51.

6

## V.  LEGAL FRAMEWORK

The law recognizes three exceptions to patent eligibility: "laws of nature, physical phenomena, and abstract ideas." *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980). Determining whether a patent claim is impermissibly directed towards an abstract idea involves two steps. First, the court determines "whether the claims at issue are directed to a patent-ineligible concept." *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014). Second, if the claim contains an abstract idea, the court evaluates whether there is "an 'inventive concept'—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id.* at 217-18.

## VI.  ARGUMENT

The claims of both the '823 Patent and the '402 Patent are invalid under 35 U.S.C. § 101 because they each fail under both *Alice* Step One and *Alice* Step Two.

### A.  The '823 Patent is Patent Ineligible.

The '823 Patent's claims are directed towards the abstract idea of using cookies to identify a client device or user. Previously, during the motion to dismiss phase, Plaintiff represented to the Court that the patent "bakes a new type of cookie" that renders the claims more than just an abstract idea premised on the use of cookies. *See* Dkt. 123 at 6. However, facing actual scrutiny during claim construction, Plaintiff abandoned that pretense and conceded that the reference to a first and second "type" of cookie merely refers to pre-existing cookie types that have long been known in the art. As a result, Plaintiff did not invent a new type of cookie or anything else that would allow the '823 Patent to survive under *Alice*.

#### 1.  Claim 1 is representative of all claims of the '823 Patent.

The parties agree that Claim 1 is representative of the '823 Patent's claims:

| |
|---|
| 1. A system, comprising: |
| one or more processors configured to: |
| receive a network resource request from a client device, wherein the network resource request corresponds to a first cookie of a first type that was caused to be stored to the client device during a first previous network session, wherein the first cookie of the first type was caused to be stored to the client device at least in part by causing the client device to initiate a set of network resource requests determined during the first previous network session, wherein the client device initiating the set of network resource requests caused data representative of the set of network resource requests to be stored at the client device, wherein a second cookie of a second type different from the first type was caused to be stored at the client device during a second previous network session, and wherein the first cookie of the first type is stored in a first client device browser storage area and the second cookie of the second type is stored in a second client device browser storage area different from the first client device browser storage area; |
| based at least in part on the network resource request from the client device corresponding to the first cookie of the first type caused to be stored at the client device during the first previous network session, determine information that was encoded and stored in the client device; |
| perform a first identification of at least one of the client device and a user of the client device using the first cookie of the first type, wherein the first identification is performed using the first cookie of the first type at least in part by using the determined information that was encoded and stored in the client device; |
| perform a second identification of at least one of the client device and the user of the client device using the second cookie of the second type; and |
| perform a determination based at least in part on (1) a presence of a network resource request associated with one of the first cookie and the second cookie, and (2) an absence of a network resource request associated with the other of the first cookie and the second cookie; and |
| a memory coupled to the one or more processors and configured to provide the one or more processors with instructions. |

**2.  *Alice* Step One: the claims of the '823 Patent are directed to storing and using cookies to identify a client device or user.**

The claims of the '823 Patent recite nothing more than the "well-understood, routine, [and] conventional" use of cookies to identify a client device or user. '823 Patent at 1:31-34 (describing the invention as simply "causing a browser to store information in a browser storage area of a client device"). Claim 1 describes generic functional steps—such as receiving network resource requests from a client device corresponding to cookies, determining information encoded and stored in the client device, performing an identification, and performing a determination—on

8

generic computer systems. '823 Patent, cl. 1. Each of these steps amounts to nothing more than abstract steps taking place on off-the-shelf hardware. Moreover, the '823 Patent does not invent or claim a "new type of cookie." The Court's claim construction order confirms that the first and second cookie only differ in how they are accessed by the server, and can be any of a number of well-known cookie types. *See* Dkt. 128 at 12; '823 Patent, 1:46-2:10, 4:56-5:9.

Such claims for tracking a user and collecting and storing data are routinely held ineligible. In *Miller Mendel*, the Federal Circuit affirmed this Court's grant of a Rule 12(c) motion finding ineligible claims reciting a "method for a computing device with a processor and a system memory to assist an investigator in conducting a background investigation" because the claims were "directed to receiving, storing, transmitting, determining, selecting, and generating information, which place them in the 'familiar class of claims directed to a patent-ineligible concept.'" *Miller Mendel, Inc. v. City of Anna,* 107 F.4th 1345, 1352 (Fed. Cir. 2024) (citation omitted).

In *Universal Secure Registry*, the Federal Circuit determined that the claim at issue (which recited the functional steps of "receiving" a transaction request, "mapping" a code to a customer's identity, "accessing" the customer information, "providing" identifying information to a third party but not to a merchant, and "enabling or denying" the merchant to perform the transaction without the customer's identifying information) was "directed to the abstract idea of obtaining the secure verification of a user's identity to enable a transaction." *Universal Secure Registry LLC v. Apple Inc.*, 10 F.4th 1342, 1346-47 (Fed. Cir. 2021) (collecting Federal Circuit cases holding claimed authentication technologies patent ineligible). The Court reasoned that the claims "simply recite conventional actions in a generic way (e.g., receiving a transaction request, verifying the identity of a customer and merchant, allowing a transaction) and do not purport to improve any underlying technology." *Id.* at 1349 (citation and internal quotation marks omitted).

