████████████████████████

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| RAVENWHITE LICENSING LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE HOME DEPOT, INC., *et al.*,<br><br>Defendants. | Case No. 2:24-cv-00688-JRG-RSP<br>(Lead Case) |
| RAVENWHITE LICENSING LLC,<br><br>Plaintiff,<br><br>v.<br><br>WALMART INC., *et al.*,<br><br>Defendants. | Case No. 2:24-cv-00689-JRG-RSP<br>(Member Case)<br><br>████████████████ |

**PLAINTIFF'S OPPOSITION TO WALMART'S MOTION**
**TO EXCLUDE OR STRIKE CERTAIN OF MR. WEINSTEIN'S OPINIONS**
**UNDER *DAUBERT* OR RULE 702**

████████████████████████████

## TABLE OF CONTENTS

I.  Mr. Weinstein's Hypothetical Negotiation Analysis Is Proper ............................................... 1

    A.  Any inaccuracies in Mr. Weinstein's report are obvious and correctable, and do not affect the substance of his opinions. .................................... 1

    B.  Dr. Jakobsson would have negotiated the same agreement on behalf of RavenWhite, RavenWhite Security, Inc., and SecurityInnovation LLC............................................................................................................................ 2

    C.  Mr. Weinstein's opinions are reliable and admissible................................................ 4

II.  Mr. Weinstein's Use of Walmart's ROIC Is Proper.................................................................. 5

III.  Mr. Weinstein Applies An Apportionment Factor for the '402 Patent that Is Tied to the Facts of the Case ....................................................................................... 8

IV.  Mr. Weinstein Does Not Improperly Include Revenue From Non-Infringing Activities........................................................................................................................... 10

    A.  Mr. Weinstein does not improperly include revenue from the mobile app for the '823 Patent. ............................................................................................ 10

    B.  Mr. Weinstein properly includes ████████ revenue for the '402 Patent. .................................................................................................................... 11

V.  Mr. Weinstein's Calculations Using GMV Lift Are Supported and Tied to the Facts of the Case.............................................................................................................. 12

    A.  Mr. Weinstein properly supports his use of ████ GMV lift as a proxy for the benefits of the '823 patent functionality............................................ 12

    B.  Mr. Weinstein's inclusion of GMV lift using ROAS of ██ for the '402 Patent is conservative, well supported, and tied to the facts of this case by Walmart's own metrics................................................................................ 13

VI.  Conclusion................................................................................................................................ 15

████████████████████████████████

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anonymous Media Res. Holdings, LLC v. Samsung Elecs. Am. Inc.*,
No. 2:23-cv-00439 (E.D. Tex. Sept. 17, 2025) .......................................................................... 6-7

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014) ...................................................................................................8

*Arctic Cat Inc. v. Bombardier Recreational Products Inc.*,
876 F.3d 1350 (Fed. Cir. 2017) .................................................................................................12

*Cassidian Communications, Inc. v. Microdata GIS, Inc.*,
No. 2:12-cv-00162-JRG, 2013 WL 12148459 (E.D. Tex. Dec. 10, 2013) .................................2

*Daedalus Blue LLC v. SZ DJI Tech. Co., Ltd.*,
No. W-20-CV-00073-ADA, 2022 WL 831619 (W.D. Tex. Feb. 24, 2022)
(Albright, J.) ..............................................................................................................................4

*Daingean Techs. Ltd. v. T-Mobile USA, Inc.*,
No. 2:23-cv-00347-JRG-RSP, 2025 WL 1811921 (E.D. Tex. June 30, 2025) ...................9, 10

*Fundamental Innovation Sys. Int'l LLC v. Anker Innovations Ltd.*,
No. 21:339-RGA (D. Del. Feb. 11, 2025) ..................................................................................7

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
318 F. Supp. 1116 (S.D.N.Y. 1970).......................................................................................6, 8

*i4i Ltd. Partnership v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010)...................................................................................................12

*Image Processing Techs., LLC v. Samsung Elecs. Co.*,
No. 22-CV-00050-JRG, 2020 WL 2499736 (E.D. Tex. May 14, 2020) ............................12, 13

*Micro Chem., Inc. v. Lextron, Inc.*,
317 F.3d 1387 (Fed. Cir. 2003)..................................................................................................10

*MicroSource, LLC v. Eco World Group, LLC*,
587 F. Supp. 3d 770 (N.D. Iowa 2022).......................................................................................4

*Opticurrent, LLC v. Power Integrations, Inc.*,
No. 17-cv-03, 2018 WL 6727826 (N.D. Cal. Dec. 21, 2018)..............................................4, 5

*Oracle America, Inc. v. Google Inc.*,
798 F. Supp. 2d 111 (N.D. Cal. 2011) .......................................................................................4

*Salazar v. HTC Corp.*,
   No. 2:16-CV-01096-JRG-RSP, 2018 WL 1783157 (E.D. Tex. Apr. 13, 2018)......................10

*Streamscale, Inc. v. Cloudera, Inc.*,
   No. 6:21-cv-00198-ADA (W.D. Tex. Sept. 21, 2023) ...............................................................7

