███████████████████████████████████████

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| RAVENWHITE LICENSING LLC, | |
| Plaintiff, | |
| v. | Case No.  2:24-cv-00688-JRG-RSP (Lead Case) |
| THE HOME DEPOT, INC., *et al.*, | |
| Defendants. | |
| RAVENWHITE LICENSING LLC, | |
| Plaintiff, | |
| v. | Case No.  2:24-cv-00689-JRG-RSP (Member Case) |
| WALMART INC., *et al.*, | |
| Defendants. | ████████████████ |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT OF INELIGIBILITY OF THE
ASSERTED PATENTS UNDER 35 U.S.C. § 101**

i

███████████████████████████████████████████

**TABLE OF CONTENTS**

I.    Introduction ................................................................................................... 1

II.   Response to Statement of Issues....................................................................... 1

III.  Response to Statement of Undisputed Material Facts ......................................... 2

IV.   Argument........................................................................................................ 2

    A.    The Court should not disturb its prior rulings that the patents' claims
          are patent eligible. ................................................................................... 2

    B.    The '823 claims are patent eligible under *Alice* Step 1 and 2. ....................... 6

          1.    The '823 claims are directed to network communication solutions
                to overcome technical problems associated with the deletion of
                traditional cookies.................................................................... 7

          2.    The '823 claims disclose innovative steps, including new uses,
                types, and storage locations of cookies................................... 12

    C.    The '402 claims are patent eligible at *Alice* Step 1 and 2. ......................... 15

          1.    The '402 claims are directed to complex multistep methods and
                systems to form individual user profiles with various applications. .................. 15

          2.    The '402 claims disclose innovative steps, including calculations
                regarding first and second quality levels. .......................................... 19

V.    Conclusion.................................................................................................... 22

███████████████████████████████████

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l,*
   573 U.S. 208 (2014) ........................................................................................ *passim*

*Ancora Techs., Inc. v. HTC Am., Inc.,*
   908 F.3d 1343 (Fed. Cir. 2018), *as amended* (Nov. 20, 2018) .........................................11, 12

*Berkheimer v. HP Inc.,*
   881 F.3d 1360 (Fed. Cir. 2018).......................................................................................2

*Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*
   788 F. App'x 882 (Fed. Cir. 2019) .......................................................................17, 21

*Broadband iTV, Inc. v. Amazon.com, Inc.,*
   113 F.4th 1359 (Fed. Cir. 2024) .....................................................................................17

*CardioNet, LLC, v. Infobionic, Inc.,*
   955 F.3d 1358 ........................................................................................................17, 18

*Cellspin Soft, Inc. v. Fitbit, Inc.,*
   927 F.3d 1306 (Fed. Cir. 2019)........................................................................................2

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n,*
   776 F.3d 1343 (Fed. Cir. 2014)........................................................................................9

*Contour IP Holding LLC v. GoPro, Inc.,*
   113 F.4th 1373 (Fed. Cir. 2024) .................................................................................9, 18

*Cosmokey Sols. GmbH & Co., KG v. Duo Sec. LLC,*
   15 F.4th 1091 (Fed. Cir. 2021) ......................................................................................15

*Customedia Techs., LLC v. Dish Network Corp.,*
   951 F.3d 1359 (2020)......................................................................................................16

*DDR Holdings v. Hotels.com, L.P.,*
   773 F.3d 1257 ................................................................................................................20

*Elec. Commun. Techs., LLC v. ShoppersChoice.com, LLC,*
   958 F.3d 1178 (Fed. Cir. 2020)........................................................................................9

*Enfish, LLC v. Microsoft Corp.,*
   822 F.3d 1327 (Fed. Cir. 2016).............................................................................9, 12, 18

███████████████████████████████

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
   879 F.3d 1299 (Fed. Cir. 2018)...............................................................................11, 12

*Free Stream Media Corp. v. Alphonso Inc.*,
   996 F.3d 1355 (Fed. Cir. 2021).....................................................................................17

*Intell. Ventures I LLC v. Capital One Bank (USA)*,
   792 F.3d 1363 (Fed. Cir. 2015).....................................................................................21

*Intell. Ventures II LLC v. BITCO Gen. Ins. Corp.*,
   362 F. Supp. 3d 370 (E.D. Tex. 2019)......................................................................18, 21

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
   942 F.3d 1143 (Fed. Cir. 2019).....................................................................................12

*McRO Inc., v. Bandai Namco Games Am. Inc.*,
   837 F.3d 1299 ...............................................................................................................17

*Miller Mendel, Inc. v. City of Anna, Texas*,
   107 F.4th 1345 (Fed. Cir. 2024) .....................................................................................8

*Recentive Analytics, Inc. v. Fox Corp.*,
   134 F.4th 1205 (Fed. Cir.), cert. denied, 146 S. Ct. 891, 223 L. Ed. 2d 277
   (2025)..........................................................................................................................3, 16

*Rhine v. Casio, Inc.*,
   183 F.3d 1342 (Fed. Cir. 1999)........................................................................................3

*Sri Int'l, Inc. v. Cisco Sys., Inc.*,
   930 F.3d 1295 (Fed. Cir. 2019).......................................................................................12

*TecSec, Inc. v. Adobe*
   Inc., 978 F.3d 1278 ............................................................................................. *passim*

*TLI Communs. LLC v. AV Auto., LLC (In re TLI Communs. LLC Patent Litig.)*,
   823 F.3d 607 (Fed. Cir. 2016).........................................................................................20

*Universal Secure Registry LLC v. Apple Inc.*,
   10 F.4th 1342 (Fed. Cir. 2021) .........................................................................................8

*Weisner v. Google LLC*,
   51 F.4th 1073 (Fed. Cir. 2022) .......................................................................................20

**Statutes**

35 U.S.C. § 101...........................................................................................................1, 2, 3, 22

35 U.S.C. § 282.........................................................................................................................2

Case 2:24-cv-00688-JRG-RSP    Document 227    Filed 07/21/26    Page 5 of 29 PageID #: 8577

