# Exhibit D

# Piranha Media Distrib., LLC v. Hulu, LLC

United States District Court for the Central District of California

September 11, 2024, Decided; September 11, 2024, Filed

CASE NO. 2:24-cv-00498-JLS-KS

**Reporter**

748 F. Supp. 3d 928 *; 2024 U.S. Dist. LEXIS 164644 **; 2024 U.S.P.Q.2D (BNA) 1644

PIRANHA MEDIA DISTRIBUTION, LLC, Plaintiff, v. HULU, LLC, Defendant.

**Subsequent History:** Appeal filed, 10/08/2024

**Counsel:** **[**1]** For Hulu LLC, Defendant: Christopher Scott Ponder, Harper Siems Batts, LEAD ATTORNEY, Jeffrey Liang, Sheppard Mullin Richter and Hampton LLP, Menlo Park, CA; Lai Lam Yip, Sheppard Mullin Richter and Hampton LLP, San Francisco, CA.

For Piranha Media Distribution LLC, Plaintiff: Charles S. Barquist, Maschoff Brennan, Los Angeles, CA; Curt Holbreich, David L Alberti, Hong Syd Lin, Jeremiah A Armstrong, Robert Francois Kramer, LEAD ATTORNEY, Russell S Tonkovich, Sal Lim, Zachariah Allen Higgins, Kramer Alberti Lim and Tonkovich LLP, Burlingame, CA; Robert C. Mattson, PRO HAC VICE, Kramer Alberti Lim and Tonkovich LLC, Alexandria, VA.

**Judges:** HONORABLE JOSEPHINE L. STATON, UNITED STATES DISTRICT JUDGE.

**Opinion by:** JOSEPHINE L. STATON

## Opinion

**[*930] ORDER GRANTING DEFENDANT'S MOTION TO DISMISS (Doc. 23)**

Before the Court is a Motion to Dismiss filed by Defendant Hulu, LLC. (Mot., Doc. 23.) Plaintiff Piranha Media Distribution, LLC opposed, and Hulu responded. (Opp., Doc. 28; Reply, Doc. 30.) Having considered the parties' briefs and held oral argument, the Court now GRANTS Hulu's Motion for the reasons stated below.

### I. BACKGROUND

Piranha initiated this action for patent infringement against Hulu on January 19, 2024. (*See* Compl., Doc. **[**2]** 1.) Piranha's claims arise from two patents, U.S. Patent No. 10,986,403 ("'403 Patent") and U.S. Patent No. 11,463,768 ("'768 Patent"), which both relate to the integration of advertising content into digital media streams. (*Id.* ¶¶ 1-2.) Piranha alleges that Hulu has engaged in unauthorized use of Piranha's patented technologies. (*Id.* ¶ 3.) Hulu has moved to dismiss the Complaint, arguing that the claims of the asserted patents were ineligible for patenting under the U.S. Patent Act, 35 U.S.C. § 101. (Mot. at 2.)

The parties agree that, for the purposes of this Motion, the Court can treat the '403 Patent, and in particular claim 1 of the '403 Patent, as the representative claim. (*See* Mot. at 21; Opp. at 11, 15.) Claim 1 of the '403 Patent claims:

> A digital media player device for controlling digital media presentations, the digital media player device comprising:
>
> > one or more processors for receiving data comprising digital media content and digital advertising content;
> >
> > a user interface input for allowing a user to control a course of presentation of the digital media content received;
> >
> > an intersplicer for controlling one or more

insertion points of the digital advertising content into the digital media content thereby sequencing the digital media content and the digital advertising content,

