UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

RAVENWHITE LICENSING LLC )
VS. ) CIVIL ACTION
THE HOME DEPOT, INC., ET AL ) NO. 2:24-CV-00688
_______________________________)

PRETRIAL CONFERENCE HEARING ON SEPTEMBER 16, 2026
OFFICIAL TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE
MARSHALL, TEXAS

FOR THE PLAINTIFF:

Robert F. Kramer
Robert C. Mattson
Kramer LLP
1133 Broadway
Suite 1510
New York, New York 10010

Zachariah A. Higgins
Rachael Chan
Kramer LLP
303 Twin Dolphin Drive
Suite 600
Redwood City, California 94065

FOR THE DEFENDANTS:

Eric James Enger
William Brown Collier, Jr.
Heim, Payne & Chorush LLP
609 Main Street
Suite 3200
Houston, Texas 77002

Roger Brian Craft
Findlay Craft P.C.
7270 Crosswater Avenue
Suite B
Tyler, Texas 75703

Amir H. Alavi
Alavi & Anaipakos PLLC
600 Main Street
Suite 3200
Houston, Texas 77002

Produced by mechanical stenography, transcript produced by computer.

JODI D. TERRY, RPR
FEDERAL OFFICIAL COURT REPORTER
300 FANNIN STREET, ROOM 4209
SHREVEPORT, LOUISIANA 71101
(318) 934-4755

COURT SECURITY OFFICER: All rise.

THE COURT: Good afternoon. Please be seated.

For the record, we are here for the completion of the pretrial conference in RavenWhite Licensing versus Walmart, which is under our lead Case Number 2:24-688.

Would counsel state their appearances for the record.

MR. KRAMER: Good afternoon, Your Honor. Robert Kramer on behalf of the plaintiff, RavenWhite. Along with me are my colleagues, Zack Higgins, Robert Mattson, and Rachael Chan. Ms. Fair is upstairs in the trial and apologizes.

THE COURT: All right. Thank you, Mr. Kramer.

MR. CRAFT: Good morning, Your Honor. Brian Craft here. Good afternoon, I should say. Brian Craft here on behalf of Walmart. With me is Mr. Amir Alavi, Mr. Eric Enger, and Will Collier. We are ready to proceed.

THE COURT: All right. Thank you, Mr. Craft.

The agenda for this afternoon, I think the primary item is the preadmission of exhibits and I understand that counsel have submitted bucket lists for the objections and I'll see that those are placed in the record as exhibits to the minutes in this case.

There was also a motion in limine, Defendants' Motion in Limine Number One that was carried at the pretrial conference to be taken up at this hearing or in some other

way addressed.

I would like to confirm that the amended pretrial order takes care of all of the issues that were still contested in the original pretrial order, and then to the extent we have additional time to take up oral argument on the motions that counsel for defendants identified in their request following the last pretrial conference.

I will also confirm for the record that this case has been placed on the list of cases that are being readied for Judge Gilstrap's November 6th trial date. There are more cases currently in that category than I expect will be on the order of trials order that will issue from Judge Gilstrap probably around the end of this month or first of next month.

But in any event, as soon as that order has been established, it will be clear where Ravenwhite stands in that listing.

Does the plaintiff have any other items that it wants to see addressed this afternoon?

MR. KRAMER: We do not, Your Honor.

THE COURT: All right. What about defendant?

MR. ALAVI: We do not, Your Honor, but I do have an update on the buckets that we submitted last night because the parties diligently worked late last night and this morning to try to resolve some disputes. I thought

maybe it would be worthwhile to tell you those resolutions now before we get into each bucket.

THE COURT: That is fine.

MR. ALAVI: So these all relate to RavenWhite's exhibits. Bucket number four, which is Plaintiff's Exhibits 16, 17, and 18, the parties agree that the admissibility of those exhibits will turn on the Court's ruling on the Daubert motion. So there is no need to take up argument and when the Court rules the parties agree that the exhibits are either in or out based on the Court's ruling. So there is no need to take any argument on bucket number four.

THE COURT: All right.

MR. ALAVI: And on bucket number five we have -- these are documents involving revenue numbers and large numbers, we have reached an agreement on redaction as to all of the exhibits and the only exhibit that we will be arguing over is Plaintiff's Exhibit 20, which happens to be a representative exhibit.

THE COURT: So will that, once we have addressed Plaintiff's Exhibit 20, also resolve the defendants' Motion in Limine Number One?

MR. ALAVI: I don't know if it will -- it will certainly resolve it with respect to exhibits. We still believe the mill is appropriate to prevent expert witnesses

and other witnesses from, without using the exhibit, reciting large numbers without first approaching the Court and asking permission to do so.

THE COURT: Well, as long as it would be understood that any of the numbers that are in the exhibits that have been pre-admitted are fair game, then what you are saying is that you would request that Defendants would request that the Motion in Limine be granted to the extent that if larger numbers than those are sought to be used that there should be prior leave sought?

MR. ALAVI: That is correct, Your Honor. You can see an expert without an exhibit saying, well, Walmart's revenue for advertising is [redacted]. You don't need an exhibit to say that as a witness, or we do believe that the mill is still appropriate to prevent that type of unexpected testimony that is not tied to an admitted exhibit. But we agree that the numbers in the admitted exhibits, as redacted, are fair game without approaching.

THE COURT: All right. I'll -- I will hear from counsel for plaintiff on that when we get there. Is that your understanding of the extent of the agreement you wanted to mention?

MR. ALAVI: That is, Your Honor.

THE COURT: All right. And I guess perhaps, Mr. Alavi, while you're up or almost up, I want to hear from

both sides if they believe the amended pretrial order resolves all of the issues that were still in dispute from the original pretrial order.

MR. ALAVI: I believe it does from the defendants' perspective, Your Honor.

THE COURT: All right. Thank you.

MR. KRAMER: And it does, Your Honor, from the plaintiffs's perspective.

THE COURT: All right. Mr. Kramer, tell me what is your reaction to the suggestion that with respect to the large numbers issue that was carried in Defendants' Motion in Limine Number One and is agreed to, to some extent, in the category five of the objections, is there any reason why the Court should not say that the Defendants' Motion in Limine Number One is granted to the extent that use of numbers that are larger than those that are in the pre-admitted exhibits requires leave of Court?

MR. KRAMER: I see a lot of heads nodding okay over here and so I think we're okay with it, Your Honor.

THE COURT: All right. Then I will try to include this in the minutes, but Defendants' Motion in Limine Number One will be granted to that extent and we'll spell that out.

And we'll get to the arguments on Plaintiff's Exhibit 20 shortly. In fact, why don't we turn to the objections to exhibits now and we can take them up in whatever order

counsel think is most efficient. But I would like to hear from the defendants about the objections to the plaintiff's exhibits.

MR. ALAVI: Your Honor, we suggest we take it up in the order that we presented in the Court's -- in the email to the Court, if that is acceptable to the Court and to counsel.

THE COURT: If by that you mean in the order of the groups that are on that list?

MR. ALAVI: That is right, Your Honor.

THE COURT: All right. That is fine.

Good afternoon, Mr. Enger.

MR. ENGER: Good afternoon, Your Honor. Eric Enger on behalf of the defendant, Walmart.

If I might have the ELMO, please.

All right, Your Honor, we'll start with RavenWhite's exhibits bucket number one. This includes four exhibits. Plaintiff's Exhibit 1 and 22 through 24. Each of these exhibits were created by RavenWhite's infringement expert, Dr. Smith. And the parties agreed that Plaintiff's Exhibit 22 and 23 are representative. We believe that each of these exhibits are inadmissible hearsay under Rule 802. What I have shown Your Honor on the screen is Plaintiff's Exhibit 22. This is one of the representative exhibits. And it is also, coincidentally, Exhibit F to Dr. Smith's infringement

report. You can see that right there on the top right.

And this is a table that Dr. Smith graded for his infringement report that lists various Walmart advertising models, whether or not Dr. Smith believes the ad model infringes and, importantly, the reason why Dr. Smith believes it infringes. That is highlighted --

THE COURT: Mr. Enger, I think at this point I have heard enough to require the plaintiff to respond, and then I'll let you respond to that as necessary. But I don't see a way around the hearsay objection.

MR. HIGGINS: Your Honor, Zack Higgins for plaintiff, RavenWhite. So that exhibit is a -- we believe it should be admissible as a summary under Rule 1006. The first -- even just the first cell of the first column in what Mr. Enger was just showing is a summary, a cross reference of one of the admitted exhibits. And to get to the point of understanding what that cell is referring to, you have to look at three different pages of one of the admitted exhibits.

THE COURT: I understand that. But a summary, by definition, has to be something that does not include the judgment of the creator of the document. It is just supposed to reflect underlying contents. How does this not reflect your expert's judgment?

MR. HIGGINS: So the language that Mr. Enger was

referring to is essentially a checklist. There are more than 40 different portions of -- 40 different models that are being referred to, some of which are included in Mr. Smith's opinion for infringement and some of which are not. This is a checklist repeating the same language over and over again as to whether it is included in his opinion and, if so, under which of two buckets. So it's not actually some statement that involves anything complicated, Your Honor. It is essentially he could have had a checkbox instead.

THE COURT: And that would be hearsay, too. I mean, this represents his testimony. It is very rare for one of the attachments to an expert's report to be itself admissible, but if you want to show me what part of it you say is simply quoting from underlying admissible documents, I'll be happy to consider that.

MR. HIGGINS: Okay, Your Honor. Well, on a different tack, as we hear you on the Rule 1006, we also submit that it should be admissible under Rule 807 under residual hearsay because the underlying exhibits, like, for example, JX-31 and 35, they are what is called confluence files. They are meant to be viewed with a web browser. They have columns that extend far off to the right. They can't be reproduced on 8 1/2 by 11 paper in any meaningful, readable way. They also don't have separators, graphical

separators across the columns and rows.

So to get to the point of even understanding where the 43 models begin and end in the original is actually quite a chore. So we submit that our exhibit and the reason our expert made the exhibit was to take those unwieldly originals that aren't meant to be shown on paper and to put it in a format that can fit on an 8 1/2 by 11 piece of paper.

THE COURT: Well, he is not just taking numbers from the underlying exhibits, I take it. He is telling you what those numbers represent?

MR. HIGGINS: He is -- for example, there is shorthand abbreviations that these models are referred to. So the first row, for example that we saw a moment ago, the first row refers to OG_CI, which is a reference to two different things in the original document. And so it's not a number, per se, Your Honor, but it's similar that these are shorthand references to these different models.

