IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

RAVENWHITE LICENSING LLC, )(
PLAINTIFF, )( CIVIL ACTION NO.
)( 2:24-CV-688-JRG-RSP
VS. )( MARSHALL, TEXAS
)(
THE HOME DEPOT, ET AL., )( AUGUST 19, 2026
DEFENDANTS. )( 9:00 A.M.

PRETRIAL HEARING

BEFORE THE HONORABLE ROY S. PAYNE

UNITED STATES MAGISTRATE JUDGE

FOR THE PLAINTIFF:

Mr. Robert F. Kramer
Kramer LLP
1133 Broadway
Suite 1510
New York, NY 10010

Mr. Zachariah A. Higgins
Ms. Rachael Chan
Kramer LLP
303 Twin Dolphin Drive
Suite 600
Redwood City, CA 94065

Mr. Robert C. Mattson
Kramer LLP
2121 Eisenhower Avenue
Suite 304
Alexandria, VA 22314

Mr. Garrett Parish
Ms. Andrea Leigh Fair
Miller Fair Henry PLLC
1507 Bill Owens Parkway
Longview, TX 75604

FOR WALMART: Mr. Amir H. Alavi
Ms. Amanda Woodall
Mr. Scott W. Clark
Alavi & Anaipakos PLLC
609 Main Street
Suite 3200
Houston, TX 77002

Mr. Eric J. Enger
Mr. Blaine A. Larson
Mr. William B. Collier, Jr.
Heim, Payne & Chorush, LLP
609 Main Street
Suite 3200
Houston, TX 77002

Mr. Eric H. Findlay
Findlay Craft, PC
7270 Crosswater Avenue
Suite B
Tyler, TX 75703

COURT REPORTER: Ms. Shelly Holmes, CSR, TCRR
Official Court Reporter
Honorable Robert W. Schroeder III
United States District Judge
Eastern District of Texas
Texarkana Division
500 North State Line Avenue
Texarkana, TX 75501
shelly_holmes@txed.uscourts.gov

(Proceedings recorded by mechanical stenography, transcript produced on a CAT system.)

COURT SECURITY OFFICER: All rise.

THE COURT: Good morning. Please be seated.

For the record, we're here for the pretrial conference in RavenWhite Licensing versus Walmart, which is under our Lead Case No. 2:24-688.

Would counsel state their appearances for the record?

MR. PARISH: Good morning, Your Honor. Garrett Parish for the Plaintiff. With me today I have Mr. Robert Kramer, Ms. Rachael Chan, Mr. Zack Higgins, and Mr. Robert Mattson, and my law partner, Ms. Andrea Fair. And we're ready to proceed, Your Honor.

THE COURT: All right. Thank you, Mr. Parish.

MR. FINDLAY: Good morning, Your Honor. Eric Findlay on behalf of Walmart. Also with me is William Collier, Amanda Woodall, Amir Alavi, Eric Enger, Scott Clark, and Blaine Larson. And we're ready to proceed, Judge.

THE COURT: Thank you, Mr. Findlay.

This case is, I guess, most recently set for jury selection before Judge Gilstrap on September 14. That jury selection has been moved to September 11, but this case is not on the order of trials that has been recently issued for that case. So I can officially release this case from the September docket.

09:02:07 The next docket that Judge Gilstrap has is October the 5th. There's also one on November the 2nd and December the 7th. He's currently in trial upstairs now. After the current trial ends, there -- I'm not sure when the order of trials for the October docket will issue, but I will try and make sure that counsel are aware as soon as I learn what the status of this case is on the upcoming trial dockets. But at this point, it is released from the September docket and will be reset for an upcoming docket.

My goal today, though, is the same as it would otherwise be, which is to get this case ready for trial on the next docket that Judge Gilstrap has available for it. So I -- my intention will be to take up all of the motions in limine.

There are two motions related to discovery that have not been addressed in the record yet. We'll take those up, as well.

It looks like the parties have exhibits ready and grouped, and the Court has the time to take those up if the parties want to go forward with it in view of the fact that the trial will not be as scheduled. If counsel think that it would be better to take up the exhibit issues on a later day, that's something that I'm amenable to. And I'll just ask you at the next break to talk about that and decide. But it's -- I'm absolutely available to take those up

09:04:27 today. So I'm not trying to change that. I just want to
09:04:32 offer that in case counsel think it would be better.
09:04:36 I have looked at the witness list on this, and I
09:04:44 see that the Plaintiff has just two will call witnesses.
09:04:51 The Defendant has three will call witnesses. And I would
09:04:58 think under those circumstances, even considering the may
09:05:05 calls, that this is a case that should be able to be
09:05:08 presented to a jury within 10 hours per side. And if
09:05:14 either side wants to argue for more, this would be the time
09:05:19 to do that. Otherwise, that will be the order.
09:05:25 And I'm not seeing anybody stand.
09:05:31 MR. ALAVI: Your Honor, may I be heard on that?
09:05:33 THE COURT: You may, Mr. Alavi.
09:05:34 MR. ALAVI: Your Honor, I agree that there are a
09:05:41 small number of will call witnesses, but one of the reasons
09:05:45 behind that is at least for the Defendant, we have a single
09:05:48 expert who is designated as the expert on both patents for
09:05:54 both non-infringement and validity.
09:05:57 Normally, in a case like this, you might see the
09:06:00 Defendant split that up between two experts. And given
09:06:04 that this is a two-patent case, I do think the jury would
09:06:09 be better served with an extra hour so that they -- both
09:06:13 sides can present the technological issues in a non-hurried
09:06:18 fashion. So we spend a little bit less -- more time on the
09:06:21 front end presenting and the jury spends maybe a little bit

09:06:25 less time trying to figure things out during deliberation.
09:06:28 So I would respectfully ask for the Court to
09:06:31 consider perhaps 11 hours per side of testimony because I
09:06:36 do think the number of witnesses is a little misleading
09:06:38 given how we've decided to hire experts to have it all
09:06:43 dealt with by one -- one expert.
09:06:46 THE COURT: I would imagine there's still a fair
09:06:49 savings of time in using the single expert, even if he has
09:06:56 two patents to cover.
09:06:57 MR. ALAVI: There is in the sense of background
09:06:59 for the expert. That's why I asked for 11 hours instead of
09:07:02 11 and a half hours, which is what my normal ask would be.
09:07:06 The two patents are not as related as the Court might
09:07:10 think. So it's not like you get a lot of efficiency from
09:07:14 having two patents that are dealing with exactly the same
09:07:18 type of functionality. So each -- each patent will have to
09:07:22 be dealt with both on non-infringement and -- and validity
09:07:24 separately.
09:07:25 And in this case, while we think the Court -- we
09:07:28 have a 101 motion, and we think the Court will ultimately
09:07:31 grant that. If the Court does not, we do think that the
09:07:35 validity case will deal with not just prior art but at
09:07:39 least potentially the second step of the Alice analysis.
09:07:42 So it's a -- it's a little bit longer technological
09:07:47 presentation than the normal case, given the Federal

09:07:50 Circuit's recent rulings on how the jury charge needs to be
09:07:53 done and how you present the second step.
09:07:56 THE COURT: All right.
09:07:57 MR. ALAVI: But that's my pitch, Your Honor. I
09:07:59 don't have a strong view on it, but I do think 11 hours
09:08:02 would actually benefit the Court because I think the jury
09:08:05 can better understand the technology and spend a little
09:08:07 less time struggling during the deliberations on those
09:08:09 issues.
09:08:10 THE COURT: All right.
09:08:11 MR. ALAVI: Thank you.
09:08:12 THE COURT: Thank you.
09:08:14 Does Plaintiff want to be heard on that,
09:08:19 Mr. Kramer?
09:08:20 MR. KRAMER: Briefly, Your Honor.
09:08:21 Your Honor, we think, for the Plaintiff, that 10
09:08:27 hours would be fine. On the other hand, we don't object if
09:08:30 counsel truly believes that 11 is needed. Personally, I
09:08:35 think the jury will just struggle for an extra hour if it's
09:08:38 11 hours, but we have no objection to 11 if Your Honor is
09:08:45 persuaded.
09:08:45 THE COURT: All right. I will go to 10.5, and
09:08:52 we'll set that. So each side will have 10.5 hours to
09:09:00 present evidence to the jury. That'll be in addition to
09:09:04 the 30 minutes per side allowed for the voir dire, the 30

09:09:08 minutes per side for opening statements, and 40 minutes per side for closing arguments.

09:09:17 With respect to the voir dire, counsel are advised that the first few minutes, say, three minutes of that, can be devoted to a high-level, non-argumentative overview of what's at issue in the case. And I do stress the non-argumentative nature of that because Judge Gilstrap will interrupt if the voir dire is perceived as argumentative.

09:09:50 The rest of the voir dire should be devoted to gathering information from the venire to exercise your challenges.

09:10:04 There will be four peremptory challenges per side. Those are exercised in a blind simultaneous fashion, meaning that each side is directed to submit their four peremptory challenges in writing at the same time, and those are then applied to the venire by the Court before the jury is seated.

09:10:31 In connection with the jury selection, the parties are given the opportunity to have a jury questionnaire. I think the current docket control order had that questionnaire due to the jury administrator on August 18 -- August 17.

09:10:58 Has that already been submitted?

09:11:00 MR. PARISH: Yes, Your Honor, it has.

09:11:03 THE COURT: Okay.

09:11:04 MR. FINDLAY: Yes, Your Honor.

09:11:05 THE COURT: All right. Well, then Ms. Cadenhead, 09:11:09 who has taken over from Ms. Clendening in that role, will 09:11:13 maintain that, and that questionnaire will be submitted to 09:11:20 the venire when this case is next on the trial list.

09:11:29 But the answers to that questionnaire will be 09:11:33 available -- made available to you the Thursday before a 09:11:40 Monday jury selection. If the jury selection is on a 09:11:44 Friday, as is becoming more common in Judge Gilstrap's 09:11:49 practice, then the jury questionnaire will be made 09:11:54 available on Wednesday. We'll talk more about that day in 09:12:01 a few minutes. But in any event, you will have the benefit 09:12:06 of the juror questionnaire for your jury selection.

09:12:10 You're also able to do a certain amount of 09:12:16 investigation of the venire in addition to what's in the 09:12:24 jury questionnaire. If you're going to do that, you should 09:12:27 look at Judge Gilstrap's standing order on jury 09:12:35 investigation. He has a lot of detail about what you can 09:12:43 and can't do with the jury information that we give you 09:12:52 before jury selection. So if you're planning to do any 09:12:54 investigation, I would urge you to view that standing 09:12:57 order.

09:12:58 The essence of it is that the Court does not want 09:13:04 any investigation done in a manner that can get back to the

09:13:13 venire that they're being investigated. So while you can
09:13:16 consult databases, if you have those available to you,
09:13:19 that's fine. But you should not contact their friends,
09:13:22 neighbors, co-workers, family members, or anyone else who
09:13:26 will let them know that they're being investigated.

09:13:34 We ask for a lot from our jurors, and we don't
09:13:39 want them thinking that their personal privacy is being
09:13:42 compromised as a result of their jury service.

09:13:45 The Court will conduct a general but fairly
09:14:02 high-level of instruction before the counsel are given the
09:14:06 opportunity for their 30 minutes per side.

09:14:11 After that -- counsels' portion of the voir dire
09:14:16 is completed, the Court will take up challenges for cause.
09:14:23 Those are based on the record that's established during the
09:14:29 voir dire.

09:14:32 After that -- after rulings on challenges for
09:14:35 cause, the peremptory challenges will be considered, and
09:14:39 the eight jurors first remaining in the order in which they
09:14:45 were randomly seated will be the trial jury.

09:14:50 After the trial jury is sworn, there will be a
09:14:56 more detailed preliminary charge given to the trial jury,
09:15:06 and then the Court will take up opening statements.

09:15:12 Typically, the openings will occur after lunch,
09:15:20 but if the -- if it goes quicker than that, counsel should
09:15:23 be prepared to deliver their openings before lunch, but

09:15:31 there will definitely be evidence taken that afternoon, so
09:15:34 it's important for the Plaintiff to have evidence --
09:15:39 witnesses available for that. But we'll talk more about
09:15:45 what's necessary.
09:15:46 If the Plaintiff wants to use depositions on that
09:15:52 afternoon before, and the gist of that is that you will --
09:15:58 the Plaintiff will have to make sure that either there are
09:16:00 no objections to those deposition designations or they have
09:16:05 been resolved by the Court in advance of the first day.
09:16:11 Otherwise, the Plaintiff will just not be able to use those
09:16:16 depositions on that first afternoon. So that's something
09:16:21 we'll discuss further in a moment.
09:16:24 As I mentioned, we'll allow 10 hours per -- 10.5
09:16:29 hours per side for the evidence, and at the close of all of
09:16:40 the evidence, the Court will consider Rule 50(a) motions.
09:16:45 I stress now on the record that it is at the close of all
09:16:49 evidence. So counsel should understand that they are not
09:16:55 waiving anything by waiting until the close of all the
09:17:01 evidence. That's why I'm specifically ordering that at
09:17:05 this time, to avoid any waiver concerns.
09:17:08 I think in the pretrial order -- and we'll go
09:17:16 through the pretrial order in a moment because there are
09:17:18 some objected-to portions of it that we'll have to take up,
09:17:22 but in the pretrial order, I think you have a pretty good
09:17:27 protocol laid out for disputes that arise during the trial.

And I think your protocol will work with Judge Gilstrap's procedure. But basically, the part of Judge Gilstrap's procedure that it's important that you conform to is that to the extent there are disputes that are not resolved by the meet and confer process, in order to be taken up the next morning by the Court, the parties will need to email the clerk by not later than 10:00 p.m., and by the clerk, I mean the law clerk assigned to the case.

After that email has issued, by 7:00 the next morning, counsel should submit a jointly prepared three-ring binder to chambers that has a copy of any demonstrative that's at issue or if there's a deposition issue that was for some reason unresolved or if there is an exhibit that for some reason has not had objections resolved. If there is a document, that should be in the three-ring binder.

There should also be a short narrative, maybe a half page or so per side about the dispute in order to prepare the Judge to take up that dispute at 7:30 that morning, all of which is designed to make sure that the dispute is resolved before the jury reports at 8:30 so that we're able to get full use of their time.

In order to maximize that time, we also will provide lunch for the jury in the courthouse. That allows us to keep the lunch breaks to roughly 45 minutes or so and

09:19:43 get back to the case, so counsel should be prepared to be
09:19:49 on that same schedule.
09:19:52 The Court will adjourn daily sometime in the 5:30
09:20:00 to 6:00 o'clock range, depending on how things go with the
09:20:07 witnesses, all of which is part of our effort to give the
09:20:11 juries what they tell us they want, which is longer days
09:20:15 and shorter trials.
09:20:18 So between the 10.5 hours per side and this
09:20:24 schedule, it's our expectation that -- that one week of
09:20:28 jury service is all that will be required for the case.
09:20:32 If there are deposition designation disputes, with
09:20:44 the exception of any that the Plaintiff wants to use on the
09:20:49 first day, those are things that should be taken up in
09:20:54 accordance with this protocol that you have laid out in the
09:20:59 pretrial order such that the disputes are presented to the
09:21:08 Court the day before they are to be used. In other words,
09:21:14 the notice to the Court, the email -- the evening email
09:21:22 will be two days before so that the Court can address these
09:21:26 objections the morning of the day before the deposition is
09:21:31 to be played, which is all to make sure that any problems
09:21:38 in editing those depositions will not result in a delay
09:21:44 during the trial.
09:21:44 With respect to the depositions that the Plaintiff
09:21:51 wants to use on the first day, if -- if there are
09:21:55 unresolved objections, those need to be taken up with the

09:22:01 Court during the week before the trial. In other words, if 09:22:12 it's a Friday jury selection, not later than Thursday, 09:22:16 those will need to be taken up. If it's a Monday, then not 09:22:20 later than Friday. And you can do that by contacting 09:22:27 Judge Gilstrap's chambers. If for any reason he's not 09:22:31 available, then contact my chambers, and I'll get those 09:22:35 objections resolved.

09:22:37 But one way or the other, if the Plaintiff wants 09:22:40 to preserve the opportunity to use that deposition on that 09:22:45 first afternoon, the Plaintiff needs to be in charge of 09:22:50 getting any objections resolved.

09:22:53 The counsel have been working on the jury 09:23:05 instructions and verdict form, I know. I ask you to 09:23:12 continue working on that. And I wanted to emphasize the 09:23:17 importance of working on the verdict form.

09:23:21 Recent jurisprudence from the Federal Circuit is 09:23:24 stressing the importance of the verdict form reflecting a 09:23:31 fair amount of thought about the best way to make sure that 09:23:38 any issues that arise during the trial can be taken up 09:23:44 post-trial without requiring a new trial. And so I think 09:23:53 the verdict form is important to that, and we'd ask you to 09:23:57 continue to work on that.