9

Similarly, in *ShoppersChoice*, the Federal Circuit found abstract claims focused on monitoring the location of a mobile device and using authentication software to increase security. *Elec. Commun. Techs., LLC v. ShoppersChoice.com, LLC*, 958 F.3d 1178, 1181 (Fed. Cir. 2020). In that case, the claims recited code that "(1) enables a first party to input authentication information; (2) stores the authentication information; . . . (5) provides the authentication information to the first party; and (6) enables the party to select whether or not to communicate with a second party having access to particulars of the pickup or delivery." *Id.* At *Alice* Step One, the court singled out the authentication limitations and determined that these limitations were abstract because the claimed authentication information could be essentially any information recognizable to the party being contacted and noted that businesses have long been recording customer information that would qualify as authentication information as broadly defined in the specification. *Id.* at 1181-82. The Court also noted that the process of recording authentication information and including it in a subsequent customer communication is abstract because it amounts to nothing more than "gathering, storing, and transmitting information." *Id.* at 1182.

Like the claims in *ShoppersChoice*, which were directed to inputting, storing, and providing authentication information to enable some determination, claim 1 of the '823 Patent is directed to receiving, storing, and providing cookies to enable a determination. In fact, the only difference between *ShoppersChoice* and claim 1 is merely the direction in which information flows—in *ShoppersChoice*, the authentication information originated with the user/customer, was stored at the server/merchant, and was sent back to the user/customer. Here, the cookies originate with the server/merchant, are stored at the user/customer device, and are sent back to the server/merchant. Thus, the result in *ShoppersChoice* applies equally here.

In *Content Extraction*, the Federal Circuit found claims unpatentable that were "drawn to

the abstract idea of 1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in memory." *Content Extraction and Transmission LLC v. Wells Fargo Bank*, 776 F.3d 1343 at 1347-48 (Fed Cir. 2014). Claim 1 of the '823 Patent is no different. It recites "receiv[ing] a network resource request from a client device," which causes "data representative of the set of network resource requests," "a first cookie of a first type," and "a second cookie of a second type" to be stored at a client device, which is nothing more than collecting and storing information. Claim 1 next recites "determin[ing] information that was encoded and stored in the client device," performing a "first identification," a "second identification," and "a determination" based on the stored information, which is simply analyzing (and using) the collected and stored information.

Consistent with these cases, the Federal Circuit has distinguished unpatentable claims relating to data collection, storing, and analysis from those found to validly disclose specific improvements in the way computers operate. *See ShoppersChoice*, 958 F.3d at 1182 (explaining that a claim amounting to "nothing more than gathering, storing and transmitting information" is "quite unlike the 'improvements in computer capabilities'" that courts have found eligible at Step One). Similarly, the Federal Circuit has recognized that "[i]n cases involving authentication technology, patent eligibility often turns on whether the claims provide sufficient specificity to constitute an improvement to computer functionality itself." *Universal Secure Registry*, 10 F.4th at 1346 (collecting cases). The claims of the '823 Patent simply fail to claim any technological improvement in the way computers operate.

As Plaintiff seemingly recognizes in their motion, the claims merely recite using an additional cookie (*i.e.*, a second type of cookie) "to provide another layer of authentication." *See* Dkt. 183 at 10. This is not a technological improvement to the operation of a computer but rather

11

the act of data collection, storing, and analysis. Nonetheless, in an attempt to obscure the abstract nature of the claims, Plaintiff posits that this second type of cookie is a "new cookie type" that is akin to an actual technological improvement in computing. This is incorrect.

As conceded by Plaintiff's own expert, the term "cookies" simply encompasses three types of cookies that pre-existed the patent and were commonly known in the art. In addition to the "traditional" cookie, the claims contemplate "cache cookies" that are "cookies implemented with URLs (browser history)" or "cookies implemented with TIFs [Temporary Internet Files]." *See* Dkt. 110-16 at ¶ 32. In effect, the use of two types of cookies simply means choosing from these three pre-existing types of cookies which were commonly known in the art. *See, e.g.*, Dkt. No. 186-7, Dep. of Dr. Jakobsson at 172:9-20 (stating that the invention used existing technologies); 187:3-18 (acknowledging work by others prior to the '823 Patent that identified other types of cookies); Dkt. No. 186-8, Dep. of Holmes at 88:2–18 (conceding that Plaintiff did not invent cookies or cache cookies); Ex. 1, Dep. of Jansen at 9:1-3, 56:5-8, 65:15-66:1.

The Court's claim construction further reinforces this fact. During claim construction, the Court observed that rather than introducing a "new" cookie type, the reference to a first type and second type of cookie merely refers to ***how*** the cookie is accessed and is an intrinsic property of the cookie itself. *See* Dkt. 128 at 10-11. Whereas traditional cookies are "transmitted directly to a server," cache cookies "are not transmitted to a server at all" and are read indirectly or "inferentially." *Id.* In other words, the claims are not directed to a new ***way*** or procedure for accessing a cookie that represents a technological improvement over old ways of access. Indeed, in construing the cookie terms, the Court rejected Plaintiff's attempt to define these terms with respect to any "access procedure," which is not recited or required in the claims. *Id.*

Similarly, there is no dispute that the locations where these cookies are stored do not

represent an improvement in computing technology. The Court recognized during claim construction that "[t]he claims do not limit the storage areas to any specific sub-type (like 'history cache' or 'TIF area')" and that "[t]he specification treats 'browser storage area' as a known term of art." *See* Dkt. 128 at 14. These claims are therefore unlike the eligible claims in the cases cited by Plaintiff, all of which recite a new and specific way to improve the functionality of a computer. *See Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1303-05 (Fed. Cir. 2018); *Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1348 (Fed. Cir. 2018); *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1150-51 (Fed. Cir. 2019); *TecSec, Inc. v. Adobe Inc.,* 978 F.3d 1278, 1297 (Fed. Cir. 2020) (similar); *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1303-04 (Fed. Cir. 2019). Tellingly, while Plaintiff asserts that the '823 Patent "describes *how* to accomplish the desired result," it provides no explanation or supporting evidence. Mot. 11.