*Summit 6, LLC v. Samsung Elecs. Co., Ltd.*,
   802 F.3d 1283 (Fed. Cir. 2015)................................................................................................12

*Wapp Tech Ltd. P'ship v. Seattle Spinco, Inc.*,
   No. 4:18-cv-469 (Dkts. 437, 452) (E.D. Tex. Mar. 5, 2021) ....................................................7

*Wirtgen America, Inc. v. Caterpillar, Inc.*,
   No. 1:17-cv-00770-JDW, 2024 WL 531234 (D. Del. Feb. 9, 2024) .........................................5

*WSOU Investments, LLC v. Salesforce.com, Inc.*,
   No. 6:20-cv-01165-ADA (W.D. Tex. April 25, 2025) ..............................................................4

**Rules**

Fed. R. Evid. 702 ......................................................................................................................1, 15

Fed. R. Civ. P. 26(e)(1).....................................................................................................................2

████████████████████████████

**TABLE OF EXHIBITS**

| Ex. | Description |
|---|---|
| A | Deposition Transcript of David A. Haas, dated June 30, 2026 (excerpts) ("Haas Dep.") |
| B | Deposition Transcript of Bhanu Bhardwaj, dated April 14, 2026 (excerpts) ("Bhardwaj Dep.") |
| C | Rebuttal Expert Report of David A. Haas, dated June 18, 2025, Exhibit 22 (excerpts) ("Haas Report") |
| D | Expert Report of Dr. Hugh Smith Relating to Infringement by Walmart of U.S. Patent Nos. 10,594,823 and 11,562,402, dated May 21, 2026 (excerpts) ("Smith Report") |
| E | Declaration of Roy Weinstein in Support of Plaintiff's Opposition to Walmart's Motion to Exclude or Strike Certain of Mr. Weinstein's Opinions Under Daubert and Rule 702 ("Weinstein Decl.") |
| F | Expert Report of Roy Weinstein (excerpted) ("Weinstein Report") |
| G | Declaration of Bjorn Markus Jakobsson in Support of Plaintiff's Opposition to Walmart's Motion to Strike Mr. Weinstein's Opinions ("Jakobsson Decl.") |
| H | RW00007522-7539 - Limited Liability Company Operating Agreement of RavenWhite Licensing LLC (excerpts) ("RavenWhite Agreement") |
| I | RW00008178-8199 - Management Agreement between RavenWhite Security and Jakobsson (excerpts) ("RavenWhite Security Agreement") |
| J | RW00008260-8273 – Operating Agreement of SecurityInnovation, LLC (excerpts) ("SecurityInnovation Agreement") |

v

Plaintiff RavenWhite Licensing LLC ("RavenWhite") submits this opposition to Defendants Walmart Inc. and Walmart Stores Texas, LLC's (collectively, "Walmart") motion to exclude or strike certain of Mr. Weinstein's opinions Under *Daubert* and Rule 702 as follows:

## I.    MR. WEINSTEIN'S HYPOTHETICAL NEGOTIATION ANALYSIS IS PROPER

### A.    Any inaccuracies in Mr. Weinstein's report are obvious and correctable, and do not affect the substance of his opinions.

Mr. Weinstein understands that a hypothetical negotiation is between the patentee and accused infringer at the time just before infringement begins. Ex. F (Weinstein Report) ¶ 21. Two paragraphs of his report could have been more accurate when identifying the relevant patentee for each of the asserted patents. Ex. F ¶¶ 32, 33.

For the '823 patent, the Report states that "RavenWhite and Walmart would participate in a hypothetical negotiation for a license to the '823 patent in March 2020, when infringement began." Ex. F ¶ 32. While footnote 51 indicates that Mr. Weinstein "refer[red] to RavenWhite as party to the hypothetical negotiation involving the '823 patent," to be precise, paragraph 32 should have stated that "***RavenWhite Security, Inc.*** and Walmart would participate" in the hypothetical negotiation. Similarly, for the '402 patent, the Report states that "RavenWhite and Walmart would participate in a hypothetical negotiation for a license to the '402 patent in March 2020, when infringement began." Ex. F. ¶ 33 and n.53. This paragraph should have more precisely stated that "***SecurityInnovation LLC*** and Walmart would participate" in the hypothetical negotiation.

RavenWhite intends to file a motion for leave to serve a supplemental report to revise these portions of Mr. Weinstein's report. The revisions do not change the substance of Mr. Weinstein's opinions because the negotiations would have led to the same results, regardless of which of the Dr. Jakobsson-managed companies was involved. Ex. G (Jakobsson Decl.) ¶8; Ex. E (Weinstein Decl.) ¶ 7.