## TABLE OF EXHIBITS

| Ex. | Description |
|---|---|
| A | U.S. Patent No. 10,594,823 (excerpts) |
| B | U.S. Patent No. 11,562,402 (excerpts) |
| C | Rebuttal Expert Report of Bernard J. Jansen, Ph.D., Relating to Validity of U.S. Patent Nos. 10,594,823 and 11,562,402, served on June 18, 2026 (excerpts) |
| D | Opening Invalidity Expert Report of Kevin C. Almeroth, Ph.D., served on May 21, 2026 (excerpts) |
| E | Rebuttal Expert Report of Dr. Kevin Almeroth, served on June 18, 2026 (excerpts) |
| F | '402 Patent File History, Notice of Allowability of 10/3/2022 (excerpts) |

Plaintiff RavenWhite Licensing LLC ("RavenWhite") submits this opposition to Defendants Walmart Inc. and Walmart Stores Texas, LLC ("Walmart")'s motion for summary judgment of ineligibility of U.S. Patent Nos. 10,594,823 ("the '823 Patent") and 11,562,402 ("the '402 Patent") (collectively, the "Asserted Patents") under 35 U.S.C. § 101 ("MSJ") as follows:

## I.    INTRODUCTION

Walmart's MSJ asks the Court to hold, contrary to its prior rulings on Walmart's motion to dismiss, that the Asserted Patents are ineligible under section 101. Walmart cites the Court's Claim Construction Order as justification for a new ruling on an old issue, but the Claim Construction Order predates the Court's ruling on 101, and its constructions do not affect patent eligibility. The '823 Patent is patent eligible under *Alice* Step 1 because, for example, the claims of the '823 Patent ("'823 claims") are directed to the non-abstract idea of network communication solutions to overcome technical problems associated with the deletion of traditional cookies, and using the claimed "second type" of cookie to identify a client device or user was not known. Under *Alice* Step 2, the '823 claims do not merely recite generic computer components and require an innovative combination of at least four aspects of the claimed cookies. The '402 Patent is patent eligible under *Alice* Step 1 because, for example, the claims of the '402 Patent ("'402 claims") are directed to a technical solution to a technical problem associated with determining quality levels, including determining categories of interest based on a unique identifier and clustering—as the examiner found and the Court noted in its previous ruling. Under *Alice* Step 2, the '402 claims present unconventional and non-routine computer-based approaches, including a combination of novel elements. The Court should deny Walmart's MSJ.

## II.    RESPONSE TO STATEMENT OF ISSUES

The '402 claims and '823 claims are not invalid under 35 U.S.C. § 101. They are not directed to abstract ideas and they recite inventive concepts.

III. **RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.      Disputed. This statement is disputed to the extent Walmart is making a claim construction argument or interpreting the term "targeted advertising" in a specific manner.

2.      Disputed. This statement is disputed to the extent Walmart is making a claim construction argument or interpreting the term "clustering" in a specific manner.

4.      Disputed. This statement is disputed because it is a material issue of fact that is triable to a jury, and to the extent that it oversimplifies the '823 claims as being directed to merely "using multiple cookies to identify a user or a device." The '823 claims are not merely directed to "using multiple cookies to identify a user or a device" and include multiple additional innovative elements. Further, the '823 Patent emphasizes that prior art cookies do not identify devices. *See, e.g.*, Ex. C ¶¶ 63-64 (quoting Ex. A at 2:41-44 ("there remains a need to identify a client **device**")). Indeed, Walmart's own expert did not identify any reference with two cookies that identify a device. *See, e.g.*, Ex. C ¶¶ 121, 154, 180, 194-95.

IV. **ARGUMENT**

Pursuant to 35 U.S.C. § 282, the Asserted Patents are presumed valid under § 101. To overcome this presumption, a defendant must show ineligibility by clear and convincing evidence under both prongs of the *Alice* framework. *See Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1319 (Fed. Cir. 2019); *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). Walmart is not entitled to summary judgment at either *Alice* Step 1 or 2.

A.      **The Court should not disturb its prior rulings that the patents' claims are patent eligible.**

The Court already ruled that the Asserted Patents claim patent eligible subject matter. Dkt. 131 (Order adopting Dkt. 123 Report & Recommendation recommending denial of Walmart's Motion to Dismiss). Walmart acknowledges the Court's previous decision, yet presents the same

████████████████████████

issue again and asks the Court to rule differently this time. Dkt. 186 at 6-7. Nothing meaningful has changed since the Court first ruled, so the Court should not disturb its ruling.

Tacitly acknowledging that this type of change in circumstance would be required for changes to the Court's 101 ruling, Walmart identifies the Court's claim construction order as an alleged justification for change. But the Court ruled on claim construction before—not after—the Court ruled on 101. *See* Dkt. 128 (3-24-26 claim construction order), Dkt. 131 (3-30-26 order that the patents are not invalid under 101). The Court did not contradict the Court's own ruling from the previous week. Indeed, the Court had both claim construction and 101 issues pending when the Court construed the claims, and the Court considered—and rejected—invalidity arguments as part of the claim construction order. *See, e.g.*, Dkt. 128 at 11-12; *see also Rhine v. Casio, Inc.*, 183 F.3d 1342 (Fed. Cir. 1999) ("Claims are generally construed so as to sustain their validity, if possible.") (internal citation and brackets omitted). Similarly, Walmart cites *Recentive*, but that case also issued before—not after—the Court's order. Dkt. 186 at 13-14 (citing *Recentive Analytics, Inc. v. Fox Corp.*, 134 F.4th 1205, 1211 (Fed. Cir.), cert. denied, 146 S. Ct. 891, 223 L. Ed. 2d 277 (2025), and noting that the 2025 *Recentive* decision issued after briefing on 101, but silent on the fact that it issued before the Court's 2026 order). Thus, *Recentive* is another so-called change that is not grounds for disturbing the Court's ruling. At best, Walmart could have filed a notice of supplemental authority after briefing concluded in 2025—but chose not to.