> the sequencing comprising ordering one or more **[**3]** data blocks of the digital media content and one or more data blocks of the digital advertising content into a content stream playable as audio or visual content perceivable by the user, **[*931]** the content stream comprising one or more initially sequenced insertion points at which the digital advertising content is scheduled to be presented relative to the digital media content during play;
>
> in response to user input updating a current play position in the content stream to a new play position in the content stream, the one or more processors using one or more adaptive preference rules to adaptively modify a presentation position of the digital advertising content from at least one of the one or more initially sequenced insertion points to one or more alternatively sequenced insertion points in the digital media content,
>
> at least one of the one or more alternatively sequenced insertion points being different than the one or more initially sequenced insertion points relative to the digital media content within the content stream;
>
> the one or more alternatively sequenced insertion points being adaptively selectable by the intersplicer according to selection criteria defined by the one or more adaptive **[**4]** preference rules taking into account the new play position and at least one of a length of time associated with playing the digital media content and a number of digital media data blocks of the digital media content to be played,
>
> such that at least one of the alternatively sequenced insertion points is positioned at a play position in the digital media content that satisfies a condition selected from:
>
> the play position being a predetermined length of time after the new play position,
>
> the play position being a predetermined number of digital media data blocks after the new play position; and
>
> a user interface output for causing presentation of the content stream during a play period associated with one or more states of play such that a part of the digital advertising content is adaptively played at the one or more alternatively sequenced insertion points, instead of at the one or more initially sequenced insertion points; and
>
> at least a first memory for storing a setting to indicate a first state of play, the setting including a first value to indicate presentation of a required part of the digital advertising content is in progress during presentation of the content stream such that responsive **[**5]** to detecting the first value in the first memory, the user interface input is disabled to prevent commands comprising at least one of a user volume control or a user navigation control from altering a course of presentation of the content stream while presentation of the required part of the digital advertising content is in progress.

(Ex. A to Compl., '403 Patent at 43-44, Doc. 1-1.)

According to the allegations of the Complaint, "[t]he

claimed invention allows computer performance of a function not previously performable by a computer (*e.g.*, disabling user interface commands at a digital media player system during a resequenced play period)." (Compl. ¶ 30.) Further, the claims "are directed to specific technological improvements to allow for the wide digital distribution of media content in a way that allows the free use of media properties, on demand, while at **[*932]** the same time offering equitable return to the copyright holder, and providing for a strict level of control over the enforcement of license agreements on the part of the distributor." (*Id.* ¶ 33.)

The '403 Patent had a lengthy prosecution period. Here, the Court takes judicial notice of some of the documents from the underlying patent prosecution **[**6]** before the U.S. Patent & Trademark Office. (*See* Request for Judicial Notice ("RJN"), Doc. 24); *see also Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994) (judicial notice may be taken of "[r]ecords and reports of administrative bodies"). The application for the patent was first filed on June 26, 2003, and the claims were rejected by the Patent & Trademark Office several times. (*See* Exs. 1-6 to RJN; Docs. 24-1-24-6.) An office action dated October 12, 2016, again rejected the claims and Piranha appealed to the Patent Trial & Appeal Board; the Board affirmed the rejection, finding that the claims were patent ineligible under § 101. (*See* Ex. 8 to RJN, PTAB Decision, Doc. 24-8.) Piranha then amended the claims and resubmitted them to the Patent & Trademark Office; those claims were also rejected under § 101. (*See* Ex. 9 to RJN, Doc. 24-9.) Finally, after another round of amending the claims, Piranha was issued the '403 Patent, although the examiner's decision lacked any analysis under § 101. (*See* Ex. 11 to RJN, Doc. 24-11.) Hulu argues that a proper analysis under § 101 dooms the eligibility of the '403 Patent, and, based on its material similarities, the '768 Patent as well. (Mot. at 7, 12.)