THE COURT: Well, go ahead and show me one of the representative exhibits and tell me what part of that is just taken from underlying documents.

MR. HIGGINS: Sure.

THE COURT: Now, I see right at the top it says infringing reason.

MR. HIGGINS: Yes, Your Honor.

THE COURT: Is that what the underlying document says?

MR. HIGGINS: No, Your Honor.

THE COURT: I mean --

MR. HIGGINS: Okay. Well, we hear you, Your Honor.

Then the -- our final fallback that we would ask you to consider is to allow us to -- for the expert to use this in a demonstrative under 703 because he is relying on this for his opinion. This is a much easier way to show the underlying facts regarding the existence of the 43 models and which ones fall in which bucket.

THE COURT: Well, the decisions that we're making today are just what exhibits can be pre-admitted. Whether this would be allowed to be used as a demonstrative is a decision that Judge Gilstrap will make based on the objections that are presented to him in accordance with the protocol that you all have agreed to in the admitted pretrial order. And that will depend on what the arguments are at that time. But I can tell you that it's not a close call as to whether this is an admissible exhibit.

MR. HIGGINS: Thank you, Your Honor.

And just to clarify in the last statement that you just made, so you would expect that we would resolve any 703 type of situation with Judge Gilstrap and not with you

today?

THE COURT: No. I mean, that -- certainly, those objections, to the extent they relate to admissibility, will be taken up today. But I am not sure exactly what you mean by 703 type objection.

MR. HIGGINS: Oh, I am sorry, Your Honor. I meant could we get guidance from you today regarding whether you would be inclined to allow our experts to show the underlying data to the jury?

THE COURT: Well, the underlying data is something that you obtained in discovery?

MR. HIGGINS: In this particular case, yes. It's those confluence files that I was referring to. The reason I ask, Your Honor, is because there is going to be -- you will hear me say similar things later today, I suspect, and we might be able to shortcut some of that.

THE COURT: Well, you are talking about confluence files. Are those something that the defendants created and provided to you in discovery, or are those something that your side has put together as part of your trial preparation?

MR. HIGGINS: In this particular case they are from the defendant and they are actually already joint exhibits 31 and 35, and then there are some source code, so...

THE COURT: Okay. So you are certainly able to show the jury any joint exhibits or any exhibits, plaintiff's exhibits that are pre-admitted.

Are you asking about how to go about doing that, or what?

MR. HIGGINS: Oh, I was just merely wondering whether I should bother asking the Court today about this Rule 703 exceptions or permissions to show something to the jury, because I think I heard you explain that we should take that up with Judge Gilstrap, but I just wanted to ask to clarify.

THE COURT: No. What I was referring to taking up with Judge Gilstrap is whether something can be used as a demonstrative.

MR. HIGGINS: Understood. Okay. Thank you, Your Honor.

THE COURT: And that is something that goes through the meet and confer process, and then the morning dispute process, if it hasn't been resolved by the meet and confer. But the exhibits are not subject to that. If, you know, to the extent that this confluence file is part of a joint exhibit, you're free to use it in front of the jury with your witnesses.

MR. HIGGINS: Okay. Thank you, Your Honor.

THE COURT: All right. Well, I will sustain the

defendants' objection to PX-122, 23, and 24 unless there is further argument.

MR. HIGGINS: Yes, Your Honor. There is one -- even though they are in the same bucket there is one outlier in there and that is PX-1. So I think that as to the other three documents in that I think they are all under the same category. But PX-1 is separate.

And I don't know if you would like to hear from the defendants first or me prebutting what I think their arguments might be.

THE COURT: Why don't you show me, what is PX-1.

MR. HIGGINS: Yes, Your Honor.

So, Your Honor, PX-1 may be going for the record for the largest number of pages in a single exhibit because it's what is called an http archive file. Essentially it's a transcript of the communication between the browser and the server. So it is Walmart servers talking to the Walmart software operating on a browser. It records all of the back and forth. And this exhibit has actually more than 9,000 request/response pairs. We want to use this exhibit as the foundation -- it's the just the raw data that is used by our expert in one of the exhibits that is also in this bucket.

And the reason we would like to use it is, first of all, because our expert cites and quotes less than one percent of one percent of the actual data in this document.

And I can get into what -- an example of what that is later.

But we want to make sure that he can, number one, support the facts that he pulled from the archive; and, also, if there is any question about anything else that happened during this transcript or any archive we can have the data available to resolve any question about it.

THE COURT: And what is the formatting of this data? Is it in paper, or is it something that you have on a drive of some kind?

MR. HIGGINS: Well, the original is digital and we actually provided that to Walmart. And so they have exactly the same digital data that we have. This is, again, another example of something that doesn't really work well on paper, Your Honor. But the original, if I can -- thank you. I can show you just the beginning of -- this is actually the beginning part. This is the beginning of the file, Your Honor.

So each of these rows, for example, row number one at the very top, represents a request and response pair between the browser and the server. So the beginning of this file the -- towards the beginning the browser, the user on the browser goes to Walmart.com and presses enter. Five hundred-thirty one request and response pairs later the -- we ended that archive. And the part that our expert wants to cite out of that 531 transactions is one string from one

of those transactions, number 167. And so the raw data is important because that shows proof of yes, this particular cookie got set in transaction number 167, and so that is the raw data that we want to be able to use.

THE COURT: And is that three-ring binder that you have now, is that the full extent of it?

MR. HIGGINS: This is about the extent, Your Honor. And we can work -- we're happy to work with Walmart. But we can work on making this an easier to use format. But the rough -- the fundamental issue is that it is a huge amount of data because it is recording the entire session and we only need a tiny part of it.

THE COURT: All right. Thank you, Mr. Higgins.

MR. ENGER: Your Honor, we believe that this is certainly more in line with what a typical exhibit might look like, but we still believe that this has -- contains hearsay. These are out-of-court statements used to show the truth of the matter asserted.

THE COURT: Who made these out-of-court statements?

MR. ENGER: As I understand it, it was plaintiff's expert, Dr. Smith, or at least someone of his technical underlings.

THE COURT: This is not documentation that was produced by the defendants?

MR. ENGER: No, Your Honor.

As I understand it, plaintiff's expert ran some tests and had some sort of a -- an analyzer or a packet control capture, and then these are the results of those tests that he ran, as I understand it.

THE COURT: So what part would you show me on the first page there that you would say is hearsay?

MR. ENGER: I would say almost all of it, Your Honor. Let me see if I can zoom it a bit. It is tough for me to read.

Yeah, so it's saying that there was a particular message sent at a particular time on a -- by a particular server. And then I think if I -- well, on the first line -- yeah, let me have it.

THE COURT: I mean, the server IP address is just a physical --

MR. ENGER: It's an address.

THE COURT: It is a designation of a server that is not subject to being true or false, is it?

MR. ENGER: True or false.

THE COURT: I mean --

MR. ENGER: I mean, it is what it is. It's not objective, if that's what you are asking.

THE COURT: I -- what we're talking about is what is it? So just saying it is what it is is not --

MR. ENGER: Yes, Your Honor. It's an address of a server that a message could be sent to that particular IP address.

THE COURT: Okay. So I don't see that as -- what -- who is the human that is telling us something that we need to have on the stand under oath?

MR. ENGER: In order to make this -- have this make sense you would need to have an expert who would explain it. I mean, it's, frankly, incomprehensible to a layperson.

THE COURT: You know, what is the difference between this and a blood test?

MR. ENGER: Well, there is some obvious differences, Your Honor, but, you know, in the sense that there are certain results of blood tests, this would be akin to the results of a blood test.

THE COURT: And those aren't considered hearsay? It's -- those are the product of a machine, which you can't cross-examine anyway.

MR. ENGER: I think maybe one difference, Your Honor, is that in the blood test there is no one controlling what is happening at a higher level because all you are doing is you are feeding a drop of blood into the machine; whereas here someone is manipulating -- and by someone I mean plaintiff's expert, Dr. Smith, is manipulating the

computers to do certain things and these are the results of the manipulations that he is doing.

THE COURT: All right. Well, thank you, Mr. Enger.

I guess I need a little bit of explanation from plaintiff's counsel as to how this was created. My initial impression was that this was just something that was obtained from Walmart.

MR. HIGGINS: Yes. Thank you, Your Honor.

We think the blood test analogy is appropriate. And I'll explain that. I can -- I am happy to explain in detail what exactly happened here, at a high level. So, the browser started off just blank. The human touch in Walmart.com at that point the communication is all controlled by Walmart servers, which download -- tell the browser to download Walmart software, then Walmart software, on the browser, talks to the Walmart software on the server. We cannot control what Walmart does when we visit Walmart.com.

So although it is true that a human typed in Walmart.com, that is it. The rest is just a recording of what Walmart software did server-side and browser-side.

If anything, these are statements by Walmart and, therefore, are an admission by the party opponent because we can't change Walmart software.

And to the extent there is any question about any veracity of this file, as I said, we gave them the digital file, a hard file, that http archive file. That's the industry standard way of capturing a session. Google has a tool for analyzing this. So it's very plain vanilla, Your Honor. It's just voluminous.

THE COURT: So what you're saying is that your expert used the Walmart website to create the information that's on this exhibit?

MR. HIGGINS: More accurately, Your Honor, to capture the data that Walmart provided.

THE COURT: And during discovery did you provide this captured data to Walmart?

MR. HIGGINS: We did indeed, Your Honor, as soon as we -- with the expert report part of our production was this, these digital files.

THE COURT: And were they reviewed by the defendants' experts as well and commented in their reports?

MR. HIGGINS: Commented, yes. And I don't believe that the -- counsel for Walmart can correct me if I am wrong. I don't believe that their expert raised any question about the authenticity or anything else about the records. He just commented on their existence and made some observations about them.

THE COURT: All right. Thank you, Mr. Higgins.

Mr. Enger, my impression is that this is testing that the plaintiff's expert ran on the defendants' facility and as far as the veracity of anyone who needs to be tested goes that would be the plaintiff's expert. Why is there anything about this that you can't adequately explore through the discovery from and at trial the cross-examination of the defendants' expert?

MR. ENGER: Well, I do think, Your Honor, that we could explore through cross-examination exactly what this file shows with the defendants' expert. That is absolutely right. Obviously, you can't ask this spreadsheet any questions. It would have to be used with an expert.