09:23:58 At the close of all the evidence, the Court will 09:24:03 have an informal charge conference with counsel just to go 09:24:08 over what the parts of the Court's proposed charge are that

09:24:15 the parties object to or wish to alter. And then after
09:24:24 those have been taken into account, the Court will provide
09:24:28 counsel with a final proposed jury instruction and hold an
09:24:35 on-the-record charge conference to take up objections to
09:24:40 that. But between now and then, I would ask counsel to
09:24:47 continue to work on those.
09:24:53 I think local counsel are definitely aware of
09:24:56 this, but it is Judge Gilstrap's practice to require that
09:25:01 counsel and witnesses not refer to other participants by
09:25:08 their first name only. The witnesses should be advised
09:25:14 that they can use last name only or first and last name,
09:25:18 but just not first name only. And I bring that up now to
09:25:22 remind you to tell your witnesses about that so that they
09:25:28 don't have to get corrected on the stand in front of the
09:25:32 jury.
09:25:32 There is likely to be evidence that will be
09:25:39 offered during this trial that is subject to protection
09:25:44 under the protective order for the case. I would ask
09:25:49 counsel to make sure that they have reviewed the standing
09:25:54 order that Judge Gilstrap has on sealing the courtroom,
09:26:02 and in order to preserve your right to request the sealing
09:26:07 of parts of the transcript after, it is important that you
09:26:10 have followed those steps during the trial. So take a look
09:26:13 at that standing order.
09:26:16 And we'd ask you to please try and group the

09:26:23 confidential evidence as much as possible so that we can seal and unseal the courtroom as few times as possible and to advise the Court when that evidence is complete, which is something that I routinely violate.

So you can help me out by letting me know when the courtroom should be reopened, and the court reporter will be less mad at me.

Let me see, with respect to the juror questionnaire that we talked about before, which you have requested and therefore will get, you are reminded that that juror questionnaire will be provided to you with the express understanding that it is not to be duplicated or distributed, that it is to be used solely by your trial team, and that after the jury selection, it is to be destroyed. It definitely should not be uploaded into any databases. It's private information about the jurors that is given to you solely for the purpose of the jury selection and then should be destroyed.

And let me see, we also want to provide the jury with jury notebooks that will assist them during the trial. We'll ask you to jointly put together 12 notebooks and provide those to the Court by the same time that you pick up the jury questionnaires and drop off the juror notebooks. Those notebooks have copies of the asserted patents. If both patents remain in the case, then it would

09:28:35 be both of them.

09:28:37 It would also have the Court's construction of any disputed terms from claims that remain asserted in the case. All that we're talking about there obviously is not the Court's claim construction order but just a page that has the disputed term on the left column and the Court's construction -- just the construction on the right column.

09:29:10 In addition to those items, there should be a page for each of the witnesses who may be called in the case either live or by deposition. If you're not sure about which witnesses are going to be called live, it is acceptable to provide those pages to the Court's courtroom deputy in the morning before that testimony occurs, but it's important that the jury have the -- those pages to keep their notes on by the time the witness is called. So either provide them all at the outset before the trial when you deliver the notebooks or at least supplement them that morning of the testimony.

09:30:19 We're talking about a head and shoulders picture up in the upper left-hand corner of the page and the name of the witness under the picture. There's no other information that should be on it other than the name. No description of the witness. No title. Just the name. All of which is designed to allow the jury to -- during their deliberations, connect the testimony of that witness to

09:30:51 that witness. And they always tell us that that is a very
09:30:55 helpful thing to them during their deliberations.
09:30:57 As you know, the Court's rules require that the
09:31:07 testimony of experts should be confined to the four corners
09:31:12 of their report. Occasionally, there are disputes or
09:31:17 objections about whether certain questions are within the
09:31:21 scope of those reports, which causes the Court to need
09:31:28 access to the expert's report.
09:31:31 So you will be getting an email when your case is
09:31:36 about to go to trial, and I'm just giving you a heads up
09:31:42 about that. At that point, the Court will require a
09:31:48 physical copy of the expert's report. I'm not talking
09:31:52 about all the appendices or exhibits to the report, just
09:31:57 the -- the text of the report, however many paragraphs and
09:32:05 pages that may be. And the Court will also want those on a
09:32:11 thumb drive. But as I say, you'll get further information
09:32:18 about that, but you should be prepared for that right
09:32:21 before trial.
09:32:22 I would ask you or caution you to be judicious
09:32:33 about objections to the scope of the expert's testimony
09:32:40 and -- because the Court will charge that time to the
09:32:44 losing party on those objections. I think you probably
09:32:50 know this better than I do, but I'll say it anyway, that in
09:32:54 designing your direct and cross-examination of an expert,
09:32:59 you should -- and I guess this is really just the direct --

09:33:04 you should have the paragraph of the expert's report that
09:33:12 discloses the testimony that you're about to ask -- should
09:33:18 have that noted and ready to provide if there is an
09:33:22 objection.

09:33:22 I'd like to turn now to the pretrial order and
09:33:31 specifically take up the issues that are preserved in that.
09:33:42 There is a notation on the first page in the pretrial order
09:33:45 about a proposed amendment regarding RavenWhite Security
09:33:56 and Security Technology. Has that been addressed?

09:34:06 Mr. Parish?

09:34:06 MR. PARISH: Yes, Your Honor. I'll be addressing
09:34:08 the issues with the pretrial order.

09:34:10 With respect to the amendment Your Honor was
09:34:13 referring to earlier, I believe Walmart has withdrawn its
09:34:17 opposition to our motion for leave to amend to add those
09:34:22 parties, but I'll let Walmart confirm.

09:34:25 MR. ALAVI: Your Honor, that's correct. The
09:34:27 docket number is Docket 187. It's a motion to amend the
09:34:30 complaint, and last night we withdrew our opposition.

09:34:34 THE COURT: All right. In that case, I will grant
09:34:38 that motion to amend.

09:34:46 Are there any consequences to that amendment that
09:34:47 need to be addressed procedurally?

09:34:50 MR. PARISH: Not that I'm aware of, Your Honor.

09:34:53 MR. ALAVI: Your Honor, the only thing is we

09:34:54 would -- I don't think the order that counsel provided is
09:34:59 self-effectuating, that is, I think they have to file the
09:35:03 amended complaint once the order is granted.
09:35:06 THE COURT: Is the amended complaint going to do
09:35:09 anything other than add those entities as co-Plaintiffs?
09:35:15 Is there a paragraph describing their relationship to the
09:35:20 case? And if so, has that been provided to the Defendant
09:35:28 so we can know if there's an issue about it?
09:35:31 MR. PARISH: I don't believe it's been provided to
09:35:35 the Defendants, Your Honor. We can certainly do that prior
09:35:37 to filing it.
09:35:39 THE COURT: I tell you what, at -- at a break
09:35:42 later today, would you just indicate to counsel for
09:35:47 Defendant what it is that you're going to allege about
09:35:53 RavenWhite Security and Security Technology, LLC, so that
09:35:56 we can find out today if there is an issue about what
09:36:02 you're going to say about them?
09:36:04 MR. PARISH: Yes, Your Honor. We'll make sure
09:36:06 that we confer with Defense counsel and make sure we don't
09:36:09 have any issues related to that that aren't resolved today.
09:36:13 THE COURT: All right.
09:36:13 MR. ALAVI: Your Honor, I think maybe -- maybe I
09:36:15 misspoke. There's a redline of the amended complaint
09:36:18 attached to the motion, so we know what the amended
09:36:20 complaint says. We're aware of that.

09:36:23 I think they just need to officially -- a
09:36:27 non-redline version of the complaint needs to be officially
09:36:30 filed by the Plaintiff, and then we'll file responsive
09:36:32 pleadings. I think we have some standing issues with
09:36:34 respect to the new parties that the Plaintiffs contend
09:36:38 should be dealt with through motion practice as opposed to
09:36:40 opposing the amendment.
09:36:41 And so we haven't evaluated yet whether or not
09:36:44 we're going to file a standing motion or not, but there may
09:36:48 be a motion filed after the complaint is amended and the
09:36:50 new parties are added.
09:36:51 THE COURT: All right. Then what I'll do is grant
09:36:57 the motion with leave to file the amended complaint that
09:37:04 was attached to that motion.
09:37:05 Mr. Alavi, what is a reasonable time period for
09:37:11 the Defendants to, first, answer, and, second, file any
09:37:19 motion? And I'm not saying it needs to be in that order,
09:37:21 but I want to address both of those.
09:37:23 MR. ALAVI: Your Honor, I think -- if I'm right,
09:37:27 the rules provide for 10 days. If the Court wants us to do
09:37:30 it in a shorter time period, we can do it within a week of
09:37:33 the amended complaint being filed.
09:37:35 And just to be clear, there may not be a motion
09:37:39 filed, but I wanted the Court to be aware. There may be a
09:37:43 motion to dismiss one or two of the parties. We just

09:37:47 haven't made a final decision.
09:37:48 THE COURT: I understand that, and I appreciate
09:37:50 that. I just want to have a date established for any
09:37:55 motion because otherwise, I'm not sure there is a relevant
09:37:59 date in the rules. So give me the time period that you're
09:38:05 willing to live with for a responsive pleading and also any
09:38:14 motion to dismiss.
09:38:14 MR. ALAVI: One week would be sufficient for the
09:38:17 Defendants, Your Honor.
09:38:18 THE COURT: All right. Thank you, Mr. Alavi.
09:38:23 While you're up there, Mr. Parish, the next issue
09:38:30 is on Page 5 of the pretrial order under the Nature of
09:38:36 Action section.
09:38:42 MR. PARISH: Yes, Your Honor. And I think I can
09:38:45 save the Court a little bit of time here. The only issue
09:38:48 that is still in dispute is on Page 12 as it relates to the
09:38:54 identification of witnesses. The other issues that are
09:38:56 raised in the pretrial order have been resolved. We'll
09:39:00 reflect those agreements when we file an amended pretrial
09:39:04 order.
09:39:05 THE COURT: Well, that's worth knowing. When do
09:39:08 you intend to file an amended pretrial order?
09:39:11 MR. PARISH: We would expect to file that
09:39:13 following today's pretrial conference, one, to reflect
09:39:16 those agreements, but also to reflect the resolutions with

09:39:19 exhibits, so on and so forth.
09:39:21 THE COURT: Well, are there other amendments that
09:39:26 you want to make to the pretrial order other than resolving
09:39:32 the issues that are reflected in the current pretrial
09:39:37 order?
09:39:37 MR. PARISH: Not that I'm aware of, Your Honor.
09:39:40 THE COURT: Well, it seems to me that the
09:39:51 information that the Plaintiff wanted to present on Page 5
09:39:55 is a part of the Contentions section of the Plaintiff on
09:40:00 Page 6 and 7. So that portion should be omitted from the
09:40:08 Nature of Action section on Page 5 and 6. I assume that's
09:40:14 what you're doing in the amended order.
09:40:23 MR. PARISH: Your Honor, there, we were simply
09:40:25 going to just include competing statements of each side's
09:40:29 statement of the Nature of the Action. We can continue to
09:40:33 do that, or I understand the Court's position on that, and
09:40:35 we can delete those. But if the Court will allow it, we'd
09:40:40 like to have competing statements on that.
09:40:48 THE COURT: All right. That's what the
09:40:50 Contentions of the Parties section is about. But if you
09:40:57 want to have it in both places, I guess there's no
09:41:01 particular harm in that.
09:41:08 There is a dispute listed on Page 12.
09:41:15 MR. PARISH: Yes, Your Honor.
09:41:16 THE COURT: And how have you resolved that?

09:41:19 MR. PARISH: That is -- that portion is still in
09:41:22 dispute, and I'm happy to jump into that now or after we go
09:41:27 through the remaining resolved issues in the pretrial
09:41:30 order.
09:41:30 THE COURT: All right. Go ahead into that issue
09:41:32 now.
09:41:33 MR. PARISH: Yes, Your Honor.
09:41:34 So what we're trying to do with this provision is
09:41:38 simply avoid the cost, expense, burden of preparing for
09:41:43 witnesses that will not testify at trial. We think this
09:41:48 sort of disclosure is consistent with the Court's practice
09:41:52 for disclosures during trial and, quite frankly, consistent
09:41:56 with the Court's policy of disclosure throughout a case.
09:41:59 The way we have written this, it is so that
09:42:05 witnesses are being disclosed seven days in advance of that
09:42:07 trial but only if the case is actually going to trial. So
09:42:11 we're not asking the parties to lay out their will call
09:42:16 live witnesses, you know, potentially several months in
09:42:20 advance. We're asking when we know we're going to trial,
09:42:24 tell us who you're calling live, and that way we can
09:42:27 prepare -- prepare accordingly.
09:42:28 And that's -- again, we think that's consistent
09:42:33 with the Court's disclosure practices in trial.
09:42:36 THE COURT: And what is in Paragraph 2 right below
09:42:43 that is -- seems to be an alternative.

09:42:49 MR. PARISH: No, Your Honor, that is -- that is -- may be redundant in some ways, but a part of the typical practice of disclosing who is going to testify on -- on what day. What we're asking for in Paragraph 1 is give us your list of will call live witnesses seven days in advance in no particular order, but let us know who we need to prepare for and who we don't.

09:43:18 THE COURT: All right.

09:43:23 MR. ALAVI: So, Your Honor, we think the normal practice in this district of doing what's in No. 2, which is two days before trial, identify who you're going to call that day is -- works. We do it all the time.

09:43:38 The proposal that the Plaintiffs have presented is that seven days before trial or when we're set for trial, each side will disclose who their will call witnesses will be. That's what the witness list is for. We've provided witness lists, and we've provided will calls and may calls.

09:43:57 For a Defendant, the may calls are may calls. We will see how the case is tried. We may have a witness who we think, depending on how the Plaintiff presents their case, we want to call live, and we may have a witness where as the case plays out, we decide we don't want to call them. That's why you have a may call category, to require the Defendants who don't know how the Plaintiff is necessarily going to try the case. I mean, we anticipate

09:44:23 some of it -- to disclose our will calls seven days in
09:44:27 advance when we don't know if we're going to call them , I
09:44:32 think, prejudices the Defendant.
09:44:36 I mean, we understand our disclosure obligations.
09:44:38 We don't play around with may call -- may calls and will
09:44:41 calls to try to, you know, fake out the other side. Our
09:44:46 will calls are our will calls, and our may calls are the
09:44:50 witnesses that we may call depending on whether or not, as
09:44:54 the case proceeds, we think we need them.
09:44:57 So I don't think -- I think it's just an extra
09:44:59 layer of bureaucracy. I've tried cases for 20 plus years
09:45:04 with this type of notice provision of two days before with
09:45:07 the witness list, and I haven't had any problems yet.
09:45:10 THE COURT: All right. Thank you, Mr. Alavi.
09:45:12 Mr. Parish, it does not look to me like either
09:45:15 side has a witness list that is designed to conceal their
09:45:24 real intentions, as there are only, I think, maybe eight
09:45:33 will call -- I mean, may call witnesses on the Defendant's
09:45:39 list.
09:45:41 MR. PARISH: I would agree with that
09:45:42 characterization, Your Honor. There's a handful of may
09:45:45 call witnesses. But, again, we're trying to avoid the
09:45:48 burden and expense. If they're only going to call one of
09:45:50 their may call witnesses, there's no need for us to prepare
09:45:54 for the other three.

09:45:54 THE COURT: Well, I have granted versions of what
09:46:00 you're seeking in cases where it appeared to the Court that
09:46:04 the parties were not providing a good-faith listing of the
09:46:13 people that they actually were still considering whether to
09:46:15 call. But in this case, I think the parties have very
09:46:20 similar lists on both sides in terms of numbers and in
09:46:27 terms of how many are will call versus may call.
09:46:30 So I'll decline the Plaintiff's request to require
09:46:39 in advance identification of those witnesses.
09:46:44 So we'll strike Paragraph 1 of that Trial
09:46:51 Management Procedures on Page 12.
09:46:56 What else remains in dispute, Mr. Parish?
09:47:01 MR. PARISH: There are no other provisions of the
09:47:03 pretrial order in dispute, Your Honor. What was
09:47:09 identified -- previously identified as a dispute has now
09:47:11 been resolved. It appears on Page 17 of Paragraph C(2),
09:47:19 RavenWhite will accept Walmart's proposal there. We'll
09:47:22 reflect that change in the amended pretrial order.
09:47:26 THE COURT: All right. I think that's an
09:47:28 appropriate resolution of that.
09:47:42 Thank you, Mr. Parish.
09:47:43 In that case, the pretrial order, with those
09:47:48 notations, is adopted. And if counsel want to submit an
09:47:52 amended pretrial order, as long as it's in conformity with
09:47:57 that understanding, then that will be -- leave will be

09:48:04 granted for that filing, as well.
09:48:06 And I think this would have come up, but I'm
09:48:13 taking it there are no procedural objections to witnesses
09:48:18 identified by either side, and I'm not including in that
09:48:27 any pending motions to strike or Daubert motions. But
09:48:32 other than those, are there any issues regarding witnesses
09:48:37 proposed by either side?
09:48:38 MR. PARISH: Not from the Plaintiff, Your Honor.
09:48:40 THE COURT: All right.
09:48:40 MR. ALAVI: Not from the Defendant, Your Honor.
09:48:41 THE COURT: Very good. Thank you.
09:48:43 In that case, we'll turn to the motions in limine
09:48:50 and start with the Plaintiff's motions in limine.
09:48:54 MR. PARISH: Your Honor, before we get started on
09:49:10 those, I hope the Court will welcome the opportunity for me
09:49:14 to inform the Court of some agreements on these motions in
09:49:17 limine.
09:49:17 THE COURT: Yes. And I've seen the joint notice
09:49:20 that you filed, but this would be a great time to go over
09:49:27 those.
09:49:27 MR. PARISH: Yes, Your Honor.
09:49:28 There are no further agreements other than what's
09:49:32 identified in the joint notice. What it leaves in dispute
09:49:36 is Plaintiff's MIL 1, 2, and 3 and Defendant's MIL 1.
09:49:53 THE COURT: All right.

09:49:55 MR. PARISH: And our agreements are reflected in the joint notice that we filed with the Court. At least for the Plaintiff, we think we have written this in a way that the Court can implement those into its order on the motions in limine and would request that it do so.