Finally, Plaintiff's argument that the Patent Office withdrew an eligibility rejection is irrelevant as "courts are not required to defer to Patent Office determinations as to eligibility." *Sanderling Mgmet. Ltd. v. Snap Inc.*, 65 F.4th 698, 705 (Fed. Cir. 2023).

As a result, the '823 Patent merely recites generalized steps performed on a computer using generic and well-known techniques, and does not identify any special (or novel) methods, interfaces, protocols, or data structures. The specification makes clear that it is directed to authenticating a user by combining the storage and use of a "traditional" cookie and a "cache" cookie, both of which are conventional in the field of computing. '823 Patent, 8:11-13 ("A cache cookie may also be combined with a traditional cookie, for example to provide another layer of identification (e.g., authentication)."), 14:7-10 ("[C]ache cookies can also be used to authenticate a user, for example, after a server uses traditional cookies to identify a user."). Simply combining and rearranging well-known, routine, and conventional techniques and elements to achieve an

13

expected result (*i.e.*, another layer of authentication) does not make the claim patent eligible. *Universal Secure Registry*, 10 F.4th at 1350.

### 3. *Alice* Step Two: the claims of the '823 Patent contain no inventive concept sufficient to render the abstract idea patent eligible.

At Step Two, the Court determines whether, apart from the abstract idea, the claims add anything inventive—something more than well-understood, routine, conventional activity. *BSG Tech LLC v. Buyseasons*, 899 F.3d 1281, 1290 (Fed. Cir. 2018). The '823 claims do not.

In addition to using well known cookie types, the claims only recite such generic steps as "receive a network resource request," "determine information," "perform an identification," and "perform a determination." That the claim recites numerous, lengthy individual abstract steps does not save it: "[a]t *Alice* step two, it is irrelevant whether [the claim] may have been non-routine or unconventional as a factual matter. As a matter of law, narrowing or reformulating an abstract idea does not add significantly more to it." *BSG*, 899 F.3d at 1291; *see also SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1168-69 (Fed. Cir. 2018) ("[w]hat is needed is an inventive concept in the non-abstract application realm," so "claim details" that "are themselves abstract" are insufficient).

Indeed, the '823 Patent acknowledges that it takes existing elements of the prior art (i.e., cookies) and merely arranges these existing elements in identified storage locations.'823 Patent, 1:56-2:4. However, the requirement that the cookies be stored in "different" browser storage areas does not render the claims any less abstract, particularly when the existence of cookies stored in different storage areas was a conventional aspect of "non-traditional" cookies. *See Specialized Monitoring Sols., LLC v. ADT LLC*, 367 F. Supp. 3d 575, 582 (E.D. Tex. 2019) (stating that "[a]s for the limitation that specifies a database containing a plurality of secure storage areas, it is clear that the database is simply the location where the information is stored after being analyzed" and that "[u]sing a database to store information in discrete categories is itself an abstract idea").

14

In its motion, Plaintiff argues that the claims still provide an "innovative combination" that is enough to satisfy *Alice* Step Two. *See* Dkt. 183 at 14. Specifically, Plaintiff points to four aspects: the different types of cookies, the timing of the cookie storage, the locations of storage, and the use of network resource requests. *Id.* But these "four innovative aspects" are merely conventional files, the time and location they are saved, and conventional use of cookies. As with the cases discussed above, saving conventional files in two different locations is conventional and was specifically a conventional aspect of the different cookie types claimed by the '823 Patent. Plaintiff fails to explain how these aspects provide an inventive concept that is not just the conventional action of sequentially storing two cookies in respective locations in browser storage. *See Bridge & Post, Inc. v. Verizon Communs., Inc.*, 778 F. App'x 882, 884-885, 891 (Fed. Cir. 2019) (inventions that allegedly "solved the problem of privacy-concerned users deleting cookies and tracking data" "recite no more than a computer implementation of the abstract idea of using persistent identifiers to implement targeted marketing…, lacking anything significantly more.").

The claims of the '823 Patent fail both *Alice* steps and are ineligible under § 101.

### B.    The '402 Patent is Patent Ineligible.

#### 1.    Claims 1, 10, and 19 are representative of all claims of the '402 Patent.

The '402 Patent's claims are directed to targeted advertising, an idea that has long been held to be abstract, as the Court previously recognized. *See* Dkt. No. 123 at 5. Independent Claims 1, 10, and 19 each include virtually identical elements and are representative of the claims. Whereas Claim 1 covers a method for the described targeted advertising, Claims 10 and 19 execute the exact same steps in the form of a "system" claim and a "computer program" claim, respectively. Given that Plaintiff agrees in its motion for summary judgment that Claim 1 is representative, Walmart also focuses on Claim 1 for purposes of this brief:

| 1. A method, comprising: |
| --- |
| determining a first quality level associated with a user profile, wherein the first quality level is based at least in part on an estimate of a likelihood of an event, wherein the first quality level is determined based at least in part on at least one of: (1) a first search associated with the user profile or (2) a first purchase associated with the user profile, and wherein the determining of the first quality level is based at least in part on a unique identifier and clustering; |
| determining, for a user associated with the user profile, an indication of interest in a first category, wherein the indication of interest in the first category is determined based at least in part on at least one of: (1) a second search associated with the user profile or (2) a second purchase associated with the user profile; |
| storing, in a record associated with the user, the indication of interest in the first category; |
| subsequent to determining the indication of interest in the first category, determining, for the user, that a need relative to the first category has been met based at least in part on at least one of: (1) a third search associated with the user profile or (2) a third purchase associated with the user profile; |
| based at least in part on the determination that the need relative to the first category has been met, determining an indication of interest in a second category wherein the indication of interest in the first category and the indication of interest in the second category comprise a sequence of related indications of interest; |
| in response to determining that the need relative to the first category has been met, determining a second quality level associated with the user, wherein the second quality level is determined with respect to the first category; |
| wherein at least one of the first quality level or the second quality level is based at least in part on a conversion assessment associated with the user profile, and wherein the conversion assessment is based at least in part on historical click behavior; and |
| displaying an advertisement to the user based at least in part on at least one of the first quality level or the second quality level. |