Seeking the Court's leave to serve a supplemental report is the appropriate way to correct

inaccuracies or factual mistakes in an expert report. *See* F.R.C.P. 26(e)(1); *Cassidian Communications, Inc. v. Microdata GIS, Inc.*, No. 2:12-cv-00162-JRG, 2013 WL 12148459 (E.D. Tex. Dec. 10, 2013). In *Cassidian*, the defendant's damages expert used an incorrect hypothetical negotiation date. 2013 WL 12148459 at *1. While the court initially excluded the expert's testimony, it later reversed course and allowed defendant to serve a corrected report. *Id*. at *2. Key to the Court's decision was the fact that defendant's expert "largely incorporated his original damage assessment in the supplemental report," leading to a lack of substantial prejudice. *Id*.

The same is true here because, as explained in the next section, the outcome of the hypothetical negotiation would have been the same regardless of which of the Dr. Jakobsson-managed entities owned the patents at the time infringement began.

**B.     Dr. Jakobsson would have negotiated the same agreement on behalf of RavenWhite, RavenWhite Security, Inc., and SecurityInnovation LLC.**

The inventor of the asserted patents, Dr. Jakobsson, will be a fact witness at trial, if needed, to establish the predicate facts to frame the hypothetical negotiation, consistent with his declaration submitted herewith. Ex. G (Jakobsson Decl.). Dr. Jakobsson is one of two managers of RavenWhite. Ex. G ¶ 1; Ex. H (RavenWhite Agreement) § 1.1, Definition of Managers. The managers have the exclusive power and authority to enter into contracts on behalf of the company. Ex. H § 3.1(a). As manager, Dr. Jakobsson is responsible for negotiating license agreements for the asserted patents on behalf of RavenWhite. Ex. G ¶ 8.

At the time of the hypothetical negotiation, RavenWhite Security owned the '823 patent, and Dr. Jakobsson was (and still is) its Chief Technology Officer and Co-Founder. Ex. I (RavenWhite Security Agreement) § 3; Ex. G ¶ 3. In that capacity, Dr. Jakobsson would have been responsible for negotiating any license between RavenWhite Security and Walmart. Ex. G ¶ 4.

At the time of the hypothetical negotiation, the '402 patent was owned by SecurityInnovation LLC. Dr. Jakobsson was one of two Members, and the sole Manager, of the company. Ex. G ¶ 7;

2

Ex. J (SecurityInnovation Agreement) Preamble, § 4.1. As sole Manager, Dr. Jakobsson had

including

entering into contracts. Ex. J, § 4.1. In that capacity, Dr. Jakobsson would have been responsible for negotiating the hypothetical license between SecurityInnovation and Walmart. Ex. G (Jakobsson Decl.) ¶ 7.

Thus, Dr. Jakobsson would have conducted any patent licensing negotiations on behalf of RavenWhite Security, SecurityInnovation, or plaintiff RavenWhite. Ex. G ¶ 8. Relative to anyone else at these companies, Dr. Jakobsson has the best understanding of the technical merits of the patents and is in the best position to conduct those negotiations. Ex. G ¶¶ 4, 7. And, because all three of these entities are similarly situated, in that their primary assets are the patents invented by Dr. Jakobsson and they have no products or competitors, the licensing outcome for any particular patent would not have differed based on whether the licensor at the time was RavenWhite Security, SecurityInnovation, or RavenWhite. Ex. G ¶ 8.

While Walmart argues that plaintiff RavenWhite did not exist at the time of the hypothetical negotiations for the asserted patents, and that it is 100% owned by Mark Holmes, these facts are irrelevant given that RavenWhite Security and SecurityInnovation were the patentees at the time of the hypothetical negotiations. What *is* relevant is that Mr. Weinstein considered that Dr. Jakobsson would have negotiated a hypothetical license on behalf of any of these entities, including RavenWhite if it had been the patentee at the time. Ex. G (Jakobsson Decl.) ¶ 8; Ex. E (Weinstein Decl.) ¶ 8. And, the resulting hypothetical license would have been no different if Dr. Jakobsson had been negotiating on behalf of RavenWhite versus RavenWhite Security versus SecurityInnovation. Ex. G ¶ 8; Ex. E ¶¶ 4, 6. Mr. Weinstein's simplified reference to the hypothetical licensor as RavenWhite—instead of specifying RavenWhite Security or SecurityInnovation—therefore has no bearing on his methodology or conclusions.

### C.    Mr. Weinstein's opinions are reliable and admissible.

None of Walmart's cases compels excluding Mr. Weinstein's opinions. Nor are they precedential. In *Daedalus*, an expert used the wrong party to a hypothetical negotiation, then "reconsidered the entirety of his opinions" in a supplemental report using the correct party. *Daedalus Blue LLC v. SZ DJI Tech. Co., Ltd.*, No. W-20-CV-00073-ADA, 2022 WL 831619, at *1 (W.D. Tex. Feb. 24, 2022) (Albright, J.).[1] The court found that the initial report was deficient, and the supplemental report was an improper attempt to remedy the deficiency. *Id*. at *2. That is not the case here, where none of Mr. Weinstein's opinions changes based on which Jakobsson-managed entity would have negotiated the hypothetical license. And, Mr. Weinstein's supplemental report is squarely in line with the rationale in *Daedalus*, that supplemental reports should be used to correct inaccuracies. *Daedalus,* 2022 WL 831619, at *2.