The file history provides yet another decision that has not changed since the Court's ruling. As the Court's ruling points out and Walmart acknowledges, "the '402 Patent examiner specifically identified 'clustering' in its § 101 analysis to find patentability." Dkt. 186 at 6-7, citing Dkt. 123 at 5. Walmart notes that the Court did not construe "clustering" to require machine learning. Dkt. 186 at 13. Walmart then suggests that the absence of "machine learning" in the court's construction relates to the file history by asserting incorrectly, without citation or

3

explanation, that "the Patent Office found the claims eligible based on their use of machine learning …." Dkt. 186 at 13. On the contrary, the patent examiner did not even mention the term "machine learning." Ex. F at 3-4. Instead, the examiner determined that the claims "are directed to a technical solution to a technical problem associated with determining quality levels, including determining a first category, and a second category of interest based on a unique identifier and clustering, … based on the foregoing analysis, the aforementioned claims are patent eligible." Ex. F at 3-4. Walmart itself reinforces the examiner's conclusion that the claims require using clustering and unique identifiers in a particular way. Dkt 186 at 3 ("The '402 Patent also claims 'determining of the first quality level is based at least in part on a unique identifier and clustering,' i.e., the quality level is determined based on a unique user ID, which is itself determined by a clustering technique."). Walmart asserts that clustering was known and conventional. Dkt. 186 at 7, 9. Walmart also asserts that a unique identifier was known, but cites no facts in support of that assertion. Instead, Walmart merely cites the '402 patent specification's descriptions of the invention, not the prior art; Walmart also cites its expert's report, but the relevant paragraph merely cites those same specification passages. Dkt. 186 at 16, citing '402 Patent, 3:30-35, 13:35-37, and 15:58-67, and citing Ex D. ¶ 882. Even if clustering and unique identifiers were known, however, that does not show it was known to use clustering and unique identifiers to determine quality level as claimed—and Walmart does not assert otherwise. Thus, Walmart has not rebutted the examiner's analysis, identified any change that occurred after the Court's ruling, or pointed to any other reason to disturb the Court's ruling.

As for the claim construction order's alleged impact on the Court's 101 ruling regarding the '823 Patent, Walmart asserts incorrectly that the Court "rejected" RavenWhite's "argu[ment] that the claims invented a new type of cookie that allowed improvements in authenticating users of a computer." Dkt. 186 at 2. Similarly, Walmart asserts that the Court's "constructions confirm

4

that '823 Patent does not claim or require a 'new type of cookie'; nor is it used for 'website customization' or 'fraud prevention.' Instead, the claim construction only requires a second type of cookie as part of identifying a device or user ….” Dkt 186 at 24. Walmart further argues that “claim construction has eliminated RavenWhite's previous argument” about why the '823 claims are eligible at *Alice* Step 1. Dkt. 186 at 23-24. Contrary to Walmart's assertions, the Court's construction of a cookie of a second type, and a different storage location for that cookie, simply construed those particular terms. The Court's claim construction order does not mention the term “authentication”—let alone “reject” RavenWhite's authentication argument presented in connection with 101. Similarly, the Court's claim construction order did not rule on whether the '823 Patent requires a “new type of cookie,” whether the claimed cookies are used for website customization, or whether the claimed cookies are used for fraud prevention. Indeed, none of those topics were at issue in claim construction.

Further, the Court's claim construction reinforced—rather than rejected—RavenWhite's 101 validity argument regarding improved authentication. For example, identification—which Walmart admits is part of the '823 claims—does indeed relate to authentication including “fraud prevention,” as Walmart's own expert explains. Dkt. 186 at 18 (“The '823 Patent's claims are direct to the idea of using cookies to **identify** a client device or a user.”); *see, e.g.*, Ex. D, at ¶ 229, p. 103 (“The fact that these **authentication** attempts were made either from a device (node) which has been previously (IP/secure cookie/flash cookie, etc.) **identified** by the fingerprinting of the present invention helps identify a potential **fraudulent** activity… .”), ¶ 231 (“The flash cookie and/or the secure cookie are used to **identify** the user device on subsequent login or **authentication** attempts.”), ¶ 321 (“… post-**authentication** information, which includes 'user **identifications**.'”). Further, as Walmart's expert explained, Walmart's solution

which (in RavenWhite's

5

expert's opinion) is a cookie of the "second type" that identifies a user. Ex. E ¶ 115 ("…

Walmart.com's

**B.     The '823 claims are patent eligible under *Alice* Step 1 and 2.**

The '823 claims, which focus on network communication solutions to address a specific

problem with the use of traditional cookies (*see* Ex. C ¶ 208; Ex. A at 7:57-8:51), are directed to

patentable subject matter, for the reasons set forth below.

Claims 1 and 2 are the only remaining '823 claims asserted in this case, and recite:

1.  A system, comprising:

one or more processors configured to:

receive a network resource request from a client device, wherein the network resource request corresponds to a first cookie of a first type that was caused to be stored to the client device during a first previous network session, wherein the first cookie of the first type was caused to be stored to the client device at least in part by causing the client device to initiate a set of network resource requests determined during the first previous network session, wherein the client device initiating the set of network resource requests caused data representative of the set of network resource requests to be stored at the client device, wherein a second cookie of a second type different from the first type was caused to be stored at the client device during a second previous network session, and wherein the first cookie of the first type is stored in a first client device browser storage area and the second cookie of the second type is stored in a second client device browser storage area different from the first client device browser storage area;

based at least in part on the network resource request from the client device corresponding to the first cookie of the first type caused to be stored at the client device during the first previous network session, determine information that was encoded and stored in the client device;

perform a first identification of at least one of the client device and a user of the client device using the first cookie of the first type, wherein the first identification is performed using the first cookie of the first type at least in party by using the determined information that was encoded and stored in the client device;

perform a second identification of at least one of the client device and the user of the client device using the second cookie of the second type; and

6

perform a determination based at least in part on (1) a presence of a network resource request associated with one of the first cookie and the second cookie, and (2) an absence of a network resource request associated with the other of the first cookie and the second cookie; and

a memory coupled to the one or more processors and configured to provide the one or more processors with instructions.

2. The system of claim 1 wherein the client device is identified by a server in a domain different from a server that caused the two different types of cookies to be stored to the client device during the first and second previous network sessions.

Ex. A, Claims 1 and 2.

### 1.    The '823 claims are directed to network communication solutions to overcome technical problems associated with the deletion of traditional cookies.