## II. <u>LEGAL STANDARD</u>

### A. Motion to Dismiss

In deciding a motion to dismiss under Rule 12(b)(6), courts must accept **[**7]** as true all "well-pleaded factual allegations" in a complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). Furthermore, courts must draw all reasonable inferences in the light most favorable to the non-moving party. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). However, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986)). The complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### B. Patentable Subject Matter Under 35 U.S.C. § 101

Section 101 of the Patent Act defines the subject matter that is eligible for patent protection: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. This section, however, contains important implicit exceptions. "Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216, 134 S. Ct. 2347, 189 L. Ed. 2d 296 (2014) (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589, 133 S. Ct. 2107, 186 L. Ed. 2d 124 (2013)). The concern that drives these exceptions is preemption; laws of nature, natural phenomena, **[**8]** and abstract ideas are "the basic

tools of scientific and technological work," and granting patents based on these exceptions might impede innovation more than it would promote **[*933]** it. *Id.* Yet, to some extent "all inventions ... embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Alice*, 573 U.S. at 217 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 71, 132 S. Ct. 1289, 182 L. Ed. 2d 321 (2012)). "Thus, an invention is not rendered ineligible for patent simply because it involves an abstract concept." *Id.*

The Supreme Court has analyzed § 101 by distinguishing "between patents that claim the 'buildin[g] block[s]' of human ingenuity and those that integrate the building blocks into something more, thereby 'transform[ing]' them into a patent-eligible invention." *Id.* (alterations in original) (citations omitted) (quoting *Mayo*, 566 U.S. at 72, 89). In *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, the Supreme Court set forth a two-step framework for distinguishing between these two types of patents. "First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. If so, we then ask, '[w]hat else is there in the claims before us?'" *Alice*, 573 U.S. at 217 (alteration in original) (citations omitted) (citing and quoting *Mayo*, 566 U.S. at 78). The second step is essentially **[**9]** "a search for an 'inventive concept'—*i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* at 217-18 (alteration in original) (quoting *Mayo*, 566 U.S. at 72-73). The elements of each claim must therefore be considered both individually and "as an ordered combination." *Mayo*, 566 U.S. at 79.

"Issues of patent-eligible subject matter are questions of law." *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1369 (Fed. Cir. 2011). In attempting to invalidate a patent on Section 101 grounds, a challenger must overcome the presumption that "every issued patent is presumed to have been issued validly absent clear and convincing evidence to the contrary." *Open Text S.A. v. Alfresco Software Ltd.*, 2014 U.S. Dist. LEXIS 132080, 2014 WL 4684429, at *3 (N.D. Cal. Sept. 19, 2014); *see also State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1067 (Fed. Cir. 2003) ("A party seeking to establish that particular claims are invalid must overcome the presumption of validity in 35 U.S.C. § 282 by clear and convincing evidence.").

## III. ANALYSIS

First, the Court addresses whether this Motion may be resolved at the present stage of the litigation or, as Piranha argues, whether the Court needs to wait until claim construction to resolve the meaning of the term "intersplicer." (*See* Opp. at 11.) In response, Hulu asserts that the Court need not await claim construction because even if the Court accepts the definition of **[**10]** intersplicer that is most favorable to Piranha, the patent is still ineligible under § 101. (*See* Reply at 22.) Therefore, the Court accepts Piranha's proposed definition of intersplicer for the purpose of deciding this Motion:

> [A] digital rights management software that enforces the conveyance of advertisements inserted into a digital media stream for presentation during the course of media playback to allow for free, unlimited viewing of requested digital media through a general licensing process that is transparent to the user.

(Opp. at 12.) If, even under that favorable definition, the claims of the '403 Patent are ineligible, the action may be properly dismissed without claim construction. *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1349 (Fed. Cir. 2014) **[*934]** (because "claim construction is not an inviolable prerequisite to a validity determination under § 101," a district court may resolve patent eligibility where it construes terms "in the manner most favorable to" the plaintiff).

Second, the Court addresses Hulu's argument that the decision issued by the Patent Trial and Appeal

Board on August 12, 2020, has preclusive effect on the Court's analysis. Specifically, Hulu argues that when the Board "issues a final decision against a party on a patent issue, this has issue **[**11]** preclusion effect against that same party relitigating that same issue in a district court action." (Mot. at 31.) Piranha responds that the claim adjudicated in the August 2020 decision is different in scope than the claims at issue here and that the addition of the intersplicer clause materially changes the claim. (Opp. at 25-26.) The Court rejects Hulu's preclusion argument as unsupported by caselaw and reaches the merits of the parties' positions. But the Court does rely on the Board's decision to the extent that the Court finds the reasoning persuasive and relevant to the analysis of the '403 Patent.