THE COURT: Yeah, I don't think that there is a valid hearsay objection to Plaintiff's Exhibit 1.

Is there something other than this type of spreadsheet that is part of this exhibit? I know it is just the first page.

MR. ENGER: Not to my understanding, Your Honor. I believe it all looks very much like this.

THE COURT: All right. Well, I am going to overrule the objection to PX-1.

MR. ENGER: Thank you, Your Honor.

THE COURT: Thank you, Mr. Enger.

Which takes us to the second category with PX-4 as the representative exhibit.

MR. ALAVI: So, Your Honor, the second bucket, which is represented by Plaintiff's Exhibit 4, is a series of third-party articles from the internet. I will give the exhibit numbers for the record. Plaintiff's Exhibit 2, 3, 4, 5, 8, 9, 14, and 30.

These are hearsay statements, out-of-court statements by a nonparty being offered for the truth of the matter asserted. We understand that RavenWhite's expert relies on many of these articles, which experts sometimes do. Whether or not it is appropriate to do so is not at issue with respect to admissibility of the exhibit. It's simply not admissible under the hearsay rule.

And we have some 402, 403 objections and I'm not quite clear whether or not we agreed to any redactions, but this one, for example, that has large revenue numbers would also be subject to 402 and 403. For example, that [redacted] number, which includes not just accused revenue, but unaccused revenue. But our primary objection is hearsay, Your Honor.

THE COURT: All right. Thank you, Mr. Alavi.

MR. HIGGINS: Yes, Your Honor. Well, thanks to your previous guidance, I mean, I think we can short-circuit a lot of this. We are not contesting that it's hearsay and we haven't in our discussions with Walmart before.

On the -- just to clear the record up, we have

already agreed to redact the [redacted]. So that is correct as Counsel suggested might be the case.

And so we -- this is another one, Your Honor, where we -- given your guidance earlier, we would -- I guess we would take this up later. The only thing that I would like to know is if there is some kind of 402, 403 objection to these types of documents, this and other buckets, we would like to know those now while we're all here because, for example, this particular one we quoted our expert relies on a quote saying that Walmart's ad business is important and growing, essentially, or something to that effect. It is an innocuous quote. We don't dispute that it's hearsay, but we don't understand what could be prejudicial about that.

THE COURT: Well, so I am not sure I understand. Are you saying you agree that these are not admissible?

MR. HIGGINS: We agree that they are hearsay. We were thinking that maybe we could get permission to show them just on a demonstrative, but you already gave guidance on that, Your Honor, so we're not going to ask you that repeatedly today.

But we would like to resolve -- if there is some kind of prejudice argument we would like to know what it is so that we're not planning on using this in a demonstrative and asking Judge Gilstrap later, and then finding out that actually there is a recurring theme of prejudice here that

we weren't understanding.

THE COURT: All right. I will sustain the hearsay objection, but I understand your request now is whether there are objection -- relevance or prejudice objections other than the large number issue?

MR. HIGGINS: Yes, Your Honor.

THE COURT: All right.

MR. ALAVI: So, Your Honor, with respect to that, I am not in a position of having gone through each of these articles to identify paragraphs in the articles that, for example, are not relevant or that are prejudicial. But what I would suspect is if they want to put it on a demonstrative and they put one page of the article on the demonstrative, we get it sent to us the night before, if we think there is a paragraph that is somehow prejudicial or not relevant we can raise it in our meet and confer the night before and address it with Judge Gilstrap in the morning.

The one that jumps to mind, obviously, are all of the large numbers that -- some of which have been redacted. But I'll be honest with you I'm not in a position to go line by line, paragraph by paragraph on the series of hearsay articles and tell you which paragraphs we think are not relevant, which are prejudicial, and I didn't expect to have to do that today, but take it up if they want to use it as a demonstrative at trial.

THE COURT: All right. I don't think that is an unreasonable position to be in. So I will just note that I am sustaining the hearsay objection to this bucket two, the third-party arguments bucket. And we'll leave the issue of what, if any, parts of these can be used as demonstratives to be litigated during the trial.

MR. ALAVI: Thank you, Your Honor.

THE COURT: Which takes us to the third bucket, which is entitled white papers.

MR. HIGGINS: I am not sure who -- I think we can short-circuit this one. I believe you are going to -- sorry. I think, Your Honor, we have three buckets that are very, very similar where we agree there is no dispute that they are hearsay and given what -- your guidance just now I think we would expect this next bucket to be resolved the same way because the only difference is the source's academic papers instead of trade papers, so...

THE COURT: All right. Then the hearsay objection to the third bucket is sustained.

Are there other buckets with hearsay that there is no applicable exception to be argued?

MR. HIGGINS: Yes, Your Honor. Bucket number six, which is about the technical papers. It is the same thing except that the source of it was a technical document.

THE COURT: All right. And so if -- what you are

saying is that there is no exception that you contend would cover it?

MR. HIGGINS: Yes. I think that is -- I think that is fair, Your Honor, because -- yeah, both experts in terms of the technical document both experts actually relied on it. But I don't think we are arguing that it is not hearsay.

THE COURT: All right. Then I'll sustain the hearsay objection to bucket six also. So that is two, three and six.

Are there any others that you want to take up in that fashion?

MR. HIGGINS: I think that is it for that one, Your Honor.

THE COURT: All right. That pretty much takes us to the PX-20 issue in bucket five.

MR. ALAVI: That is right, Your Honor.

Just for the record, bucket four is deferred pending the Court's mill ruling.

This one is a little bit more complicated. So let me, if I may, give you a little bit of background. This is -- I want to put on the ELMO the original -- the original exhibit and it has several pages with all types of large revenue numbers. And there is a 402, 403 objection. We've reached an agreement on redactions, which left us a little

perplexed as to why the exhibit is being offered. I'll tell you what the agreement is. The agreement is that everything is redacted except for this box here.

And when we queried why this should even be admitted as an exhibit at all because we were concerned that showing the jury an exhibit, you know, a 20-page exhibit with everything redacted would be prejudicial and would suggest that Walmart is, without saying anything, hiding information, we got an answer that we didn't expect that I would like to go through with you. And I think it is a manufactured rationale to try to get the document in.

The answer we received relates to one of the damage issues in this case. And the damage issue is the following: This document, which reflects a little over [redacted] in revenue for a particular time period, contains both accused revenue and unaccused revenue. That is revenue from the Walmart website is accused revenue. Not all of it, but portions it. But revenue from Walmart's app sales, ad revenue or sales revenue from their mobile app, are admittedly not accused. There is no dispute about that. It is not part of this case.

This number that is in this document contains revenue from both, from the website and the mobile app.

Mr. Weinstein, who is the expert on damages, testified that that is the case. He understands that the

revenue in this document is both internet revenue and app revenue. But he did not apportion out the mobile app revenue because he said he didn't know how to do it. He didn't have sufficient information to be able to apportion it out. That is the subject of the Daubert motion. We think he had sufficient information.

But what we've been told is they would like to introduce this exhibit, even though all of the testimony in the case is that it includes mobile app revenue so that they can argue that, because it says Walmart.com, that it does not include mobile app revenue and, therefore, Mr. Weinstein's damage number is 100 percent accurate. We think that raises a 402, 403 issue.

This document, by everyone's admission, including their expert, is not limited to the internet site that includes the mobile app. And they want to take a line from a document that has been redacted out of context and argue otherwise.

Now, you may say, well, Mr. Alavi, why can't you cross-examine someone about that? And here is the rub. To do so we would have to get into large numbers. So let me show you Joint Exhibit 6. This is an exhibit, and it is really hard to read, that covers revenue for the same time period and it leads -- has the same top line revenue, [redacted]. But it, in detail, explains that that revenue is a

roll-up of revenue not just from the internet site, but also from the mobile app.

And for us to -- if this exhibit, fully redacted, is introduced and used in a way that no witness will support, not even their expert, to suggest that that number that Mr. Weinstein used is only internet revenue, we would have to tie these two documents together by disclosing the revenue. That is we would have to show that this document, which is for the exact same time period, the revenue in this document, which is detailed as having both mobile app and internet revenue, matches the [redacted] revenue in this document. We can't do that without suffering the prejudice of disclosing the large revenue numbers.

So we think given that all of the testimony in the case, even from their expert, is that this document is both mobile app and internet, to introduce it for the reason that has been articulated, which is to take the title of it and suggest otherwise, creates a 402, 403 problem and it should not be admitted.

So sorry for being long-winded. It was a little complicated to get there, but that is the crux of the dispute on this exhibit, Your Honor.

THE COURT: All right. Thank you, Mr. Alavi.

MS. CHAN: Good afternoon, Your Honor. Rachael

Chan for RavenWhite.

So with respect to Counsel's background, that is a fair characterization. This document started -- started in the objections bucket because of Walmart's objections to the large numbers. So through the negotiations process based on their mill and the meet and confer on that, RavenWhite has offered to redact all of the numbers. And Walmart then asked RavenWhite to just withdraw the document. But the document does still have probative value that outweighs any prejudice to Walmart that Walmart would purportedly experience with no large numbers on the document anymore at all.

The probative value of this document is basically what Counsel was saying. But, essentially, to simplify things, the document -- sorry. I lost my -- it's much simpler than that. The document shows what Mr. Weinstein relied upon in coming up with his -- in his calculations for the '823 patent.

Walmart has disputed -- in a motion to strike they argued that this document does improperly include mobile app revenues and they actually cited this document in their motion to strike as a document that he relied upon.

THE COURT: Can you show me the document and describe for me what Mr. Weinstein wants to use it for?

MS. CHAN: So Counsel is -- so Counsel is correct

in that this is what the document would look like with the numbers redacted. And what it shows is that there is no mobile app revenue carved out in these numbers. This is the source data that Walmart provided to RavenWhite and this is the source data that RavenWhite's expert worked with to come up with the damages calculations.

Since Walmart has attacked these calculations by Mr. Weinstein, if this issue gets through the pending motion to strike and shows up in front of the jury, RavenWhite would like to be able to explain to the jury and show the jury that this document does not carve out those numbers.

This all kind of goes back to what we talked about at the last pretrial conference where on that motion to compel we explained that, you know, we requested certain granularity in the revenues and profits figures and a lot of that documentation was withheld. So RavenWhite's expert worked with the available data that was provided.