09:50:12 THE COURT: All right. I'm happy to do that. And that leaves us the first three motions in limine by the Plaintiff; is that right?

09:50:24 MR. PARISH: Yes, Your Honor.

09:50:25 THE COURT: Then we'll start with No. 1.

09:50:26 MR. KRAMER: All right. Your Honor, Plaintiff's Motion in Limine No. 1 relates to 20 license agreements that the Defendants would like to have their damages expert and perhaps technical expert discuss with the jury. Five of those, they have a technical expert opinion that they're comparable. The other 15, they do not.

09:51:12 So turning to the 15 that they have no expert opinion that those -- that the technologies are technically comparable to those of the patents-in-suit, I think those seem relatively easy. I think perhaps they're stipulating that they would not use them. I'm not sure.

09:51:29 But we -- Plaintiff's position is that there is no expert opinion that the technologies of those 15 licenses are technically comparable. Therefore, they should not be using those licenses with the jury.

09:51:41 THE COURT: Mr. Kramer, is there a listing in the record along the lines of what you're discussing?

09:52:00 MR. KRAMER: I think that the best place in the record for that is in the motions themselves, the motion papers. The 15 -- I'll make sure to give Your Honor a list of that. I don't have that right in front of me. It's one of the exhibits to the papers.

09:52:15 I think the real dispute here is as to the five license agreements, and those are listed in the Plaintiff's motion in limine on Page 3, also listed in Defendant's motion in limine on Page -- the Defendant's opposition to Plaintiff's motion in limine on Page 2.

09:52:39 THE COURT: So you've mentioned that five of the 20 have been identified by the Defendants' expert as technically comparable. And those five, I see, are listed on Page 3, but those are not the ones you're focused on?

09:53:00 MR. KRAMER: Yeah, I was focused first on the 15 because I thought those were sort of simpler, and I don't know --

09:53:07 THE COURT: And is there -- that's what I'm inquiring about. Is there a listing of those 15 somewhere?

09:53:14 MR. KRAMER: I believe it's in Exhibit A to Plaintiff's motion, but we will provide that to the Court in a list, Your Honor, on a break here to make sure Your Honor has that easily accessible, the 15 that are --

09:53:29 there's no technical comparability opinion.

09:53:34 THE COURT: The benefit of a list is that we can
09:53:37 be specific among all of us to make sure we're talking
09:53:41 about the same thing.

09:53:46 So let me see, I'm pulling up Exhibit A to the
09:53:50 motion.

09:54:09 And Exhibit A is the rebuttal expert report of
09:54:15 Mr. Haas?

09:54:16 MR. KRAMER: It is, Your Honor, and I'm just
09:54:18 looking for a page there of where he's -- lists out the 15.

09:54:32 THE COURT: It looks like maybe that's in his
09:54:34 table of contents --

09:54:36 MR. KRAMER: Uh-huh.

09:54:38 THE COURT: -- which is Document 223-1 at Pages 4
09:54:47 and 5.

09:54:50 MR. KRAMER: That's right, Your Honor. In the
09:54:57 Defendant's damages expert, Dr. Haas', expert report, I can
09:55:02 see in the table of contents that he shows on Pages 47
09:55:06 through 55 a listing of the 15 license agreements for which
09:55:13 Defendants do not have a technical comparability opinion
09:55:16 from their expert.

09:55:18 We'll hear from them, but I think that they may be
09:55:24 agreeing that those cannot be used and that really the
09:55:26 focus here is on the five that their technical expert has
09:55:29 opined are technically comparable.

09:55:31 THE COURT: All right. Let me hear from them for
09:55:38 a moment as to what is at issue on this MIL.
09:55:42 MR. KRAMER: Uh-huh.
09:55:42 MS. WOODALL: Good morning, Your Honor.
09:55:46 So Mr. Kramer is right that there are two buckets
09:55:51 of licenses at issue, some that have not been opined on as
09:55:57 technically comparable. We submitted in our briefing that
09:55:58 we are happy to stipulate that we will not introduce the
09:56:02 dollar amounts for those licenses, but we still believe
09:56:04 that they are relevant to the hypothetical negotiation
09:56:12 under GP Factor 3, which addresses the nature and scope of
09:56:15 the hypothetical license. So --
09:56:17 THE COURT: Wouldn't that apply to licenses that
09:56:23 were not made by the Plaintiff?
09:56:24 MS. WOODALL: Yes. There's a separate
09:56:27 Georgia-Pacific factor, Georgia-Pacific Factor 1, that
09:56:34 applies to licenses made by the patentee.
09:56:35 THE COURT: I understand that. I don't see how
09:56:37 licenses by third parties would be relevant to show what
09:56:44 was likely to come from the hypothetical negotiation.
09:56:46 MS. WOODALL: They're Walmart licenses.
09:56:49 THE COURT: Oh.
09:56:49 MS. WOODALL: So they would be informative as to
09:56:52 what type of license Walmart would have negotiated, lump
09:56:56 sum versus running royalty, other scope issues, as well.

09:56:58 And that's the only way that they've been used by Mr. Haas.
09:57:01 THE COURT: So all of the ones that are not by the
09:57:03 Plaintiff are by the Defendant?
09:57:05 MS. WOODALL: Yes.
09:57:06 THE COURT: All right. And so you are agreeing
09:57:13 that you will not use any of the financial terms of these
09:57:21 licenses that are listed in Mr. Haas's report as not being
09:57:29 subject to a finding of technical comparability?
09:57:32 MS. WOODALL: Yes, correct.
09:57:33 THE COURT: Are you seeking to use all of those
09:57:37 licenses in some redacted form as evidence of the form of
09:57:49 the license that would result from the hypothetical
09:57:50 negotiation?
09:57:50 MS. WOODALL: It is very doubtful that we would
09:57:53 use all of the licenses, Your Honor.
09:57:54 THE COURT: But that is something you want to
09:57:59 preserve, or are there only some that you are interested in
09:58:04 using for that purpose?
09:58:05 MS. WOODALL: We'd like to preserve that for the
09:58:07 time being, please.
09:58:09 THE COURT: Okay. Now, what about the -- I guess
09:58:15 I need to hear this from counsel for Plaintiff, but I guess
09:58:21 is there a dispute about the five licenses that Mr. Haas
09:58:29 says have been found to be technically comparable? Do you
09:58:37 know if those are in dispute?

09:58:38 MS. WOODALL: Yes, they're objecting to the introduction of those into evidence, as well, or any testimony about them, saying that Mr. Haas's analysis was not appropriate in the way he used them, which we think is a bit of a backdoor Daubert motion. And we would submit that one of the licenses entered into for the patents-in-suit by the Plaintiff is highly probative under Georgia-Pacific 1, and the remaining four licenses are highly probative under Georgia-Pacific 2.

09:59:08 THE COURT: All right. Thank you, Ms. Woodall.

09:59:19 MR. KRAMER: Your Honor, if you'd like, I will focus on the five license agreements for which Defendant's technical expert has given an opinion that they're technically comparable and explain what the Plaintiff's position is on that.

09:59:33 THE COURT: And I guess before you do that, are you seeking any relief regarding the other 15 licenses that are noted in the report with the understanding that the financial terms of those will not be used?

09:59:49 MR. KRAMER: Your Honor, I think that those probably should not be used at all. I think their point is that under Georgia-Pacific Factor 3, they want to present evidence as to the form of license, lump sum, running royalty, and so forth. If that issue ends up being in dispute in front of the jury and they don't show the

10:00:10 financial terms of those 15 licenses, then we'll have no
10:00:14 problem with them using those for the form of the license,
10:00:17 lump sum/running royalty only.

10:00:20 THE COURT: Well, typically, I would only take up
10:00:25 an issue on a motion in limine if there is some substantial
10:00:27 prejudice that one side or the other can identify.

10:00:33 Is there any prejudice that you can point out that
10:00:40 use of those licenses -- those 15 licenses, without their
10:00:44 financial terms, would cause?

10:00:46 MR. KRAMER: No, Your Honor. Without the
10:00:48 financial terms, we -- we would not assert there would be a
10:00:52 privilege -- there would be any prejudice.

10:00:54 THE COURT: Well, I'll note that the Defendants
10:00:57 have agreed that any use of the 15 would be without
10:01:03 financial terms and -- but I'll deny any other relief as to
10:01:08 those 15.

10:01:10 MR. KRAMER: Okay.

10:01:11 THE COURT: So go ahead and talk about the five
10:01:14 that Mr. Haas says have been found to be technically
10:01:21 comparable.

10:01:21 MR. KRAMER: Thank you, Your Honor.

10:01:23 So of those five licenses, one of those is a
10:01:27 license made by the Plaintiff RavenWhite -- pardon me, one
10:01:33 of those is a license made by a company that the -- yes,
10:01:40 made by the Plaintiff RavenWhite. It's a covenant not to

10:01:44 sue. There was a companion case to this one, the
10:01:48 RavenWhite versus Home Depot case. And in that one, a stay
10:01:54 had issued of these cases pending completion of an IPR.
10:01:58 The Plaintiff RavenWhite and Home Depot agreed to
10:02:01 dismiss the IPR, dismiss the case against Home Depot in
10:02:06 exchange for RavenWhite giving a covenant not to sue Home
10:02:13 Depot, which resolved that dispute, and it lifted the stay,
10:02:17 thus this case, RavenWhite versus Walmart, proceeded.
10:02:22 [redacted]
10:02:25
10:02:26 Walmart is now wanting to use that characterizing
10:02:31 it as [redacted] to argue to the jury that that
10:02:36 represents the parties to that license -- sorry, to that
10:02:40 covenant not to sue agreement. RavenWhite and Home Depot
10:02:46 is agreeing that [redacted].
10:02:50 That's how they want to use that license.
10:02:53 There is an opinion that it's technically
10:02:56 comparable by their technical expert. That's fine if they
10:03:01 want to say that. The problem here is that this one -- it
10:03:05 plainly does not demonstrate that the [redacted], and it would prejudice the jury and create confusion,
10:03:16 right? If at its highest form -- if they have it the way
10:03:19 they would like, they'll be arguing to the jury, look, we
10:03:22 made a license agreement with a large company, Home Depot,
10:03:25 agreeing that our [redacted] and that they

10:03:29 [redacted].

10:03:31 That's, of course, not the reason that covenant 10:03:36 not to sue was made, and it would be prejudicial to us and 10:03:39 confusing to the jury.

10:03:41 I think an important point that cuts across that 10:03:47 covenant not to sue agreement, plus the four other 10:03:51 agreements, which are all license agreements that the 10:03:55 Defendant Walmart -- the other four are license agreements 10:03:58 the Defendant Walmart made with other parties to have 10:04:02 patent license agreements is that their expert, Dr. Haas, 10:04:06 does not use any of these five agreements to give an 10:04:11 opinion or as inputs to determine what a reasonable royalty 10:04:17 should be paid for -- by Walmart for a license to the 10:04:22 patents-in-suit, none.

10:04:24 What he does is in the very end of his report, the 10:04:30 last three paragraphs of his report, Paragraphs 300 through 10:04:34 302, simply says in so many words, look, there's these 10:04:41 other five agreements and that they might be a check on the 10:04:47 value of the patented technology.

10:04:50 So nowhere in his -- in his 143-page expert report 10:04:55 does he do any economic analysis of these five agreements. 10:05:01 He does not know and their 30(b)(6) witness did not know 10:05:04 whether Walmart uses the technology in the four license 10:05:08 agreements that they want to use. They don't know whether 10:05:13 that technology was valuable in any way to Walmart.

10:05:17 Basically, what they want to do is show the jury
10:05:21 four license agreements they made with third parties not
10:05:27 relating to the patents-in-suit here and show what are very
10:05:30 small dollar amounts, [redacted], this and that.
10:05:33 If I could have the ELMO, Your Honor, I'd like to
10:05:36 show Page 136 of Dr. Haas, the Defendant's damages expert's
10:05:42 report.
10:05:43 And if we look at -- okay, this is Paragraph 291
10:05:53 of Dr. Haas's report. The argument that Walmart is making
10:05:57 as to why they should be entitled to use the five license
10:06:01 agreements that they have the technical expert saying are
10:06:06 technically comparable is under Georgia-Pacific Factors 1,
10:06:10 2 -- and 3 is the form of the license, so we can put that
10:06:13 aside -- is under Factor 1, which are patent licenses made
10:06:17 for the patents-in-suit, RavenWhite's patents; and Factor 2
10:06:20 are licenses made by the Defendant licensing other
10:06:24 technology that they contend is comparable.
10:06:26 So if we look, this is Dr. Haas's statement of
10:06:33 the -- of the expert's opinions. The left column is
10:06:36 showing under Factors 1 and 2 that RavenWhite's damages
10:06:42 expert, Dr. -- Mr. Weinstein gives his opinion about the
10:06:46 effect of various licenses.
10:06:48 On the right column -- and that's really what's
10:06:51 important. On the right column is Dr. Haas's opinion, and
10:06:54 his opinion is Factor 1 is not applicable. Factor --

10:06:58 Georgia-Pacific Factor 1.

10:07:01 Georgia-Pacific Factor 2, he also says is not 10:07:06 applicable.

10:07:07 So what he's summarizing here, and it's clear in 10:07:10 his report, is he's saying that these two Georgia-Pacific 10:07:12 factors are not applicable to the opinions he's giving in 10:07:14 the case as to what a reasonable royalty would be paid by 10:07:19 Walmart to RavenWhite in a hypothetical negotiation.

10:07:24 So that tells us that not only did he not -- 10:07:27 Dr. Haas did not perform any economic analysis of the five 10:07:32 license agreements at issue here, but he then summarizes 10:07:35 and concludes that there are no agreements that he believes 10:07:39 are applicable to Georgia-Pacific Factors 1 and 2.

10:07:43 Now, in the briefing, Walmart is saying otherwise. 10:07:46 They're saying that these license agreements would be 10:07:50 applicable to 1 and 2. But that's not what's in the report 10:07:53 itself. So there's a disconnect between their argument and 10:07:57 what's actually in Dr. Haas's report.

10:08:00 So what are we left with? We're left with Walmart 10:08:04 has a damage expert giving an opinion as to what a 10:08:07 reasonable royalty should be -- would have been agreed to 10:08:10 in a hypothetical negotiation between the Plaintiff and 10:08:14 Walmart for the patent -- the two patents-in-suit, and 10:08:19 their damage expert does no economic analysis to -- 10:08:24 analysis as to why the five license agreements would be

10:08:28 economically comparable or relevant to his opinion on the topic. And then he summarizes here in Paragraph 291, saying that these two Georgia-Pacific factors are not even applicable to his report.

So what they want to do is tell the jury about five license agreements. One where [redacted]. That's the agreement made between RavenWhite and Home Depot to terminate the IPR in the case.

They want to tell the jury about four other license agreements under Georgia-Pacific Factor 2, which their damage expert says is not even an applicable factor in his opinion because those have very small amounts that Walmart paid for some other technology, not for the patents-in-suit. It's prejudicial. We don't want to see these small dollar amounts that will confuse the jury when they're -- these license agreements are not economically comparable to those that are in suit here.

So perhaps I should stop there, Your Honor, unless you have questions.

THE COURT: Are there any licenses that Mr. Weinstein argues are comparable?

MR. KRAMER: No, there are not, Your Honor. And certainly none that would be, you know, technically comparable to the patents-in-suit.

THE COURT: So there are no other licenses issued

10:09:54 by RavenWhite for the patents-in-suit?

10:09:56 MR. KRAMER: I believe that's correct. That's
10:10:02 correct.

10:10:02 THE COURT: And tell me what your position is on
10:10:04 why RavenWhite decided to issue the covenant not to sue to
10:10:14 Home Depot.

10:10:15 MR. KRAMER: [redacted]
10:10:18
10:10:22
10:10:27
10:10:29
10:10:33
10:10:37
10:10:40
10:10:45

10:10:45 Your Honor, Home Depot filed the IPR, not Walmart.
10:10:48 So RavenWhite and Home Depot had a discussion, let's
10:10:52 terminate your IPR. We'll terminate the district court
10:10:56 litigation against Home Depot. In exchange, the -- a
10:11:06 covenant not to sue Home Depot on these patents was given,
10:11:09 and based on that, the IPR was terminated. This case
10:11:12 against Walmart proceeded without a lengthy delay.

10:11:18 So there's no valuation. That's really what's
10:11:21 key, right? The reason one uses license agreements in
10:11:25 these cases to begin with, right, the premise is, well,

10:11:28 let's see what other willing licensees paid for a license
10:11:30 to the same patents in some like circumstance, because that
10:11:35 would be probative of what perhaps the Defendant should
10:11:37 pay.

10:11:38 But here, [redacted]
10:11:43
10:11:47 giving a covenant not to sue Home Depot for the purpose of
10:11:51 [redacted]
10:11:55 yet here's Walmart wanting to tell the jury that
10:11:58 this technology is [redacted] because, look, we gave
10:12:02 a license to -- or covenant not to sue to Home Depot.
10:12:05 That's a big company that looks a lot like Walmart, and so
10:12:09 [redacted] and that's -- you know, that's an
10:12:13 indication that RavenWhite believed its technology was
10:12:17 [redacted] and that Home Depot felt it was [redacted] And
10:12:21 that's certainly not at all what was occurring and what's
10:12:23 reflected in that agreement, and that's why it would be
10:12:26 prejudicial and should not be permitted to be presented to
10:12:29 the jury.

10:12:30 THE COURT: The record reflects that there was a
10:12:33 dismissal with prejudice against Home Depot. Was there a
10:12:35 separate covenant not to sue, as well?