### 2. *Alice* Step One: the claims of the '402 Patent are directed towards the abstract idea of targeted advertising.

In determining patent eligibility under § 101, the Court must first determine whether the claims are directed to an abstract idea. *Alice*, 573 U.S. at 217-18. In making this assessment, the Court must "look past the claim language to the purpose of the claim [to determine] what the invention is trying to achieve." *See Morales v. Square, Inc.*, 75 F. Supp. 3d 716, 725 (W.D. Tex. 2014), *aff'd*, 621 F. App'x 660 (Fed. Cir. 2015), *cert. denied*, 136 S. Ct. 1461 (2016) (internal quotations and citations omitted).

16

Here, as shown by Claim 1, the claims are directed to targeted advertising and simply involve iteratively determining the likelihood of a customer's purchase and their interests based on their search and purchase history. Illustrating the abstract nature of the claims, Claim 1 requires making various determinations, such as a first and second "quality level" and an "estimate of a likelihood of an event," based on observed user behaviors, such as search history, purchase history, and "historical click behavior." None of these determinations require a specific inventive algorithm or even a concrete, non-subjective calculation. In fact, Plaintiff's own invalidity expert, Dr. Jansen, conceded that the use of purchase history was commonly known in the art at the time of the '402 Patent, and could not dispute that the elements of the '402 Patent can be performed in the human mind. Ex. 1 (Jansen Depo.) at 166:23-168:11, 216:3-17. As a result, the claims do not recite a specific improvement in computer capabilities, and to the extent they even include computer elements such as a processor or memory, the claimed computer is merely invoked as a tool. *See Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1303 (Fed. Cir. 2018) (noting that the inquiry "often turns on whether the claims focus on the specific asserted improvement in computer capabilities or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool").

Courts have routinely found similar advertising-focused patent claims ineligible under § 101. *See, e.g.*, *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1362 (Fed. Cir. 2020) (holding that the claims were "directed to the abstract idea of using a computer to deliver targeted advertising to a user"). In *Customedia Technologies*, the claims recited a "data delivery system for providing automatic delivery of . . . specifically identified advertising data." *Id.* at 1362-63. However, in concluding that the claims were patent ineligible, the Federal Circuit emphasized that "the claimed invention merely improves the abstract concept of delivering targeted advertising using a computer only as a tool." *Id.* at 1363 and 1365 (further noting that a "purported

17

improvement in user experience did not improve the functioning of the computer, make it operate more efficiently, or solve any technological problem").

Similarly, in *Bridge & Post*, the Federal Circuit analyzed a "targeted marketing" claim that was substantially similar to Claim 1 above and that recited, in part: (1) "retrieving a persistent device identifier," (2) "retrieving historic information for the user" that included "patterns of usage," (3) "generating a user profile based on the historic information," (4) "incorporating into the user profile one or more group characteristics," (4) "assigning a group identifier to the group based on patterns of usage," and (5) "placing directed media" that has "content customized to the user based on the user profile." *See Bridge & Post*, 778 Fed. App'x at 887. In concluding that the claim was ineligible under § 101, the Federal Circuit observed that "[t]argeted marketing is a form of 'tailoring information based on [provided] data,' which we have previously held is an abstract idea." *Id.* (citing *Intell. Ventures I LLC v. Cap. One Bank (USA)*, 792 F.3d 1363, 1369 (Fed. Cir. 2015)). The Court further noted that this is "a fundamental practice that dates back to newspaper advertisements." *Id.*

In *Broadband iTV*, the Federal Circuit similarly held that a claim that collected viewing history to recommend content—a type of targeted advertising—was "directed to the abstract idea of collecting and using viewing history data to recommend categories of video content." *See Broadband iTV, Inc. v. Amazon.com, Inc.*, 113 F.4th 1359, 1368-71 (Fed. Cir. 2024) (further stating that this was "not a sufficient technological solution to a technological problem, but rather a results-oriented abstract idea").

Likewise, in *Free Stream Media*, the patent-at-issue related to providing a mobile phone user with targeted advertising information deemed relevant to the user based on data gathered from the user's television. *See Free Stream Media Corp. v. Alphonso Inc.*, 996 F.3d 1355, 1358 (Fed.

Cir. 2021). In concluding that the claims were not patent eligible, the Federal Circuit observed that the claims were directed to nothing more than "(1) gathering information about television users' viewing habits; (2) matching the information with other content (*i.e.*, targeted advertisements) based on relevancy to the television viewer; and (3) sending that content to a second device." *Id.* at 1361-62. As stated by the Court, "the alleged technological improvement does nothing more than implement a computer to achieve the abstract idea of providing targeted advertising to the mobile device user." *Id.* at 1365 (noting that the claims merely "provid[e] a user with targeted content using generic processes and machinery"); *see also, e.g.*, *Chewy, Inc. v. Int'l Bus. Machines Corp.*, 94 F.4th 1354, 1365 (Fed. Cir. 2024) (holding ineligible claims for providing "targeted advertising" based on user activity); *Intell. Ventures I*, 792 F.3d at 1369-70 (holding ineligible claims for "tailoring information based on [provided] data").