In *Oracle* and *MicroSource*, the experts used the wrong date and the wrong patentee for the hypothetical negotiation. *Oracle America, Inc. v. Google Inc.*, 798 F. Supp. 2d 111, 1117 (N.D. Cal. 2011); *MicroSource, LLC v. Eco World Group, LLC*, 587 F. Supp. 3d 770, 828 (N.D. Iowa 2022). In both cases, the analysis and opinions would have fundamentally changed had the experts used the correct parties and dates. That is not true here.

In *Opticurrent*, the expert used the plaintiff instead of the individual inventor as the patentee at a hypothetical negotiation. *Opticurrent, LLC v. Power Integrations, Inc.*, No. 17-cv-03, 2018 WL 6727826, at *9 (N.D. Cal. Dec. 21, 2018). The plaintiff argued that there would have been no difference in the outcome even though one party would have been an entity and the other an individual. *Id*. While the court ultimately excluded the expert's opinion, it also rejected that

---

[1] *WSOU Investments* is an Omnibus Pretrial Order that provides no analysis of, or rationale for, Judge Albright's conclusion that Mr. Weinstein's opinions were unreliable for using the wrong parties. *WSOU Investments, LLC v. Salesforce.com, Inc.*, No. 6:20-cv-01165-ADA (W.D. Tex. April 25, 2025), Dkt. 473 at 2.

4

argument as "conclusory and counter-intuitive." *Id*. In contrast, Mr. Weinstein relies on the factually supported and logical conclusion that Dr. Jakobsson would have negotiated the same agreement regardless of which of the entities he managed owned the patents at the time. Ex. G (Jakobsson Decl.) ¶ 8; Ex. E (Weinstein Decl.) ¶¶ 4, 6, 8. This situation is more like the one in *Wirtgen*, where an expert used an affiliate of the patentee as the party to the hypothetical negotiation. *Wirtgen America, Inc. v. Caterpillar, Inc.*, No. 1:17-cv-00770-JDW, 2024 WL 531234, at *1 (D. Del. Feb. 9, 2024). The court did *not* exclude the expert's testimony for identifying the wrong party, because the companies' interests were closely aligned. *Id*. at *5.

Even if the Court does not grant RavenWhite leave to serve a supplemental report, Mr. Weinstein's original report should not be excluded for purportedly using the wrong party to the hypothetical negotiations. Footnotes 51 and 53 of his original report, while could have been better worded, establish that Mr. Weinstein has adopted a simplified naming convention—referring to the licensor for all hypothetical negotiations as "RavenWhite" instead of specifying RavenWhite Security for the '823 patent and SecurityInnovation for the '402 patent. Ex. F (Weinstein Report) at 14; Ex. E (Weinstein Decl.) ¶¶ 4, 6.

Moreover, the identity of the patentee at the time of the hypothetical negotiation is only relevant to Mr. Weinstein's consideration of Georgia-Pacific factors 4, 5 and 15. *See* Ex. F. (Weinstein Report) ¶¶ 63-65, 125-139. Nothing about Mr. Weinstein's analysis for these factors would be different if he had specified RavenWhite Security or SecurityInnovation as parties to the negotiations. Ex. G (Jakobsson Decl.) ¶ 8; Ex. E ¶ 7. Walmart's disagreement with that conclusion goes to the weight of Mr. Weinstein's opinions, not their admissibility.

## II.    MR. WEINSTEIN'S USE OF WALMART'S ROIC IS PROPER

Mr. Weinstein's use of ROIC (return on invested capital) is not "rule of thumb," and Walmart's complaints go to the weight, rather than the admissibility, of Mr. Weinstein's opinion.

Indeed, this Court has already denied motions to exclude opinions making similar criticisms of Mr. Weinstein's use of ROIC to determine the parties' bargaining split.

Mr. Weinstein's ROIC analysis addresses *Georgia-Pacific* factor 15, which emphasizes that a hypothetical licensee—here, Walmart—must "be able to make a reasonable profit" from its license. *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). Mr. Weinstein selected ROIC to represent this "reasonable profit," which is not "untethered to the facts" (Dkt. 181 at 6) but is specific to Walmart and specific to the date of each hypothetical negotiation. Ex. F (Weinstein Report) ¶¶ 136-38. The ROIC rates of return were actually realized by Walmart at these specific times, providing direct evidence as to the rate of return Walmart could expect on its investments. Mr. Weinstein thus does not consider ROIC in a vacuum, rather, he analyzes the *Georgia-Pacific* factors, as well as other factors affecting the unique bargaining position of each party, based on facts of this case. Ex. F ¶¶ 134-35.