Walmart asserts incorrectly that the '823 claims are directed "to the abstract idea of using cookies to identify a client device or a user," that doing so is a "longstanding use of cookies," and that the claims are patent ineligible under *Alice* Step 1. Dkt. 186 at 1, 18-19. However, the Court should reject Walmart's argument and deny summary judgment for '823 Patent at *Alice* Step 1 for several reasons.

Independent claim 1 is not representative of dependent claim 2, contrary to Walmart's assertion, because there is a significant difference: claim 1 requires identifying a user or device, but claim 2 requires identifying a device—as opposed to a user. Dkt. 186 p. 19; Ex. A claim 2 ("The system of claim 1 wherein the **client device** is identified by a server …"). Using the system of claim 1 to identify a device was not known, as demonstrated by the fact that Walmart's own technical expert did not point to any identification of a device in connection with claim 2. At best, Walmart's expert referred to identifying users—as opposed to devices—in connection with the four prior art references in his report. Ex. C ¶¶ 121, 154, 180, 194-95. Walmart's motion repeatedly alleges that using cookies to identify a "user or device" was conventional, but never asserts that identifying a device—as opposed to a user—was conventional. *See, e.g.*, Dkt. 186 at 19, 24.

7

Walmart asserts incorrectly that "RavenWhite did not invent a new type of cookie or anything else tied to the functioning of cookies …" Dkt. 186 at 18. On the contrary, it was not known to use the "second type" of cookie to identify a user or device as claim 1 requires. RavenWhite's technical expert opined that each of the four references that Walmart's technical expert discussed does not disclose this concept. *See, e.g.*, Ex. C ¶¶ 107-08, 122-24, 169 (Hinton, Varghese, and Kou do not disclose the claimed "second type" of cookie at all); ¶ 186 (Felten does not disclose identifying a user or device using the claimed "second type" of cookie.). At best, Walmart could have asserted that there is a disputed material fact by citing the portions of its expert's report that RavenWhite's expert rebutted. Rather than address the facts the experts include in their reports, Walmart addresses only subsets of claim language. Specifically, Walmart asserts that [1] cache cookies were known, and [2] using cookies to identify users was known. Yet Walmart never asserts that using a claimed cookie of the "second type" to perform such identification was known. *See, e.g.*, Dkt. 186 at 19, 24. Put another way, even if using cookies to identify users was known, that merely indicates that traditional cookies (a first type of cookie) could be used to identify users. It does not show that using a cache cookie—let alone the claimed "second type" of cookie—to identify a user or device was known.

Walmart trivializes cookie technology by citing cases that found "tracking a user and data collection and storage" to be abstract, without addressing the differences between a cookie—let alone the claimed "second type" of cookie—versus the more generic concepts of tracking, collecting, and storing data. Dkt 186 at 20-23. *Miller* ruled on a claim "directed to the abstract idea of performing a background check." *Miller Mendel, Inc. v. City of Anna, Texas*, 107 F.4th 1345, 1353 (Fed. Cir. 2024). The claims in *USR* "simply recite[d] conventional actions in a generic way" and failed "to improve any underlying technology." *Universal Secure Registry LLC v. Apple Inc.*, 10 F.4th 1342, 1349 (Fed. Cir. 2021) (citation omitted). As Walmart itself points out, the claims

8

in *Content Extraction* were directed to collecting data and storing a recognized subset of that data. *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014). Walmart analogizes the '823 claims to *ShoppersChoice* by asserting that "[t]he only difference" is the direction of data flow between server and client, but direction is merely one of many differences because the claims in that case were directed to the abstract idea of "providing advance notification of the pickup or delivery of a mobile thing." *Elec. Commun. Techs., LLC v. ShoppersChoice.com, LLC*, 958 F.3d 1178, 1181-82 (Fed. Cir. 2020) (citation omitted). In contrast to the claims in those cases, the '823 claims require using novel cookie technology—such as the claimed "second type" of cookie—and require more than merely tracking a user and storing data— such as identifying a user or device using a cookie and data that was encoded, and making a determination based on network resource requests associated with different types of cookies. Ex. A, claim 1.

Further, Walmart's arguments are based on an oversimplification of the '823 claims, which the courts have cautioned against. *Contour IP Holding LLC v. GoPro, Inc.,* 113 F.4th 1373, 1379 (Fed. Cir. 2024)*; ; Enfish, LLC v. Microsoft Corp.,* 822 F.3d 1327, 1337 (Fed. Cir. 2016); *Alice Corp. Pty. Ltd. v. CLS Bank Int'l, 573 U.S. 208, 217 (2014)*. The '823 claims teach much more than the purportedly "abstract idea of using cookies to identify a client device or user" or storing data. They require more than identification and are directed to network communication solutions to overcome technical problems associated with the deletion of traditional cookies, using several innovative aspects.

The '823 Patent specification, in the "Background of the Invention," identifies a technological problem associated with the use of traditional cookies, which Walmart mentions but argues (based on its oversimplification of the claims) constitutes "all components and processes used in the claimed system [which] were routine and conventional" (*see, e.g.*, Dkt. 186 at 5-6).

9

██████████████████████

Prior to the '823 Patent, webpages relied on cookies to customize webpages for users by sending a message to the server and requesting, transmitting, and storing user information in the web browser, which is sent back to the server each time the browser requests a web page from the server. Ex. A at 1:39-52; Dkt. 186 at 5; Ex. C ¶ 209; Dkt. 128 at 9; Dkt. 110-16 ¶¶ 22-23. But these conventional cookies had drawbacks. For example, users had security and privacy concerns with storing cookies on a user's computer without the user's consent, and the potential for sharing information about a user with third parties. Ex. A at 2:10-23; Ex. C ¶ 210. This led to some users blocking or clearing cookies, or using common spyware programs to target cookies—ultimately leading to problems such as the loss of business by ecommerce organizations, and financial institutions having to rely on a username and password for identification, which is prone to fraud. Ex. A at 2:24-40; Ex. C ¶ 210; Dkt. 110-16 ¶ 23; s*ee also* Dkt. 128 at 9-10.