Accordingly, the Court proceeds with its patent-eligibility analysis. As the Supreme Court's two-step test dictates, the Court begins by determining whether the claims at issue are directed to an abstract, patent-ineligible concept. Because the Court holds that Piranha's patent is directed to an abstract concept, the Court then assesses whether the patent contains an inventive concept sufficient to transform the abstract idea.

**A. Abstract Idea**

Hulu argues that claim 1, the representative claim of the '403 Patent, is directed to "the abstract idea of preventing ad skipping by receiving, organizing, displaying, **[**12]** and storing data." (Mot. at 13-14.) Breaking that concept into two parts, Hulu further argues that preventing ad skipping is a longstanding concept and is closely related to the concept of "displaying an advertisement in exchange for access to copyrighted media," which the Federal Circuit has already deemed abstract. (*Id.* at 14 (quoting *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 714 (Fed. Cir. 2014)).) And as to receiving, organizing, displaying, and storing data—which is how Hulu characterizes claim 1—Hulu asserts that the Federal Circuit has also already found similar data-related processes to be abstract. (*Id.* at 15); *see also Electric Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1351-52, 1354-55 (Fed. Cir. 2016) (considering a patent for a "method of detecting events on an interconnected electric power grid ... and automatically analyzing the events" through the receipt and display of data and explaining that the analyzing of information and display of the results, "without more," is abstract); *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1339-40 (Fed. Cir. 2017) ("*Intellectual Ventures*") (considering a patent for a "system and method for editing XML documents" that created dynamic documents to permit user modification of XML data through a special interface and explaining that the recitation of "data manipulation steps" is often an abstract process).

The Court finds these arguments persuasive. **[**13]** Piranha objects to Hulu's characterization of claim 1 of the '403 Patent, arguing that Hulu "groups eight claim elements together" into a single abstract idea that "overgeneralize[es]" the claim language and "gloss[es] over" the claim elements. (Opp. at 17.) But the Court agrees that claim 1 simply details a process for receiving and displaying data, here digital media and digital advertising content. The processor "receiv[es]" the digital content; it then sequences the content, meaning it places the data in order, interspersing **[*935]** blocks of media content with blocks of advertising content; it then displays the content stream. (*See* Ex. A to Complaint, '403 Patent at 43.) The next elements of the claim describe the processor's ability to "adaptively modify," *i.e.* reorder the blocks of advertising content, in response to the user input of updating the play position in the entire content stream. (*Id.*) The "user interface output" presents the content stream, with the blocks of advertising content alternatively sequenced throughout the stream. (*Id.*) Finally, the processer disables the user interface input during the display of advertising content so that the user cannot "alter[]" the presentation of the content **[**14]** stream. (*Id.* at 43-44.) As the Patent Trial & Appeal Board noted, organizing content, storing data, and disallowing choice are all mental processes; none of the added

language in claim 1 changes that conclusion. (*See* Ex. 8 to RJN, PTAB Decision at 16-17.) Rather, claim 1 continues to resemble the abstract ideas in *Electric Power Group* and *Intellectual Ventures* by describing a process that boils down to the receipt, display, and manipulation of data.