THE COURT: And so what you want to use this for is to identify to the jury that some figure from Mr. Weinstein's report is -- was revealed or disclosed in the SG&A row?

MS. CHAN: The purpose of it is simply to show that there is no breakout of mobile app revenues in these numbers.

THE COURT: So you are seeking to use, through

Mr. Weinstein, the sales figures for both the accused and the nonaccused device?

MS. CHAN: So that issue -- and thanks for reminding me of that. We wanted to clarify that it is our understanding is that issue is still in dispute based on the prior briefing as to inclusion of mobile app revenues.

THE COURT: So is the theory there that Mr. Weinstein used what was available to him and that is the justification for using the combined term?

MS. CHAN: That's correct, Your Honor.

And just to clarify, you know, these numbers taken from this document are not the ones, you know, that would be shown to the jury. These numbers are, you know, subject to an apportionment factor that then brings them down to the GMV lift attributable to the accused functionalities.

So the only purpose of this document is to show that there is no breakout for mobile app revenues to the extent that that issue still remains in dispute.

THE COURT: And how does it show that, that there is no breakout?

MS. CHAN: Well, we would expect to see some kind of, you know, for -- like, heading in the column. I mean, I think that a layperson, you know, can understand headings and rows and columns and, you know, this court document clearly doesn't show any breakout of mobile app versus

desktop revenues.

THE COURT: How does one looking at this know what revenue is being listed? You're just -- you're talking about the reference to total Walmart.com?

MS. CHAN: That's correct.

I mean, even Walmart agrees that the revenue in this document is the top line numbers. So there wouldn't be -- shouldn't be a dispute on that issue.

And, you know, through the expert's explanation about the rows and columns, you know, that could assist the jury as well.

It's -- the bottom line is that there is still probative value to this exhibit that outweighs any prejudice to Walmart related to concerns about hiding numbers. The jury will already see redactions on, presumably, some of the exhibits, so...

THE COURT: All right. And I take it that what is on the screen now represents one year and there are multiple pages of similar charts?

MS. CHAN: That's correct, Your Honor. This document breaks down, monthly, these dollar figures by -- through several years.

THE COURT: All right. And you are saying that you want to use this document without any of the dollar figures?

MS. CHAN: That is correct, Your Honor.

THE COURT: All right. Thank you, Ms. Chan.

MS. CHAN: Thank you.

MR. ALAVI: Your Honor, there is very little probative value, if any, to this document and let me explain where the prejudice comes from. What we believe the plaintiffs intend to do is to not have Mr. Weinstein say just that this one document didn't break out mobile app numbers and, therefore, I couldn't break it out. He can say that without the document. He can get up there and testify that I was provided spreadsheets that did not break out mobile app revenue from internet app revenue and, therefore, I was unable to do so without this document.

What they want to do and they disclosed to us in our meet and confers is to suggest that because of the title, this is only internet-based revenue and does not include mobile app revenue.

THE COURT: What is only that revenue? If the jury doesn't see any of these dollars, how are they going to connect the phrase Walmart.com site activity to numbers?

MR. ALAVI: What Mr. Weinstein is going to testify to, which I think is accurate, that his damage calculation started with this document. He used the revenue disclosed in this document to make his calculations. He is going to say, I did not deduct mobile app revenue. And we think the

plaintiffs want to use the title to suggest he didn't have to because this doesn't include any mobile app revenue because the words mobile app don't appear anywhere in the title. That is the risk of prejudice and confusion.

And what is the probative value? He doesn't have to show this document to make that explanation.

THE COURT: Mr. Alavi, I guess to the extent this has probative value it would be to the question of whether Mr. Weinstein was on notice that the numbers that he was using were over-inclusive.

MR. ALAVI: He admitted to that, Your Honor, both in his report and in his deposition. He admitted that he understood that this -- these numbers include mobile app revenue.

THE COURT: But he also contended, I am gathering, that this was the only relevant information that was provided to him for that purpose?

MR. ALAVI: That's his contention and we have a Daubert motion on that. I am not going to argue that Daubert motion. I would be surprised if he could legitimately say that when there are documents like this which break down the revenue by mobile app, desktop, and internet.

The problem that we have is, for us to tie this document to rebut his argument -- look, I am -- let me just

take a step back. I have no problem -- I think it's something that should be granted on their Daubert, but if you deny it, if Mr. Weinstein wants to get up and say I didn't have the data to break out the mobile app revenue, he can say that.

The question is whether or not this should be admitted into evidence and used to confuse the jury and suggest that the revenue he looked at did not include any mobile app revenue, which is how we think it could be intentionally or unintentionally used with the jury. There is no probative value to the title.

If we want to redact this out, the -- that row, then I don't have an objection to it. He can say, look, here are the rows and there is no breakout of mobile app versus nonmobile app. I didn't have the information to do it.

It's the inclusion of this line that is misleading. And what we believe is going to happen, which is the jury is going to be confused and believe that this document does not include any mobile app.

THE COURT: All right. I understand that argument, Mr. Alavi. Thank you.

MR. ALAVI: And the issue for us is we can -- to tie it together to this document, so if they make that argument and he says it doesn't include mobile app, this document is for the same time period, has the same top line

revenue as Exhibit 20. To tie the two together and to show that the revenue in this document is included in Exhibit 20 we would have to show the top line revenue, which is prejudicial.

THE COURT: Well, if Mr. Weinstein admitted in his deposition that those numbers include both, then you wouldn't need to resort to that other exhibit to establish that, would you?

MR. ALAVI: It depends on how much he fights me on the impeachment and whether or not we think we made clear impeachment with the jury, Your Honor. I hear you. We -- impeachment is sometimes easier said than done and it depends on how effective the impeachment is.

THE COURT: But you are saying he did concede that --

MR. ALAVI: He did.

THE COURT: -- in this deposition?

MR. ALAVI: He did.

THE COURT: All right.

MR. ALAVI: But if you're going to let this in I don't know why this highlighted line is probative to anything.

THE COURT: Well --

MR. ALAVI: And it could create confusion.

THE COURT: I intend to explore that with Ms.

Chan. Thank you.

MR. ALAVI: Thank you, Your Honor.

THE COURT: My first question to you, Ms. Chan, is do you agree that the line in PX-20 that has the Walmart.com reference is over-inclusive, that it includes both mobile app and internet revenue?

MS. CHAN: All we would agree to, Your Honor, is clarify that Mr. Weinstein actually testified that he didn't know whether these numbers included mobile app revenues or not.

THE COURT: That is not my question. My question is, do you agree that it includes both mobile app and internet revenue?

MS. CHAN: Can you give me a moment to speak to my team, Your Honor?

THE COURT: Sure.

MS. CHAN: Your Honor, we just don't know. This is why we requested more documents from Walmart and moved to compel.

THE COURT: Do you disagree that Mr. Weinstein conceded in his deposition that that includes both mobile app and internet revenue?

MS. CHAN: Without having that testimony in front of us our recollection is that he did not know. He testified that he did not know. And we can check that, but

that is our recollection on that.

And, you know, the bottom line on that, Your Honor, is this is necessary to explain Mr. Weinstein's methodology. If Walmart takes issue with it they can object or they can cross-examine him on it. But it's --

THE COURT: I can tell you that I am -- if his opinion on this or testimony on this survives the Daubert motion, my inclination would be to admit this. But that would -- it would be with the understanding that you're not going to contend to the jury that it does -- is not over-inclusive if, in fact, you know that it is. But I don't have that kind of assurance.

Have you looked at the other exhibit that Mr. Alavi was showing that he says has what is the same number from that Walmart.com row and shows it broken down into both mobile app and internet revenue?

MS. CHAN: We have not looked at that exhibit with respect to the specific line of reasoning from Walmart yet because this is the first time we have heard kind of the full reasoning that they have in their objection here.

THE COURT: Interesting.

So that document was not explored with Mr. Weinstein at his deposition?

MS. CHAN: We could check on that, Your Honor.

THE COURT: Is there anybody who was at his

deposition?

MR. ALAVI: Unfortunately, I was not there.

MS. CHAN: I was there. It was a while ago, so I would have to double-check, Your Honor.

I think it is likely that some type of daily -- these were called daily -- I forget the title of these documents. But there were several that were provided by Walmart. So I think it is quite likely that these documents were introduced as an exhibit and I think I remember that. I couldn't tell you the specific month or if that specific data was the subject of new questioning or testimony.

THE COURT: I guess what confuses me is you have agreed to redact all of the numbers, but which I took as an indication that you were not contesting that the numbers are over-inclusive. But that may not be the case.

MS. CHAN: We agreed to redact all of the numbers because there are very large numbers that are top line figures from Walmart.

THE COURT: All right.

MS. CHAN: And these numbers are then apportioned down to the actual accused functionalities.

THE COURT: So these are the numbers that Mr. Weinstein relied upon before he apportioned?

MS. CHAN: The GMV lift numbers are those that were included in Exhibit 5 of his report. I can show that

to Your Honor if you want.

Exhibit 5 then feeds into Exhibit 9, which shows his damages calculations for the '823 patent. And those numbers are line one, and then they are applied -- they are subject to a .12 percent apportionment factor that was based on a proxy personalized compartmentalization technology to get the apportioned GMV lift attributable to the accused functionality.

THE COURT: And do you believe that the issues regarding PX-20 are adequately addressed in the pending Daubert motion?

MS. CHAN: I would agree that the issues with respect to the underlying dispute of whether mobile app -- mobile app revenues are properly included -- or are appropriately addressed in the underlying Daubert briefing. There may be some summary judgment briefing on it as well. But I would have to double-check on that.

THE COURT: Well, what my current inclination is then to carry the defendants' objection to PX-20 to take up in connection with that Daubert motion on Mr. Weinstein so that I can get a better understanding of the evidence on this.

Do you have any reason to think that would not be a way to resolve it?

MS. CHAN: No, Your Honor. I would agree that a

decision on that briefing will certainly help resolve this.

THE COURT: All right. Thank you, Ms. Chan.

MS. CHAN: Thank you, Your Honor.

THE COURT: Mr. Alavi, why shouldn't I proceed in that fashion?

MR. ALAVI: Your Honor, I certainly agree that if you defer until resolving the Daubert motion you will have significantly more information to make the decision. I think that would be helpful.