10:12:39 MR. KRAMER: Yes, Your Honor. The agreement
10:12:41 itself is a covenant not to sue. And in that agreement, it
10:12:47 provides [redacted]

10:12:54 [redacted] and that RavenWhite would covenant not to sue
10:13:04 Home Depot.

10:13:05 THE COURT: All right. Thank you, Mr. Kramer.

10:13:18 MS. WOODALL: Your Honor, I think the main point
10:13:21 that's a bit conceded by Mr. Kramer's argument is that this
10:13:24 is -- oh, I don't need that, thanks -- this is a
10:13:27 methodological error that they are asserting against
10:13:31 Mr. Haas, but they did not file a Daubert motion. You
10:13:34 heard a lot of argument about flawed methodology, failure
10:13:39 to address economic impact, failure to look at the economic
10:13:42 underpinnings, and general misuse of the comparable
10:13:47 licenses in the context of Georgia-Pacific.

10:13:49 That's a Daubert motion. That is not a limine.
10:13:52 And all of the issues that Mr. Kramer has raised go to
10:13:55 cross-examination of the witnesses. It would be unduly
10:14:00 prejudicial to Walmart to say there's this [redacted], and we cannot cross-examine their
10:14:11 witness on the purported reasons for granting the
10:14:16 [redacted]

10:14:17 Mr. Haas, also I would point out -- if I could
10:14:21 have the ELMO for a moment?

10:14:25 The chart that -- let's see, I always do it

10:14:30 backwards. Yeah, I always do it backwards.
10:14:32 The chart that Mr. Kramer showed you was a summary of criticisms of Mr. Weinstein. It was not his saying I don't consider these licenses whatsoever in my analysis --
10:14:43 Let me see if I can get this straight.
10:14:45 -- because he says at Paragraph 301 that in addition to the errors that he described, he points out his failure to address any comparable licenses in his analysis.
10:14:56 Mr. Weinstein went through a number of the licenses and just dismissed them all out of hand based on cross-examination points. Nothing to do with the technology, nothing to do with the situation of the parties. He just said: I'm not considering these because XYZ reason.
10:15:10 Mr. Haas has addressed and has incorporated these licenses into his analysis directly. He did not use them as direct economic inputs by imputing a royalty, nor is he required to.
10:15:21 If you were to do that, you would be basically reading out all the other Georgia-Pacific factors because once you found a technically comparable license under GP2 or there was an established royalty under GP1, the analysis would be done, and that's not what the Georgia-Pacific analysis is.
10:15:36 Georgia-Pacific analysis posits a willing

10:15:40 hypothetical negotiation where the parties have full access
10:15:43 to all relevant information to make a reasonable royalty
10:15:48 determination. So what they want you to do is exclude
10:15:52 evidence [redacted] and prejudge whether or
10:15:58 not the jury should have access to the credibility question
10:16:02 regarding Dr. Jakobsson's testimony about their rationale
10:16:07 for having entered into it.
10:16:08 Mr. Haas has not taken an inflammatory position in
10:16:12 his report or in his opinion saying that [redacted].
10:16:16 He has instead done what the Federal Circuit has said that
10:16:16 he is allowed to do, which is use technically comparable
10:16:22 licenses to provide a reasonableness check and provide a
10:16:26 bound, an upper range for the '402 patent and a lower range
10:16:26 for the '823 patent as to what Walmart would have
10:16:26 considered in the hypothetical negotiation.
10:16:33 He has not [redacted]. He has not
10:16:35 said it's [redacted]. He hasn't said
10:16:40 it's [redacted]. He has granted them the benefit of the doubt
10:16:43 and used the highest license that is technically comparable
10:16:47 across the board, but it is not the case that Walmart would
10:16:52 not have known about [redacted] because
10:16:54 Federal Circuit precedent says they would have.
10:16:57 THE COURT: I think that while the covenant not to
10:17:06 sue could be otherwise admissible, I do think there's a
10:17:10 serious Rule 403 issue as to whether the unfair prejudice

10:17:18 exceeds the probative value. As far as probative value
10:17:24 goes, do you have any evidence that Home Depot was
10:17:29 negotiating for a license to RavenWhite's patents and that
10:17:36 it, therefore, intended some use of them?
10:17:43 MS. WOODALL: Well, yes, Your Honor, and that's
10:17:45 addressed by another one of the limine points. It's --
10:17:49 nobody contests Limine 3, which addresses Home Depot's
10:17:54 system. It's been analyzed. It's technologically the same
10:17:59 as Walmart's. Their witness, I think it was Mr. Holmes,
10:18:03 who is the owner through an LLC of the Plaintiff, testified
10:18:08 that they did, in fact, believe that Home Depot was
10:18:10 infringing. And so it was clear that in the context of
10:18:15 that license negotiation that Home Depot believed it was
10:18:19 buying peace to be able to use the technology.
10:18:22 Our expert has opined -- Dr. Almeroth has opined
10:18:26 that they are using the same technology. Mark Holmes, who
10:18:30 is the sole owner of RavenWhite Licensing, testified that
10:18:34 they believed Home Depot was infringing. Absolutely there
10:18:37 was a license grant contemplated for the right to use the
10:18:41 patents-in-suit.
10:18:48 THE COURT: Part of my concern is that it seems
10:18:50 that introducing that license, that covenant, brings into
10:19:01 the jury's consideration the PTAB, IPRs, companion
10:19:07 litigation, all sorts of issues that would be time
10:19:13 consuming and distracting from the issues in this case.

10:19:20 MS. WOODALL: Your Honor, we'd be happy to redact all references to the IPR.

10:19:25 THE COURT: Well, how would the Plaintiff explain why they entered into this covenant with Home Depot without a discussion of the stay and the companion litigation that led to it?

10:19:42 MS. WOODALL: Well, we believe that they would be able to say that there was a timing consideration or a stay involved without opening the door to the IPR. That would depend on the scope of the testimony that they elicit from their witness -- witnesses on direct. We assume that this is coming up prior to our raising it.

10:20:01 So to the extent that they, you know, circumscribe their questioning and don't open the door to that, we would not open it ourselves.

10:20:16 THE COURT: And what does Mr. Haas say about the amounts of the other agreements that -- the other four agreements that are at issue here, the Walmart licenses?

10:20:43 MS. WOODALL: What did he say about them? He listed the amounts, he gave the background context for the different licenses, and then in the end, he used the -- I think it's the [redacted] (sic) license as the upper -- upper bound. He did not try to scale anything or do direct economic inputs into the analysis. But he used the license agreement that was $1.05 million.

10:21:08 THE COURT: So he used those licenses to create a
10:21:18 range and --
10:21:23 MS. WOODALL: That's correct.
10:21:23 THE COURT: -- he selected -- all right.
10:21:23 MS. WOODALL: And one last point with respect to
10:21:26 the Home Depot license, Your Honor. It's our position that
10:21:28 it's really no different than any other litigation
10:21:31 settlement agreement. Parties have lots of considerations
10:21:34 in mind when they enter into settlement agreements. The
10:21:40 Federal Circuit has still found them to be highly
10:21:43 probative.
10:21:44 THE COURT: I'm not sure the Federal Circuit finds
10:21:46 them highly probative, but they find them admissible,
10:21:49 right? But all right.
10:21:56 Thank you, Ms. Woodall.
10:22:05 I am going to grant a portion of this motion in
10:22:16 limine, that being the portion relating to the Home Depot
10:22:21 covenant, on the grounds of Rule 403. I think that it has
10:22:28 relatively low probative value and a very high prejudicial
10:22:34 effect by requiring the Plaintiff, if it is admitted, to
10:22:42 offer evidence about IPRs, the PTAB, and the litigation
10:22:54 against Home Depot, all of which would be very time
10:22:59 consuming, confusing, and prejudicial.
10:23:04 And I don't think that it, in fact, has
10:23:10 significant probative value as to what a reasonable royalty

10:23:14 is in this case.

10:23:17 I'm going to deny the motion as to the 15 other
10:23:22 licenses that were mentioned with the understanding that
10:23:27 the financial terms of those licenses will not be referred
10:23:32 to.

10:23:34 I'm going to deny as to the four Walmart
10:23:37 agreements on the grounds that I think that is something
10:23:42 that can be addressed in cross-examination of Mr. Haas or
10:23:50 other Walmart witnesses.

10:23:59 Mr. Kramer, is there anything that you think is
10:24:01 not clear about that ruling?

10:24:02 MR. KRAMER: Your Honor, that's clear. Thank you.

10:24:07 THE COURT: All right. Then I would turn to
10:24:09 Plaintiff's Motion in Limine No. 2.

10:24:11 But before we do so, we will take the morning
10:24:16 recess.

10:24:20 And I would ask counsel to talk about whatever it
10:24:23 was that we indicated should be taken up.

10:24:28 And we'll take a 15-minute recess. Thank you.

10:24:31 COURT SECURITY OFFICER: All rise.

10:24:32 (Recess.)

10:24:32 COURT SECURITY OFFICER: All rise.

10:24:33 THE COURT: Thank you. Please be seated.

10:39:05 And we can turn to the Plaintiff's second motion
10:39:14 in limine.

10:39:18 MR. MATTSON: Good morning, Your Honor. May I
10:39:20 proceed?
10:39:20 THE COURT: Yes.
10:39:21 MR. MATTSON: Robert Mattson for RavenWhite.
10:39:23 MIL No. 2 relates to similar issues to what we
10:39:28 just heard for MIL No. 1 and the licenses. The MIL seeks
10:39:32 to preclude Walmart from presenting evidence about
10:39:35 non-infringing alternatives. And the reason for that is
10:39:37 one of relevance and one of a risk of juror confusion.
10:39:42 And here, again, what Mr. Haas did -- and there is
10:39:46 no expert on Walmart's side either that's done this -- is
10:39:49 to link any of the NIAs to the reasonable royalty that
10:39:54 would have been negotiated between the parties.
10:39:57 So we're in a situation where there are all these
10:40:00 NIAs that have been identified, but there's -- there's no
10:40:04 discussion of their impact on the reasonable royalty, and,
10:40:09 therefore, they're irrelevant. And just by parading all
10:40:12 these NIAs in front of the jury, you risk confusion. In
10:40:16 fact, that's probably the only effect you could achieve.
10:40:20 The situation here is the same as the one this
10:40:23 Court considered in Correct Transmission. And there --
10:40:26 independently of all the other reasons for striking the
10:40:28 expert report there, the failure to provide any financial
10:40:32 analysis of the impact of an NIA on the reasonable royalty
10:40:38 resulted in striking the -- the NIAs because the only

10:40:45 result of that -- of presenting such NIAs would be juror
10:40:49 confusion.
10:40:51 THE COURT: Are you representing that the
10:40:59 Defendant's expert does not discuss those non-infringing
10:41:05 alternatives at all or simply does not rely on them or
10:41:09 what?
10:41:10 MR. MATTSON: He does not rely on them, Your
10:41:13 Honor. There's no math to attack. There's no opinion to
10:41:15 attack. That's why this isn't a Daubert motion.
10:41:17 He acknowledges that non-infringing alternatives
10:41:22 have been identified by Walmart's technological expert.
10:41:28 He -- when he runs through his statement of what the law is
10:41:31 for damages, he acknowledges that non-infringing
10:41:35 alternatives may play a factor in some of the
10:41:37 Georgia-Pacific factors, but he never provides an opinion
10:41:41 whether the existence of any of these non-infringing
10:41:43 alternatives is a plus factor or a down factor or a --
10:41:49 Walmart talks about caps, but there's also -- there's zero
10:41:53 financial analysis at all.
10:41:54 THE COURT: Is there a mention of what the cost of
10:41:58 these alternatives would be?
10:42:01 MR. MATTSON: No, Your Honor. And, in fact, I
10:42:03 asked Mr. Haas at his deposition whether he had even
10:42:06 consulted with anyone at Walmart about these NIAs, and the
10:42:11 answer was no.

10:42:12 THE COURT: So what is the prejudice that you're concerned would occur from mentioning the existence of the alternatives?

10:42:21 MR. MATTSON: Well, that all of these NIAs would be dangled in front of the jury, and then there's no -- they would just jump to their own conclusion about whether -- what their effect is. Mr. Haas wouldn't be able to testify about their effect on the reasonable royalty because he didn't say what it was in his report.

10:42:44 THE COURT: And so your position is that unless a non-infringing alternative is used in the determination of the royalty, it is not admissible?

10:42:56 MR. MATTSON: No, Your Honor. I think there -- there are other things that could be done with it. For example, maybe an opinion that says, okay, that the NIAs would have changed the bargaining position of the parties, or it would have strengthened or weakened someone's position at the table, or this is -- would have a positive effect on the royalty or a negative effect on the royalty. But none of that exists.

10:43:20 THE COURT: All right. Thank you, Mr. Mattson.

10:43:30 MR. LARSON: Good morning, Your Honor. Blaine Larson for the Defendant Walmart.

10:43:38 What I think you just heard, Your Honor, is a pure untimely Daubert challenge. This is a challenge to the

10:43:47 methodology applied by Mr. Haas, Walmart's damages expert,
10:43:54 and how he used non-infringing alternatives.

10:43:56 And I think your question put a perfect bow on it.
10:44:00 Their argument is that Mr. Haas -- not just Mr. Haas but
10:44:03 Walmart in general cannot discuss non-infringing
10:44:07 alternatives because Mr. Haas did not use the value of
10:44:10 non-infringing alternatives as a numerical input into his
10:44:14 reasonable royalty analysis.

10:44:16 The Federal Circuit has never held that, Your
10:44:19 Honor. There is no Federal Circuit case that says a
10:44:22 non-infringing alternative is only relevant if it is used
10:44:26 as a numerical input.

10:44:29 Mr. Haas served a rebuttal report in this case.
10:44:31 He was rebutting the opinions of Mr. Weinstein. One of the
10:44:33 things Mr. Haas said is that, look, Mr. Weinstein did not
10:44:38 consider the impact of non-infringing alternatives. He
10:44:40 said -- Mr. Haas addressed that in two different sections
10:44:44 in his report. He's got a background section, which
10:44:47 includes some general criticisms of Mr. Weinstein, and one
10:44:50 of the things he says in that background section is
10:44:53 Mr. Weinstein failed to consider the impact of
10:44:55 non-infringing alternatives.

10:44:57 Mr. Haas addresses non-infringing alternatives in
10:45:01 a second place in relation to Georgia-Pacific Factors 9 and
10:45:05 10. He once, again, says Mr. Weinstein failed to consider

10:45:09 the impact of these.

10:45:10 RavenWhite talked about the Court's Correct 10:45:17 Transmission case, Your Honor. In the Correct Transmission 10:45:20 case, the Defendant's damages expert did not mention 10:45:24 non-infringing alternatives in his report. And that was an 10:45:27 opinion about whether or not to strike technical testimony 10:45:29 from the technical expert.

10:45:30 Here, in two different sections, which we cited in 10:45:34 our briefing, Mr. Haas discusses non-infringing 10:45:37 alternatives.

10:45:38 The Federal Circuit's Mars v. Coin Acceptors case 10:45:42 I think is the most relevant case on this issue, Your 10:45:45 Honor. In that case, the Defendant tried -- or the 10:45:47 Defendant's expert, I should say, tried to use the value of 10:45:51 non-infringing alternatives as a numerical cap on the 10:45:53 damages that could be awarded under a reasonable royalty 10:45:57 analysis.

10:45:58 The Federal Circuit said that's incorrect. The 10:46:00 value of NIAs cannot be treated as a numerical cap. So 10:46:05 they're divorcing the idea that a reasonable -- that a 10:46:09 non-infringing alternative has to be a numerical input.

10:46:12 And briefly, Your Honor, most of the discussion 10:46:14 today was about Mr. Haas, but the way this MIL is written 10:46:17 is extremely, extremely broad.

10:46:20 Let me read a sentence from their briefing:

10:46:22 Walmart must also be precluded from referencing, arguing,
10:46:26 or questioning any witnesses about NIAs, whether during
10:46:30 opening statements, cross-examination, or closing
10:46:33 arguments.
10:46:33 So regardless of whether or not Mr. Haas is
10:46:36 permitted to testify about non-infringing alternatives, and
10:46:39 we think he should be, it should be fair game for Walmart
10:46:44 to cross-examine Mr. Weinstein and Dr. Smith, the technical
10:46:49 expert, about their failure to consider NIAs.
10:46:52 THE COURT: Tell me what you think the relevance
10:46:59 of the NIAs would be if they are not used to show a cost
10:47:12 alternative to the patented technology.
10:47:16 MR. LARSON: Your Honor, they are a sanity check
10:47:18 on the reasonableness of Mr. Weinstein's number.
10:47:20 Mr. Weinstein is going to apply a damage -- or going to
10:47:23 testify about a damages number that's significant, and it
10:47:25 is fair for us, in rebuttal to that, to say let's think
10:47:29 about what you considered and what you didn't consider.
10:47:32 And one of the things he did not consider in his
10:47:34 analysis is the value of the next closest alternative. I
10:47:38 think that's a very fair criticism of his analysis.
10:47:42 THE COURT: And is there any evidence anywhere in
10:47:50 the record about what these NIAs would cost to implement?
10:47:59 MR. LARSON: I don't believe so, Your Honor. I
10:48:01 don't think Mr. Haas or Dr. Almeroth assigned a numerical

10:48:05 value to any particular non-infringing alternative.
10:48:12 Although, I believe -- I believe Mr. Haas said they -- I
10:48:15 believe Dr. Almeroth said it would be trivial to implement
10:48:18 them.