Like these cases, the claims of the '402 Patent merely claim an abstract mental process that would have routinely been performed by any sales or customer service professional. For example, a sales personnel could monitor their customers as they searched through the store, talk with customers about their product interests, and even observe what a customer had physically placed in their shopping cart, all with the goal of better suggesting (*i.e.*, advertising) certain additional products to that customer. Or to state this another way, any Bass Pro Shop employee worth their salt would realize a customer that recently purchased a fishing boat and a fishing rod might also have a heightened interest in bait, lures and other fishing gear.

In fact, the '402 Patent itself confirms that the claims are merely directed to this common process. In the preferred embodiment, the '402 Patent describes a customer interested in buying a camera, and as the customer begins looking for one, that search is tracked. '402 Patent at 5:15-30. Similarly, the customer's subsequent searches for camera *accessories* are also tracked, indicating

that the user had bought a camera. *Id.* at 31-40. At that point, targeted advertisements can then be shown to the customer based on the purchase. *Id.* 6:1-17. Importantly, none of these steps require a computer or otherwise improve the functioning of computer technology (or any other technology). Instead, like the cases described above, to the extent the claims of the '402 Patent even recite computer elements, the claims do not go to solving any "technological problem" and merely invoke a computer as a tool.

In its motion, Plaintiff argues that "the Federal Circuit has held patent eligible claims for an improved technological process using specific rules and algorithms." *See* Dkt, 183 at 17. However, the cited *CardioNet* case is inapposite. *See CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358 (Fed. Cir. 2020). In that case, the claims covered an "improved cardiac monitoring device" that could identify "atrial fibrillation and atrial flutter in light of the variability in the beat-to-beat timing caused by ventricular beats." *Id.* at 1368. As a result, the Federal Circuit held that the claims fundamentally went to a technological improvement—*i.e.*, a better heart monitor—rather than to an abstract idea that merely used a computer as a tool. *Id.* Here, Plaintiff cannot realistically claim that the '402 Patent is directed toward a technological improvement or somehow created an improved targeted advertising computer.

Similarly, unlike the claims of the '402 Patent, the Federal Circuit noted that the claims "focus on a ***specific means or method*** that improved cardiac monitoring technology." *Id.* (noting that the device could detect beat-to-beat timing and premature ventricular beats to "more accurately detect the occurrence of atrial fibrillation and atrial flutter—***as distinct from V-TACH and other arrhythmias***") (emphasis added). The same cannot be said for the '402 Patent claims, which as shown in representative Claim 1, do not require or improve any specific computer technology. Similarly, whereas the claims in *CardioNet* implemented a specific method that was

targeted to the specific heart maladies of atrial fibrillation and atrial flutter, the '402 Patent has no such specific focus and seeks to monopolize the general use of search and purchase history for targeted advertising.

In fact, Plaintiff's incorrect belief that "the claims identify *how* this functionality is achieved through limitations such as, for example, determination of quality levels, clustering, and conversion assessment" only highlights why the claims are patent ineligible. *See* Dkt. 183 at 18 (emphasis in original). For example, for the claimed "quality levels," the claims merely state that they are "based on an estimate of a likelihood of an event" without providing any specific method or means for how that abstract "estimate of a likelihood" is performed or calculated. Similarly, the claims say nothing about how any "clustering" is performed. Instead, representative Claim 1 merely recites the word "clustering" without requiring any specific clustering technique or algorithm. In effect, the claims would cover anything that performs "grouping based on analysis of data indicative of user behavior" to any degree of presumed success. *See* Dkt. 128 at 39. The claims also recite no specific algorithm for calculating a "conversion assessment." Thus, as construed by the Court, this term would cover *any* general "indication of how likely it is that a given individual will engage in a desired behavior if presented with an advertisement." *Id.* at 41. For each of these abstract concepts, the '402 Patent does not recite "how" the functionality is achieved or put any objective guard rails on the concepts that would limit the claims to any specific means or method. As a result, the claims fundamentally are directed towards an abstract idea.

As mentioned above in the introduction, this Court previously denied Walmart's motion to dismiss based on Plaintiff's assertion that the term "clustering" incorporated "a 'specific, detailed algorithm' that enables 'machine learning technology' to deliver targeted advertisements." *See* Dkt. 123 at 5. However, after the benefit of claim construction briefing, accompanying expert

declarations, and discovery, the Court *rejected* Plaintiff's argument on the merits. As observed by the Court, the claim language "does not specify what is being clustered, what algorithm or mechanism performs the clustering, or what purpose the clustering serves beyond its role as an input to quality level determination." *See* Dkt. 128 at 36. Similarly, the Court observed that "no claim language requires that clustering employ a processor, a statistical algorithm, or a machine learning technique." *Id.* at 37. The same is equally true for the other claim elements that Plaintiff focuses on, such as the claimed "quality levels" or "conversion assessment."