Furthermore, as Mr. Weinstein points out (Ex. F ¶ 136 n.372), his use of ROIC as a basis for bargaining split has already been accepted by multiple courts, including this Court. *See, e.g.*, Order on Pretrial Motions & Motions *In Limine* (Dkt. 274), at 3, *Nanoco v. Samsung Elecs. Co.*, Ltd, No. 2:20-cv-00038-JRG (E.D. Tex. Sept. 21, 2022). In *Nanoco*, this Court denied defendant's motion to exclude Mr. Weinstein's damages opinion, holding that "the use of [defendant's] ROIC when considered with Mr. Weinstein's *Georgia-Pacific* factor analysis and in light of the facts of this case make exclusion improper." *Id*. It further concluded that defendant's "complaints in this regard are able to be adequately addressed through robust cross examination." *Id*. In yet another case, this Court again denied a motion to exclude Mr. Weinstein's ROIC-based analysis, referencing *Nanoco*, reaffirming that "using ROIC is not sufficiently unreliable so as to warrant exclusion," and defendant's complaints about Mr. Weinstein's ROIC-based bargaining split "go to weight, not admissibility." Memorandum Order (Dkt. 247), at 5, *Anonymous Media Res. Holdings, LLC v.*

████████████████████████████████

*Samsung Elecs. Am. Inc.*, No. 2:23-cv-00439 (E.D. Tex. Sept. 17, 2025). *See also* Ex. F at 84 n.372 (citing Order on Motions Heard at Pretrial Conference, at 2 (Dkt. 303), *Streamscale, Inc. v. Cloudera, Inc.*, No. 6:21-cv-00198-ADA (W.D. Tex. Sept. 21, 2023); Verdict of the Jury, *Wapp Tech Ltd. P'ship v. Seattle Spinco, Inc.*, No. 4:18-cv-469 (Dkts. 452) (E.D. Tex. Mar. 5, 2021) & Order, *Wapp Tech* (Dkt. 437) (Feb. 26, 2021)).

Walmart's reliance on a District of Delaware case involving Mr. Weinstein's use of ROIC is misplaced. Dkt. 181 at 7. There, the use of the ROIC was in relation to a "cost savings approach," not at issue here. Mem. Op. at 30 (Dkt. 261), *Fundamental Innovation Sys. Int'l LLC v. Anker Innovations Ltd.*, No. 21:339-RGA (D. Del. Feb. 11, 2025). The Delaware court also noted that while Mr. Weinstein testified he has used the methodology in other cases and it has never been excluded, he "cites no instances in his report where he was permitted to use this methodology in another case," and so the court's decision was primarily based on plaintiff's "struggle[] to find supporting literature or case law" and insufficient support from the one article plaintiff did provide. *Id.* at 32-33. In contrast, here Mr. Weinstein provides numerous citations to prior court decisions refusing to exclude his use of ROIC. Ex. F ¶ 136 n.372.

Walmart also argues that Mr. Weinstein's analysis is unreliable because he relies upon UBS information to calculate his ROIC. Dkt. 181 at 7-8. But, this is attorney argument, unsupported by any specific reasoning from Walmart's expert David Haas or any other industry source about why his use of the UBS data is improper. Mr. Weinstein's reliance upon the UBS figures is proper. As stated in his report: UBS is "a global provider of independent investment insights and one of the most well-known investment research companies in the world." Ex. F ¶ 137. It is "one of the largest wealth management companies in the world with trillions of dollars in assets under its management. It was named by Euromoney as the 'World's Best Bank' in 2024." Ex. F ¶ 137 n.373. The footnote also explains how the data relied upon were located: "These data were located using

7

the LSEG platform, which is 'one of the world's largest providers of financial markets and data infrastructure,' and has over 40,000 customers and 400,000 end users across 190 markets. LSEG is the sole provider of Reuters news to the global financial marketplace." Ex. F ¶ 137 n.373.

In sum, the Court should reject Walmart's argument because Mr. Weinstein's opinion is reliable and based on the facts of this case and his *Georgia-Pacific* analysis; and this Court has already accepted Mr. Weinstein's ROIC-based analyses in other cases and ruled that defendant's complaints should be addressed on cross-examination.

### III.    MR. WEINSTEIN APPLIES AN APPORTIONMENT FACTOR FOR THE '402 PATENT THAT IS TIED TO THE FACTS OF THE CASE

Mr. Weinstein has sufficiently apportioned the ad revenues based on the incremental value of the '402 Patent, seeking to limit the damages to the footprint of the patented technology. This is not a case where the damages expert has failed altogether to apportion the value of a multi-component product; rather, Mr. Weinstein's analysis took several apportionment steps. First, Mr. Weinstein isolated the incremental profits from only the incremental targeting premium offered by the accused

from January 24, 2023 to September 14, 2026. Ex. F ¶¶ 121, 140. Second, Mr. Weinstein applied a conservative apportionment factor of                   , based on his understanding from RavenWhite's technical expert Dr. Hugh Smith that


is attributable to the '402 Patent. Ex. F ¶ 121. It is entirely appropriate for Mr. Weinstein to rely on Dr. Smith's analysis. *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1321 (Fed. Cir. 2014) ("Experts routinely rely upon other experts … for expertise outside their field.").