The '823 claims focus on a solution to the technological limitations and problems with Web browsers, and are thus directed to an improvement in computer functionality. *See TecSec, Inc. v. Adobe* Inc., 978 F.3d 1278, 1293. The pioneering technology described by the '823 Patent allows devices and servers to communicate without further exclusive reliance on conventional cookies. Ex. C ¶ 211. Its claims are thus directed to network communication solutions to overcome technical problems associated with the deletion of traditional cookies. Ex. C ¶ 208; Ex. A at 7:58-8:51.

For example, a server may write or read a cache cookie to and from a browser storage area that is different from where the conventional cookie is stored, which circumvents traditional cookie technology's security concerns. *See, e.g.,* Ex. A at 2:66-3:4; Ex. C ¶ 211; Dkt. 110-16 ¶ 24. The '823 Patent describes exemplary embodiments where "[t]he browser storage area may include a history cache and/or a Temporary Internet Files (TIFs) area," shown in Figure 2. Ex. A at 3:3-4; Dkt. 110-16 ¶ 24. In one embodiment, a new type of "cookie may also be combined with a

███████████

traditional cookie, for example to provide another layer of identification (e.g., authentication)."

Ex. A at 8:11-13. These features enhance authentication by obstructing the deletion and manipulation of cookies and related information. Ex. A at 3:5-12; Ex. C ¶ 211; Dkt. 110-16 ¶ 24. Combining different types of cookies in this way requires a user desiring to delete cookies "to clear or block cookies during the same interval of time that the browser storage area [] is cleared." Ex. A at 8:15-18. Furthermore, the invention enhances server identification—and thereby reduces fraud risk—without requiring installation of additional software, instead relying solely on a browser. Ex. C ¶ 211. This feature advantageously increases the number of identifiable client computers because it does not depend on voluntary user opt-in, such as software installation. *Id.* This illustrates that Claim 1 does not "describe[] generic functional steps [] on generic computer systems []," as Walmart asserts. Dkt. 186 at 20.

The Federal Circuit has held claims, like those in the '823 Patent, to be patentable that are directed to a specific improvement in computer functionality. For example, in *Finjan*, the Federal Circuit determined that the representative claim "employs a new kind of file that enables a computer security system to do things it could not do before." *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1305 (Fed. Cir. 2018) (patent eligible claims involving "scanning a downloadable and attaching the results of that scan to the downloadable itself in the form of a security profile" recited a specific improvement to computer functionality and more than a mere result; claims "recite[d the] specific steps" of "generating a security profile that identifies suspicious code and linking it to a downloadable."). Similarly, the '823 claims are directed to a specific, non-abstract improvement in computer functionality by using two types of cookies to identify users or devices even if some data is deleted.

In *Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1348 (Fed. Cir. 2018), *as amended* (Nov. 20, 2018), the Federal Circuit found that placing a software verification record in BIOS

11

memory—a standard computer component that was well known to be difficult to hack—was a technological improvement over prior art approaches that simply placed the verification record elsewhere on the computer, *e.g.*, on a hard drive. This made it more difficult to install unlicensed software by manipulating the verification record. The '823 claims similarly are directed to an improvement to computer technology by providing for a new type of cookie for identification (and authentication) that cannot easily be circumvented when a user clears their web history using their browser. The '823 claims satisfy the test in *Ancora* of claiming "a specific technique that departs from earlier approaches to solve a specific computer problem" through the use of two types of cookies. *Id.* at 1348; *see also Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1150-51 (Fed. Cir. 2019) (claims directed to detection of errors in data transmission were non-abstract because they specifically recited a permutation for reordering information that solved problem in the prior art); *TecSec*, 978 F.3d at 1297 (patent eligible and non-abstract claims were directed to specific improvements to basic function of computer data distribution network); *Sri Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1303-04 (Fed. Cir. 2019) (claims directed to monitoring and surveillance of computer networks for intrusion detection not directed to abstract idea).

Moreover, the '823 Patent is not results-based, but rather describes *how* to accomplish the desired result, step by step, including facilitating the identification of client devices or users, with a specific, unconventional approach using different cookie types, from different previous network sessions, from different browser storage areas. *See, e.g., Finjan*, 879 F.3d at 1305-06. The claimed techniques require specific, technical steps that a user would not perform mentally, and that are not conventionally executed by general-purpose computers. *See Enfish*, 822 F.3d at 1339.

### 2. The '823 claims disclose innovative steps, including new uses, types, and storage locations of cookies.

Walmart asserts incorrectly that the '823 claims do not recite any inventive concept under *Alice* Step 2 because "there is no material fact dispute" regarding step 2 and "nothing about the

12

claims is unconventional." Dkt. 186 at 25. On the contrary, the claimed "second type" of cookie is unconventional. Walmart acknowledges that the claims as construed by the Court requires two different types of cookies that are [1] accessed by the server differently, and [2] stored in different storage areas. Dkt. 186 at 7 (mistakenly asserting that server access is the only difference between the claimed cookie types), 20 (mistakenly asserting that the storage area is the only difference between the claimed cookie types), 24. Walmart notes that the claimed "second type" of cookie need not be "cache cookies." Dkt. 186 at 20. Yet cache cookies are the only possible "second type" of cookie to consider in connection with Walmart's motion, because Walmart does not mention any other cookie as being different than "traditional cookies." Dkt. 186 at 24-25.

Walmart notes that the '823 Patent acknowledges cache cookies as prior art, but the underlying prior art is merely a single academic paper that the '823 Patent inventors cited to the examiner. Dkt. 186 at 24-25, citing Ex. C ¶ 215, which in turn at ¶¶ 213-215 refers to Felten; *see also* Ex. C ¶ 185 (the '823 Patent inventors cited Felten). Walmart also asserts without explanation or citation that "cookies stored in different storage areas was [] conventional." Dkt. 186 at 26. Perhaps Walmart had in mind the same single academic paper. The existence of a single academic paper does not prove that cache cookies were conventional, and Walmart does not assert otherwise.