Piranha also argues that the claims "are directed to software that makes non-abstract improvements to computer-based [] technologies," and that Federal Circuit precedent establishes that such claims are patent eligible. (Opp. at 13.) But the Federal Circuit cases that Piranha cites are easily distinguishable and show why the '403 Patent does not make a non-abstract improvement. Piranha identifies two cases, *Finjan, Inc. v. Blue Coat Systems, Inc.*, 879 F.3d 1299 (Fed. Cir. 2018) and *Ancora Technologies Inc. v. HTC America, Inc.*, 908 F.3d 1343 (Fed. Cir. 2018). In *Finjan*, the at-issue patent "recite[d] a system and method for providing computer security at a network gateway by comparing security profiles associated with requested files to the security policies of requesting users." 879 F.3d at 1302. The Federal Circuit characterized the system as a "'behavior-based' approach to virus scanning"—an approach in which the **[**15]** scans "analyze a downloadable's code and determine whether it performs potentially dangerous or unwanted operations"—which was distinct from the old "'code-matching' systems" that "simply look for the presence of known viruses." *Id.* at 1304. The Federal Circuit reasoned that the patent's claims were "software-based innovations" that made "'non-abstract improvements to computer technology'" because the patent used "a new kind of file" that allowed for improved identification of security threats. *Id.* at 1304-05 (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016)).

Similarly, *Ancora* dealt with a patent related to software licensing records. *See* 908 F.3d at 1345. The patent attempted to improve upon existing methods for "identifying and restricting [] an unauthorized software program's operation" by storing the license record in a novel part of the computer's memory. *Id.* at 1344. By moving the license record to the computer's Basic Input Output System ("BIOS") memory, which is much harder to hack, the patented method improved the security of software programs by preventing alteration of the license. *Id.* at 1345. The patent also provided for a "verification structure," which halted software program operations if the license record for the program did not match the license record stored in the BIOS. **[**16]** *Id.* at 1345. Finding that the patent provided a non-abstract improvement, the Federal Circuit explained, citing *Finjan*, that "[i]mproving security—here, against a computer's unauthorized use of a program—can be a non-abstract computer-functionality improvement if done by a specific technique that departs from earlier approaches to solve a specific computer problem." *Id.* at 1348. Because the patent departed from "previous **[*936]** verification techniques for computer security," it "passe[d] muster under *Alice* step one." *Id.* at 1349.

Piranha argues that, like these cases, claim 1 is "directed to software, including the 'intersplicer,' that improve security by preventing unauthorized use of copyrighted digital media content." (Opp. at 13-14.) But this misstates the central reasoning of *Finjan* and *Ancora*. It is clear from the Federal Circuit's reasoning in both cases that a non-abstract software development must address a *technological* problem—a problem specific to the technology in use. In *Finjan*, the technological problem was computer viruses, unique to computing technology; and in *Ancora*, the problem was vulnerability to hacking software licenses, also unique to computing technology. In contrast, claim 1 does not address a problem with computing technology. Despite **[**17]** Piranha's efforts to analogize to the security concerns raised in *Finjan* and *Ancora* by characterizing claim 1 as being directed at providing a "secure" media system and "preventing unauthorized access," Piranha does not show how claim 1 addresses a technological problem with computers. (Opp. at 14-15.) Nor can Piranha make such a showing. According to Piranha's own framing of claim 1, the claim is directed at "ensur[ing] that copyright holders are not giving away their content for free." (Opp. at 13.) Protecting

copyrighted material is a general problem, not a problem specific to computing technology.

The Court concludes that claim 1 is directed to the abstract idea of displaying an advertisement in exchange for access to copyrighted material, as well as the abstract idea of receiving, organizing, and displaying data. Because the claims at issue are abstract, the Court moves onto the second step of the *Alice* test.

**B. Inventive Concept**

In the second step, the Court considers whether the challenged claims contain an "'inventive concept'—*i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] **[**18]** itself.'" *Alice*, 573 U.S. at 217-18 (alteration in original) (quoting *Mayo*, 566 U.S. at 72-73). This inventive concept ensures "that the [claim] is more than a drafting effort designed to monopolize the [abstract idea]." *Mayo*, 566 U.S. at 77. Thus, an inventive concept requires that the claim "do more than simply state the [abstract idea] while adding the words 'apply it.'" *Id.* at 72.