I would -- and this is not -- this is more to address the issue. We think you should grant the Daubert motion. But if you deny it and you say it is an issue for cross-examination I would just point out the dilemma that we face, which is -- and you heard it from my opposing counsel's argument. They are not willing to concede that this doesn't include mobile app revenue. Mr. Weinstein is now not going to concede that it doesn't. And this line item here is misleading, this yellow line when a document for the exact same time period with the exact same revenue makes clear that it contains both.

And I am surprised that Counsel was not aware of this document and may be why Mr. Weinstein does not do any apportionment. But for us to tie the two documents together we would either need a stipulation that these two documents represent the same revenue, or we are going to be forced in

the position of having to disclose the top-line revenue tying the two documents together.

So that is my only concern is that as you think of the issues, the prejudice issue and the ability for us to tie these two documents is going to be a little difficult for us without some relief from the Court.

THE COURT: All of that argument is premised upon the belief that both mobile app and internet revenues are represented on that line. And I guess that is an issue that I am hoping will be addressed in the briefing of the Daubert motion. But, otherwise, I don't think this is the appropriate way to decide that factual issue.

MR. ALAVI: And I think it is addressed in the Daubert briefing and we are happy to, if the Court has any questions about it, after -- if you are ready, to address any questions you might have.

THE COURT: All right. Well, I am going to overrule the objections to this bucket other than PX-20 with the understanding that there have been agreed redactions which resolve those objections.

With respect to PX-20 I'll carry that to be considered along with the Weinstein Daubert motion.

MR. ALAVI: Thank you, Your Honor.

THE COURT: Thank you.

And that leaves us with the last bucket referred to

as Walmart-Trade Desk MSA.

MR. ENGER: Your Honor, this last bucket, bucket seven of plaintiffs' exhibits comprises one exhibit, Plaintiffs' Exhibit 29. This is the Walmart-Trade Desk master services agreement. Trade Desk is a company that Walmart works with to supply something called off-site ads. And this document is really only relevant to the issue of whether Walmart's off-site ads infringe.

Specifically, RavenWhite wants to use this document to show that Walmart controls the Trade Desk to prove infringement under *Centillion*.

For some background, this document is not cited in any expert report. It wasn't used in any deposition. The first time that it showed its face in this case was during the summary judgment briefing on non-infringement of off-site ads.

All right. If you will indulge me, with that background, we believe it should be excluded under 802 because RavenWhite is using it in a hearsay manner, a non-party admission type way. RavenWhite wants to use this agreement to show how Trade Desk, the other party to the contract, behaves, not how Walmart behaves.

RavenWhite will not use this document to show the facts or the circumstances of the agreement; rather RavenWhite will use this document to create inferences about

how Trade Desk behaves. And that is, again, kind of an out-of-court statement used to prove how Trade -- how the Trade Desk actually performs.

THE COURT: You know, legal contracts are generally not considered hearsay because the issue is not whether the statements are true. It's the legal effect of the statements.

MR. ENGER: And I don't think there is going to be any dispute about what the statements say. It's going to be about the inference about when you read these statements can you attribute to what Trade Desk actually did in the real world. And that is the hearsay problem that we run into.

THE COURT: All right.

MR. ENGER: There is also a 402 objection that I can talk about now or I can wait.

THE COURT: Go ahead. You can give me the flavor of that.

MR. ENGER: So the flavor of that is, again, this only relates to the off-site ads issue. And Walmart has moved for summary judgment on that off-site ads issue. So should the Court grant that summary judgment motion, this document would have absolutely no probative value on anything. So it is kind of a conditional 402 based upon the possibility that Your Honor might grant the summary judgment motion of non-infringement.

THE COURT: All right.

MR. ENGER: Thank you, Your Honor.

THE COURT: Thank you, Mr. Enger.

MR. MATTSON: Good afternoon, Your Honor. Robert Mattson for Plaintiff.

Your Honor is exactly right. Because this exhibit is a contract, it is not hearsay. The last page -- or, actually, the page with the signature shows that both parties signed it. The person signing it for Walmart was the senior vice-president and GM of the Walmart media group. There is no question that this satisfies the hearsay exception.

I am not quite sure I understand what the hearsay argument was, but just to provide a little more context about the document, it is Walmart who put the divided infringement defense into play. The only document I believe right now that mentions this agreement is Defendants' Exhibit 76. I'll show you that, which is --

THE COURT: Tell me what within the master service agreement indicates control of Trade Desk by Walmart.

MR. MATTSON: There is a -- I think the best page is one of the -- it's Exhibit 4 within the statement of work. The next page, I should say. And under the Walmart domain portion you see creative ad serving. Ad serving or ad display is the claim element that Walmart contends is

performed by the Trade Desk and not Walmart. So this is just one example of how this contract breaks down and allocates the division of responsibility between the two parties.

I have got other examples as well, Your Honor. Walmart refers to those even publicly, I believe, as a white-label version of the platforms. So, essentially, Walmart is using the Trade Desk's hardware to provide the Walmart DSP, which is the -- that is how off-site ads are delivered because Walmart doesn't have that technology in-house or hasn't developed it yet, but what they do is they go to a third party and say, hey, we're going to give you our whole algorithm and process for generating audiences that we're going to deliver advertisements to and you're the one that is going to -- and we're going to pay you to deliver them on third-party websites.

So we have got this, the white-label statement here. There is a lot of stuff in this contract, actually, Your Honor.

THE COURT: The motion for summary judgment that has been referred to, is that a motion by the defendant that seeks a ruling that off-site, this -- what is performed by Trade Desk, does not infringe?

MR. MATTSON: It is, Your Honor. And if that argument is granted, then this argument becomes moot.

THE COURT: All right. Well, then I don't think that this is subject to the hearsay objection. I find it's a non-hearsay use and my intention, therefore, is to overrule the objection to PX-29 with the understanding that if that motion for summary judgment, or for that matter, any other ruling removes off-site from the case, that it will be the responsibility of Walmart to raise that, in which case the Court will order that PX-29 be removed from the exhibits.

MR. MATTSON: And, frankly, Your Honor, we would have no occasion to use it if that were the outcome.

THE COURT: All right. Well, at this point I am going to overrule the hearsay objection and we can revisit that if the off-site issue is removed from the case.

Thank you, Mr. Mattson.

And before we turn to the objections to the defendants' exhibits, we will take the afternoon recess. Fifteen minutes.

COURT SECURITY OFFICER: All rise.

(Recess.)

COURT SECURITY OFFICER: All rise.

THE COURT: Thank you. Please be seated.

We can turn now to the plaintiff's objections to the defendants' exhibits.

Mr. Mattson.

MR. MATTSON: Thank you, Your Honor.

Since hearsay seems to be gaining some traction today, I think I'll start there. The -- all of these exhibits are third-party documents, so hearsay. They are not being relied upon as prior art, which, you know, there wouldn't be hearsay because they are not relying on the document for the truth of the matter asserted. These are background documents, I believe. We will wait to hear from Walmart to see how they intend to use them, but they are all -- can I have the ELMO, please?

They are all documents along the same lines as this, which is a -- this is a blog, a Google blog. It's DX-3. Some of them are -- they are all describing a Google, allegedly describing a Google system. Some of them are also by third parties. This is DX-4, Computer World article. All hearsay, Your Honor.

And as I said before, none of them are being used in combination, at least based on the joint pretrial order, so this would also run afoul of the standing Court MIL No. 4, which precludes prior art unless it's being used in a specific accommodation.

THE COURT: All right. Thank you, Mr. Mattson.

MR. ENGER: Your Honor, Mr. Mattson is absolutely right, that these are articles relating to -- they are all from 2009 and they relate to Google's advertising program,

but they are not hearsay for the following reason: And let me give you a little -- well, let me just give you the reason. Because they are not being used for the truth of the matter asserted.

And let me give you some background. They show up -- this is an excerpt from the invalidity expert's report. This is Dr. Almeroth. And this is in the online advertising and technological background of the '402 patent.

So what he is using these for is to show what a person of ordinary skill in the art would know, what kind of background they would have. He is not offering these for the truth of the matter asserted of whether or not Google's system actually works this way, but to kind of set the stage and show what a person of ordinary skill in the art would actually do.

Again, it's not really relevant whether or not Google's system, in fact, worked 100 percent like this. It's really more to show, like, what was available and what was in the background knowledge of one of ordinary skill in the art. So, in that sense, it's no different than a patent because it shows, again, what was available, what a person of ordinary skill in the art knew.

I also heard a discussion about the Court's mill. Again, we are not using this to prove invalidity. This is to set the stage about what a person of ordinary skill in

the art knew, which is one of the *Graham v. John Deere* factors. So that is the relevance and that is the way that it ties in and avoids the Court's mill against using prior art not in a particular combination.

THE COURT: How does the jury know you are not using this to show invalidity?

MR. ENGER: It will be very apparent from Dr. Almeroth's presentation. There will be, like, a background section where he kind of explains what was in the knowledge of one of ordinary skill in the art. And then there will be, like, a slide that says, now we're proving invalidity. And it will explain why a particular prior art that was properly disclosed, according to the Court's timeline, invalidates the '402 patent in this case by showing each and every limitation.

But this particular Google knowledge, or what a person of ordinary skill in the art knew about Google will not be used to invalidate the '402 patent.

THE COURT: And do you use similar technical documents, third-party documents, to establish your invalidity claim?

MR. ENGER: I believe it's mostly patents and printed publications.

THE COURT: Well, aren't these printed publications?

MR. ENGER: Yes. But not -- these relate to Google and, obviously, the prior art that we're relying upon, Hinton and -- the other -- the prior escapes me, the other names. But those are different.

THE COURT: You know, the concern that normally keeps unelected prior art from being admitted as exhibits is the concern that the jury won't know whether this is part of your invalidity case or not, and if the plaintiff doesn't rebut it by showing why it's not anticipating then they run the risk that the jury will think, well, plaintiff never said why that article doesn't anticipate, so they must be conceding that.

So but we routinely say you can discuss this with your expert, but not admit it in the same fashion that your elected prior art, which the plaintiff does have to rebut, is admitted.

So I am going to -- unless you have got other arguments for the Court to consider, I'm going to sustain the objection and say that you can seek to use these as demonstratives, but the prior art like this that is not being offered for a validity cannot be admitted as an exhibit.

MR. ENGER: Understood, Your Honor.

THE COURT: All right. I'll sustain the objection to DX-3, 4, 5, and 6.

MR. MATTSON: Your Honor, one quick point. For the demonstratives I don't think Plaintiff would be losing its right to object through the normal pretrial procedure or during the -- as we discussed before, with the --

THE COURT: You're right.