10:48:25 THE COURT: All right. And Dr. Almeroth is your
10:48:27 technical --

10:48:28 MR. LARSON: Yeah, I apologize, Your Honor. My
10:48:30 co-counsel reminded me of this. Dr. Almeroth, in his
10:48:33 report -- he is our technical expert. In his report, he
10:48:37 opines on some particular alternatives, and he says that
10:48:40 they could be implemented with minimal engineer time and
10:48:43 cost. And he describes how they would be -- how those
10:48:46 changes would be implemented. He does not assign a
10:48:49 specific dollar amount, but he gives a relative cost of
10:48:53 implementation.

10:48:54 THE COURT: All right. Thank you, Mr. Larson.

10:49:07 MR. MATTSON: Before I proceed, Your Honor, did
10:49:09 you have any questions for me?

10:49:10 THE COURT: No. You can simply respond to
10:49:19 Mr. Larson's argument.

10:49:20 MR. MATTSON: Certainly, Your Honor. Well, I
10:49:24 already mentioned in the beginning that this is a 402/403
10:49:28 issue, not a Daubert issue, because there's no opinion to
10:49:30 attack. There's no -- no math. There's no process that we
10:49:34 could address here. There's nothing. That's why the

10:49:37 opinions are irrelevant and why presenting them to a jury
10:49:42 would be prejudicial.
10:49:42 THE COURT: Why isn't it fair game for the
10:49:44 Defendant to cross-examine your experts about whether they
10:49:50 considered these non-infringing alternatives?
10:49:52 MR. MATTSON: It is fair game, Your Honor, and we
10:49:54 told them that at the MIL meet and confer that if -- we're
10:49:57 going to have a decision to make whether Mr. Weinstein is
10:50:00 going to talk -- that's our damages expert -- whether he's
10:50:04 going to talk about non-infringing alternatives or not. If
10:50:07 he does, then cross-examination would be fair game.
10:50:10 THE COURT: Well, even if he doesn't, why isn't it
10:50:13 fair game to ask whether in determining a reasonable
10:50:18 royalty, he looked at what the other alternatives are?
10:50:24 MR. MATTSON: They could certainly do that, and
10:50:26 his opinion would be that he did look and he talked to
10:50:30 RavenWhite's technical expert and determined that there
10:50:35 were no non-infringing alternatives. That's in his report.
10:50:39 THE COURT: So testimony by the Defendants about
10:50:47 their belief that there are non-infringing alternatives
10:50:49 would be rebuttal to your expert's opinion?
10:50:54 MR. MATTSON: If he provided that opinion, you're
10:50:59 right, Your Honor.
10:51:00 There's also another factor at play here, which is
10:51:03 there's a motion to strike from Dr. Almeroth -- he's

10:51:07 Walmart's technical expert -- from his report, his
10:51:11 discussion of NIAs. A lot of those are going to fall out,
10:51:16 we believe, because they were presented in Dr. Almeroth's
10:51:19 rebuttal expert report. Some of them, even in his opening
10:51:23 report, weren't disclosed during fact discovery, and there
10:51:28 are also issues with his methodology in that he's never --
10:51:33 also has never talked to anyone at Walmart about the
10:51:36 feasibility of any of these alleged NIAs.

10:51:38 THE COURT: Well, I'm going to deny your Motion in
10:51:44 Limine No. 2. But that denial is without prejudice to any
10:51:49 arguments that are in your pending motions to strike. And
10:51:55 I'll take those issues up separately, but this MIL, I
10:52:02 think, is too broad to support, so it is denied.

10:52:23 Which takes us to the Plaintiff's third motion in
10:52:26 limine.

10:52:27 MR. MATTSON: Your Honor, we talked about
10:52:29 Plaintiff's MIL No. 3 in the hallway during the break, and
10:52:34 because of the granting of MIL No. 1 with respect to the
10:52:40 Home Depot covenant not to sue, which, of course, Walmart
10:52:44 takes issue with, MIL No. 3 would -- they'd be granted as a
10:52:49 result of that.

10:52:53 THE COURT: Well, I guess I'd have to hear that
10:52:56 from the Defendant.

10:52:58 And, Mr. Alavi, nothing you say here will be a
10:53:03 waiver of your objection to the Court's ruling on the

10:53:09 covenant, but go ahead.

10:53:11 MR. ALAVI: Your Honor, this is actually not my
10:53:13 MIL. I believe counsel is correct, that given the ruling
10:53:17 on MIL No. 1, MIL No. 3 would follow from that. I did want
10:53:21 to address that, the covenant issue, if I may.

10:53:25 I understand the Court's point about prejudice,
10:53:27 and I want to address that because I think excluding the
10:53:30 Home Depot license is far broader relief than is required
10:53:37 to resolve any potential prejudice the Plaintiffs have with
10:53:41 respect to that covenant.

10:53:43 This is a -- the Home Depot covenant is a license
10:53:46 to the asserted patents. It is a license to [redacted]. It was a license granted to Home Depot
10:53:54 who was sued for infringement at the same time as Walmart.
10:53:57 They are similar in size to Walmart, and the Plaintiff's
10:54:03 expert in this case has an opinion that the damages for
10:54:06 Walmart are $200 million.

10:54:09 Now, I understand [redacted] feels
10:54:13 prejudicial, but it was their decision to do a license.

10:54:17 The real prejudice that the Court addressed was,
10:54:19 well, how do they explain it away without talking about the
10:54:22 IPRs and without creating a sideshow about the IPRs? And
10:54:26 there's a very easy way to do that. It's, in fact, the way
10:54:29 they did do it in both their interrogatory and in
10:54:33 Mr. Holmes's testimony.

10:54:34 They can simply testify that we granted Home Depot a license because procedurally we would not have been able to proceed with the Walmart case for a period of time because there was a stay. They don't have to get into why there was a stay. They don't have to get into why there's an -- there was an IPR. They don't have to get into any of that, and we would not. We would not do so ourselves.

10:54:58 THE COURT: And I understand why you wouldn't, because their explanation has no weight.

10:55:04 MR. ALAVI: No, the Court had issued a stay procedurally, and we could not move forward with the Walmart case until the Home Depot issue was resolved. That -- that's their explanation.

10:55:14 They're not -- their explanation is not they did it because the IPR. They said they did it for the stay. And we're entitled to test that because the Walmart license would also have been a hundred million dollars under Mr. Weinstein's theory. And does it makes sense that you would walk away from hundreds of millions of dollars to save a six-month or one-year stay? No. It makes sense to do it if you thought the license was worth less.

10:55:38 And it is a probative valuation metric for the license-in-suit because it's against a Defendant who Plaintiff alleges infringes whose product operates the same way as Walmart's accused product. I know they don't like

10:55:53 it. [redacted]. And they can explain it the way they've
10:55:56 tried to explain it. We wanted to avoid a two-year delay
10:56:00 in proceeding against Walmart. We don't have to get into
10:56:03 the IPRs to do that, Your Honor.
10:56:04 THE COURT: Mr. Alavi, it is no more probative
10:56:07 than evidence that there are other companies that have the
10:56:14 same systems or similar systems that Walmart has that
10:56:19 RavenWhite hasn't sued.
10:56:20 MR. ALAVI: It is probative. They sued them, and
10:56:22 they entered into an agreement and [redacted]
10:56:25 that agreement. It's no different than any other
10:56:28 litigation settlement. If the -- if the license had been
10:56:30 [redacted], we -- we could have used it.
10:56:36 The prejudicial aspect is not the IPRs. They
10:56:38 don't like the fact that [redacted].
10:56:43 We have this in cases all the time. [redacted] litigation
10:56:47 settlements. Those are data points that can be used to
10:56:51 evaluate the value of the license.
10:56:52 And Mr. Haas does not say that the technology is
10:56:55 [redacted]. What he does, he says: There are five
10:56:59 licenses to technologically comparable patents, including
10:57:03 the patents-in-suit, and none of them, none of them
10:57:07 approach $200 million.
10:57:09 THE COURT: And he can still make that point with
10:57:11 the other four.

10:57:12 MR. ALAVI: Except with the other four, they can
10:57:15 cross him by saying those aren't these patents. Those are
10:57:18 different patents. I've seen that done with the Defense
10:57:22 expert, and it is very effective.
10:57:24 We have the most probative license. It is a
10:57:28 license to the patents-in-suit, and it wasn't for hundreds
10:57:31 of millions of dollars.
10:57:33 And so I'd ask the Court to -- I think you can
10:57:36 grant a more limited limine, which is to say that you can't
10:57:39 mention the IPR. You can't talk about it. They're allowed
10:57:41 to say what they've said in their interrogatory and in
10:57:44 their sworn testimony. There was a procedural stay against
10:57:48 the Walmart case. We could not proceed against Walmart
10:57:53 until we reached a resolution with Home Depot, and we
10:57:56 decided to avoid a two-year stay. It made sense to give
10:58:00 Home Depot [redacted]. They can say that.
10:58:03 And then the jury can decide whether or not a --
10:58:08 a -- saving two years of time implies a value of $200
10:58:12 million or implies that you really didn't think these
10:58:15 patents nor did Home Depot think these patents were -- are
10:58:19 worth $200 million.
10:58:21 And that's the probative value of these licenses
10:58:23 to the patents-in-suit. They are market transactions that
10:58:27 indicate the value of the patents-in-suit, much different
10:58:32 than transactions involving different patents.

10:58:34 So I know it's hard to get you to change your
10:58:37 mind, but I did want to at least suggest that there's a
10:58:40 more limited relief available.
10:58:42 THE COURT: You're not addressing what I think is
10:58:44 the value that that covenant reflects, and that's the value
10:58:50 of the IPRs.
10:58:52 MR. ALAVI: That's no different than any other
10:58:53 litigation license, if they want to say we were in
10:58:55 litigation with Home Depot and we wanted to avoid
10:58:58 litigation risks. But I understand the Court -- and
10:59:01 rightfully so because I'm usually at this table, Your
10:59:04 Honor -- wants to avoid discussions of IPRs. It's a
10:59:10 collateral proceeding, and there's good reason to exclude
10:59:13 it.
10:59:13 But you don't have to mention the word "IPR." You
10:59:15 can say we were in litigation with Home Depot. There was
10:59:18 litigation risks, if they want to add that to their list of
10:59:21 excuses, but they chose -- they chose to say the reason
10:59:25 they did it was to avoid a two-year delay. They didn't say
10:59:28 they did it to avoid the risk of the IPR. They have an
10:59:32 interrogatory and sworn testimony.
10:59:33 Their excuse [redacted] is we wanted to
10:59:36 avoid the six to two-month procedural delay in moving
10:59:40 forward with Walmart. They can say that and not implicate
10:59:44 the IPRs in any way, which would be prejudicial to talk

10:59:47 about the IPRs. They made their bed. They said the reason we did it was to avoid a two-year delay. They can say that without mentioning IPRs at all. We can redact the license to take out all mention of the IPRs.

If they had said we wanted to avoid litigation risks -- they didn't say any of those things. They're crystal clear in their interrogatory. They're crystal clear in their sworn testimony. We granted the license because our case against Walmart was stayed. We didn't want a two-year delay. We wanted to lift the stay. That can all be packaged in a way that is not prejudicial.

Juries hear about -- what's stay mean? You couldn't move forward with your case. We can give them the full explanation as to why they wanted to avoid a two-year delay and get in a highly relevant comp.

It's hard to believe -- and this is why they want to exclude it -- if these patents were worth hundreds of millions of dollars against Home Depot and Walmart, because they're both major, major retailers, would you really walk away for six months, or is it more likely that the patent's only worth a couple of million dollars?

And so that's -- that's why these comparable licenses to the patents-in-suit have been found admissible by the Federal Circuit. And it's prejudicial for Walmart to not be able to talk about "the" one license to these

11:01:08 patents.

11:01:11 So I think there's a way to limit the prejudice,
11:01:14 Your Honor.

11:01:14 THE COURT: All right.

11:01:15 MR. ALAVI: Their excuse is we wanted to avoid
11:01:18 delay. It was not risk of IPRs. It was not risk of
11:01:22 litigation. They can say all of that without the prejudice
11:01:24 of getting into this collateral proceeding and talking
11:01:28 about the IPRs.

11:01:28 THE COURT: Thank you, Mr. Alavi.

11:01:29 MR. ALAVI: Thank you.

11:01:30 THE COURT: Now, if I agreed with you on the
11:01:35 probative value, I might agree with you on the alternatives
11:01:41 to explaining the issuance of the covenant, but I don't
11:01:50 agree that this covenant is probative of the reasonable
11:01:58 royalty. And I think that it is highly prejudicial because
11:02:03 it would be misunderstood by the jury unless there were an
11:02:10 explanation of the IPR system and the effect of the
11:02:16 collateral litigation involving Home Depot and the fact
11:02:20 that Home Depot filed IPRs that Walmart did not.

11:02:25 And for all those reasons, I will not reconsider
11:02:35 the Rule 403 ruling.

11:02:39 And so we are back to this issue. I guess MIL
11:02:53 No. 3 is -- does it add anything to the ruling the Court
11:03:03 made under Rule 403 as to the covenant?

11:03:08 MR. ENGER: Good morning, Your Honor. Eric Enger
11:03:12 for the Defendant.
11:03:13 Respectfully, we don't think -- we disagree with
11:03:19 the ruling on MIL No. 1, but I think the rationale, if you
11:03:22 accept it, applies equally to MIL No. 3.
11:03:25 The only comparison that will be -- that any
11:03:28 expert does in this case of an accused product to another
11:03:32 infringing product is the Walmart product to the Home Depot
11:03:35 product. So if the Home Depot license is out, there's
11:03:38 really no reason for Dr. Almeroth to compare the Home Depot
11:03:43 and Walmart accused systems.
11:03:45 THE COURT: All right.
11:03:46 MR. ENGER: So he won't be offering those
11:03:48 opinions.
11:03:49 THE COURT: That makes good sense, Mr. Enger.
11:03:52 I'll grant MIL No. 3 for the reason that the Court
11:03:56 granted the part of MIL No. 1.
11:04:04 MR. ENGER: Thank you, Your Honor.
11:04:05 THE COURT: Thank you, Mr. Enger.
11:04:16 Which takes us to the Defendant's motions in
11:04:27 limine and Motion in Limine No. 1.
11:04:28 MR. ALAVI: Your Honor, before we get to MIL
11:04:31 No. 1, because it may impact how you want to deal with MIL
11:04:34 No. 1, we've conferred with counsel, as the Court
11:04:40 requested, and our recommendation, if the Court is willing

11:04:42 to do it, is to have -- deal with exhibits separately at a different pretrial conference for numerous reasons. One is many of them will be impacted by the Court's MIL rulings that you've already made and some motions to strike that are pending.

The other reason is in response to MIL No. 1, there are numerous exhibits that are impacted by it. We've redacted many of them, and we have an agreement to try to redact others. There is still a dispute as to MIL No. 1 as to one or two exhibits, so we can take that up this morning.

With respect to the second pretrial conference to deal with exhibits, we'd also ask that there are a few motions that we think the Court could benefit from oral argument on, at least from the Defendant's perspective. It's the 101 motion and the motion for summary judgment on enforceability.

The Plaintiffs may have some.

And we'd ask the opportunity to provide a notice to the Court of what we think the Court would benefit from. We understand you can say no, but that would be at least the proposal.

THE COURT: All right. I certainly would consider the parties' recommendations in that regard and take that into account in setting the follow-up hearing on exhibits.

So what would be most helpful to me, if you want to submit a joint notice or a joint motion for an oral hearing on some of the motions, would be if you prioritized the motions and if the party doing so would indicate what they see as the beneficial effect of prioritizing those motions over other motions.

MR. ALAVI: We will do that, Your Honor. Thank you.

And now we can take up MIL No. 1, which Ms. Woodall will argue. This is -- I think you've seen it a lot. It's a MIL about revenue numbers. That's why it's inextricably tied to some of these exhibits.

So I've conferred with counsel. They suggested maybe we do that at the same time we take up the exhibits, or we do it first and take up the exhibits, but we'll leave that entirely to your judgment and discretion.

THE COURT: I really defer to counsel in terms of when it is most efficient to take them up. I do think that when we're talking about these numbers, it's important to take them up in the context of the way they're used in the different reports and -- or not used.

And so there are -- some of the numbers, just by categories, you can know. For instance, I guess the first category here is Category A, and that is reflected as Walmart's overall revenues and profits, and that looks to

11:07:55 me to be a pretty easy grant. But when you get further into this as far as revenue numbers that relate to the use of the accused technology, then that's -- those are closer questions that cannot be decided without consideration of the use by the experts.

11:08:26 But anyway, if -- if Walmart wants to take those up now in some way, I'm open to that. If Walmart thinks it'd be more effective to leave this to be done in connection with the exhibit issues, I am not opposed to that.

11:08:47 MS. WOODALL: I think we'd like to proceed on a few of the exhibits and limine points that cross over. Ms. Chan and I worked together to discuss redactions, and we think we're -- made a lot of progress, but we would like the Court's guidance on where to help draw lines.

11:09:05 THE COURT: All right.

11:09:10 MS. WOODALL: Okay. Okay. So Your Honor already addressed kind of the company-wide, company-level financials, and these do come up in a number of the exhibits. These are some examples, PX-10, 11, 12. Walmart proposed some additional redactions in addition to those provided by RavenWhite's counsel. And I think we're in agreement that company-level financials should not be coming in.