Moreover, after briefing concluded on the motion to dismiss, the Federal Circuit in *Recentive Analytics* held as a matter of law that introducing machine learning to a field does not render a patent's claims eligible. *See Recentive Analytics, Inc. v. Fox Corp.*, 134 F.4th 1205, 1214 (Fed. Cir. 2025). The court reiterated that "patents may be directed to abstract ideas where they disclose the use of an 'already available [technology], with [its] already available basic functions, to use as [a] tool[] in executing the claimed process.'" *Id.* at 1214 (citing *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1169-70 (Fed. Cir. 2018). Applying this to the patents-at-issue, the Court determined that the claims were "not rendered patent eligible by the fact that (using existing machine learning technology) they perform a task previously undertaken by humans with greater speed and efficiency than could previously be achieved." *Id.* at 1214. The Federal Circuit recently reiterated this reasoning, explaining that even claiming s that machine "be trained on a specific subset of data is 'incident to the very nature of machine learning,' and thus is not a 'technological improvement' rendering the claims eligible under § 101." *Dental Monitoring SAS v. Align Tech., Inc.*, No. 2024-2270, 2026 U.S. App. LEXIS 19691, at *11 (Fed. Cir. July 7, 2026) (quoting *Recentive Analytics*, 134 F.4th at 1212).

For the above reasons, the claims of the '402 Patent are directed towards an abstract idea

under *Alice* Step One.

### 3. *Alice* Step Two: the claims of the '402 Patent contain no inventive concept sufficient to render the abstract idea patent-eligible.

Since the claims of the '402 Patent are directed to an abstract idea, the Court must next determine whether the patent contains an "inventive concept sufficient to transform the claimed abstract idea into a patent eligible application." *Alice*, 573 U.S. at 221 (internal quotations omitted). To pass this step, the claims "must do more than simply recite 'well-understood, routine, conventional activity.'" *Universal Secure Registry LLC v. Apple Inc.*, 10 F.4th 1342, 1346 (Fed. Cir. 2021). Here, the asserted claims are broadly generic and do not contain meaningful limitations that would restrict them to a non-routine, specific application of the abstract idea.

The claims of the '402 Patent only recite functional determination steps at a high level of generality; specifically, "determining a first quality level associated with a user profile," "determining for a user associated with the user profile, an indication of interest in a first category," "storing, in a record associated with the user, the indication of interest in the first category," "determining for the user, that a need relative to the first category has been met," "determining an indication of interest in a second category," "determining a second quality level associated with the user," and "displaying an advertisement." These abstract functional descriptions are devoid of any technical explanation as to how to implement the purported invention in any inventive way. *See In re TLI Commons. LLC v. AV Auto., LLC (In re TLI Commons. LLC Patent Litig.)*, 823 F.3d 607, 615 (Fed. Cir. 2016) (claims failed *Alice* Step Two where specification limited its discussion of "additional functionality" of conventional components "to abstract functional descriptions devoid of technical explanation as to how to implement the invention").

To accomplish these steps, the claims recite only conventional and well-understood elements and tools, such that they cannot meet the threshold to qualify as an inventive concept

23

regardless of whether they are considered either individually or as an ordered combination. Indeed, they are indistinguishable from the many other targeted advertising claims that the Federal Circuit has held add nothing inventive at Alice Step Two—and thus ineligible—as a matter of law, such as in *Customedia*, *Bridge & Post*, *and Broadband iTV*. *See, e.g.*, *Customedia*, 951 F.3d at 1366 ("[T]he invocation of already-available computers that are not themselves plausibly asserted to be an advance . . . amounts to a recitation of what is well-understood, routine, and conventional.) (quotation omitted); *Bridge & Post*, 778 F. App'x at 892-93 (specification confirmed that alleged inventive concept was known and conventional); *Broadband iTV*, 113 F.4th at 1370 (automatically generating displays based on data content providers upload to a database and a content management system do not constitute an inventive concept).

The only hardware elements recited in the claims are "a processor" and "a memory," and the specification makes clear that both are generic components. '402 Patent, 1:62-2:2. The specification also makes clear that the other components used in carrying out the claimed method were similarly conventional. For example, the advertisement platform server may "comprise[] standard commercially available server hardware" and run "typical server-class operating systems." *Id.*, 2:53-59; *see also id.*, 2:59-67. As another example, the claimed "unique identifier" is exemplified by the age-old concept of "cookies … stored on [a] notebook." *Id.*, 3:30-35, 13:35-37; *see also id.*, 15:58-67 (stating that the unique identifier may be an "HMTL cookie, a user agent, a cash [sic] cookie, and an identifier similar to a UDID [unique device identifier]").

Similarly, there is nothing inventive in any of the "determining" steps or associated factors, such as determining a "quality level" associated with "a user profile," using a "unique identifier" and "clustering" to identify a user, forming an "estimate of a likelihood of an event," identifying a user's "search or purchase history," determining "an indication of interest" that a user may have

for a product category, determining that a user's need "has been met," "storing" such information in a record, or making a "conversion assessment" based on any of these routine considerations. None of these activities are "unconventional" or inventive in any way.

For *Alice* Step Two, Plaintiff argues that "[i]mportantly, the claimed invention provides two routes by which the invention can provide an advertisement to a user" because the system can display the advertisement to the user based on either the "first" or "second" quality level. *See* Dkt. 183 at 20. As stated by Plaintiff, "[i]n this manner, the system can use different valuations (quality levels) of the user, depending on the type of ad to be displayed" such that "a banner ad could be displayed based on the first quality level and an ad in a carousel could be displayed based on the second quality level." *Id.*

However, there is nothing inventive about determining a user's "quality level" based on commonly-used factors, and the mere fact that the claims recite making two such conventional determinations—*i.e.*, determining a first quality level and a second quality level—does not lead to a different result. For example, looking at the claim language that introduces the "second quality level," the claims merely recite that it is "associated with a user" and "determined with respect to the first category" of products. '402 Patent, cls. 1, 10, 19. The claims do not require the conventional factors discussed above to be used to determine this "second" quality level, and the claims specifically recite that only "one of" the first and second quality levels even need to be based on the "conversion assessment." *Id.* As a result, Plaintiff's reliance on this "second" quality level fails to show any inventive concept.