Third, Mr. Weinstein has applied a bargaining split that allocates value to Walmart in consideration of several factors, many of which inherently include aspects of Walmart's business that allow it to collect                , including:

8

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

████████ . *See* Ex. F ¶ 135. Mr. Weinstein has thus applied an appropriate apportionment factor. He "relies on other experts in the case to identify the benefits of the patent and he took several apportionment steps in order to confine the damages model to the infringing features." *Daingean Techs. Ltd. v. T-Mobile USA, Inc.*, No. 2:23-cv-00347-JRG-RSP, 2025 WL 1811921, at *2-3 (E.D. Tex. June 30, 2025).

The apportionment that Walmart advocates                                    (Dkt. 181 at 9)—is unsupported, arbitrary, and based only on a mischaracterization of Dr. Smith's discussion of the testimony of Bhanu Bhardwaj. Under questioning, Mr. Haas could not point to record evidence in support of Walmart's                        , and instead had to recast Ms. Bhardwaj's testimony about (A) the percentage of ad revenue involving ads that have some form of targeted advertising based on ████████████ into (B) the value of the ad revenue that is based on the stored ████████████████ :

> Q: So if Ms. Bhardwaj didn't actually say what you're interpreting Dr. Smith to have said, then you have no basis for that                        right? [objection omitted]
>
> A: I'm not sure I – I understand your question. This – this is information that's in the record. There are – Dr. Smith interpreted the testimony from Ms. Bhardwaj. He included a statement in his expert report that explained that he is relying on that statement, and then there's the underlying statement                        of the value of the ad revenue **is based on the** ████████████████ .

Ex. A (Haas Dep.) at 24:13-25:17 (emphasis added). But the question that elicited                        from Ms. Bhardwaj—the question that Walmart studiously avoids in its criticism— was about the "percentage of ad revenue [that] involves ads that have some form of targeting based on ████████████ ," not the value of ████████████████ independent of the ads:

> Q: What – do you know what percentage of ad revenue **involves ads that have some form of targeting based on** ████████████ ? [objection omitted]

███████████████████████████████████████████████████████

A: No, I don't – I – I don't know the specifics. I mean, I – I – we have the number. I'm sure someone can get it for you, but I don't know specifically. It would be some portion of                    .

Q: Do you have any general idea of how much of              ?

A: Just ████████ I don't know.                percent or something, Is that – I don't know.

Ex. B (Bhardwaj Dep.) at 81:18-82:6 (emphasis added). This is the basis for Mr. Weinstein's and Mr. Smith's observations that                            in ad revenue involved ads that have some form of targeting based on ███████████. Ex. F ¶ 93.

At bottom, not only is Walmart's argument unsupported, but it essentially boils down to the presentation of conflicting facts, which is not an issue for admissibility. "When … the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of those facts." *Salazar v. HTC Corp.*, No. 2:16-CV-01096-JRG-RSP, 2018 WL 1783157, at *1 (E.D. Tex. Apr. 13, 2018) (quoting *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391-92 (Fed. Cir. 2003)) (denying defendant's motion to exclude damages expert opinion and rejecting argument expert failed to apportion non-patented features, when defendant's motion was based on presentation of "conflicting facts about the extent to which the [device] includes non-patented features"). Walmart's apportionment complaints about how Mr. Weinstein accounted for the ███████████ (Dkt. 181 at 8-9), goes to the weight of his opinion, and not admissibility, and are for the fact finder to decide. *See, e.g., Daingean*, 2025 WL 1811921, at *2-3.

IV.  **MR. WEINSTEIN DOES NOT IMPROPERLY INCLUDE REVENUE FROM NON-INFRINGING ACTIVITIES**

A.  **Mr. Weinstein does not improperly include revenue from the mobile app for the '823 Patent.**

Walmart argues that the court must exclude Mr. Weinstein's damages calculation for infringement of the '823 Patent by Walmart's accused ████████ functionality within Walmart's mobile app, because Dr. Smith offered no opinion that Walmart's mobile app infringes the asserted

███████████████████████████████████████████████

claims. Dkt. 181 at 10-11. Walmart only assumes that GMV revenues from Walmart's mobile app are included in the royalty base for the '823 Patent; in actuality this is unclear. Mr. Weinstein relied upon Walmart source data that referenced sales on "Walmart.com" and do not specifically reference the mobile app. Ex. F (Weinstein Report) Ex. 5 (citing WMT-RW0029147). Neither does Mr. Haas reference mobile app sales when citing to the same source data; he instead describes the data as sales on "Walmart.com." Ex. C (Haas Ex. 22) (citing WMT-RW0029147).

Further, the economic benefits of the infringing ███████████ are not mutually exclusive with use of the mobile app. For example, Walmart.com can perform an infringing ███████ independently of any mobile app usage, and subsequently, the items ██████ can be purchased with the mobile app. Ex. F ¶ 102. (Mr. Weinstein discusses a 2018 study published in the Journal of Marketing regarding these very same benefits. Ex. F ¶ 102.) Walmart.com can also use the infringing functionality in the reverse operation: a logged-in user could add an item to a ███ while using the mobile app, then use a desktop web browser as a guest, and once the user logs in on the desktop web browser, an infringing use ██████ occurs regardless of the previous usage of the mobile app. Ex. F ¶ 102. Furthermore, the data source for personalization of ads and products includes data that is collected from web browsers. That data can be used on web browsers and mobile apps, and that personalization, even on mobile apps, is tied directly to the data from web browsers. The damages theories thus apply even when a mobile app is used for some or all of the customer journey. Therefore, the potential inclusion of GMV revenues from Walmart's mobile app does not require exclusion of Mr. Weinstein's analysis.