Further, the '823 Patent does not state that cache cookies, as opposed to "traditional cookies"—were conventional, and Walmart does not identify any specification passage that could be interpreted to the contrary. Ex. A; Dkt. 186 at 24-26. Walmart quotes the '823 patent's description of a preferred embodiment that reads a cache cookie to identify a device. Dkt. 186 at 5, citing '823 Patent at 5:29-34. That passage is directed to the invention, not the prior art. Put another way, the '823 Patent does not state that prior art cache cookies could identify a device. Indeed, the '823 Patent teaches that identifying a device without traditional cookies is a needed improvement that the '823 Patent discloses and is not in the prior art. Specifically, in the

13

"Background of the Invention" section, the '823 Patent does not state that identifying devices is known, and concludes by stating: "Therefore, there **remains a need to identify a client device** when the user (i.e., browser) accesses a Web page that the user has previously visited without many of the privacy issues associated with cookies." Ex. A at 2:41-44. Walmart also asserts that a URL or TIF (temporary internet file) was conventional, and points out that the '823 discloses cache cookies that can take the form of a URL or TIF. Dkt. 186 at 24, citing '823 Patent, 5:10-16, 6:24-27, 6:27-32, 6:39-41, 7:1-13. Even if a URL or TIF was conventional, however, that does not show that cache cookies—using a URL, TIF, or other format—were conventional.

At best, Walmart has raised a disputed material fact regarding whether cache cookies were conventional, which precludes summary judgment.

Furthermore, Walmart's *Alice* Step 2 argument ignores the combination of the elements, including the innovative combination of at least four aspects of the claimed cookies: (i) the different types of cookies; (ii) the timing of the cookies' storage relative to different network sessions; (iii) the different locations of the cookies in browser storage; and (iv) the use of network resource requests associated with the cookies to make determinations. Ex. A at 15:32-67, 16:4-9; Ex. C ¶¶ 220-21, 225, 230. This is not the recitation of generic computer components. The '823 claims specifically differentiate between sequentially-stored "first" and "second" cookie types stored in different browser storage areas. Ex. C ¶ 225; Dkt. 128 at 6-12. This novel arrangement enables dual-layered identification and customization through the use of persistent, differentiated storage locations, thereby avoiding the conventional problems associated with erasable, changeable, or movable files. Nor is this an attempt to "narrow[] or reformulate[e] an abstract idea." Dkt. 186 at 26. Therefore, even if the '823 claims were held abstract at *Alice* step 1 (they should not be), there are at least genuine disputes of fact as to whether the particular arrangement of these extra steps recited in the claims provide an inventive step sufficient to satisfy *Alice* step

14

2, and involve techniques that are not well-understood, routine, or conventional. *See, e.g., Cosmokey Sols. GmbH & Co., KG v. Duo Sec. LLC*, 15 F.4th 1091, 1098-99 (Fed. Cir. 2021).

**C.    The '402 claims are patent eligible at *Alice* Step 1 and 2.**

The '402 Patent is titled "Advertising Model." Ex. B. Its claims focus on improved advertising systems that enable "'[t]iered advertisement bidding,' in which '[a]n advertisement bid is selected from a plurality of tiered bids' based on 'quality metrics associated with a user profile.'" Ex. B, Abstract; Dkt. 110-16 ¶ 53; Ex. C ¶ 321. The '402 claims, which relate to improved advertising systems for tiered bidding and selection of ads based on quality metrics, are directed to patentable subject matter, for the reasons set forth below.

**1.    The '402 claims are directed to complex multistep methods and systems to form individual user profiles with various applications.**

The Court should reject Walmart's argument and deny summary judgment for the '402 Patent at *Alice* Step 1 for several reasons.

Walmart asserts that "… 'machine learning'—which the Court relied [sic: on] to deny the motion to dismiss—is not actually part of the claims." Dkt. 186 at 13. On the contrary, machine learning is "part of" and expressly required by claim 14. Thus, claims 10 and 19 are not representative of dependent claim 14, because claim 14 requires machine learning. Compare Dkt. 186 at 9-10. Walmart notes that the Court did not construe the term "clustering" to require machine learning, but does not address the Court's reasoning that machine learning provides additional support for finding the claims valid. The Court's reasoning applies to at least claim 14, which expressly requires machine learning. Although Walmart asserts that "[d]ependent claims 11-15 and 18 … merely 'recite well-known, routine, and conventional functions of . . . computers,'" Walmart provides no evidence to support its assertion, and never specifically asserts that using machine learning as required by claim 14 was conventional. *See, e.g.*, Dkt. 186 at 13-14. Instead, Walmart asserts that a Federal Circuit case held that machine learning would not provide an

additional grounds for validity. Dkt. 186 at 13-14, citing *Recentive*. *Recentive*, however, merely found that claims that "do no more than apply established methods of machine learning to a new data environment" are not patent eligible. *Recentive*, 134 F.4th 1205, 1211. Here, the claims do more than merely apply machine learning to targeted advertising. Indeed, as Walmart itself points out, the claims other than claim 14 do not even require machine learning. Dkt. 186 at 13. As to claim 14, it does not merely apply machine learning to a new data environment, because, for example, it depends from claim 10, which in turn requires using clustering and unique identifiers in a particular way that was not conventional, as the Court already held and examiner have pointed out. *See* Section IV.A.

Similarly, Walmart asserts that two other concepts are not claimed. First, Walmart quibbles that an "advertisement platform" is not in the '402 claims. Dkt. 186 at 14-15. Although the claims do not recite that exact phrase, they do require advertising and claim 10, for example, requires a "system." As Walmart itself points out in discussing "the claimed processes and components," the platform could simply be a server. Dkt 186 at 4 ("… the advertising platform (i.e., server) …") Second, Walmart notes that the term "tiered bidding" is not in the claims in connection with discussing RavenWhite's expert report, but does not suggest that tiered bidding is relevant to the Court's previous order on 101, and does dispute that the claims enable improved tiered bidding. Dkt. 186 at 14-15.