Hulu argues that claim 1 does not contain an inventive concept because it "recites only generic and conventional computer components and software" and because it is an "'entrepreneurial rather than a technological'" innovation by simply applying the business model of "paid commercial interruptions" to the "streaming context." (Mot. at 18-20 (quoting *Ultramercial*, 772 F.3d at 721 (Mayer, J., concurring)).) Again, the Court agrees with Hulu and finds *Ultramercial* particularly instructive. In *Ultramercial*, the Federal Circuit considered a patent "directed to a method for distributing copyrighted media products over the Internet where the consumer receives a copyrighted media product at no cost in exchange for viewing an advertisement, and the advertiser pays for the copyrighted content." 772 F.3d at 712. The method began with a "facilitator" receiving protected media products from a content provider; then, selecting a sponsor message to be affiliated **[**19]** with the media product; the product was then provided for sale, with restricted access for the general public. *Id.* If a consumer wanted to access **[*937]** the product in exchange for viewing a sponsor message, the consumer would submit the request and the claimed method would display the sponsor message. *Id.* Once display of the message was complete and the consumer had responded to any queries associated with an interactive message, the consumer would gain access to the product and the transaction event was noted in an activity log. *Id.*

The Federal Circuit concluded that these steps "simply" implemented an abstract idea with "routine, conventional activity." *Id.* at 715. The parts of the claimed sequence of steps that appeared unique, such as the use of an activity log, "represent[ed] insignificant 'data-gathering steps.'" *Id.* at 716 (quoting *CyberSource*, 654 F.3d at 1370). The *Ultramercial* court also explained that the "invocation of the Internet [] adds no inventive concept" because it simply applies an abstract idea to a "'particular technological environment.'" *Id.* (quoting *Alice*, 573 U.S. at 222).

The Court finds that the bulk of this reasoning applies to the claimed processes in the '403 Patent. Particularly as to the first steps of claim 1, the Court finds that the patent refers **[**20]** only to insignificant data-gathering steps. The intersplicer collects, sequences, and displays media and advertising content and fails to introduce an inventive concept as to any those functions. *See also Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1371 (Fed. Cir. 2016) ("*Capital One Bank*") (explaining that the "the breakdown and organization of [] entered data according to some criteria" and "the transmission of information derived from that entered data to a computer user, all through the use of conventional computer components ... operating in a conventional manner" are insufficient for patent eligibility). Nor are the sequencing's responsiveness to the play position or the memory storage of that position inventive. Again, these are simply data

organization tools. Relying on user input—here the play position—to affect the data output of how the content blocks are sequenced is just another instruction for the data's display. *See Intellectual Ventures*, 850 F.3d at 1342 (when a process "provides little more than an unspecified set of rules for displaying and organizing [data]," there is no inventive concept). And storing the play position in a first memory refers simply to the implementation of generic computer capabilities related to data storage and memory. *See Alice*, 573 U.S. at 223-24 ("Given the ubiquity of computers, **[**21]** wholly generic computer implementation is not generally the sort of 'additional featur[e]' that provides any [inventive concept]." (cleaned up) (quoting *Mayo*, 566 U.S. at 77)).

This leaves only the question of whether the intersplicer's ability to disable the user interface input and prevent the alteration of the course of presentation of the content stream amounts to an inventive concept. Again, the Court finds the reasoning of the Patent Trial & Appeal Board to remain relevant. The Board explained that the "limitation of disallowing a choice is recited functionally without details on how, technologically or by what algorithm, a disallowance is achieved, and as such is a way of controlling access to resources or data, which is a mental process." (Ex. 8 to RJN, PTAB Decision at 17 (citing *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1327 (Fed. Cir. 2020)).) Claim 1, which states that "the user interface input is disabled to prevent commands," features this same shortcoming. (Ex. A to Compl., '403 Patent at 43.) The claim does not provide any detail for how the disabling occurs or what technological innovation drives the disallowance. "[T]he claim language here provides only a result-oriented solution, with insufficient **[*938]** detail for how a computer accomplishes it." *Intellectual Ventures*, 850 F.3d at 1342.