MR. MATTSON: Okay. Thank you.

THE COURT: I am not ruling on it. I am just pointing out that I am not foreclosing that either.

MR. MATTSON: Thank you.

THE COURT: Which takes us to DX-29.

MR. ALAVI: Mr. Kramer, I may be able to shortcut this one.

Your Honor, I know normally the objecting party will speak first on this, but this is the Home Depot covenant not to sue and unless the Court wants full blown argument over it, you've already heard the argument, you've already granted the motion in limine. We would just like to offer it. We would incorporate our prior arguments.

THE COURT: The CNS's covenant not to sue?

MR. ALAVI: Yes, Your Honor.

THE COURT: All right. I was unclear as to what that acronym was for. But, yes, I will simply say that, for the reasons assigned with respect to Plaintiff's Motion in Limine Number One, this objection is sustained.

MR. ALAVI: Thank you, Your Honor.

THE COURT: Thank you.

Let's turn to the Defendants' Motion in Limine Number One. And I don't know if that is covered by the agreement that was described earlier on the defendants' bucket five of large number documents, but, if so, I want to make the record clear.

MR. ALAVI: Your Honor, I believe at the -- earlier in the hearing we talked about MIL No. 1, and if I recall, the Court indicated and gave us some guidance that you were going to consider granting MIL No. 1 subject to any numbers that are in exhibits that have been admitted can be discussed without violating MIL No. 1. If you would like additional argument I am happy to do so.

THE COURT: Well, what the order on the motions in limine, which is Docket Number 290, at page three, says in reference to Defendants' MIL Number One, the Motion in Limine is carried until the next hearing. The Court ruled that overall revenues and profits would likely be excluded and that top-line net sales revenues would likely be excluded unless they were necessary for the presentation of the royalty analysis. Counsel sought time for further negotiation between the parties.

And so that is the way we left it and so I am now checking in to say, what has the further negotiation yielded?

MR. ALAVI: So, Your Honor -- and maybe we may have a difference of opinion on this, but I think the negotiation was focused on redactions of the financial documents. And we have reached agreement on those redactions. And at least from the defendants' perspective, any number that is in one of those documents that is unredacted is not subject to MIL No. 1 if you grant it.

We would, however, ask the Court to grant MIL No. 1 so that a witness or an expert does not talk about top-line revenue or large numbers that are redacted in the documents and get around -- get around it by having an expert say, for example, you know, total revenue and ad space is [redacted] a quarter when that information was redacted.

So we think MIL No. 1 -- we would ask the Court to grant MIL No. 1 with respect to unapportioned revenues, top-line revenues as laid out there with the caveat that any number that is contained in an exhibit that has been pre-admitted you can talk about it without violating MIL No. 1.

THE COURT: Which is pretty much what we discussed regarding bucket five, I guess.

MR. ALAVI: That's right. Bucket five -- and I would just put on the record there are -- bucket five is not -- is not the only set of redacted documents. There were numerous documents that are not in bucket five where the

parties agreed to redactions of numbers. And so I would just put -- note that on the record because I don't want to limit Plaintiffs to just those exhibits that were listed in bucket five because I think there is some other exhibits, joint exhibits, that have numbers where we have agreed that they -- those numbers come in. So financial documents that are pre-admitted that have numbers, those numbers -- discussion of those numbers would not be a violation of MIL No. 1.

THE COURT: All right.

MR. ALAVI: Thank you, Your Honor.

THE COURT: Thank you, Mr. Alavi.

What is the plaintiff's position on that proposed resolution of Defendants' MIL No. 1?

MS. CHAN: Your Honor, we agree with all that.

THE COURT: All right. In that case then I guess that will go hand in hand with what we said about bucket number five. And I'll make sure that the minutes or a written order, one or the other, reflect this updated ruling on Defendants' MIL No. 1.

MS. CHAN: Thank you, Your Honor.

THE COURT: Thank you, Ms. Chan.

All right. I earlier today granted the defendants' motion to file a supplemental motion for summary judgment on the matter related to the joinder of the additional

plaintiffs. And so my question is, to what extent will that affect the motion that the defendants wanted to argue on non-enforcibility?

MR. ALAVI: Your Honor, I don't think it affects the underlying motion, which is docket -- I think it's Docket 176. The new motion raises the same grounds that are in Docket 176, and then raises a separate standing ground with respect to the newly added plaintiffs. So I think it doesn't impact Docket 176. It just provides coverage as to the new plaintiffs on that motion, and then it adds a separate standing argument as to those new plaintiffs that is not available as to the original plaintiff.

THE COURT: Well, I don't want to put the plaintiff at the disadvantage of having to respond to the motion that was just authorized. I know it has been served in connection with the motion for leave to file it. But I think they're entitled to additional time. But your position is that Docket 176 can be argued without implicating the newer motion?

MR. ALAVI: That's correct, Your Honor.

And I think we filed -- we went ahead and got your order this morning and we actually filed a motion for summary judgment, so it has actually been filed.

So I do think that -- let me phrase it this way. Docket 176 has been fully briefed. With respect to the new

plaintiffs there has been a "me, too" motion on Docket 176 filed. We don't expect the briefing to be any different.

And then there is a second alternative grounds to dismiss the new plaintiffs, which is a standard Article 3 standing issue. So I think Docket 176 is ripe for the Court to rule.

THE COURT: All right. And do you prefer to start with that, or with your 101 motion?

MR. ALAVI: We would prefer to start with the 101 motion, but if the Court would like us to flip it, we're happy to do so.

THE COURT: All right. Thank you, Mr. Alavi.

Does the plaintiff disagree with the idea that the non-enforcibility motion that has been filed for a while can be argued separately from the new motion?

MR. KRAMER: Thank you, Your Honor.

And I'm glad you raised it. We are a bit uncomfortable with this because, as Mr. Alavi just said, there is an additional grounds of statute of art -- you know, Article 3 standing that we haven't had an opportunity, really, to look at and digest. And I hate to do this in pieces that way.

I think if Your Honor would like to hear from us, the parties, on the standing and enforceability issues today, we are glad to do so. But it seems like we now have new

arguments raised; otherwise we would have certainly just stipulated that the pending motion would apply to the newly added owners of the patents, as well, but, apparently, there is additional arguments being presented there that we really haven't had a chance to go through yet.

THE COURT: All right. Thank you, Mr. Kramer.

Let's start and take up the 101 motion, and then we'll see if there is additional time to at least touch somewhat on the non-enforceability motion.

MR. COLLIER: Your Honor, may I pass some slides up real quick?

THE COURT: Yes.

MR. COLLIER: Good afternoon, Your Honor. Willis Collier on behalf of defendant Walmart and I will be addressing the 101 motions.

Both of RavenWhite's '402 and '823 patents that they assert in this case are patent ineligible under Section 101.

The '402 patent claims targeted advertising. Targeted advertising is a concept that the Federal Circuit has repeatedly held as abstract and not patent eligible.

The RavenWhite's '823 patent simply claims the idea of using two cookies, which is a term we'll discuss later, to identify a user or a device. But this two-cookie claim is simply directed -- I think it is effectively directed to the abstract idea of using, say, a primary form of

identification and a secondary form of identification, but done on a web browser.

Neither patent has any technical innovation that can save the claims and make them patent eligible. For example, the steps of the '402 patent can all be done entirely without involving a computer. The '823 patent simply uses generic, well-known techniques such as web cookies or browser storage, saving files on a web browser, and similar techniques that are used to identify a user, which is itself a restrictional, longstanding use of cookies.

But before I get into the technical details of both the patents I want to address an argument that RavenWhite has made, essentially, that the Court shouldn't even address -- RavenWhite's argument is that the Court shouldn't even address the merits of Walmart's motion because, according to RavenWhite, doing so would disturb the Court's prior ruling from the motion to dismiss.

So, as the Court may remember, Walmart moved under Rule 12 to dismiss Walmart -- to dismiss RavenWhite's complaint under Section 101. The Court found, based on arguments that have evolved since that time, that the case should be allowed to proceed. And so RavenWhite now contends that, well, that previous ruling, finding that the complaint survived Walmart's Rule 12 motion, prohibits the Court from re-addressing the abstract idea arguments and the

concept arguments that Walmart raises now.

Now, if this were true, that the arguments are exactly the same between the motion to dismiss and these motions for summary judgment, RavenWhite would actually be arguing the exact same thing now as they did before. But they simply are not.

On the screen, on the slide four, I have a couple of examples of where things have changed since the motion to dismiss phase. The first is on the '402 patent. During the motion to dismiss, or briefing the motion to dismiss, RavenWhite's arguments focused heavily on this claim term "clustering". And I can address that term in more detail later. But, for now, I will just note that they argued at the time, RavenWhite argued at the time, that using clustering was a process -- or it is a process that only exists in the context of computers and the internet and, thus, they argued that the claims of that patent, the '402 patent, were non-abstract. Since that time, though, the Court construed the term "clustering" -- or before I get into that I should note that the Court, they relied on this reasoning in denying Walmart's motion to dismiss.

After the Court issued its report of recommendation, the Court subsequently defined the term "clustering" in a way that foreclosed this argument. Clustering now essentially means clustering data to analyze it.

So RavenWhite has had to shift its position. RavenWhite is now arguing that, instead of clustering and making these claims tied to technology in the non-abstract, their claims instead are directed to a cascading series of interrelated calculations. Now, I will explain why that is also abstract.

But if the issues now at summary judgment were the same as the motion -- as they were in the motion to dismiss, RavenWhite wouldn't be taking this different position.

There is a similar pattern in the '832 patent. At the time of the motion to dismiss Ravenwhite focused on the idea that the '823 patent presents a new type of cookie at issue that we'll get into later. But, again, the Court's claim construction foreclosed that argument.

And so now RavenWhite is arguing, well, it's not so much that it invites a whole new type of cookie, but it overcame problems associated with traditional cookies and now we can use a second cookie to identify a user, which RavenWhite contends is novel.

So, as we can see when looking and comparing these arguments, the issues now, after the Court issued its claim construction ruling, after discovery has been conducted, after the parties have submitted their expert reports, have evolved. And it's appropriate for the Court to directly grant Walmart's motion for summary judgment and not simply

fall back on the motion to dismiss for reasoning.

THE COURT: What do you contend is the Federal Circuit's closest case to your argument here?