11:09:48 Then we have -- and this may be more of an issue

11:09:52 because PX-19 is specifically still at issue -- is a
11:09:56 spreadsheet that addresses total ad revenues totalling $20
11:10:02 billion for Walmart Connect. Walmart Connect is Walmart's
11:10:07 retail media platform for which certain functionalities in
11:10:11 certain groups of advertisements are accused of infringing
11:10:15 the '402 patent. Top-line revenues, we believe, should not
11:10:18 come in. It would be highly prejudicial.

11:10:22 We did have a meet and confer on this -- I think
11:10:24 it was two weeks ago now -- and RavenWhite's counsel
11:10:27 informed us that they wanted the month-by-month top-line
11:10:30 numbers because they needed it to show growth, size, and
11:10:33 importance of Walmart Connect to Walmart's overall
11:10:36 business. We believe that's improper.

11:10:38 There are a few examples of, you know, the
11:10:41 revenues generated. We're looking at PX-3. It's $6.4
11:10:47 billion for one year. PX-4, $4 billion. PX-13, $3.4
11:10:54 billion. These numbers are grossly overstating what's at
11:10:57 issue in the case, and that's why we believe that they
11:10:59 should be excluded in limine.

11:11:01 To help the Court understand what we're dealing
11:11:04 with in terms of relative dollar amounts, we have done a
11:11:08 chart that shows accused ad functionality on the left and
11:11:12 unaccused ad types and functionality on the right.

11:11:15 The top-line numbers that you just saw, the
11:11:19 billions of dollars in ad revenues apply to all of this,

11:11:23 not just the accused ad functionalities on the left. So by
11:11:28 our calculation, for example, just looking at sponsored
11:11:32 product ads, 65 percent of the revenues in Walmart Connect
11:11:37 that are represented by sponsored product ads are not
11:11:40 accused, not even remotely accused, have nothing to do with
11:11:44 the accused technology.

11:11:44 In addition --

11:11:46 THE COURT: Tell me what the 65 percent comes
11:11:48 from.

11:11:49 MS. WOODALL: So let me flip through. Here it is,
11:11:52 Your Honor.

11:11:52 So on PX-21, there is actually a breakdown of
11:11:59 sponsored product ads and revenues. And the column on the
11:12:02 right that's highlighted is just for Q2, okay? So you can
11:12:06 see that there are different locations where ads would have
11:12:09 been placed, page type; my items; item page; cart; last
11:12:15 call; PAC, which is post add to cart; homepage; and then
11:12:19 the overall total revenues for sponsored product ads.

11:12:20 The only placements on this list that are at issue
11:12:24 in this case are certain modules on items page, not all of
11:12:29 them, and certain on the homepage, not all of them. My
11:12:32 items are not at issue. Cart-sponsored product ads are not
11:12:36 at issue. Last call, PAC. So the top-line number that you
11:12:41 see here, which is $99 million for a quarter for one type
11:12:45 of ad that's then later rolled up into Walmart Connect,

11:12:49 none of these should be coming in in front of the jury, and 11:12:52 this is the document I used to calculate the 65 percent of 11:12:55 revenues are unaccused. And that's just for sponsored 11:12:57 product ads.

11:12:58 But that's not all that's in play for the Walmart 11:13:02 Connect top-line revenues. When you look at the preceding 11:13:06 slide, Your Honor, you can see that for the display ads, 11:13:10 there's only one type of ad that is accused of infringing 11:13:14 the asserted claims of the '402 patent, and it is 11:13:17 behaviorally targeted ads using persona as a way to 11:13:24 identify and target the advertisements. There are display 11:13:27 ads that use in market-based behavioral targeting. There 11:13:34 are six other types of behavioral-targeting that are not 11:13:37 accused of infringement. There's contextual targeting 11:13:40 that's not accused of infringement, keyword targeting, 11:13:43 homepage lockouts, video ads, run of site.

11:13:47 The Walmart Connect revenues include in-store 11:13:51 demonstrations. They include back-of-the-wall TV ads. So, 11:13:55 like, when you go into a Walmart and you see the TV section 11:13:58 and advertisements are running, those are included in the 11:14:01 top-line Walmart Connect revenues, and they have nothing to 11:14:03 do with this case. Social media ads are not accused of 11:14:07 infringing.

11:14:07 And then if you look at the modules that I was 11:14:10 referring to on the next slide, Your Honor, it shows you

11:14:12 how many of the modules per page type are accused. Only one of 11 for item page, and then homepage is 16 of 22. And then there are numerous types of sponsored product ads that are not accused of infringement.

So the vast majority of the revenues associated with Walmart Connect have nothing to do with this case. In fact, the top-line revenues for display ads covers a lot of ground that is not addressed by the patents-in-suit, so --

THE COURT: So --

MS. WOODALL: -- too, for sponsored products.

THE COURT: Are top-line revenues a category in your motion?

MS. WOODALL: Yes. We have business unit level revenues, Your Honor.

THE COURT: Because, frankly, what I find most important in determining the use of these numbers is the reliance that the Plaintiff's witnesses put on those numbers. And the ones that they don't rely upon that are large numbers are easily excluded. And the ones that they use in their analysis, then it, to me, becomes an issue of whether that's a proper methodology, which would be a Daubert issue, as opposed to just a motion in limine issue.

So I guess with respect to this category of top-line sales and revenue numbers, I would need to hear from the Plaintiffs as to whether they can show that their

11:15:57 witnesses rely upon those numbers in a meaningful way.

11:16:01 MS. WOODALL: So I can answer that question if 11:16:03 you'll give me the opportunity. It is in Mr. Weinstein's 11:16:06 exhibits. He has Exhibits 8 and Exhibit A, which are for 11:16:12 the '402 patent and relevant to Walmart Connect. And I 11:16:14 believe it's Line Item 1. He uses the overall top-line 11:16:19 number, and then he does some additional calculations to 11:16:22 try to apportion to the value of the asserted claims and 11:16:26 the technology at issue.

11:16:27 Our problem would be his putting that number up 11:16:30 and just showing the jury this top-line number because it 11:16:34 will be anchored in their minds, as opposed to drilling 11:16:39 down to a further level of apportionment on his chart.

11:16:41 We would be happy to work with counsel for 11:16:45 RavenWhite to come up with an appropriate level from which 11:16:49 they can start. But starting with a royalty base of $12 11:16:54 billion and then parsing it down is going to be highly 11:16:57 prejudicial to Walmart.

11:16:59 THE COURT: I would agree with that proposition. 11:17:03 And if their expert's analysis can be as well explained 11:17:09 starting at an apportioned level, I think that that's an 11:17:17 appropriate ruling. But I'll need to get argument on the 11:17:25 role that the top-line numbers play in his analysis to 11:17:28 understand that.

11:17:29 MS. WOODALL: Also, with the top-line numbers, we

11:17:32 have -- for the '823 patent, we have -- this is one that deals with cart merge functionality, and it's the '823, and the damages model uses the entire gross merchandise value as the starting point. It's Line Item 1, I believe, again, and this is Exhibit 9 to Mr. Weinstein report. And he applies a multiplier to that to get some valuation for the accused cart merge functionality.

And, for example, there, it's just gross margin, huge number -- gross merchandise value -- excuse me, huge number, and then there's a multiplier. And the experts, for example, with the '823 patent, their point of divergence is that multiplier.

So, you know, Walmart's position would be that it's easy enough for both experts to start with just competing, you know, initial cut numbers and give their relative opinions as to why those numbers were appropriate as opposed to telling the jury $400 billion of Walmart revenue was made for this tiny, tiny feature, because there is no way to put this top-line number and have it not be prejudicial.

THE COURT: I agree with that argument. I think that is very problematic. And so I would be receptive to a solution that has the expert start at a different starting point in their analysis with the understanding that if it is necessary to defend that starting point, that that could

11:19:17 be a basis for the Plaintiff to approach and seek leave to go into the numbers that came there.
11:19:23
11:19:28 But I think that hopefully what it -- would be proposed would be something where the Defendants would not have to make that challenge and open that door. I don't think there's any defense to starting with a hundreds of billions of dollars number.
11:19:32
11:19:36
11:19:47
11:19:52
11:19:54 MS. WOODALL: Thank you.
11:19:55 There are a few other slides that are not just in the context of the expert reports that were not used as direct inputs, and so we can't anticipate how they're planning to use them.
11:19:59
11:20:05
11:20:08
11:20:09 An example is PX-15. That's not to say that Mr. Weinstein didn't look at this, but this is a document that we would, you know, contend actually has nothing to do with the damages calculation, but it is on their exhibit list, and it is talking about forecasted numbers for net sales, gross profits, operating income for Walmart Connect. And these are billions of dollars every year. There's no apportionment in these numbers whatsoever to the type of ad or to the accused functionality.
11:20:12
11:20:16
11:20:20
11:20:23
11:20:28
11:20:30
11:20:35
11:20:39
11:20:43 THE COURT: Well, there may be other issues as to the admissibility. If this is what the exhibit looks like, it looks much more like a demonstrative to an expert's testimony as opposed to an evidentiary exhibit, but I
11:20:46
11:20:53
11:20:59

11:21:06 understand the issue with the numbers themselves.

11:21:10 So if you want to -- I don't know if you're at 11:21:18 this point looking for general guidance or whether you're 11:21:22 looking for rulings on specific exhibits.

11:21:25 MS. WOODALL: I think you've given us appropriate 11:21:27 guidance, and we're happy to confer with RavenWhite's 11:21:29 counsel about the starting point that we can agree on for 11:21:32 the apportionment analysis by both experts.

11:21:34 THE COURT: All right. I'll give them an 11:21:35 opportunity to respond if they want it, but I think that my 11:21:44 approach will be consistent with what I've said.

11:21:47 MR. KRAMER: Your Honor, Ms. Chan will address 11:21:49 this issue for RavenWhite. But I think our proposal is the 11:21:53 parties are close, and they're continuing to negotiate. I 11:21:55 think they should be able to resolve this without a ruling 11:21:59 on it today.

11:21:59 THE COURT: All right. Thank you, Mr. Kramer.

11:22:03 Ms. Chan.

11:22:05 MS. CHAN: Good morning, Your Honor. My name is 11:22:06 Rachael Chan, and I, with Kramer, is representing -- am 11:22:11 representing Plaintiff RavenWhite. And I think that we 11:22:14 can -- like everybody has been alluding to here, keep 11:22:18 this -- make this simple and keep it simple.

11:22:23 And essentially to start with, you know, 11:22:29 RavenWhite agrees no top-line numbers will be shown to the

11:22:35 jury. We're in agreement on that. The only issue is some of these numbers feed into calculations that are subject to Daubert and MSJ motions that are still pending. And so we know that Walmart is attacking those calculations.

And to the extent, notwithstanding the outcome of those motions, Walmart continues -- Walmart opens the door, RavenWhite would like to be able to use -- get permission to use numbers as appropriate to show the jury to support Mr. Weinstein's calculation.

THE COURT: And certainly you're always free to seek leave, and, you know, there is no restriction on that. The restriction will be on using the -- the numbers without seeking leave in advance.

MS. CHAN: And the only other -- the other issue simply relates to the way the MIL is written. There's some vagueness written into the MIL that RavenWhite was concerned could result in preventing RavenWhite from using numbers like percentages, rates, and qualitative descriptions. For example, it says preclusion of evidence regarding large numbers.

But as we've said -- as counsel has said, we're in an iterative process working on redacting specific line -- specific numbers in the exhibits. And that process has been working very well so far, and we will continue that with the guidance based on the discussion today.

11:24:22 THE COURT: All right. So at this point, we'll carry the Defendant's Motion in Limine No. 1 until after the parties have completed their negotiations, and then we can take up whatever remains.

11:24:41 MS. CHAN: Thank you, Your Honor.

11:24:42 THE COURT: Thank you, Ms. Chan.

11:24:53 It looks like the remaining Defendant's MILs have been agreed to, if I'm understanding the notice properly.

11:25:07 MR. ALAVI: That is correct, Your Honor.

11:25:11 THE COURT: All right. Let me take up the Plaintiff's motions to compel that were filed at the close of discovery.

11:25:50 MS. CHAN: Your Honor, I will be handling the first motion to compel that relates to damages. And I first want to note for the Court that the disputes have been significantly narrowed via the statement that was filed on Friday. But also since then, RavenWhite -- we've informed counsel for Walmart that RavenWhite is withdrawing the categories indicated in Item 4 and Interrogatory No. 23.

11:26:27 So the only remaining disputes are the breakdown data requested in Items 1 through 3. And at bottom, Your Honor, all RavenWhite is seeking is asking the Court to order Walmart to produce revenue, sales, and impressions data broken down granularly by targeting tactic. And that

11:26:52 means the way that Walmart determines what ad to display to a customer using its algorithms.

That information will allow RavenWhite to properly apportion revenues for their reasonable royalty calculation.

RavenWhite's been asking for this specific material since at least January. And while Walmart has produced some of its data that our damages expert has been able to work with, there's still a lot that's missing. The importance of these documents is more evident now than ever. You can see that through the discussions we've had so far today.

Walmart has been complaining about top-line numbers, and also in its -- in its -- first, in particular, its expert has attacked certain assumptions made by RavenWhite's expert that he needed to do to account for the missing information.

Specifically, Mr. Weinstein applied a one-seventh ratio to Walmart's revenues to represent the revenues that are associated with the accused functionality for the '402 patent because he did not have that information on the granular revenues for apportionment.

THE COURT: Now, this motion was filed, I think, on the last day of discovery and wasn't even fully briefed at the time of the expert reports, was it?

11:28:25 MS. CHAN: Give me a moment, Your Honor. I can get those dates for you, but that sounds right perhaps.

11:28:36 THE COURT: I'm not understanding how you would propose to use this if you got it without redoing expert reports.

11:28:47 MS. CHAN: So together with our request, Your Honor, would be a request to supplement Mr. Weinstein's expert report. Once we get the information, he could work that into his calculation.

11:28:59 THE COURT: Start off then -- start off by telling me why this was not filed before the last day of discovery.

11:29:08 MS. CHAN: So the discovery negotiations process between the parties has -- was long going. There was a lot of back and forth. We sent them, you know, several communications asking for this information, and we'd get some -- much foot -- foot dragging without any kind of real excuses for why we were not getting the information other than Walmart was investigating and looking for it.

11:29:38 In its brief, Walmart indicated -- seems to make a burden argument arguing that the data is not kept in a dynamic database, but it's in a data link. But that doesn't excuse Walmart from producing the information in accordance with its discovery obligations. Walmart hasn't provided any detail on burden. There's been no information about cost or man hours, anything like that. There's been

11:30:12 no declarations, et cetera.

11:30:15 So, you know, RavenWhite still doesn't understand 11:30:22 why it hasn't been produced. We know that the information 11:30:25 is tracked. We can see it in documents. I can show that 11:30:28 to you, Your Honor. And, in fact, this is some of the 11:30:32 information our expert was able to use to go through his 11:30:36 calculation.

11:30:39 But like I said, it's -- it's not all there. And 11:30:44 production of this information would solve a lot of the 11:30:46 problems that the parties are having with respect to 11:30:51 identifying what is accused, what's not accused, and what 11:30:53 is the revenue associated with what is accused.

11:31:00 THE COURT: And when did your side become aware of 11:31:07 the problems that you're referring to now?

11:31:09 MS. CHAN: That was an ongoing process over the 11:31:14 months that we were negotiating with Walmart.

11:31:22 THE COURT: Which started more than a year ago?

11:31:24 MS. CHAN: So it was two years ago that -- it was 11:31:30 the summer of 2024 that RavenWhite sent its initial list of 11:31:34 categories of documents to assist Walmart in doing its -- 11:31:38 its document collection. And then starting in January of 11:31:41 this year, RavenWhite whittled that down to the categories 11:31:46 that are listed at the top of Exhibit 1, which is the 11:31:49 nomenclature that we used for identifying the categories in 11:31:53 this brief.

11:31:54 From that point, the parties went back and forth
11:31:58 with respect to production of the information and
11:32:02 discussing that. And, you know, for lack of a better way
11:32:09 to say it, you know, Walmart -- Walmart's response is just
11:32:13 string RavenWhite along. We're going to produce what we
11:32:16 have, we're still looking.
11:32:18 And, you know, here we are at the end of
11:32:20 discovery, so we filed the motion before the deadline. And
11:32:26 our expert used what methods that he could with what he
11:32:29 had.
11:32:34 THE COURT: So tell me how your motion relates to
11:32:36 the discovery deadline.
11:32:37 MS. CHAN: Can you rephrase the question, Your
11:32:40 Honor?
11:32:40 THE COURT: When was the discovery deadline?
11:32:42 MS. CHAN: Can you give me one moment to get that
11:32:47 information for you, Your Honor?
11:32:48 THE COURT: All right.
11:33:29 MS. CHAN: Thank you very much, Your Honor.
11:33:30 So the deadline for substantial completion of
11:33:35 production was on February 6th, 2026, and the discovery
11:33:39 deadline we had was May 13th of '26.
11:33:43 THE COURT: And you filed the motion six days
11:33:47 before that?
11:33:48 MS. CHAN: That's correct.