Moreover, contrary to Plaintiff's characterization of the claims, the actual claim language does not even require both quality levels to be used in selecting any advertisement(s). Instead, the claims simply recite "displaying an advertisement to the user based at least in part ***on at least one***

*of the first quality level or the second quality level*." '402 Patent, cls. 1, 10, 19 (emphasis added). In other words, the allegedly inventive "second" quality level does not even have to be used, and the language is satisfied if the displayed advertisement is based simply on the first quality level.

Lastly, for the reasons discussed above, Plaintiff is incorrect that the '402 Patent claims are "rooted in computer technology to overcome a problem specifically arising in the realm of computer networks." *See* Dkt. 183 at 20 (quoting *Smartflash LLC v. Apple Inc.*, No. 6:13-cv-447, 2015 WL 661174, at *8-9 (E.D. Tex. Feb. 2015)). Not only is the claimed method of targeted advertisement independent of any technological implementation, but Plaintiff's own expert could not identify even one element that could not be performed in the human mind. Ex. 1 (Jansen Depo) at 216:6-17. Moreover, Plaintiff fails to mention that the Federal Circuit *reversed* this Court's decision in *Smartflash* and held the access control claims in that case *ineligible* as a matter of law. *Smartflash LLC v. Apple Inc.*, 680 F. App'x 977, 984 (Fed. Cir. 2017). So *Smartflash* strongly supports Walmart, not Plaintiff. Even though the *Smartflash* patents purported to improve access control technology, the Federal Circuit recognized that the claims recited "precisely the type of Internet activity"—including "allowing access to multimedia content" based on various "data" and "access rules"—that the court had previously found non-inventive at Step Two. *Id.* Even more so here, Plaintiff's claims add nothing inventive—no technological advance—at *Alice* Step Two and instead   simply computerize commonplace business practices for targeted ads. *Id.*

Plaintiff's other cited cases also do not support its position. For example, in *DDR Holdings*, the Federal Circuit noted that the patent-at-issue addressed "the problem of retaining website visitors that, if adhering to the routine, conventional functioning of Internet hyperlink protocol, would be instantly transported away from a host's website after 'clicking' on an advertisement and activating a hyperlink." *See DDR Holdings LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed.

26

Cir. 2014). As a result, the claims in *DDR Holdings* were directed to an actual technological improvement that is "necessarily rooted in computer technology" and that overcomes "a problem specifically arising in the realm of computer networks." *Id.* In contrast, here, the claims do not address a technology-specific problem or provide any particular technological improvement and instead merely implement longstanding business concepts with generic computer technology, as in the cases discussed. *See, e.g.*, *Free Stream Media*, 1365-66 (distinguishing *DDR Holdings*); *Smartflash*, 680 F. App'x at 983-84 (same).

Similarly, in *Weisner*, which involved a motion to dismiss rather than an adjudication on the merits, the Federal Circuit simply held that certain claims "should not have been held ineligible under step two at this stage." *See Weisner v. Google LLC*, 51 F.4th 1073, 1085 (Fed. Cir. 2022). The court held dismissal was not warranted as to those claims because they "plausibly capture[d] an inventive concept in the form of a specific technique for using physical location history data to improve computerized search results." *Id.* (noting that this is "more than just the concept of improving a web search using location history—it is a specific implementation of that concept"). Even looking past the different case postures, the '402 Patent claims are not restricted to improving any such "computerized" results and are more akin to the claims that the Federal Circuit held *were* ineligible as a matter of law in *Weisner* because they merely implemented an abstract idea ("improving a web search using location history") using generic computer technology. *Id.*

Plaintiff is also incorrect that the bare concepts of "clustering" or making a "conversion assessment" are "unconventional and non-routine computer-based approaches" to targeted advertising. *See* Dkt. 183 at 20. In stark contrast, the '402 Patent itself states that "clustering" can be any "variety of clustering techniques." *Id.*, 12:63-65, 12:65-13:9.3. And the Court previously held that "[n]othing in the specification states that clustering must be 'processor-executed,' must

27

apply a 'statistical or machine learning algorithm,' or must group users 'into one or more personas.'" *See* Dkt. 128 at 38. In fact, as the Court observed, the claim language "does not specify what is being clustered, what algorithm or mechanism performs the clustering, or what purpose the clustering serves beyond its role as an input to quality level determination." *Id.* at 36. Plaintiff cannot realistically claim that its use of clustering is "unconventional" or "non-routine" when the '402 Patent makes only vague reference to the general concept and does not require any specific implementation or approach to clustering.

Likewise, the claimed "conversion assessment" is only a subjective sales process that is routinely used in the field of sales and advertising. As reflected in the Court's claim construction, conversion assessment is not limited to the field of computing technology and is merely "[a]n indication of how likely it is that a given individual will engage in a desired behavior if presented with an advertisement." *See* Dkt. 128 at 41. It is also noteworthy that the required conversion assessment does not even attempt to limit its scope to a particular behavior or desired result. Instead, it is an indication of how likely it is that a given individual will engage in any desired behavior, without meaningful limitation or boundary. As a result, Plaintiff cannot claim that the broad use of a conversion assessment is somehow "unconventional" or "non-routine."