**B.    Mr. Weinstein properly includes ████████ revenue for the '402 Patent.**

Mr. Weinstein properly included ████████ in his calculation for the '402 Patent, based on his understanding from Ms. Bhardwaj's testimony that such ads are targeted. *See* Ex. F ¶ 82 n.177 & Ex. 8 at 3 n.1. Walmart argues Dr. Smith does not opine that ████████ infringe. Not so. Dr.

11

███████████████████████████████████

Smith states that "Walmart still infringes the Asserted Claims even if third parties implement any portion of the Accused System." Ex. D ¶ 86. In other words, ████████ implemented by third parties infringe.

## V.    MR. WEINSTEIN'S CALCULATIONS USING GMV LIFT ARE SUPPORTED AND TIED TO THE FACTS OF THE CASE

### A.    Mr. Weinstein properly supports his use of          GMV lift as a proxy for the benefits of the '823 patent functionality.

Mr. Weinstein properly supports, and ties to the facts of this case, his use of a sales lift associated with                              as a conservative proxy for the benefits associated with the '823 Patent with respect to          . *See* Ex. F ¶¶ 113-117. As explained by Mr. Weinstein, personalized                    are a *proxy* for the value of

Proxies, by definition, are not the same as the accused feature, but rather involve "comparing the value of infringing features based upon comparable features in the marketplace." Ex. F ¶ 29 (citing to *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015); *i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010); *Arctic Cat Inc. v. Bombardier Recreational Products Inc.*, 876 F.3d 1350, 1369-1370 (Fed. Cir. 2017); *Image Processing Techs., LLC v. Samsung Elecs. Co.,* No. 22-CV-00050-JRG, 2020 WL 2499736, at *4 (E.D. Tex. May 14, 2020)).

Contrary to Walmart's position that "                              " "ha[ve] nothing to do with" "                              ," Mr. Weinstein explains the connection, and how the benefits provided by ██████████████ and ████████ overlap, by: (1) increasing average order value; (2) reducing cart abandonment; (3) enhancing the customer experience. Ex. F ¶ 115. Not only are the two functionalities related, but                    are actually a conservative proxy for                              , which is called upon more frequently than                  Ex. F (Weinstein Report) Ex. 9 n.2. Indeed, in

12

███████████████████████████████████████████

are a conservative proxy, Mr. Weinstein identifies ***additional benefits*** provided by the accused ███████████████████ that are not offered by ███████████████ : (1) ███████ provides data that can be used for targeted advertising; (2) ███████ encourages █████████ ████████ by facilitating the use of online shopping carts as a wish-list where customers can save items and add more items over time; (3) ███████ facilitates omnichannel shopping allowing customers to begin shopping on a mobile device and finish on a desktop or vice versa; and (4) ███████ populates customer shopping carts with items that are more likely to be ████████ than items presented by ███████████████████ . Ex. F ¶¶ 115-116.

Mr. Weinstein's use of this proxy is supported and tied to the facts of this case by multiple sources, including: (1) Walmart-produced documents (Ex. F ¶ 103, quoting WMT-RW0578534-548 and WMT-RW0409454-515); (2) conversations with Dr. Smith (Ex. F ¶ 114 nn. 342-43); (3) industry articles (Ex. F ¶ 115 nn. 345-46); and (4) academic studies and literature supporting the notion that ███████ presents products to consumers that are more likely to be ████████ compared to ███████████████ , including because they remind customers about products they have already expressed an interest in, rather than ███████████████ which █████████ █████ that are only ███████ to be interesting to a consumer (Ex. F ¶ 116). In sum, "[t]his [is an] evidentiary dispute [that] does not rise to the level of methodology reliability, but rather a challenge of fact reliability." *Image Processing*, 2020 WL 2499736, at *5(denying motion to strike price premium based on comparable product).

**B.   Mr. Weinstein's inclusion of GMV lift using ROAS of   for the '402 Patent is conservative, well supported, and tied to the facts of this case by Walmart's own metrics.**

Mr. Weinstein properly supports his use of a conservative GMV lift for the '402 Patent, and ties it to the facts of this case, using Walmart's own metrics for the actual sales that Walmart itself attributes to its advertisements. Ex. F ¶ 112 ("As discussed above, Walmart determines the increase

███████████████████████████████████████

in gross merchandise sales ('GMV') attributable to its advertisements. It estimates

Apportioning to the value of the '402 Patent, Mr. Weinstein included in his calculation only increased GMV sales resulting from the incremental targeting premium portion of ad revenue attributable to the accused                    and their effect on GMV sales. *See* Ex. F ¶ 112 & Ex. 8 at lines 33-34 & n.11. This uses a ***conservative*** measure of ROAS of    Walmart has generally reported ROAS higher than    *See* Ex. F ¶ 112 (discussing several ROAS of well over and up to    in different years for certain

). Mr. Weinstein's GMV lift using an ROAS of    is also conservative because it may actually undercount sales attributable to advertisements that are difficult to detect, such as in-store cash purchases. *See* Ex. F ¶¶ 68 (citing WMT-RW0018569-582 at 580), 88 (citing WMT-RW0617355-372 at 356):

> Walmart stated that '[i]f you remove all the fluff in AdTech, advertisers only care about how much money they made by running ads aka revenue on ad spends (RoAS). In fact, the big promise with retail media is its unique ability to tie conversions with ad spends as the purchase happens within the walled garden.