Walmart cites cases that addressed claims directed to "the abstract idea of targeted advertising" that are "… mental process[es] that happens to be done on a computer" Dkt. 186 at 10-12. The '402 claims are different than the claims in those cases. For example, the claims in *Customedia* were "directed only to the abstract idea of 'using a computer to deliver targeted advertising to a user.'" Dkt. 186 at 11, citing *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1363 (2020); *see also Customedia* at 1365 ("the abstract concept of delivering targeted

advertising using a computer only as a tool."). Similarly, the claims in *Bridge & Post* were "'directed to the abstract idea of using persistent identifiers to implement targeted marketing.'" Dkt. 186 at 11, citing *Bridge & Post, Inc. v. Verizon Commc'ns, Inc.* 788 F. App'x 882, 890 (Fed. Cir. 2019). In *Broadband iTV*, the claims were "'directed to the abstract idea of collecting and using viewing history data to recommend categories of video content.'" Dkt. 186 at 11, citing *Broadband iTV, Inc. v. Amazon.com, Inc.*, 113 F.4th 1359, 1365 (Fed. Cir. 2024). In *Free Stream*, the "claims were directed to nothing more than" gathering information about a viewer, matching the information to targeted advertisements, and sending ads. Dkt. 186 at 12, citing *Free Stream Media Corp. v. Alphonso Inc.*, 996 F.3d 1355 (Fed. Cir. 2021).

In contrast, the '402 claims are like those in *McRO* and *CardioNet*, because they improve Internet advertising technology (rather than merely using a computer as a tool), and thus are not abstract. The Federal Circuit has held that claims are directed to an improved technological process and are patent eligible when they include a series of structured, computational steps like those claimed by the '402 Patent. For instance, in *McRO*, where claim 1 was "focused on a specific asserted improvement in computer animation, i.e., the automatic use of rules of a particular type," the Federal Circuit held that the claims were patent eligible because they did not "simply use a computer as a tool to automate conventional activity" given that there was "no evidence that the process previously used by animators is the same as the process required by the claims." *McRO Inc., v. Bandai Namco Games Am. Inc.,* 837 F.3d 1299, 1314, 1316; *see also TecSec*, 978 F.3d at 1294 (claims were patent eligible because they did not simply "use computers to perform" pre-existing human practice more quickly and efficiently). Similarly, the '402 claims are directed to improvements to Internet advertising systems that perform detailed tracking and analysis of a user's Internet behavior to generate first and second quality scores to facilitate selecting an advertisement. Those first and second quality scores are generated using specific rules and

17

algorithms, which the Federal Circuit has held patent eligible. *See, e.g.*, *CardioNet, LLC, v. Infobionic, Inc.,,* 955 F.3d 1358, 1368 ("In our view, the claims 'focus on a specific means or method that improves' cardiac monitoring technology; they are not 'directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery.'").

Further, Walmart's argument is based on an improper overgeneralization of the '402 claims, which is completely "untethered from the language of the claims" and "all but ensures" they would be found directed to an abstract idea. *Contour IP,* 113 F.4th at 1379; *Enfish,* 822 F.3d at 1337; *Alice*, 573 U.S. at 217; *see also* Ex. C ¶ 321. Walmart "ignore[s] what plainly are important aspects of the claims and the focus of the claimed advance in the combination." *TecSec*, 978 F.3d at 1296; *Intell. Ventures II LLC v. BITCO Gen. Ins. Corp.*, 362 F. Supp. 3d 370, 377 (E.D. Tex. 2019) ("Contrary to Defendants' focus on the abstractness of developing a personalized access point, Claim 14 is directed to using the selection and contribution of content by the users to the respective personalized access points to distribute content through a network."). The '402 claims require much more than "targeted advertising." They are directed to a specific computerized model that improves Internet advertising technology by adapting to and learning from user behavior to determine their value to advertisers and identify advertisements that are more helpful to individual users, leading to greater efficiency and lower spending for advertisers. Ex. C ¶ 323. Specifically, the '402 Patent specification identifies a technological problem, explaining that "approaches to online advertising typically involve pricing schemes in which multiple advertisers specify an amount of money they are willing to pay per impression (or per click or per other action), and in which an advertisement is selected for display to a user based on which advertiser is willing to pay the most money." Ex. B at 1:21-26; Ex. C ¶¶ 38, 322; Dkt. 110-16 ¶ 53. However, "there are inefficiencies in this approach," which does not properly assess "the quality of the user to whom the advertisement will be shown." Ex. B at 1:26-29, 3:2-7; Ex. C ¶¶ 38, 322; Dkt. 110-

18

16 ¶ 53. The '402 Patent claims a technological solution that performs three quality assessments of the user in a cascaded series of interrelated calculations, claiming several innovative elements that improve Internet advertising technology. *See TecSec*, 978 F.3d at 1293. For example, the claims "are directed to a technical solution to a technical problem associated with determining quality levels, including determining a first category, and a second category of interest based on a unique identifier and clustering …." Ex. F at 3-4. As an additional example, the claims require "determining that the need relative to the first category has been met." Ex. B, claims 10, 19.

Moreover, the '402 Patent does not merely recite desired results, because the claims identify *how* this functionality is achieved through limitations such as, for example, determination of quality levels, algorithms, and conversion assessment.

### 2. The '402 claims disclose innovative steps, including calculations regarding first and second quality levels.

Walmart argues that "there is no material fact dispute regarding step two," because "the asserted claims are broadly generic and do not contain meaningful limitations that would restrict them to a non-routine, specific application of the abstract idea." Dkt. 186 at 15. Even if the '402 claims were directed to an abstract idea (they are not), they present unconventional and non-routine computer-based approaches, including a combination of novel elements. For example, as the examiner found, the claims "are directed to a technical solution to a technical problem associated with determining quality levels, including determining a first category, and a second category of interest based on a unique identifier and clustering …." Ex. F at 3-4. As another example, the claims recite several structured, computational steps, including to make predicted associations based on user behavior and performing a conversion assessment based in part on historical click behavior to determine a first or second quality level. Dkt. 128 at 41; Ex. B at 5:51-6:17. As yet another example, a first quality level and a second quality level were not well-known or conventional prior to the '402 Patent, and Walmart does not assert otherwise. The Federal Circuit

has regularly held claims patent eligible at *Alice* Step 2 where, like here, "the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *See DDR Holdings v. Hotels.com, L.P.,* 773 F.3d at 1257, 1265 (*Alice* Step 2 satisfied on summary judgment; claims directed to system where a website visitor clicks on an advertisement hyperlink and a composite "hybrid" webpage is generated that retains the look and feel of site while displaying third-party products); *Weisner v. Google LLC*, 51 F.4th 1073, 1086 (Fed. Cir. 2022) (inventive concept found in "a specific technique for using physical location history data to improve computerized search results" because it "solve[d] a problem particular to the Internet"). To the extent Walmart disagrees the claims are directed to non-conventional, non-routine, specific applications, Walmart merely raises a genuine dispute of material fact that precludes summary judgment.