Piranha contends **[**22]** that the addition of the intersplicer should change this analysis, but the intersplicer itself is not an inventive concept. Though Piranha describes the intersplicer as a "new" type of "digital rights management, it is unable to identify what about the intersplicer is inventive. Piranha argues that the Court should accept as true its allegations that this disabling of the user interface was "not previously performable by a computer." (Compl. ¶ 30.) Therefore, because the intersplicer provides this "novel" solution to a problem unique to the streaming context, the claims are patent eligible. (Opp. at 22.) But it is not enough for Piranha to characterize the intersplicer software as "novel" and assert that it uses new, unconventional techniques that amount to an inventive concept, or to rely on the allegations of novelty in the Complaint. (*See id.* at 21-22.) Though the Court must accept well-pleaded allegations as true at the motion-to-dismiss stage, "the important inquiry for a § 101 analysis is to look to the claim." *Accenture Glob. Servs. v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013). The patent claims must actually "recite particular features" and show how the "steps are undertaken" for a court to evaluate purported novelty in the patented technique. **[**23]** *Intellectual Ventures*, 850 F.3d at 1342.

Additionally, the cases that Piranha cites in support of this argument are again distinguishable. Piranha relies on a line of cases from the Federal Circuit in which claims were found to be patent eligible because "the claimed solution [was] necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014). But, as discussed, the intersplicer does not claim a solution that is specific to computer networks; the need to protect access to copyrighted material is a general problem and the invocation of the Internet does not, on its own, add an inventive concept. *See Ultramercial*, 772 F.3d at 716.

Nor does the intersplicer use a sufficiently specific technique to improve upon computer networks. For example, in *DDR Holdings, LLC v. Hotels.com, L.P.*, the patent at issue created "an automatically-

generated hybrid web page that combines visual 'look and feel' elements from the host website and product information from the third-party merchant's website related to [a] clicked advertisement." at 773 F.3d at 1247. The claims described the steps for generating this hybrid website and the Federal Circuit observed that the patent "recite[d] a *specific* way to automate the creation of a composite web page." *Id.* at 1259 (emphasis **[**24]** added). Similarly, in *Cooperative Entertainment, Inc. v. Kollective Technology, Inc.*, the claims "recite[d] a *specific* type of content-sharing network" and it was the "*specific* network structure" that rendered the claims inventive. 50 F.4th 127, 131-32 (Fed. Cir. 2022) (emphasis added). If claim 1 provided the *specific* technique for disabling the user interface, perhaps these cases would be more applicable. But, as the Patent Trial & Appeal Board noted, a claim must discuss why a process was previously "technologically unachievable" and "recite how" the process is performed. (Ex. 8 to RJN, PTAB Decision at 26.) The '403 Patent does not do this, even with the addition of the intersplicer clause.

As a result, the Court concludes that the asserted claims are directed at an abstract idea and do not contain an inventive concept. The claims are patent ineligible and are invalid under § 101, and the claim for **[*939]** patent infringement is DISMISSED WITH PREJUDICE.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Hulu's Motion to Dismiss. The action is DISMISSED WITH PREJUDICE. Hulu shall lodge a proposed judgment within five (5) days of the issuance of this Order.

DATED: September 11, 2024

/s/ Josephine L. Staton

HON. JOSEPHINE L. STATON

UNITED **[**25]** STATES DISTRICT JUDGE

## FINAL JUDGMENT

Pursuant to the Court's September 11, 2024 Order (Doc. 50) granting Defendant's Motion to Dismiss (Doc. 23), JUDGMENT is hereby entered in favor of Defendant Hulu, LLC and against Plaintiff Piranha Media Distribution, LLC, and IT IS HEREBY ORDERED, ADJUDGED, AND DECLARED that:

1. Plaintiff shall take nothing by its complaint;

2. Hulu, as the prevailing party in this action, may seek costs in accordance with Local Rule 54 and Federal Rule of Civil Procedure 54.

**IT IS SO ORDERED**.

Dated: September 20, 2024

/s/ Josephine L. Staton

HON. JOSEPHINE L. STATON

UNITED STATES DISTRICT JUDGE

End of Document