MR. COLLIER: So on the '402 patent, Your Honor, it is, I believe, the *Bridge & Post* case. Now, that was one of the cases -- well, one of several cases that -- if I may briefly skip over to slide seven. That was one of the first cases that clearly stated that targeted advertising is an abstract idea and can't be -- cannot be patented.

Subsequently, there have been a number of other cases, but I think *Bridge & Post* is the most straightforward version of that.

For the -- for the '823 patent I believe it is the -- there is the *ShoppersChoice* case, which addresses, amongst other things, storing -- storing persistent user data. I believe that was the case. I apologize, Your Honor. I have got -- I think I have my cases mixed up.

But, yes, this one. So the *ShoppersChoice* case addresses a claim that the patent owner asserted that it provided additional security measures to storing authenticating data, which is similar to the arguments RavenWhite has made now, arguing that the claims of the '823 patent provide this added layer of security and identification that didn't exist, allegedly, prior to their patent.

In that case the Federal Circuit was -- well, found those arguments unpersuasive. One of the important points the Federal Circuit made in that case is that it's not important that -- to the abstract, the Alice and Mayo analysis, that a claim may be, you know, groundbreaking, but the term the Court uses is groundbreaking, innovative, or even brilliant. It's really are the claims themselves abstract or not? Do the claims themselves actually provide the benefit that the patent owner alleges that they provide?

In the case of that case and here the claims were too broad and too generic and simply generically -- generically used computer tools and techniques in their traditional manner. They didn't add anything to the actual function of the computer, even though they were sort of couched in this technical -- technical language.

So if I may jump back to the '402 patent, Your Honor. I'll go to slide six here. I would like to briefly discuss the claims at issue in the '402 patent, and then I'll move on to the '823.

So the '402 patent is what we have been calling the targeted advertising patent. On slide six I have included claim 10 from that patent. And I apologize. It's a long claim, but, fundamentally, it does three things. It determines the first -- what it calls the first quality level for a customer and it determines the second quality

level and it displays an ad based on those two quality levels.

The short version of this is the claim system observes a potential customer's shopping or searching habits and decides whether or not it's worth displaying an ad for them.

Within each of these steps there is, of course, substeps. There is things like determining the likelihood of events or there is a first search or purchase, first quality level, and there is a second search and third search with the second quality level. And the first quality level brings into a type of clustering, that the quality level has to be based on clustering.

But all of this simply comes down to observing a user, observing what they are doing, and then applying, however you want, some sort of value to that customer. Based on those two quality levels the claim says you can display an ad.

And another sort of important point on this claim is that these two quality levels, the first and second, are actually unrelated. So if you follow the logic of the claim, you do whatever you need to do to first identify a first quality level, separately do whatever you need to, to identify a second quality level, and at the end you can display an ad based on one of the two. It actually doesn't

matter.

The Federal Circuit has been consistently clear that observing a customer, figuring out what they might want to buy, and then displaying that is abstract. There is just no way around that conclusion.

All of the steps of this claim can be done with pen and paper. There is even a step in -- near the bottom of the claim where you have to -- the actual language is based -- one of the analyses is based on historic click behavior. Even that can be done by watching someone shop online. There is no real tie to a computer in these claims.

Now, RavenWhite has argued, or will argue, that this sequence of events is what it calls a cascading series of interrelated calculations. But even if we accept that as true, just putting these calculations in order is still abstract. You're observing a customer shop at one point, you're observing them shop at a second point, and then you are displaying an ad based on some metric that you have applied to the customer to their interests in various products.

There is nothing in the claims about how those metrics are weighed. There is no way to take the claims against some numerical value. There is nothing tied to improvement of technology in these claims.

THE COURT: And have you examined the dependent

claims, as well, to be able to say the same is true of those?

MR. COLLIER: Yes, Your Honor.

I don't have in front of me the remaining dependant claims. One is, I believe, 14, which adds this idea of -- there it is. If we can have slide eight.

So claim 14 includes the idea that the clustering or the analysis can be done, including machine learning. But even that doesn't save the claims. The Federal Circuit, within the past year or so, has made it clear that introducing machine learning to a field does not make a claim patent eligible. It is just using another technical tool for its traditional use and you added it on to some other, you know, abstract process.

The remaining claims, I know that the parties have argued this point, that if there is any other difference among any of the claims that would save any of the dependent claims from this patent, the conclusion that -- the '402 claims abstract idea.

And to make one last point on the '402 patent. With the benefit of the Court's claim construction, I have a few of those constructions on the slide. It's clear that there is also nothing that can make this patent survive step two of the Alice and Mayo analysis if there is nothing definitive. These terms, quality like level and clustering

and conversion assessment, are all simply types of data analysis. They are things that you can do with or without a computer and they are not the types of innovative and improvement changes to computer functions that we traditionally would see in a claim that is not abstract. And that would have been patent eligible.

So I would like to move on to the '823 patent, Your Honor. And I'll go to slide 10.

So the '823 patent is what I have been calling the cookie patent, the two-cookie patent. It's directed to identifying a user device using two forms of identification. And in these claims it is particularly cookies or web cookies. As I am sure the Court knows, after all the briefing back and forth on this, cookies are essentially a file saved on a website -- or saved by a website on a visitor's computer or device.

In this case the patent uses, as I'll explain shortly, two types of cookies that only differ -- according to the Court's claim construction, only differ in how they are stored and how they are accessed by a server. Otherwise, those cookies are -- those cookies are then used to identify a device. Other than that distinction, those cookies could be, essentially, a file that could be used to perform the claimed identifications.

So as with the '402 patent, the '823 patent uses

fairly long claim language and I won't get into all the technical jargon of it, but at the end of the day it's a fairly simple process. First, you have a user device where before -- essentially before this claim begins a cookie of a first type was stored on that device and a cookie of the second type was stored on that device. And this is what happens in a previous network session.

The claim system then receives a network request corresponding to the first cookie. Based on that, it determines if some of the information was stored on the user device. Then the system then performs what it calls first and second identifications based on the first and second cookies. And then, finally, it performs -- it's a little unclear on the claim now whether this is tied to the previous identification, but it finally performs a determination based on the presence or absence of certain resource requests that are tied to the two cookies.

So there is, again, some sort of technical jargon in there. But, fundamentally, the claim says, hey, computer, you're going to have these two forms of identification and we're going to use those two forms of identification to figure out who you are. So if we -- you know, if you have the first cookie and don't have the second cookie that can tell me some information. If you have both cookies, but I only get certain resource requests, that can tell me certain

information. At the end of the day, though, this comes down to nothing more than, say, having a birth certificate and a driver's license. They are both forms of identification. They are both given to you ahead of time. And depending on the situation, one or the other will identify you in certain contexts. So if you need a passport you have to provide both. But maybe if you're getting your driver's license -- or if you're, you know, walking into the court, you know, you are going to need your driver's license. You can -- you can come up with all sorts of situations where one or the other of those two identifications alone and in combination can be used to identify you.

The claims -- these -- this claim, in particular, and its dependence don't go beyond that concept, but done in this particular context of a web browser.

So let me go to -- this is slide 12.

RavenWhite has focused on this second cookie, of a second cookie type in the claim and has argued -- or initially argued that it was -- invented a new type of cookie, has now argued that it invented using this second cookie type to identify a user or a device. And that idea is not novel.

The parties in their briefing have drawn this distinction between what we've called a traditional cookie and a nontraditional cookie in the context of this argument.

So the traditional cookie is these types of files that we call cookies that existed on web browsers since web browsers were invented essentially. And a non-traditional cookie is effectively any other file that can be used like a cookie.

Because the claims -- so let me just take a step back. If this new, this second type of cookie were truly novel the claims would actually differentiate between first and second cookie. But the claims themselves are agnostic as to which cookie is which type.

So, for example, let's say you have cookie type A and cookie type B. In the claims of the '823 patent you can have -- you could follow its process and have the first cookie, or the first type be cookie A, or the second, the second type of cookie could be B. But you could also switch it. You could say cookie B is now the first cookie, cookie A is the second cookie.

The reason I mention that is because if the '823 patent, and if this claim, in particular, had intended a new type of cookie, it would have to differentiate. You would expect it to differentiate between the two cookies. It would explain how that second cookie, the new cookie, allegedly new cookie's implemented, how it works, what it does, and all, you know, various technical aspects that would make that happen.

Instead everything in the claim is using existing

technology in their expected way. You are storing files in one of two browser locations. You're using cookies to identify users, which is a long existing use of cookies in general. The only thing that arguably has changed is that you've put one file in a different spot, or you made an existing file into a cookie when maybe before it wasn't a cookie.

This is the -- if I could go to slide 13 here.

This is the exact type of claim that a case like *Finjan* that RavenWhite relies on differentiated from claims that were not abstract. So in *Finjan* the claims were found to be abstract, but the Court, the reasoning that the Federal Circuit provided was that those claims were abstract because they allowed the computer to do something it could not do before.

The '823 patent does exactly what computers did before. They are using cookies to identify users. They are storing them in the existing space on a user's computer.

They -- RavenWhite, part of their arguments in this case, one of their paltry arguments is that the '823 patent allows these cookies to be stored without modifying a web browser by using existing web browsers. They are admitting that the web browsers are doing what they are meant to do. They are not being changed at all.

Going on to step two of the analysis, RavenWhite has

argued that the '823 patent has various security benefits. I mentioned this earlier. You know, for example, it prevents users from deleting cookies. It can make more secure access available. But none of that is reflected in the claims.

And as I indicated earlier, these are the types of arguments that were rejected in cases like *Bridge & Post* and *ShoppersChoice*. In *Bridge & Post* there was a persistent identifier that allegedly couldn't be changed according to the patent owner. But the Fifth Circuit -- the Federal Circuit explained that the claims themselves only use generic computer functions to perform the abstract idea and so they don't reach the -- they are not -- they don't actually claim it as a step when you are just reusing the generic components in a generic way. And, as I mentioned, the *ShoppersChoice* case came to a similar conclusion.

So, Your Honor, if you have no additional questions I would just like to have some time to respond to the other side's arguments.

THE COURT: All right. Thank you, Mr. Collier.

MR. COLLIER: Thank you, Your Honor.

MR. MATTSON: Can I have the ELMO please, Ms. Asbel.

And, Your Honor, if it is okay with you, RavenWhite is going to split the arguments. I am going to handle the

'402 patent and my colleague, Mr. Higgins, will address '823.

THE COURT: That is fine.