11:33:49 THE COURT: The motion indicates that the
11:33:54 conference -- the meet and confer process was completed at
11:33:57 the end of March. Why the delay until May to file the
11:34:02 motion?
11:34:03 MS. CHAN: I don't have the exact dates of the --
11:34:14 any remaining discussions between the parties, but I can --
11:34:18 on the best of my recollection, but --
11:34:25 THE COURT: I can tell you I'm not -- these aren't
11:34:27 idle questions, Ms. Chan. What I'm trying to figure out
11:34:31 is, is there diligence which is sufficient to offset the
11:34:37 prejudice that results from reopening discovery and having
11:34:46 new expert reports served, which will then generate new
11:34:54 motions to strike?
11:34:56 MS. CHAN: I mean, Your Honor, all I can say is,
11:35:00 you know, the time spent was a result of the back and forth
11:35:06 with Walmart, the empty promises from Walmart, and gigantic
11:35:11 last-minute document dumps from Walmart that required
11:35:14 sifting through. I can get those dates of productions for
11:35:19 Your Honor. We can pull that together for you to show what
11:35:22 we were facing.
11:35:24 THE COURT: Well, I need some showing of diligence
11:35:28 that would justify delaying this until so late that it has
11:35:35 the prejudicial effect on the schedule that I think it now
11:35:40 has. So if you have a showing you can make that would
11:35:45 support a finding of diligence, I'm open to that.

11:36:11 MS. CHAN: Thanks, Your Honor.

11:36:14 My team helped me with some of the details on the
11:36:17 dates. But there were discussions going on with discovery
11:36:21 until the very end of the discovery, like I was alluding to
11:36:25 earlier, and there was also discussions on the technical
11:36:27 front lasting up until the end of discovery, as well. And
11:36:31 there was a very, very large production on the last day of
11:36:33 discovery.

11:36:34 We can get, you know, document and page numbers of
11:36:36 the size of those productions and the exact dates for
11:36:40 Your Honor. We'll just need some time to pull that
11:36:43 information together, but it was -- it was --

11:36:47 THE COURT: Do you have some correspondence that
11:36:51 indicates that you were being promised what you are now
11:36:56 seeking to compel?

11:36:58 MS. CHAN: I mean, there's entire chains of emails
11:37:02 back and forth that show, you know, Walmart's response to
11:37:07 us, which is we're continuing to investigate. We're not
11:37:11 refusing to produce anything. We're continuing to
11:37:14 investigate. And that was kind of just like a broken
11:37:16 record.

11:37:17 We didn't file the entire exhibit because -- due
11:37:20 to the page limits in Your Honor's order there. We can put
11:37:25 some of that on the screen to show you so you can get a
11:37:28 general sense of the back and forth.

11:37:32 THE COURT: All right. What I'm looking for is
11:37:35 something that would justify a belief that Walmart was
11:37:42 saying they were going to provide you what you're now
11:37:46 seeking. And if you can show that they in effect were
11:37:52 promising that they were going to produce it and then
11:37:54 didn't produce it, that could account for the late filing.
11:38:04 MS. CHAN: Can you give me a moment, Your Honor,
11:38:07 please?
11:38:07 THE COURT: I can.
11:38:08 MS. CHAN: Thank you.
11:40:06 Okay, Your Honor. This email chain here shows
11:40:10 that -- ongoing discussions as of the date, which I think
11:40:16 says May 4th -- oh, I have it right here in front of me --
11:40:19 May 4th. And you'll see it has some discussion about
11:40:22 technical materials there. But my colleague is going to --
11:40:26 scroll down to No. 4, Mr. Mattson.
11:40:29 So this is a reminder to them of the most critical
11:40:34 portion of RavenWhite's damages document requests. And you
11:40:38 can see here, it's the same type of response that we got.
11:40:46 Walmart produced -- made supplemental document productions.
11:40:49 It doesn't say: We produced what you're asking for. It
11:40:52 says: We produced some financial materials. And it also
11:40:58 says -- you know, makes some of the similar representations
11:41:04 in the responsive brief that they filed.
11:41:09 Now, some of this does relate to, you know, items

11:41:12 that have been dropped or there's other -- you know, we
11:41:18 were asking for an updated spreadsheet, so some of this
11:41:21 relates to that. But you can see that these discussions
11:41:24 were ongoing up until the end of -- the end of the
11:41:28 discovery period.
11:41:29 And that, combined with the large document dumps
11:41:33 from Walmart and the time it took to look through that, is,
11:41:37 you know, the driver of the timing here.
11:41:41 THE COURT: I guess what -- what I'm looking for
11:41:43 is an indication that Walmart was telling you not that they
11:41:48 don't have it but that they will produce what you're asking
11:41:52 for now.
11:41:54 MS. CHAN: That's fair, Your Honor. I can't point
11:41:57 to something that was a specific promise like that. What I
11:42:02 can say is we got promises throughout the entire period
11:42:05 that Walmart is continuing to investigate.
11:42:11 THE COURT: All right. And do you have something
11:42:14 that indicates that they're continuing to investigate this
11:42:19 specific request?
11:42:22 MS. CHAN: This may be the last -- I believe this
11:42:27 is the last response from them on this specific category of
11:42:33 documents. We can double-check that, but this, you know,
11:42:38 was shortly before the filing of our motion.
11:42:42 THE COURT: Okay. So by the time of this, I think
11:42:48 you're already into the close of discovery or a few days

11:42:52 before it. What -- what accounts for this discovery still
11:43:03 being unresolved at this stage? In other words, I -- at
11:43:12 this point the die is cast. You're already up against the
11:43:20 end of discovery and expert reports.

11:43:22 MS. CHAN: So you're right, Your Honor. This
11:43:25 email chain here was our last-ditch effort to remind them
11:43:30 of, you know, this category of documents, and they knew
11:43:32 that we were filing our motion shortly thereafter, you
11:43:36 know, hence the large meet and confer that was scheduled.

11:43:41 THE COURT: All right.

11:43:42 MS. CHAN: Formal, I mean.

11:43:44 THE COURT: What is your best evidence that
11:43:47 Walmart has the financial information you're seeking in the
11:43:55 format that you're seeking?

11:43:57 MS. CHAN: We'll pull that up for you, Your Honor.

11:44:19 So, Your Honor, this is a very large spreadsheet
11:44:23 that was produced very late.

11:44:27 We can get the date of production, as well.

11:44:29 And it actually has, I believe, 120 sheets on it.
11:44:36 And, you know, after digging, we found this Display Data
11:44:42 BigQuery sheet, which does show breakdown of clicks, ad
11:44:50 spend, et cetera.

11:44:51 If you look at Column G, it does have breakdown by
11:44:55 targeting tactic. And this, in fact, is the data that our
11:44:59 expert was able to use in his calculation. And

11:45:04 specifically --

11:45:05 Mr. Mattson, if you'd kind of scroll over to the

11:45:08 right. A little bit more.

11:45:14 So there's a key here, and it shows you BT,

11:45:20 indicates behavioral targeting there. So that's the -- one

11:45:25 of the categories or the most relevant category with

11:45:28 respect to one of the types of ads. So this here shows

11:45:37 that they track this data. And logically it makes sense

11:45:41 they do, right, because their advertising business is a

11:45:43 huge part of what they do, and they want to be able to

11:45:50 show their customers -- advertise to their customers that

11:45:52 the money they're spending is -- has value.

11:45:55 THE COURT: So how does this relate to your

11:45:57 motion? What -- what part of your request would relate to

11:46:03 this behavioral targeting spend?

11:46:08 MS. CHAN: So if you -- Item 2 is the best one to

11:46:11 look at. If you look at that Item 2 there --

11:46:20 Mr. Mattson, if you go to Exhibit -- PDF

11:46:24 Exhibit 1.

11:47:11 So you can see at the top of our exhibit here, it

11:47:16 lists different items that were at issue at the time of the

11:47:20 filing.

11:47:20 And No. 2, this seeks revenue broken out by

11:47:27 targeting type. That's the crux of it.

11:47:32 THE COURT: All right.

11:47:33 MS. CHAN: It's broad, but, you know, the -- the
11:47:36 information we need is the breakout done by targeting type.
11:47:42 THE COURT: All right. And that is what you're
11:47:44 saying this motion to compel is seeking?
11:47:47 MS. CHAN: That is the -- that is the remaining
11:47:52 dispute, Your Honor.
11:47:57 THE COURT: All right. Is that document that you
11:48:00 have on the screen in the record anywhere?
11:48:02 MS. CHAN: This is the Exhibit 1 to our -- our
11:48:06 motion.
11:48:07 THE COURT: All right.
11:48:08 MS. CHAN: So it's Docket 155-1. And this comes
11:48:15 from -- as you can see, this January email, what I -- which
11:48:18 I referenced earlier when we gave Walmart very a specific
11:48:24 list of the documents that we were looking for for damages.
11:48:50 THE COURT: All right. Then thank you, Ms. Chan.
11:48:57 Let me hear the response to the request for what
11:49:04 is Document 155-1, I guess, Section 2.
11:49:17 MS. WOODALL: Your Honor, I'm not entirely sure
11:49:22 that counsel for RavenWhite has now limited their motion to
11:49:27 compel to Item 1, but if that's the case, then I can skip
11:49:32 pretty quickly ahead.
11:49:33 THE COURT: I think it's Item 2 is what I'm
11:49:35 seeing.
11:49:36 MS. WOODALL: Well, it may be. We had Item 1, 2,

11:49:40 and 3, but she was drawing the Court's attention to the spreadsheet, Item 1, on that email.
11:49:43

11:49:48 THE COURT: Well, I'm no longer on an email. I'm now on --
11:49:50

11:49:51 MS. WOODALL: Okay. Well, I'm happy to address them all.
11:49:52

11:49:53 With respect to Item 1 -- and if we step back, you
11:49:57 know, our firm's involvement in the case was a little later
11:49:59 in the discovery period, but we were involved in a number
11:50:03 of the meet and confer discussions. And in no way was
11:50:11 Walmart dragging its feet. We got iterative requests of
11:50:15 more, more, more over and over again from the Plaintiff.

11:50:17 The documents that were produced at the close of
11:50:19 discovery were in response to specific meet and confer
11:50:23 items provided to us by RavenWhite. It was not a document
11:50:26 dump. They asked for specific source code-related
11:50:29 materials, and we produced Confluence files in response to
11:50:35 the meet and confer discussions to try to resolve and avoid
11:50:39 motions practice.

11:50:39 My colleague, Mr. Enger, will address those
11:50:39 motions to compel.

11:50:40 But to give you context, there was never Walmart
11:50:43 saying: We'll produce it. We'll produce this. We -- as
11:50:45 they presented to the Court, we told them that what we had
11:50:49 was limited and that we did not have the information in the

11:50:53 packaging that they wanted.

11:50:56 This is Item 1, which Ms. Chan just showed you
11:51:00 from Exhibit 1 to their motion to compel, which shows you
11:51:03 all of that granular detail that she's saying they're
11:51:07 missing. Walmart produced over 800 Walmart Connect
11:51:11 executive summaries. Their expert relied on them. Our
11:51:15 expert relied on them. They were able to do the
11:51:18 calculations just fine.

11:51:20 They asked for, first item, ad revenues. PX-19
11:51:25 contains a month-by-month breakdown of Walmart Connect
11:51:30 advertising revenues. The Walmart Connect executive
11:51:33 summaries have this for the daily basis, weekly basis,
11:51:37 monthly basis, 90 days rolling, quarter to date, and
11:51:42 year-to-date.

11:51:44 Clicks. This can be derived by dividing two
11:51:48 numbers that are on the Walmart Connect executive
11:51:51 summaries. You divide the revenues associated with clicks
11:51:56 by the cost per click.

11:51:57 Impressions. These are also on the Walmart
11:52:00 Connect executive summaries in terms of page views.

11:52:03 Units sold. We've never understood what this
11:52:07 meant because ads aren't sold on a per-unit basis. They're
11:52:12 sold on impressions or clicks.

11:52:13 Sales revenue. Again, that is the same as the
11:52:16 advertising revenues. They're on the Walmart Connect

executive summaries.

Click-through rates are on the Walmart Connect executive summaries.

Conversion rates. There were some early documents that referred to this, but this is not the term of art used by Walmart Connect to evaluate the efficacy of its advertising on behalf of its advertisers. Instead, that is return on ad spend, ROAS, which is, again, shown on the Walmart executive summaries.

THE COURT: Ms. Woodall?

MS. WOODALL: Yes.

THE COURT: I understand their argument to be directed now to this attachment to their motion to compel, which is Document 155-1. Do you have that?

MS. WOODALL: Document 155-1, did you say?

THE COURT: Yes.

MS. WOODALL: So that, I believe, is the -- I do -- I do have it. That's the listing of the items?

THE COURT: That may be. There is a numbered Paragraph 2 --

MS. WOODALL: Yes.

THE COURT: -- which is what I understand they are still seeking in this motion.

MS. WOODALL: Okay. That is on my next slide. If you're referring to the one that referred to detected

11:53:25 revenues, attributed revenues, estimated incremental revenue, estimated ad exposed, ROAS, and total attributed sales revenue.

11:53:36 Adam Vorchheimer was Walmart's 30(b)(6) witness on financial topics. He is the senior director of finance at Walmart Connect for the entire business unit. He was asked questions by Ms. Chan about these terms. No exhibits were marked. No document was referenced, just what is detected revenue? And Mr. Vorchheimer repeated for all of those terms: I don't know what you're talking about. I've not heard of that. Can you please provide me with a definition?

11:54:08 They skipped the last question of what's total attributed sales revenue.

11:54:13 There's no evidence that they track this. This senior director of finance at Walmart Connect didn't even know the terms.

11:54:23 Now -- and this is completely different from the exhibit she was showing you with the breakdown and the big data query. She asked him questions about this, and he didn't even know what they meant.

11:54:35 THE COURT: So your position is that as to --

11:54:37 MS. WOODALL: Item 2 -- sorry.

11:54:39 THE COURT: -- Paragraph 2 of 155-1, Walmart does not track those items in that fashion?

11:54:50 MS. WOODALL: Correct.

11:54:50 THE COURT: All right. Thank you, Ms. Woodall.

11:54:52 Ms. Chan, do you have evidence that they --
11:55:01 Walmart does, in fact, track those?

11:55:06 MS. CHAN: Your Honor, the evidence we have that
11:55:09 they track -- well, stepping back. I'll answer your
11:55:13 question, Your Honor, but just stepping back to clarify on
11:55:20 the items issue. Items 1 and 3 are really subsumed within
11:55:26 Item 2, so I used it as an example to focus this
11:55:32 discussion. But it's very simple what we're asking for,
11:55:33 and that's just revenue and profit data broken down by a
11:55:39 targeting tactic.

11:55:41 And Ms. Woodall's examples ironically talk about
11:55:44 high-level data that's produced in the same day that
11:55:48 they're complaining that we're using high-level numbers.
11:55:51 So that's just an example there of how production of this
11:55:54 broken down data will solve many of the disputes that we're
11:55:57 discussing today.

11:55:58 THE COURT: You took the deposition of their
11:56:00 corporate representative, Mr. Vorchheimer, I think?

11:56:04 MS. CHAN: That was me, Your Honor. And just
11:56:06 because their witness couldn't testify about specific terms
11:56:10 doesn't excuse their discovery -- discovery obligations.
11:56:15 The terms that he was asked about are Walmart's own terms
11:56:20 that were pulled from Walmart's documents. Granted,

those -- at the time that those questions were presented to him, those documents were not put in front of him, but it has nothing to do with Walmart's discovery obligations with respect to document and written discovery.

To answer Your Honor's question, proof of what we're asking for -- the proof that they track, you know, the information asked for in this kind of very focused topic that I'm presenting to the Court today is in the document that I showed you earlier. And we can also put up on the screen where in Walmart's documents those types of revenue are at least defined.

So we know that these are terms they talk about. We know these are terms that are discussed in presentations. And, you know, these are just types of revenue, which I can define for -- you know, we can look at the definitions there, but the bottom line is actually very simple. We're looking for revenue, sales, profit data broken down by targeting tactic.

THE COURT: All right. And tell me about your motion to compel deposition testimony.

MS. WOODALL: Your Honor, may I because I was confused about which item was remaining?

THE COURT: I am -- I will give you an opportunity to respond, Ms. Woodall.

MS. WOODALL: Okay. If we're going back to

11:58:07 Item 1, which is the one that asked for the breakdown
11:58:10 specifically by targeting type, Mr. Vorchheimer also
11:58:13 testified that they don't track it like that. So there are
11:58:16 some spreadsheets that have information about targeting
11:58:19 type, and she showed that to you, but that is different
11:58:21 from the 1 out of 7, you know --
11:58:21 THE COURT: All right.
11:58:25 MS. WOODALL: -- issue in Weinstein's allocation.
11:58:28 But he testified that they did not track targeting type in
11:58:31 the manner she was asking about.
11:58:32 THE COURT: All right. Thank you.
11:58:33 Ms. Chan, tell me about your motion to compel
11:58:37 deposition testimony.
11:58:39 MS. CHAN: Mr. Higgins is going to address that,
11:58:42 Your Honor.
11:58:42 THE COURT: All right.
11:58:43 MR. HIGGINS: Your Honor, I'm Zack Higgins,
11:58:54 representing RavenWhite.
11:58:55 I'll start on this -- on the next two motions to
11:59:00 compel, I think we can start with the topic that you
11:59:02 focused on just now with the financial documents, and that
11:59:05 is what changed before the close of fact discovery? So
11:59:09 I'll talk about that first before we even get into what
11:59:11 we're asking for.
11:59:12 So there were --

11:59:13 THE COURT: I'm not sure what you're talking about. I am asking about the motion to compel deposition testimony, which is Document 159.

11:59:23 MR. HIGGINS: Yes, Your Honor. That's -- that's the one.

11:59:25 I wanted to first explain why -- that's another motion we filed on the same day. We filed three on the same day, May 13th, the close of fact discovery. And so I thought -- I'm happy to talk about anything in any order you'd like, Your Honor, but I thought we could talk about what changed such that we feel it's appropriate for you to grant the motions to compel, even though we filed them on May 13th and even though the expert reports were filed on May 21st, in the first round, why we'd like to supplement.