The '402 Patent also does not claim to have combined its known elements in a novel way. Instead, the claims only take the age-old concept of using user information to deliver targeted advertisements and applies it with an off-the-shelf computer. *See Bridge & Post*, 778 Fed. App'x at 891 ("Even as an ordered combination, the limitations of claim 1 recite no more than a computer implementation of the abstract idea of using persistent identifiers to implement targeted marketing, lacking anything 'significantly more.'"). The claimed sequence is performed in the logical order that flows from the abstract idea (iteratively observing the actions of a potential customer, then

28

using those observations to provide a targeted advertisement). This cannot "transform the nature of the claim into a patent-eligible application" "as an ordered combination." *See Alice*, 573 U.S. at 217-18; *Intell. Ventures I*, 792 F.3d at 1371 ("Requiring the use of a 'software' 'brain' 'tasked with tailoring information and providing it to the user' provides no additional limitation beyond applying an abstract idea, restricted to the Internet, on a generic computer.").

The claims of the '402 Patent fail both *Alice* steps and are patent ineligible under § 101.

## VII.    CONCLUSION

Both the Asserted Patents are patent ineligible under *Alice* Step One and *Alice* Step Two. None of the claims recite a specific technological improvement and it is not genuinely disputable that the claims merely recite conventional concepts and activity. Previously, this Court denied Walmart's motion to dismiss based on Plaintiff's representations that the Asserted Patents were inventive: that the '402 Patent was directed to a specific method of "clustering" that employed "machine learning" algorithms to deliver targeted advertising and that the '823 Patent baked a "new type" of cookie that was itself a technological improvement. In view of the full record, including the Court's claim constructions, neither representation was correct. Accordingly, Walmart respectfully requests that the Court deny Plaintiff's motion and grant summary judgment that the Asserted Patents are ineligible under 35 U.S.C. § 101.

██████████████████████████████████████

DATED: July 14, 2026

Respectfully submitted,

By:     */s/ William B. Collier, Jr.*
Michael F. Heim
Texas State Bar No. 09380923
mheim@hpcllp.com
Eric J. Enger
Texas State Bar No. 24045833
eenger@hpcllp.com
R. Allan Bullwinkel
Texas Bar No. 24064327
abullwinkel@hpcllp.com
Blaine A. Larson
Texas State Bar No. 24083360
blarson@hpcllp.com
William B. Collier, Jr.
State Bar No. 24097519
wcollier@hpcllp.com
HEIM, PAYNE & CHORUSH, LLP
609 Main Street, Suite 3200
Houston, Texas 77002
Telephone: (713) 221-2000
Facsimile: (713) 221-2021

Amir H. Alavi
Texas Bar No. 00793239
aalavi@aatriallaw.com
Demetrios Anaipakos
Texas Bar No. 00793258
danaipakos@aatriallaw.com
Michael McBride
Texas Bar No. 24065700
mmcbride@aatriallaw.com
ALAVI & ANAIPAKOS PLLC
609 Main Street, Suite 3200
Houston, Texas 77002
Telephone: (713) 751-2362
Facsimile: (713) 751-2341

Nathaniel St. Clair, II
Texas Bar No. 24071564
nstclair@jw.com
Abigail A. Lahvis
Texas Bar No. 24138136
alahvis@jw.com
Blake Thomas Dietrich

30

Texas Bar No. 24087420
bdietrich@jw.com
William Allen Moon
Texas Bar No. 24065782
wamoon@jw.com
JACKSON WALKER LLP - DALLAS
2323 Ross Ave., Suite 600
Dallas, Texas 75201
Telephone: (214) 953-6000
Facsimile: (214) 953-5822

Leisa Talbert Peschel
Texas Bar No. 24060414
lpeschel@jw.com
JACKSON WALKER LLP - HOUSTON
1401 McKinney, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4278
Facsimile: (713) 308-4178

Eric Hugh Findlay
Texas Bar No. 00789886
efindlay@findlaycraft.com
FINDLAY CRAFT, P.C.
7270 Crosswater Ave., Suite B
Tyler, Texas 75703
Telephone: (903) 534-1100
Facsimile: (903) 534-1137

***Counsel for Defendants Walmart Inc. and
Wal-Mart Stores Texas, LLC***

31

███████████████████████████████████████

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel of record by electronic mail on July 14, 2026.

/s/ William B. Collier, Jr.
William B. Collier, Jr.

*Via E-mail*

Robert F. Kramer
CA Bar No. 181706
rkramer@kramerllp.com
Robert C. Mattson *(pro hac vice)*
VA Bar No. 43568
rmattson@kramerllp.com
KRAMER LLP
1133 Broadway, Suite 1510
New York, New York 10010
Telephone: (415) 419-1895

Nicole E. Glauser
Texas Bar No. 24050694
nglauser@kramerllp.com
KRAMER LLP
500 W 2nd Street, Suite 1900
Austin, Texas 78701
Telephone: (512) 791-9250

Zachariah A. Higgins *(pro hac vice)*
CA Bar No. 190225
zhiggins@kramerllp.com
Jeremiah A. Armstrong *(pro hac vice)*
CA Bar No. 253705
jarmstrong@kramerllp.com
Ryan Dooley *(pro hac vice)*
CA Bar No. 321645
rdooley@kramerllp.com
Robert Xie
CA Bar No. 329126
rxie@kramerllp.com
Rachael Catherine Chan *(pro hac vice)*
CA Bar No. 265002
rchan@kramerllp.com
KRAMER LLP
303 Twin Dolphin Dr., Suite 600
Redwood City, California 94065
Telephone: (212) 812-8937

Andrea L. Fair
Texas Bar No. 24078488
andrea@millerfairhenry.com
Garrett C. Parish
Texas Bar No. 24125824
garrett@millerfairhenry.com
MILLER FAIR HENRY PLLC
1507 Bill Owens Pkwy
Longview, Texas 75604
Telephone: (903) 757-6400
Facsimile: (903) 757-2323

*Counsel for Plaintiff RavenWhite Licensing LLC*

32