These increased GMV sales are benefits that are directly attributable to the '402 Patent, and would be considered as such at the hypothetical negotiation, where Mr. Weinstein also applies a bargaining split to allocate these benefits between the parties. Mr. Weinstein's application of GMV lift using ROAS of   is not only conservative, but well supported.

This ROAS represents sales Walmart attributes to advertisements – sales made and tracked by Walmart, and Walmart determines the portion of these sales attributed to advertisements it shows. Walmart does not have insight as to ██████████ on other platforms, therefore the attributed ROAS sales Walmart measures are made by Walmart, which benefit both the third party seller and Walmart. Walmart makes money on products it sells, regardless if they are third party

14

products or Walmart products. Ex. F ¶¶ 89, 112. Mr. Weinstein applies Walmart's margin on its total (GMV) sales, which is what Walmart makes overall on products it sells. Ex. F ¶ 112.

Indeed, Walmart's documents make it clear that when it calculates ROAS, it does so based on sales made by Walmart: "Walmart determined that its            advertisements drove a            ROAS, meaning every $1 spent on advertisements on                                    ." Ex. F ¶ 89 (citing WMT-RW0420332-359 at 349) (emphasis added). Another document also describes Walmart's "proprietary                      technology tracks sales results on Walmart's digital properties and in our stores." Ex. F ¶ 88 (citing WMT-RW0019981 at 984).

Walmart further attempts to cast doubt on Mr. Weinstein's analysis citing deposition testimony purportedly admitting "he could not claim accused ad-driven sales were incremental to Walmart in a basic hypothetical." Dkt. 181 at 14. However this question presented an incomplete hypothetical, and accordingly drew an objection as to form. Dkt. 181-7 at 193:12. And Walmart's other cited testimony does not change the fact that Mr. Weinstein relied upon Walmart's own documents regarding *its own* sales attributable to advertisements it serves to support his analysis.

## VI. CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to exclude or strike certain of Mr. Weinstein's opinions under *Daubert* and Rule 702.


Dated: July 14, 2026                    Respectfully submitted,

                                        */s/ Robert F. Kramer*
                                        Robert F. Kramer
                                        CA Bar No. 181706 (Admitted E.D. Texas)
                                        rkramer@kramerllp.com
                                        Robert C. Mattson (*pro hac vice*)
                                        VA Bar No. 43568
                                        rmattson@kramerllp.com
                                        **KRAMER LLP**
                                        1133 Broadway, Suite 1510
                                        New York, NY 10010
                                        Telephone: (212) 755-6475

15

Facsimile: (212) 730-8885

Nicole Glauser
Texas Bar No. 24050694
nglauser@kramerllp.com
**KRAMER LLP**
500 W 2nd Street, Suite 1900
Austin, Texas 78701
Telephone: (212) 363-1492

Zachariah A. Higgins (*pro hac vice*)
CA Bar No. 190225
zhiggins@kramerllp.com
Jeremiah A. Armstrong (*pro hac vice*)
CA Bar No. 253705
jarmstrong@kramerllp.com
Rachael Chan (*pro hac vice*)
CA Bar No. 265002
rchan@kramerllp.com
Ryan Dooley (*pro hac vice*)
CA Bar No. 321645
rdooley@kramerllp.com
Robert Y. Xie (*pro hac vice*)
CA Bar No. 329126
rxie@kramerllp.com
**KRAMER LLP**
303 Twin Dolphin Drive, Suite 600
Redwood City, CA 94065
Telephone: (212) 812-8937

Andrea L. Fair
Texas Bar No. 24078488
andrea@millerfairhenry.com
Garrett C. Parish
Texas Bar No. 24125824
garrett@millerfairhenry.com
**MILLER FAIR HENRY PLLC**
1507 Bill Owens Pkwy
Longview, Texas 75604
Telephone: (903) 757-6400
Facsimile: (903) 757-2323

*Attorneys for Plaintiff*
RavenWhite Licensing, LLC

16

████████████████████████████████████████████

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on July 14, 2026, and any confidential versions are being served by electronic mail.

*/s/ Robert F. Kramer*
Robert F. Kramer

## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

Pursuant to Local Rule CV-5(a)(7), the undersigned counsel hereby certifies that authorization for filing under seal has been previously granted by the Court in the Protective Order (Dkt. No. 51) entered in this case on December 10, 2024.

*/s/ Robert F. Kramer*
Robert F. Kramer

17