Walmart also asserts that the '402 claims contain only "abstract functional descriptions [that] are devoid of any technical explanation as to how to implement the purported invention in any inventive way." Dkt. 186 at 16, citing *TLI Communs. LLC v. AV Auto., LLC (In re TLI Communs. LLC Patent Litig.)*, 823 F.3d 607, 615 (Fed. Cir. 2016). On the contrary, the claims include detailed technical explanations regarding how to implement the claim limitations in an inventive way. For example, the "first quality level" is a score predicting the likelihood of an event based on a user's search or purchase activity. Ex. B at 3:62-4:25; Ex. C ¶ 332. To generate this score, the claimed system combines clustering techniques for multiple users with a unique identifier and user profile associated with prior purchase history. Ex. B at 3:39-44, 11:23-13:34; Ex. C ¶ 332. Also, the first or second quality level is based in part on a conversion assessment, which the Court construed as "an indication of how likely it is that a given individual will engage in a desired behavior if presented with an advertisement." Dkt. 128 at 41; Ex. B at 5:51-6:17; Ex. C ¶ 333. As another example, the second quality level is an assessment of advertisement relevance

20

by evaluating whether a user's need within a category has been satisfied, and, if so, predicting related categories of interest. Ex. B at 5:14-50, 10:22-46, 11:6-22; Ex. C ¶ 334. As the specification explains, after determining that a user interested in cameras has purchased a camera, the system may infer interest in related categories such as lenses or instructional materials and generate a second quality level reflecting the likelihood of the user responding to advertisements related to those categories. *Id.* Importantly, the claimed invention provides two routes for providing an advertisement to a user, based on either the first quality level or the second quality level. Ex. B at 19:26-28. In this manner, the system can use different valuations (quality levels) of the user, depending on the type of ad to be displayed. In practice, for example, a banner ad could be displayed based on the first quality level and an ad in a carousel could be displayed based on the second quality level.

Walmart misses the point when it asserts without proof that "conversion assessment is only a computer-automated version of a standard sales process." Dkt. 186 at 17. Even if a conversion assessment were a standard sales process, that does not show that the claimed usage of a conversion assessment is routine. For example, the unconventional "first quality level or the second quality level is based at least in part on a conversion assessment." Ex. B claim 10.

Finally, Walmart cites cases directed to "using known components to carry out an age-old practice." Dkt. 186 at 17. Those cases are inapposite. As Walmart itself points out, in *Bridge & Post*, the "specification confirmed that alleged inventive concept was known and conventional." In contrast, the '402 specification does not state that the invention was known or conventional, and Walmart does not assert otherwise. Dkt. 186 at 17. Similarly, as Walmart points out, the claims in *Intell. Ventures* were directed to "tailoring information and providing it to the user." Dkt. 186 at 17. Specifically, the claims merely applied an abstract idea and recited no more than generic computer elements (a database, a user profile) performing generic computer tasks. *Intell. Ventures*

21

*I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1368 (Fed. Cir. 2015). In contrast, the '402 claims require more than an age-old practice; they require unconventional and non-routine computer-based approaches, reciting several structured, computational steps that require two quality levels. The claimed creation and use of quality levels was not conventional.

## V.     CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion for summary judgment of ineligibility of the Asserted Patents under 35 U.S.C. § 101.

Dated: July 14, 2026

Respectfully submitted,

*/s/ Robert F. Kramer*
Robert F. Kramer
CA Bar No. 181706 (Admitted E.D. Texas)
rkramer@kramerllp.com
Robert C. Mattson (*pro hac vice*)
VA Bar No. 43568
rmattson@kramerllp.com
**KRAMER LLP**
1133 Broadway, Suite 1510
New York, NY 10010
Telephone: (212) 755-6475
Facsimile: (212) 730-8885

Nicole Glauser
Texas Bar No. 24050694
nglauser@kramerllp.com
**KRAMER LLP**
500 W 2nd Street, Suite 1900
Austin, Texas 78701
Telephone: (212) 363-1492

Zachariah A. Higgins (*pro hac vice*)
CA Bar No. 190225
zhiggins@kramerllp.com
Jeremiah A. Armstrong (*pro hac vice*)
CA Bar No. 253705
jarmstrong@kramerllp.com
Rachael Chan (*pro hac vice*)
CA Bar No. 265002
rchan@kramerllp.com
Ryan Dooley (*pro hac vice*)

CA Bar No. 321645
rdooley@kramerllp.com
Robert Y. Xie (*pro hac vice*)
CA Bar No. 329126
rxie@kramerllp.com
**KRAMER LLP**
303 Twin Dolphin Drive, Suite 600
Redwood City, CA 94065
Telephone: (212) 812-8937

Andrea L. Fair
Texas Bar No. 24078488
andrea@millerfairhenry.com
Garrett C. Parish
Texas Bar No. 24125824
garrett@millerfairhenry.com
**MILLER FAIR HENRY PLLC**
1507 Bill Owens Pkwy
Longview, Texas 75604
Telephone: (903) 757-6400
Facsimile: (903) 757-2323

*Attorneys for Plaintiff*
RavenWhite Licensing, LLC

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on July 14, 2026, and any confidential versions are being served by electronic mail.

*/s/ Robert F. Kramer*
Robert F. Kramer

23

████████████████████████████████████

## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

Pursuant to Local Rule CV-5(a)(7), the undersigned counsel hereby certifies that authorization for filing under seal has been previously granted by the Court in the Protective Order (Dkt. No. 51) entered in this case on December 10, 2024.

/s/ Robert F. Kramer
Robert F. Kramer

24