MR. MATTSON: So on the '402 patent analysis I'll just start with the *Bridge & Post* case. That case involved tailoring information to the customer targeted marketing. That is not the situation we have here with the claims -- and I'll use claim 10 as the example in the '402 patent. The '402 patent doesn't even recite a step of selecting a -- an advertisement, right? That is the targeting.

The invention here is the sequence of computations that results in a quality level. Not just one quality level, but multiple quality levels. And those are advertiser facing, not customer facing.

And as the claim construction shows, the quality level is the value of a customer to an advertiser or a merchant. It's not the process of selecting marketing tailored to a customer.

That's also consistent with the reasons that the examiner gave when performing the 101 analysis during prosecution. Claims are directed to a technical solution to a technical problem associated with determining quality levels. So this isn't a targeted advertising patent. This is talking about the quality levels that go to the emergence to the advertisers and it improves the accuracy of those

quality levels through this rather long process of computing two different quality levels, and then using one to display the advertising.

Since the report recommendation, Your Honor, the defendants have not come forward with any evidence of why this is not a -- the appropriate measure for judging what the claim is directed to. And what this case is really more like, I would say in terms of Federal Circuit decisions, is *MCRO*. And there the claims were found not to be directed to an abstract idea because they were directed to a combined order of specific rules. And there was never any evidence that the rules were in the conventional public domain. That was the evidence that the Federal Circuit was looking for the defendant to come forward with to show that the very broad label that, just like here, targeted advertising is the label that has been given the claims, that the very broad label isn't the accurate way to describe what the claims are directed to.

Here we have the order-specific sequence of steps to compute not one but two quality levels. And as the examiner said, it is not just all about clustering. There is a lot of things in this claim that lead up to the first and second quality level, includes the clustering, includes the unique identifier, all combined, and then there is, I think, I believe five different determining steps each which are

detailed. But I think the presentation you just saw reduced them to a couple of words.

And then, finally, we have these two forks, you have two quality levels. The display is based on one or the other.

I would say for the step two analysis it is the same issue, Your Honor. There is no evidence of anything that is put forward by Defendants as what is the evidence, what is the reason why the claim limitations are well understood, routine, and conventional. That analysis is missing.

And just as an exemplary step -- well, I will just start by saying that there is also a reason why there is no anticipatory references being put forward in this case either. It's only combinations of references because there is no evidence that every step was well understood, routine, and conventional.

In just one example, I mean, the final one is an example of something that is not in the well understood, routine, and conventional category is this subsequent to determining the indication of interest in the first category determining for the user that a need relative to the first category has been met based at least in part on the third search or the third purchase. That's just one example.

Another one is the step of determining that a need relative to the first category has been met determining a

second quality level associated with the user where the second quality level is determined with respect to the first category.

Now, traditionally, that would be the second category because you say, okay, what does this customer want now? Let's target an ad and we will select an ad to give to that customer. That's not what this claim is about. This looks at the need having being met in part of the calculation, and then that is going to go back to a second quality level that is determined what the same category, the first category that was just determined to have a need that was met.

So, I think, you know, looking through there is eight briefs altogether, I believe, that are at the summary judgment stage. What is lacking is that you are not going to see in those briefs -- you know, there is very detailed discussion of the case law, but you're not going to see the record evidence. That is what you would expect to see now at the summary judgment stage. Nothing has changed in that regard since the motion to dismiss.

Questions, Your Honor?

THE COURT: Not at the moment, Mr. Mattson. Thank you.

MR. HIGGINS: Your Honor, Zack Higgins representing RavenWhite. I'll speak regarding the '823 patent.

THE COURT: All right.

MR. HIGGINS: So, Your Honor, we're happy with the way the briefing went and so I am just going to summarize where the briefing wound up at the end of the briefing in light of what we heard today.

So the first thing we heard was an allegation that something has changed since the Court previously ruled on this same motion. But, in fact, nothing has changed. With the '823 patent we are still maintaining that the '823 invented a new type of cookie. I think there is some confusion here that has been reflected in the briefing. When we say a new type of cookie we don't mean merely that there is another kind of cookie. Instead we're referring to the claimed second type of cookie, which Your Honor construed, and has a lot more to it than just another type of cookie.

So, for example, early on in the briefing Walmart referred to flash cookies, but we didn't hear anything about that today because that doesn't qualify as the claimed second type of cookie, even though it is another kind of cookie.

We're not saying that we invented cache cookies because we, in fact, disclosed that to the PTO, and then got claims that improved on cache cookies.

So let's be clear that when we say we invented a new

type of cookie we mean invented as in the claimed invents and the claim includes a new type of cookie that wasn't in the art. That's the same argument we made the first time and we're still making that argument.

In terms of the focal point that I want to direct the Court's attention to in terms of where we are at the end of the briefing. So in analysis step two, as my colleague was just referring to, there is a requirement that the -- there has to be something that is well understood, routine, and conventional. As we pointed out in our surreply, there is no evidence that using a cache cookie or any type of cookie that can be qualified as the second type of cookie as claimed there is no evidence that doing so to identify a user or device was well understood, routine, or conventional.

And Walmart's only statement in the briefing on that point is that we, RavenWhite, have not shown the negative, that it wasn't routine, well understood, and conventional.

But, Your Honor, that is not our burden of proof. And if Walmart's point is that there is no evidence, well, then they lose.

So I don't know if you have any other questions, Your Honor; otherwise we're happy to just submit the '823 in the briefing.

THE COURT: All right. No, Mr. Higgins. Thank

you.

MR. COLLIER: Your Honor, may I briefly address two points?

THE COURT: Yes.

MR. COLLIER: Thank you.

As I said, there are two points I want to just briefly touch on. First, starting with the '402 patent. Opposing Counsel's argument -- argued that they have invented this particular computation. But what I did not hear Opposing Counsel say was that that sequence, this allegedly specific sequence is tied to technology at all. And it's because it's not.

If you -- in fact, the '402 patent, in its own specification, and I think it's at various points, but comps 10 and 11 both discuss it. They have this example of a person shopping for a camera. And one of the steps -- and one of steps that my colleague has referred to as being part of this novel concept is this idea that you see a second or a third search and you can decide -- you can determine whether or not someone has had their need met.

The example the patent uses if you buy -- or I think it is along these lines. If you have a customer who has bought a lens you know that they have probably bought a camera and they don't need a camera anymore. You can use analyses like that to determine whether or not they might be

interested in ads for cameras or ads for, say, watches and books.

There is nothing -- excuse me. RavenWhite's counsel also argued that the *MCRO* case supports their theory that, you know, this sequence of steps is novel, or if it is a -- or, excuse me, it is not abstract and it should be patent eligible. But in *MCRO* those steps were tied specifically to computer animation. It was, in fact, an improvement in the computers.

As I said, I even heard -- I didn't hear anything today from Counsel arguing that these steps are specifically tied to a computer or improve how a computer works or server or any similar system.

On the '823 patent, it sounds to me like RavenWhite is not contending that they've invented or claimed a new type of cookie. You know, one of the examples Counsel used was a cache cookie. My understanding of RavenWhite's theory is that cache cookies used in this method, the claimed '823 patent, would actually infringe the patent. So I'm not entirely clear on what they've invented and I think that just highlights the point I made earlier that they are using existing tools in their intended way. They are just moving one file from one place to another at the end of the day.

Both counsel for RavenWhite also argue that there has been no evidentiary issues, no orders dismissing. These

claims are abstract regardless of whatever, you know, evidence outside of the patents themselves RavenWhite has. They are, as a matter of law, directed to abstract ideas. And there is no dispute that using, you know, a computer to perform calculations or storing cookies on a computer are traditional long-established tools that RavenWhite did not invent.

That is all I have, Your Honor. Thank you.

THE COURT: All right. Thank you, Mr. Collier.

The -- I think that the Court will take this motion under advisement. And I also intend to take up the non-enforceability motion for summary judgment after the additional motion is fully briefed, which, under the schedule that was established, will be in a couple of weeks. And we'll take them both up at that time.

Mr. Mattson, is there something that you wanted to address?

MR. MATTSON: I apologize. I didn't want to interrupt you while you were saying that.

Just real quickly. The -- these are technical claims in the '402 patent. We talked about an example today, the Walmart DSP, which what that is doing is making these quality level determinations in real-time in a bidding system, so the advertisers can assess how much they are willing to pay for based on the quality of the customer.

This is all done in real-time based on click searches, purchases, and it's not the kind of thing someone can do with pen and paper.

And I also read the *McRO* case differently. I think it was the rules there that were important. There wasn't a change to how a computer -- you know, the architecture of computers or something like that. I believe the rules were all things that a human could do and because the label given to the -- what the claims were redirected to allegedly by the defendants was so broad they looked and said, okay, well, this is covering stuff that wasn't even in the prior art. Some of these rules, even if a human could do them, this notion that this is one broad abstract idea, this broad label, didn't work and so the claims were not -- found not directed to an abstract idea. Thank you.

THE COURT: All right. Thank you, Mr. Mattson.

Well, these are difficult issues that have been well briefed and the Court will take them up on those briefs. I think that is the primary thing the Court needs to do to have this case ready for trial in November is to get rulings on the pending motions and we'll undertake to do that.

And as I have mentioned, in a couple of weeks you should be getting some indication about where you stand in the order of trials for November the 6th and we will all be guided by that information.

Does the plaintiff have anything else that the plaintiff wants to raise this afternoon?

MR. KRAMER: Just thank you, Your Honor, for taking the time today. I am just wondering do you think this motion that was just filed today, this additional Article 3 standing motion, may affect the timing of the trial in some form?

THE COURT: I do not anticipate that it will have that effect.

MR. KRAMER: Okay. Thank you.

THE COURT: Is there anything further, Mr. Alavi, for the defendants?

MR. ALAVI: Nothing further for the defendants.

Thank you for the time and for hearing argument on our motions, Your Honor.

THE COURT: All right. Well, I certainly appreciate your attendance and your arguments, and we'll try to get rulings out on the pending motions promptly and we are adjourned. Thank you.

COURT SECURITY OFFICER: All rise.

(Court adjourned.)

CERTIFICATE OF OFFICIAL REPORTER

I, JODI D. TERRY, RPR, Federal Official Court Reporter, in and for the United States District Court for the Western District of Louisiana, DO HEREBY CERTIFY that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

/s/ Jodi D. Terry

JODI D. TERRY, RPR,
Official U.S. Court Reporter