11:59:59 THE COURT: All right. If -- if you can explain that in the context of your motion to compel deposition testimony, go ahead.

12:00:07 MR. HIGGINS: Yes, Your Honor.

12:00:08 So the -- there are four things that changed between April and May 13th. The first two occurred during the -- Walmart's 30(b)(6) deponent testimony on April 24th. Before that testimony, we thought, first of all, that Tempo, which is the subject of that -- one of the subjects that -- Topic 8 in the motion to compel deposition testimony. We understood because of statements by

12:00:39 Walmart's counsel, that Tempo was a third-party platform, and we thought, well, fair enough. We're not going to ask Walmart to present a witness to talk about a third-party platform, but we learned during the deposition that actually Walmart -- Tempo is a Walmart platform, not a third-party platform. Their deponent knew that it was a Walmart platform. He knew that it is responsible for designating certain ad slots in a way that matters for our infringement. But he didn't know anything else. So that's the first development that happened very late in discovery.

12:01:13 The second development, also during that deposition and in the deposition of their other 30(b)(6) witness who was also in April, is Walmart had told us that they were designating someone as a corporate representative to talk about cart merge. But as it turns out, their designee didn't know about cart merge in any significant detail. So that was another development that happened late in the game.

12:01:39 The second -- the third and fourth developments that happened late in the game are in their interrogatory responses in a supplement that they served on the last day of discovery, on May 13th, the same day we served our -- filed our motions to compel, Walmart made two new arguments.

12:02:00 First, they asserted that Walmart is not

12:02:03 responsible for displaying off-site ads. They didn't go 12:02:07 into the details of why, but we subsequently learned it's 12:02:10 because of concepts like there's a Trade Desk platform 12:02:13 that's actually a Walmart joint -- jointly developed 12:02:18 platform with The Trade Desk.

12:02:20 And the second thing that they said for the first 12:02:22 time on May 13th was that Walmart didn't do cart merge 12:02:29 before 2024, and that was news to us. And we actually -- 12:02:33 the underlying documents suggest that Walmart did do cart 12:02:36 merge before but perhaps it was done differently.

12:02:39 And so that's why we feel it's appropriate for you 12:02:42 to consider these motions to compel on the technical side, 12:02:45 despite the dates.

12:02:47 THE COURT: In effect, you're requesting a 12:02:49 continuance?

12:02:50 MR. HIGGINS: Well, Your Honor, I think we would 12:02:55 like one of two things. It could be -- and we actually 12:02:58 suspect that if we got the documents, we could actually 12:03:01 show that these distinctions Walmart is drawing between 12:03:04 on-site and off-site display ads and the cart merge are 12:03:09 distinctions without a difference, and then we could put 12:03:12 those arguments, which are currently the subject of motions 12:03:14 for summary judgment by Walmart, we could put those to bed. 12:03:16 We don't necessarily need to reopen everything. But right 12:03:22 now where it stands is we've got these new factual

12:03:25 developments in black boxes with nothing in them.

12:03:36 THE COURT: Do you think that your motions set out 12:03:41 what you would rely upon to show diligence in your 12:03:47 discovery requests?

12:03:49 MR. HIGGINS: I believe so, Your Honor. If 12:03:51 there's anything missing, we're happy to provide it.

12:03:55 THE COURT: All right. Then what I'm going to do 12:03:56 is to review the briefing on those and make -- make that 12:04:03 decision, Mr. Higgins.

12:04:04 MR. HIGGINS: Thank you, Your Honor.

12:04:05 THE COURT: Thank you.

12:04:19 MR. ENGER: Good morning -- I should say good 12:04:25 afternoon, Your Honor. Eric Enger on behalf of the 12:04:26 Defendant Walmart.

12:04:27 I'd like to briefly address some of the points 12:04:32 that my colleague on the other side just addressed. The 12:04:37 first -- I guess he listed three reasons why -- what 12:04:41 changed.

12:04:42 The first was with respect to Tempo, and he said 12:04:46 that during the deposition, they learned for the first time 12:04:48 that it was a Walmart product. I think the important thing 12:04:52 to know about that is that after they found out that it was 12:04:55 a Walmart product, the witness was willing to testify and 12:04:58 did testify about Tempo. They just didn't ask any 12:05:01 questions about it.

12:05:02 So to give them another shot at a deposition on
12:05:06 Tempo when the witness was prepared and ready to go would
12:05:11 be improper.
12:05:12 There was a discussion about cart merge and a
12:05:17 discussion about how the witnesses couldn't testify
12:05:21 knowledgeably about cart merge, but I think you'll see in
12:05:24 the motion to compel technical depositions, there's no
12:05:27 discussion about cart merge.
12:05:30 Same way with the motion to compel the documents.
12:05:32 Not one of the topics is cart merge.
12:05:34 And the last points, 3 and 4, I think they were
12:05:39 kind of merged together about the rog response. And,
12:05:42 again, this had to do with off-site ads and cart merge.
12:05:46 But, again, if you look at the subject matter of their
12:05:49 motions about technical depositions, it's about Tempo, it's
12:05:52 not about off-site ads or cart merge.
12:05:55 Same way with documents. It's about things about
12:05:58 item service and graphQL. It's not about cart merge or
12:06:03 off-site ads.
12:06:04 So I think that was candidly just pretext for
12:06:08 explaining why they didn't file their motions sooner when
12:06:12 they could have and should have.
12:06:14 If you'll entertain me, I'll briefly talk about
12:06:17 this motion to compel deposition testimony. Here are the
12:06:23 testimony categories that were presented in their motion.

12:06:25 There were eight of them, and they withdrew seven of them. 12:06:29 So the only thing that remains is something called Tempo. 12:06:34 They want another deposition on Tempo. And Tempo is a tool 12:06:38 that determines the layout of Walmart's website. So Tempo 12:06:43 basically determines where certain banners, pictures, ads, 12:06:47 et cetera, are going to appear on the page.

12:06:49 So what we have here is a screenshot of the 12:06:51 Walmart website whenever someone does a search for bikes, 12:06:54 and what Tempo does is it determines there's going to be a 12:06:59 banner at the top, there's going to be a sponsored ad in 12:07:03 the middle, and there's going to be some search results at 12:07:06 the end.

12:07:07 But importantly, Tempo doesn't determine which ads 12:07:10 or which banners are going to appear, it just takes the ads 12:07:13 that are selected by another part of the Walmart system and 12:07:17 decides how to lay them out, how to arrange them on the 12:07:19 page.

12:07:20 So this brings us to the point about Tempo being 12:07:23 irrelevant. This is what they said in their motion. They 12:07:26 need information about Tempo because it's critical to their 12:07:30 infringement claims because RavenWhite must prove how 12:07:33 Walmart selects an advertisement for display.

12:07:36 But Tempo has nothing to do with selecting the 12:07:40 advertisement. It's just about laying it out on the page. 12:07:42 So really Tempo is irrelevant, and this motion should be

12:07:46 denied on that basis alone.

12:07:48 Now let's talk about this Testimony Category No. 8 12:07:52 and how it relates to the 30(b)(6) notice that was actually 12:07:56 served in advance of the deposition.

12:07:58 As you can see, Testimony Category No. 8 on the 12:08:01 left, it's short, it's concise, and it clearly mentions the 12:08:05 word "Tempo."

12:08:07 Now, you look at the 30(b)(6) notice, it's 12:08:10 lengthy, it's wordy, and nowhere do you see the word 12:08:14 "Tempo" in that deposition notice.

12:08:16 So how can RavenWhite legitimately complain that 12:08:21 Walmart's witnesses weren't prepared to testify about Tempo 12:08:25 when their deposition never -- deposition notice never even 12:08:28 mentioned the word "Tempo."

12:08:30 Really what's happening here is RavenWhite is 12:08:32 trying to redo its 30(b)(6) notice after the fact, obtain 12:08:36 additional testimony on a topic that was not included in 12:08:39 its initial notice. And that's improper.

12:08:42 Now, notwithstanding the lack of notice, Walmart's 12:08:46 witnesses testified knowledgeably about Tempo. Here's the 12:08:51 testimony from Mr. Shankar Bhargava. He said that the page 12:08:55 layout is created using Tempo, which is one of Walmart's 12:08:58 back-end systems which controls which modules go where when 12:09:02 the pages are rendered.

12:09:03 Another of their witnesses -- Walmart's witness,

12:09:09 Mr. Sushant Kumar, testified that he had a broad
12:09:12 understanding of Tempo, and he testified that Tempo was a
12:09:17 tool that site merchants use essentially to set up the
12:09:22 layout of the homepage. Nowhere did Mr. Kumar say he
12:09:25 didn't know what Tempo was or that he wasn't prepared to
12:09:29 testify about Tempo. Quite the opposite.

12:09:31 Now, here's really the crux of RavenWhite's motion
12:09:36 and this Testimony Category No. 8. Mr. Kumar testified
12:09:39 that Tempo could be used, quote, to annotate modules like
12:09:44 POVs with details with personas. And that's almost a
12:09:48 verbatim of what this Testimony Category No. 8 is all
12:09:51 about, use of Tempo and any annotations by site merchants.

12:09:56 But what's really important here, Your Honor, is
12:09:58 that despite Mr. Kumar's testimony about this, RavenWhite
12:10:00 didn't ask any follow-up questions about how Tempo was
12:10:05 supposedly used by site merchants to do those annotations.
12:10:08 If RavenWhite had asked those follow-up questions,
12:10:11 Mr. Kumar could have testified about the issue, and that
12:10:13 would have mooted this motion altogether.

12:10:15 But RavenWhite didn't, and so RavenWhite shouldn't
12:10:18 be permitted a re-do of the deposition to ask follow-on
12:10:23 questions that it could have and should have asked at the
12:10:27 original deposition.

12:10:27 So for all those reasons, including most
12:10:30 importantly the untimeliness aspect, RavenWhite's motion to

12:10:34 compel additional deposition testimony should be denied.
12:10:36 Thank you, Your Honor.
12:10:36 THE COURT: Thank you, Mr. Enger.
12:10:53 MR. HIGGINS: Well, Your Honor, we would like to
12:10:56 propose something for your consideration, given the
12:11:00 discussion and focus on the timeline of events. We would
12:11:04 appreciate it if we could submit a timeline of relevant
12:11:10 events here, including the productions and our discussions
12:11:12 back and forth, to make it easier for Your Honor to
12:11:15 consider our motions to compel. And if you would allow us
12:11:18 to do so, we would be delighted if we could have 10 days to
12:11:24 provide that to you.
12:11:26 THE COURT: As in a supplement to your motion?
12:11:31 MR. HIGGINS: Yes, Your Honor.
12:11:31 THE COURT: All right.
12:11:39 MR. HIGGINS: And in response to -- I think our
12:11:41 pleadings speak for themselves, Your Honor. I'll just make
12:11:44 a few comments in terms of what we heard just now.
12:11:46 First off, in our motion to compel, we did, for
12:11:51 both documents and the depo testimony, we -- since
12:11:56 Your Honor will be reading the pleadings, you'll be able to
12:11:59 see for yourself -- but we did provide everything that
12:12:02 we're asking for today. There's a couple points of
12:12:04 clarification that I wanted to make sure that Your Honor
12:12:06 noticed.

12:12:07 First off, on the Tempo point, although the last sentence of the paragraph you just saw regarding Tempo on the screen was about how Walmart selects advertisements, the point we were making about Tempo specifically and the point that we have not heard any counterargument about is that Tempo is responsible for determining which modules -- which ad slots, if you will, are going to be used in an infringing way as opposed -- as opposed to a not infringing way.

12:12:38 In fact, the tutorial that we got on Tempo today is the best explanation of Tempo that I think we've seen in the case so far. So it shows why Tempo is relevant to these different -- to the infringing accused system.

12:12:52 The other thing I wanted to say about Tempo, as you'll see in the pleadings, Walmart in its -- in its response said that they shouldn't have been able to -- shouldn't have been required to prepare a witness on Tempo because our notice was so broad, and they made a reference to that.

12:13:11 Today, they're saying that their witness was prepared to testify on Tempo. I believe he wasn't. I attended that deposition, although I didn't take it. But it was clear that he -- the witnesses were not familiar with Tempo, and they pointed us to a different department that ran Tempo. And we noted that in the pleadings, Your

12:13:29 Honor.

12:13:29 The other thing that I wanted to mention about the 12:13:34 breadth of our motion to compel, we have a -- a Category 12:13:37 18 -- that's the last one remaining. There are specific 12:13:41 examples of what we were asking for in that, so those are 12:13:45 the subtopics, but Category 18 itself is the relevant 12:13:49 category, not just the specific examples we gave.

12:13:53 So, for example, in advertising, although there 12:13:57 are subtopics like graphQL in there, the headline, the main 12:14:02 category is documents about advertising and cart merge. 12:14:06 Both of those are expressly listed there. We provided 12:14:10 specific examples, including things like documents you 12:14:13 provide to third parties, which would include The 12:14:16 Trade Desk --

12:14:17 THE COURT: Category 18 of what?

12:14:18 MR. HIGGINS: Oh, of our motion to compel.

12:14:22 THE COURT: Of which motion to compel?

12:14:23 MR. HIGGINS: Of the motion -- sorry, Your Honor, 12:14:26 the motion to compel documents, which is at Docket -- I can 12:14:31 tell you the docket number in a moment.

12:14:33 THE COURT: Is that 160?

12:14:35 MR. HIGGINS: I think so.

12:14:44 THE COURT: All right. I see a Category 18 on 12:14:53 Page 2 of that.

12:14:54 MR. HIGGINS: Yes, Your Honor.

12:14:58 So the point is the Category 18 is broad. We
12:15:02 provide examples to show what type of documents we're
12:15:06 interested in. Those documents include documents that
12:15:09 Walmart provides to third parties or new hires because
12:15:12 those types of documents are documents where Walmart would
12:15:15 have to explain to someone who doesn't already know
12:15:18 everything what these things are, like how do you do cart
12:15:22 merge? How do you do advertising? So --
12:15:26 THE COURT: This is exactly what I would expect
12:15:28 you to serve back in 2024 when you started discovery, not
12:15:35 something that you would be seeking to compel on the last
12:15:39 day of discovery.
12:15:40 MR. HIGGINS: Yes, Your Honor. Well, we also did
12:15:44 ask back in 2024, and they had a discovery obligation that
12:15:48 included their February 6th -- or February 2026 was when
12:15:54 the deadline for substantial completion of discovery was.
12:15:58 And the page count -- or the document count before then
12:16:01 was -- I'll get you the figures, but --
12:16:05 THE COURT: It's all right, Mr. Higgins.
12:16:06 MR. HIGGINS: All right.
12:16:07 THE COURT: My issue is why did you wait until the
12:16:13 last day of discovery to file these motions. And I will
12:16:20 read through the motions and their supporting exhibits and
12:16:27 make a decision on that.
12:16:28 MR. HIGGINS: Thank you, Your Honor.

12:16:29 THE COURT: Thank you, Mr. Higgins.

12:16:30 MR. HIGGINS: With respect to the timeline, would it be acceptable to you if we provided you with that timeline I referred to?

12:16:36 THE COURT: If I think that I need more enlightenment on the timeline, I will definitely request that, but you don't need to file any supplement at this point.

12:16:48 MR. HIGGINS: Thank you, Your Honor.

12:16:48 THE COURT: Thank you, Mr. Higgins.

12:16:50 What else do we need to take up? I'm quite willing to come back after lunch, but if there are not additional issues currently to be raised, then I don't want to make everyone return.

12:17:12 MR. PARISH: Nothing further from the Plaintiff, Your Honor.

12:17:14 THE COURT: All right. Thank you, Mr. Parish.

12:17:15 MR. ALAVI: Nothing further from Defendant. I was going to say Mr. Kramer and I were communicating. We both agreed there was nothing further from both sides.

12:17:23 THE COURT: The one thing I would ask then is that whoever has control over your calendar, if you would meet with Ms. Asbel before you leave, and let's get a date for the exhibit hearing and for possible argument on the motions that you may prioritize.

12:17:45 MR. ALAVI: We will do that, Your Honor. May I
12:17:47 ask for some guidance, because I don't know what -- I know
12:17:50 we'll get some available dates, but there are a lot of
12:17:53 motions pending, and we want to give you enough time given
12:17:56 your very busy docket to -- to review those.
12:18:01 Do you want, you know, 30 days from now, 45 days
12:18:04 from now, or do you want it shorter? Just -- we want to
12:18:06 work around your schedule, not ours, as much as we can,
12:18:11 Your Honor.
12:18:11 THE COURT: I think that the first possible trial
12:18:15 date that you'd be looking at would be the October date,
12:18:20 and so my goal would be to accomplish this in advance of
12:18:25 that. And so sometime in September would seem to be
12:18:32 timely. So whatever is available that works best for you.
12:18:35 I think that we can do it in a few hours. So we don't need
12:18:40 to have a whole day.
12:18:41 But Ms. Asbel can show you what we got, and I am
12:18:46 available if -- Wendy, if you need input, let me know.
12:18:52 MR. ALAVI: Thank you, Your Honor.
12:18:53 THE COURT: All right. Thank you for your
12:18:58 arguments, and we're in recess. Thank you.
12:19:02 COURT SECURITY OFFICER: All rise.
12:19:02 (Hearing concluded at 12:19 p.m.)

CERTIFICATION

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.

/S/ Shelly Holmes
SHELLY HOLMES, CSR, TCRR
CERTIFIED SHORTHAND REPORTER
State of Texas No.: 7804
Expiration Date: 10/31/2027

8/19/2026
Date